IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Lennisha Reed *et al.*,<br><br>   Plaintiffs,<br><br>   v.<br><br>Wexford Health Sources, Inc., *et al.*,<br><br>   Defendants. | Case No. 3:20-cv-01139-SPM<br><br>Judge Stephen P. McGlynn |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION TO COMPEL RESPONSE TO SUBPOENA**

  Plaintiffs, through their undersigned counsel, respectfully submit this reply in support of their motion to compel the Illinois Department of Corrections ("IDOC") to respond to Plaintiffs' subpoena asking the IDOC to produce documents. (Doc. 44). Plaintiffs further submit this reply in response to the briefs in opposition filed by defendant Wexford Health Sources, Inc. ("Wexford") (Doc. 47) and the IDOC (Doc. 49).

## BACKGROUND

  The subpoena requests at issue in this present motion ask the IDOC essentially to produce documents falling into two broad categories: ***first***, copies of the medical records of multiple third-party prisoners whose medical care was discussed in two reports authored by court-appointed experts in the *Lippert* litigation, and ***second***, internal communications among IDOC employees (or between IDOC employees and third parties like Wexford) about those same patients, or about the criticisms that the *Lippert* experts leveled at the medical care (or lack thereof) that Wexford provided to the people incarcerated by the IDOC.

  Plaintiffs seek production of these documents to gather evidence supporting their "*Monell*" allegation that Wexford has a widespread practice of providing inadequate medical

care to persons with cancer, particularly in that it frequently fails to check for cancer in patients exhibiting symptoms, and that even after cancer is discovered, it fails to secure treatment in a timely manner. Plaintiffs filed their motion to compel after the IDOC refused to produce either the medical records or the communications described above. Wexford and the IDOC have both filed objections.

There is also parallel litigation relevant to this motion to compel. Plaintiffs served a Rule 34 discovery request to Wexford that seeks documents similar to those sought in their subpoena to the IDOC, including the medical records of a variety of patients whose care is described in the *Lippert* reports. Plaintiffs, however, only have access to public versions of the *Lippert* reports, in which the identities of the various patients are anonymized. In response to Plaintiff's Rule 34 request, Wexford claimed that it, too, did not have information to identify the anonymized patients. Plaintiffs therefore served a subpoena on counsel for the class in *Lippert*, Uptown People's Law Center ("UPLC"), asking UPLC to produce "keys" to the *Lippert* reports that would allow the patients to be identified. Because UPLC took the position that this information was covered by the Stipulated Protective Order governing the *Lippert* reports, Plaintiffs moved to intervene in *Lippert*, and asked that the Stipulated Protective Order be modified to permit UPLC to provide Plaintiffs the "keys" that would identify the patients in the reports.[1] On February 24, 2022, the *Lippert* court granted Plaintiffs' motion and instructed that the Stipulated Protective Orders be modified. *See Lippert v. Ghosh*, No. 1:10-cv-04603, Doc. 1534 (N.D. Ill. Feb. 24, 2022). A copy of that order is attached to this reply as Exhibit 1.

---

[1] Wexford also opened up a separate case to quash Plaintiffs' subpoena to the UPLC, *see Reed v. Wexford*, No. 1:21-cv-5954 (N.D. Ill.). That case was closed once the *Lippert* court took over the matter of the UPLC subpoena. *See id.* Doc. 11 (Feb. 8, 2022).

# ARGUMENT

Wexford and the IDOC claim Plaintiff's motion to compel should be denied, but their arguments do not withstand scrutiny and the Court should reject them.

**A. Plaintiffs have not made inappropriate allegations.**

Wexford opens its brief by arguing that Plaintiffs base their discovery on false allegations about what happened in this case, such that discovery should be stayed in this case. (Doc. 47 at 1-4.) This strident position is unsupported. Most of Wexford's argument is simply the glossing of facts that every party does to fit their preferred narrative. Wexford begins by arguing, for example, that Mr. Reed complained of constipation a mere "11 months before his death" and that "[h]is first encounter with a named defendant was on July 26, 2018, when Dr. Shah recommended a CT scan . . . ." (*Id.* at 2.) But Wexford does not dispute Plaintiffs' allegations that between February and July 2018, Mr. Reed went to the prison infirmary *eight different times* with abdominal pain and accumulating weight loss, yet was turned around each time by Wexford staff with no meaningful effort to diagnose the cause. (*See* Doc. 1 ¶¶ 10, 11, 12, 13, 15, 16, 17, 18.) Wexford is right that the individual employees that ignored Mr. Reed for all those months have not been named, (Doc. 47 at 2), but Plaintiffs assert that Wexford is responsible for that misconduct under *Monell*. Wexford then quotes Mr. Reed's outside oncologist, Dr. Saba, as writing that Mr. Reed's condition is "unfortunately an incurable disease." (Doc. 47 at 2.) What Dr. Saba actually wrote was, "This is unfortunately an incurable disease but probably treatable." (Doc 1 ¶ 25.) Massaging a complaint's allegations in this manner is perhaps to be expected in a motion for judgment on the pleadings, but not in response to a discovery motion.

Wexford does claim that two sets of allegations that are actually false. Wexford points first to Paragraph 28 of the complaint:

> Plaintiffs allege that after October 25, 2018, "Dr. Shah, Dr. Ahmed, and
> Wexford's medical staff allowed Mr. Reed to sit in the prison's infirmary, with no
> chemotherapy, as his health continued to deteriorate." (Doc. 1, p. 8, ¶28). Yet,
> during this time, as noted above, Mr. Reed was admitted inpatient at Carle
> Hospital recovering from the surgery, recommended by Dr. Saba, that placed his
> chemotherapy port and biopsied his advanced metastasized colorectal
> adenocarcinoma cancer. Dr. Saba had not yet ordered chemotherapy to begin.

(Doc. 44 at 3.) Wexford does not explain what it means by "during this time," and for good reason: Mr. Reed's medical records show that between at least November 3 and November 13 he was in the prison's infirmary, something Wexford's own brief acknowledges. (*See* Doc. 47 at 3 (noting Mr. Reed was back at the prison between November 3 and 13).) That period is critical. Dr. Saba noted on November 14:

> I have been trying to contact the correction facility for the last couple of weeks to
> try to get him down to the clinic. I was afraid that he is doing very poorly . . . and
> needs to be started on systemic chemotherapy as soon as possible. . . . I was afraid
> that we have a short window of opportunities to get some treatment and start
> getting things reversed, otherwise he will be in a position where he won't be able
> to tolerate any therapy.

(Doc. 1 ¶ 30.) Plaintiffs were entirely correct to allege that the defendants were allowing Mr. Reed to languish in the prison during a critical window of time during which his outside doctors were attempting to secure chemotherapy for him. Wexford says that "Dr. Saba had not yet ordered chemotherapy to begin," (Doc. 47 at 3), but as Dr. Saba's November 14 note makes plain, that is only because the medical staff at the prison were ignoring his calls. Plaintiffs see no merit in Wexford's claim that they made false allegations in Paragraph 28.

Wexford also claims that Plaintiff's allegation in Paragraph 31 of the complaint is false in that the complaint alleges that after November 14 the defendants did not arrange for Mr. Reed to receive acute outside medical care for his condition. (Doc. 47 at 3.) Here Plaintiff agrees the Wexford may be right. Plaintiffs' allegations in Paragraph 31 were based on a medical order that was issued on October 25 but does not appear to have been approved until December 19.

4

Plaintiffs believe this document supports their allegations but it is also possible that plaintiff counsel may have misinterpreted some of the documents from that period, such that their allegations in Paragraph 31 are incorrect, at least in part. When defense counsel told plaintiff counsel that Paragraph 31 was erroneous, plaintiff counsel agreed that an error was possible and asked defense counsel to identify which documents defense counsel was citing. Plaintiffs never received an answer to this request until Wexford filed the present response in which it demands a halt in discovery until Paragraph 31 is corrected.

Plaintiffs respectfully submit that such a remedy would not be appropriate. Lawyers make mistakes, and it is possible that plaintiff counsel made one here. Plaintiff counsel continues to review the record and if in fact there was an error in Paragraph 31, counsel will fix it. But it's not clear how an error in Paragraph 31 would or should affect the scope of discovery in any way. It does not concern the bulk of the events in this case, and would not appreciably change the scope of discovery even if it were eliminated entirely. Plaintiff respectfully submits that the Court should address the merits of the present discovery dispute.

**B. The IDOC subpoena does not implicate the *Lippert* protective orders.**

Wexford next argues that producing the documents sought in the subpoena would violate the protective orders entered in the *Lippert* case, and it asks that this Court wait until the *Lippert* court decide Plaintiffs' motion to modify the *Lippert* Stipulated Protective Order so as to gather the "keys" possessed by UPLC.

The documents that Plaintiffs seek in the subpoena are not covered by the *Lippert* protective order. Every court to consider the issue has so held, as Plaintiffs explained in their opening memorandum—even the *Lippert* court itself, in a case referred to as *Burks*. (*See* Doc. 44 at 4-7.) Wexford has no answer to these authorities except to claim that they are unlawfully

5

"overruling" the *Lippert* protective order, and improperly using the *Burks* decision to "modify[]" the *Lippert* protective orders. (Doc. 47 at 11-12.)

Those arguments are meritless. And indeed the *Lippert* court definitively rejected them in its February 24, 2022 order modifying the Stipulated Protective Order. *See* Ex. 1 *passim*. The *Lippert* Feb. 24 order read *Burks*'s unambiguous language exactly as each of the other courts to interpret that decision. *See* Ex. 1 at 4 n.3 ("Judge Martin [in *Burks*] noted that "[t]he originals of the documents relied on by Dr. Shansky remain with IDOC or Wexford. Mr. Burks could have pursued their production directly in his case if they were essential to his claim" [*Id*]. Which is exactly what Movants [*i.e.*, the Reeds] have done.")

Wexford's argument that the documents sought in the subpoena are covered by the *Lippert* Stipulated Protective Orde has now twice been rejected by the *Lippert* court itself.

### C. The *Dean* decision counsels in favor of Plaintiffs' subpoena, not against it.

Wexford next argues that the Seventh Circuit's decision in *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021) teaches that none of the documents Plaintiffs seek in the IDOC subpoena can be relevant to this case. (Doc. 47 at 13-15.) By way of background, while the *Lippert* litigation concerns claims of inadequate medical care at all IDOC facilities, the *Lippert* report experts did not examine care at every single facility. Instead they sampled a number, but not all, of the IDOC's facilities, and made the assessments about Wexford's IDOC-wide practices from the cases and facilities that they had sampled.

The *Dean* plaintiff was not at one of the facilities that the *Lippert* experts had examined, and the *Dean* court held that the *Dean* plaintiff could not use the findings from the sample facilities examined by the *Lippert* experts as *Monell* evidence in his own case. *Dean*, 18 F.4th at 238. The facility where Mr. Reed was incarcerated was not sampled by the *Lippert* experts;

citing *Dean*, Wexford argues that any discovery Plaintiff might seek relating to *Lippert* is therefore improper.  (Doc. 47 at 13-15.)

This argument simply fails to understand *Dean*'s holding.  The plaintiff in *Dean* did not base his *Monell* claim against Wexford on a widespread practice theory, but rather a theory that Wexford's collegial review policies were unconstitutional "as applied" to him alone.  *Dean*, 18 F.3d at 236.  That theory required the *Dean* plaintiff to rely "solely" on the four corners of the *Lippert* reports themselves to provide all the notice required of the "specific" problem that he claimed had caused his injury—improper implementation of collegial review.  *Id.* at 237.  The *Lippert* reports, in turn, described some variation among facilities in the way they administered collegial review.  *Id.* at 238.  As such, *Dean* held, it was "difficult to infer **solely** from the [*Lippert*] report that Wexford knew of any unconstitutional consequences from the delays and consciously disregarded the risk of those consequences while caring for Dean."  *Id.* (emphasis added).  The narrowness of the *Dean* plaintiff's *Monell* theory meant that even granular changes to Wexford's written procedures and small variations in protocol at different IDOC prisons took on dispositive significance.

Plaintiffs here are proceeding on an entirely different *Monell* theory—widespread practice.  *Dean* itself contrasted the "difficult problems of proof" presented by the *Dean* plaintiff's "as applied" theory, which forced the *Dean* plaintiff to rely solely on the precise wording of the *Lippert* reports, *see id.* at 236, with widespread practice-evidence that permits the presentation of constitutional violations on other persons to prove *Monell* liability.  The IDOC subpoena at issue here seeks to gather precisely such evidence—medical files from numerous prisoners who appear to have received inadequate medical care.  Contrary to Wexford's suggestion, these records are not hearsay at all and Plaintiffs do not plan to introduce them as

7

"notice" evidence at trial. (*Cf.* Doc 47 at 13-14.) To the contrary, Plaintiffs plan to introduce these as actual, non-hearsay evidence of the manner in which Wexford commonly fails to care for numerous other patients who suffer from cancer. Nothing in *Dean* even hints that the gathering of such evidence is improper. Through the IDOC subpoena Plaintiffs also seek to gather communications within the IDOC (and between the IDOC and Wexford) *about* the *Lippert* reports and the information they contain. But this evidence is not subject to the tight strictures of the *Dean* plaintiff's "as-applied" theory, either. It is not hearsay. Rather, Plaintiffs ultimately seek admissions of a party opponent regarding what Wexford knew and how it reacted to the information contained in the *Lippert* reports.

This is entirely different than the "as-applied" notice at issue in *Dean*. To the contrary, as *Dean* itself explained, when a plaintiff is presenting widespread practice evidence, "a prior pattern of *similar* violations puts the municipality on notice of the unconstitutional consequences of its policy, such that its continued adherence to the policy might establish the conscious disregard for the consequences of its action—the deliberate indifference—necessary to trigger municipal liability." *Dean*, 18 F.4th at 236 (cleaned up, emphasis added). Here, the *Lippert* reports themselves—and the underlying, non-hearsay evidence Plaintiffs plan to introduce—put the IDOC and its vendor, Wexford, on notice of a pattern of "similar" poor cancer care. *Dean* teaches that evidence showing Wexford disregarded that pattern of "similar" incidents and allowed poor care to continue would be evidence necessary to trigger municipal liability. *Id.* That is an entirely different form of proof than the precise notice required for an "as-applied" theory. In short, under a widespread practice theory, Wexford can be held liable if it learns of a "pattern" of unconstitutional cancer care across multiple facilities and does nothing to investigate those purported problems, or to make any changes. What Wexford and the IDOC learned from

8

the *Lippert* reports, and whether they took them to heart, is entirely relevant to Plaintiffs' widespread-practice *Monell* claim.

Notably, this case is currently in discovery. Plaintiffs are trying to gather information about what the IDOC and Wexford learned from the Lippert reports. Did the IDOC and Wexford see the reports as suggesting there might be a pattern of bad care that had to be investigated, or did they brush them off as a series of anecdotes that could safely be ignored? Did Wexford and IDOC identify different practices at other facilities that limited the value of the facilities sampled by the *Lippert* experts, or did they concede the practices at other facilities were the same and nevertheless make no changes? And through it all, did poor care for cancer continue notwithstanding the warnings by the *Lippert* report experts? Plaintiffs' discovery is designed to answer these questions. Some of the evidence answering these questions will be found in the medical records of the numerous cancer patients identified in the 2014 and 2018 *Lippert* reports, which Plaintiffs seek in this subpoena. Other additional evidence is likely to be found in the communications between and among the IDOC and Wexford, which will indicate what they knew about the reports and what they did with that information. It is entirely appropriate that Plaintiffs be permitted to gather the evidence sought in the IDOC subpoena

**D. The IDOC's confidentiality concerns are not grounds for refusing production.**

Aside from joining Wexford's "*Lippert*" arguments, the IDOC separately asserts confidentiality and privilege concerns. First the IDOC argues that inmate files requested by Plaintiffs are protected by a state confidentiality statute. (Doc. 49 ¶ 9.) But such state confidentiality rules do not prohibit discovery in federal cases, and courts routinely order their production. *See Sultan v. Duncan*, No. 3:17-CV-418, 2020 WL 2542958, at *1 (S.D. Ill. May 19, 2020) (collecting cases). The way to protect such confidential information is through a

9

confidentiality order, and Plaintiffs remain open to entry of an order that reasonably protects this information. The confidentiality law cited by the IDOC is not grounds for refusing to respond to the subpoena.

Second, the IDOC asserts that responding to the subpoena could result in the disclosure of privileged information. (Doc. 49 ¶ 10.) In Rule 37 correspondence, counsel for the IDOC clarified that this was a conventional privilege objection, noting that documents responsive to the subpoena may include some privileged documents. The rules allow for production of a privilege log to maintain the protection of that privilege.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion to compel and order the IDOC to respond to Plaintiffs' subpoena as set forth herein.

March 8, 2022                                         Respectfully submitted,

                                                      /s/ Stephen H. Weil
                                                      Stephen H. Weil
                                                      Attorney for Plaintiff

Jon I. Loevy
Sarah C. Grady
Stephen H. Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
weil@loevy.com