## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS

Lennisha Reed *et al.*,

                Plaintiffs,

                v.

Wexford Health Sources, Inc., *et al.*,

                Defendants.

Case No. 3:20-cv-01139-SPM

Judge Stephen P. McGlynn

## PLAINTIFFS' MOTION TO COMPEL

Plaintiffs Lennisha Reed and Lenn Reed, Jr., through their counsel, hereby move the Court to Compel defendant Wexford Health Sources, Inc. to produce documents in response to *Monell* discovery served against it. *See* **Ex. 1** (requests 1-46) and **Ex. 2** (requests 47-60).

Pursuant to Rule 37(a)(1), Plaintiffs certify that they have attempted in good faith to meet and confer with Wexford before bringing this motion, including through multiple telephone calls and written correspondence regarding these discovery requests. After obtaining the entry of a HIPAA-qualified protective order in this case, *see* ECF 41, Plaintiff counsel initiated several Rule 37 telephonic conferences with defense counsel. Rule 37 negotiations were then taken over by other defense counsel, who objected to making discovery responses on grounds that there were inaccuracies in the underlying complaint in this case. *See* ECF 59 (describing dispute). Plaintiff counsel and Wexford counsel then entered further negotiations in which Wexford asserted additional objections to substantially identical discovery in *Wiley v. Wexford Health Sources, Inc.*, No. 3:21-cv-00599-JPG (S.D. Ill.), which involves *Monell* claims against Wexford arising from the death of another IDOC prisoner who died of an abdominal cancer that was not diagnosed while he was under Wexford's care. By consent Wexford's positions with respect to

1

that discovery has been incorporated into its objections in this case.  After this Court granted Plaintiff's motion to compel a subpoena response against the IDOC, *see* ECF 77, whose subjects overlap with the *Lippert*-related discovery at issue in this motion, Plaintiffs confirmed that Wexford had not changed its position with respect to the discovery at issue in this motion.  This motion now follows.

### A.  Evidence relating to the *Lippert* reports is highly relevant to Plaintiffs' *Monell* claims and an appropriate subject of discovery.

Plaintiffs' discovery Request Nos. 47-60 seek to understand what Wexford knew about the information contained in the 2014 and 2018 *Lippert* reports, whether it investigated its own practices in light of the information in the two reports, and whether it made any changes to its practices in light of the information contained the reports or its subsequent investigation.[1]

This discovery overlaps with Plaintiffs' subpoena to the IDOC in this case, *compare* Ex. 2 (Request Nos. 47-60) *with* ECF 44-1 at Page ID #257-60 (Plaintiffs' IDOC subpoena Request Nos. 14-34).  After Plaintiffs moved to compel a response to that subpoena, Wexford intervened and asserted numerous objections, *see* ECF 47 *passim*, which the IDOC adopted as its own.  ECF 49.  Wexford has asserted the same objections to the "*Lippert*" discovery directed against it here, as well.[2]  Wexford has refused, among other things, to search for or produce any documents or

---

[1]    Requests 47 and 54 seek documents and communications relating to certain persons whose medical care is discussed in the two *Lippert* reports.  Requests 48-51 and 55-58 seek communications within Wexford discussing the descriptions of certain aspects of medical care contained in the two Lippert reports.  Requests 52 and 59 seek communications discussing potential or actual changes to Wexford's delivery of medical care in light of the information contained in the two *Lippert* reports.  And Requests 53 and 60 seek production of discipline or similar actions imposed in light of the information contained in the *Lippert* reports.  *See* Ex. 2.

[2]    After the Court overruled Wexford's objections in its opinion granting Plaintiff's motion to compel the IDOC's "*Lippert*" responses, *see* ECF 77, Plaintiff contacted Wexford to determine whether it was altering any of its objections in light of the Court's opinion.  Wexford responded that it was not.

2

communications that relate to the *Lippert* reports.  Indeed it has objected to *any* discovery relating to *Lippert*, including any internal communications among *Wexford* employees about the information contained in the *Lippert* reports or any consideration given to altering or at least investigating Wexford's practices in light of the information contained in the *Lippert* reports.

Wexford objects broadly that Plaintiffs' "*Lippert*" discovery is of no relevance to the claims or defenses in this case, and thus that the burden of gathering information responsive to the reports is disproportionate under Rule 26(b)(1).  The opposite is true.  *Lippert* is an injunctive case challenging the provision of medical care to all IDOC prisoners.  The 2014 report, which was authored by medical experts appointed by the *Lippert* court, concluded that the IDOC "has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." *Lippert v. Baldwin*, No. 10-cv-4603, 2017 WL 1545672, at *5 (N.D. Ill. Apr. 28, 2017).[3]  Among these systemic deficiencies were "delaying and denying specialty care."  *Id.* at *3.  With respect to that conclusion, the authors reported that during their "review of records, we found breakdowns in almost every area, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient." *Id.* at *3 n. 8 (quoting 2014 *Lippert* Report).  In 2018, court-appointed experts from the *Lippert* litigation issued a follow-up report, finding that the healthcare program had "not significantly improved" since the 2014

---

[3] An online copy of the 2014 report can be found here:  https://www.aclu-il.org/sites/default/files/wysiwyg/lippert_v_godinez_expert_report.pdf

report was issued. **Ex. 3** (2018 *Lippert* report excerpts) at 9.[4]  The experts found that clinical care was "extremely poor" and caused multiple preventable deaths.  *Id*.

Wexford is contracted to provide medical services across the IDOC, and the *Lippert* reports were thus assessments of its delivery of healthcare to IDOC patients.  Plaintiffs allege Wexford maintained a number of problematic policies and practices across the IDOC, including the failure to send patients offsite for evaluation and treatment even when such referrals were appropriate or necessary, the failure to appropriately diagnose, examine, or treat patients in its care. ECF 63 ¶¶ 34-46, 62-66. The findings of the experts in the two *Lippert* reports substantiated those allegations, and a Wexford executive has testified at trial that Wexford's executives were aware of the 2014 and 2018 reports and agreed that "they raised 'serious' concerns that Wexford took seriously." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 227-28, 253 (7th Cir. 2021) (summarizing testimony of Wexford corporate medical director).

Documents reflecting what, if any, actions Wexford took in response to those reports and the relevant findings by the court-appointed experts goes to the heart of Plaintiff's claim that Wexford acted with deliberate indifference despite being aware of inadequate policies and practices. *See J.K.J. v. Polk County*, 960 F.3d 367, 383 (7th Cir. 2020) (en banc) (affirming a *Monell* verdict based on the inaction of the municipal corporation despite notice that its inadequate policies and practices led to constitutional misconduct by one of its employees); *Rasho v. Jeffreys*, 22 F.4th 703, 710-11 (7th Cir. 2022) (discussing the relevance of a defendant's response to notice of a problem in the context of a deliberate indifference claim). Whether and how Wexford investigated or addressed the findings of the court-appointed experts in the 2014 and 2018 *Lippert* Reports are squarely relevant to Plaintiff's claim that Wexford was deliberately

---

[4] An online copy of the 2018 report can be found here:  https://www.aclu-il.org/sites/default/files/field_documents/lippert_-_report_of_second_court-appointed_expert.pdf

indifferent, as are statements and admissions about the accuracy of the information contained in the reports.  Documents reflecting efforts by Wexford to investigate and respond (including through corrective action) to the findings of the court-appointed experts in the *Lippert* reports are likely admissible as party statements, which are categorically not hearsay. Fed. R. Evid. 801(d).[5]

Wexford also objects that any documents—even internal Wexford communications—relating to the *Lippert* reports are barred from disclosure by the *Lippert* protective orders.  But the Court has already rejected this argument, since none of the materials at issue were covered by the *Lippert* protective orders in the first place.  *See* ECF 77 at 8-9.  The same is true here. Wexford did not "obtain the material" sought in Plaintiffs' discovery by way of the *Lippert* expert orders.  Plaintiffs' discovery seeks material already in Wexford's possession, whether or not copies of some documents might also have been provided to the *Lippert* experts.  *Cf. id.* at 8. And there is no plausible connection between the *Lippert* protective orders and the bulk of Plaintiffs' discovery, which seeks documents like internal Wexford communications *about* the information in the *Lippert* reports and how Wexford reacted to them.  As this Court put it, "[d]ocuments that may relate to the *Lippert* case or communications that mention, were sent in response to, or that discuss *Lippert* and were not produced in discovery or disclosed to the experts are not covered by the orders in *Lippert*. Accordingly, the orders in *Lippert* also do not prevent the production of documents that are not underlying documents and simply related to or mention *Lippert*."  ECF 77 at 9.  That same reasoning applies here.  The *Lippert* protective orders are simply irrelevant to the *Lippert*-related discovery that Plaintiffs seek in this motion.

---

[5]     Furthermore, as the Court explained in granting the Plaintiffs' motion to compel the IDOC's subpoena responses of *Lippert*-related documents, information need not be admissible to be discoverable.  *See* ECF 77 at 9-10.  *Accord Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, No. 17-cv-0991, 2021 WL 3186959, at *3 (S.D. Ill. July 28, 2021) ("[D]iscovery permits a greater breadth of relevance than would be admitted at trial.").

Finally, Wexford asserts two privilege objections with respect to the "*Lippert*" discovery. It asserts that documents going to its response to the information contained in the *Lippert* reports are protected from discovery by the peer review privilege encoded in the Illinois Medical Studies Act. That argument is incorrect, for the reasons Plaintiffs have explained, *see infra* § D. Second, Wexford objects that its response to the *Lippert* reports is broadly protected by the attorney-client privilege and the attorney work-product doctrine. As the Court pointed out with respect to the same argument asserted in opposition to the IDOC subpoena, such objections are to be addressed by the creation of a privilege log. *See* ECF 77 at 10-11. The assertion of the privilege is not grounds for refusing to respond to a discovery request.

**B. *Dean* does not limit the scope of *Monell* discovery to a particular prison.**

Wexford also attacks the scope of Plaintiff's requests, arguing that any *Monell* discovery regarding its policies and practices must be confined to the delivery of healthcare at Lawrence Correctional Center, the specific facility where Mr. Reed was housed.

Wexford grounds this argument on several lines in the Seventh Circuit's *Dean* decision. But this argument misapplies *Dean*, which did not concern either the scope of discovery or the widespread-practice *Monell* theory at issue in this case, but instead concerned a post-trial challenge to the admission of portions of the *Lippert* reports themselves, in support of a narrow, "as-applied" *Monell* theory relating only to the individual plaintiff himself, at a trial in which no widespread-practice evidence was presented. It was this narrow scope of the *Monell* evidence in *Dean* which required the court to confine its analysis to the facility where the *Dean* plaintiff was housed, and which made minor differences among facilities dispositive. In this case, by contrast, Plaintiffs are seeking to gather the very widespread-practice evidence that makes Wexford's practices across the IDOC relevant under *Monell* and an appropriate subject of discovery.

6

The Seventh Circuit's *Dean* decision arose from the admission at trial of the 2014 and 2018 *Lippert* reports. In 2017 *Lippert* was certified as a class of "all prisoners in the custody of the [IDOC] with serious medical or dental needs." *Lippert*, 2017 WL 1545672, at *10. As the *Lippert* court's 2017 decision recounts, the class certification ruling was based largely on the 2014 Lippert report. *See id.* at *1 & n.1. The *Lippert* court had tasked the 2014 report's experts with "assist[ing] the Court in determining whether the state of Illinois was able to meet minimal constitutional standards with regard to the adequacy of its health care program for the population it serves." *Id.* at *5 n.15. To make this inquiry, the *Lippert* experts visited eight facilities, *id.* at *5 & nn. 15-16, reviewed agency-level documents and communications, *id.* at *5 n.16, and reviewed a sample of slightly more than half of the non-violent deaths that occurred in the IDOC over the course of 18 months, *see id.* at *5 & n.18. Based on this review, the 2014 *Lippert* report concluded that the IDOC "has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." *Id.*

In opposing class certification, the *Lippert* defendants argued that the 2014 report did not establish that "the same issues exist at all twenty-five IDOC prisons." *Id.* at 4. The *Lippert* court rejected that argument, noting that the *Lippert* experts had selected the facilities and information to sample the care provided across the IDOC, and that based on this information, they had "'concluded that the State of Illinois has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves.'" *Id.* at *5 (quoting 2014 *Lippert* Report). As such, the *Lippert* court held, the plaintiffs had established commonality for purposes of class certification under Rule 23(a)(2) across the entire IDOC. *Id.*

*Dean* noted that the *Lippert* reports were based on a "comprehensive[] review of the IDOC's healthcare system." *Dean*, 18 F.4th at 225. *Dean* held, however, that the comprehensive

nature of this review was irrelevant, because the *Dean* plaintiff had failed to "introduce any substantive evidence of a pattern or practice of similar violations. . . . He only offered substantive evidence of collegial review causing unconstitutional delays in his own healthcare." *Id.* at 237. The widespread unconstitutional practices described in the *Lippert* reports therefore never came into play, because "evidence admitted only for notice cannot establish that a municipality acted with deliberate indifference unless the plaintiff also has substantive proof that the 'noticed' problems actually existed." *Id.* at 238. Since the Plaintiff had only introduced substantive proof about *his own* specific care, and nothing more, any notice in the *Lippert* reports had to focus, at a granular level, only on the very specific care that the *Dean* plaintiff received. *Id.* at 237.

Put differently, while the *Lippert* reports' authors identified—and as relevant here, provided Wexford with notice of—widespread failures in providing care across the IDOC, the *Dean* plaintiff did not support his *Monell* claims on any substantive evidence of those widespread failures. Instead, he introduced the reports only for notice about the specific care at issue in his case. Because the notice had such a narrowed focus, it had to "link . . . problems [identified in the *Lippert* reports] to [the *Dean* plaintiff's] personal experience," *id.* at 238—*not* to an alleged widespread practice. This required the *Dean* plaintiff to "focus[his *Monell* claim] on Wexford's *express* policy of collegial review—not on its informal customs or practices." *Id.* at 239 (emphasis added). Because the *Dean* plaintiff could not assert a custom or practice claim, minor variations among the *Lippert* report's descriptions of collegial review in different facilities, and the fact that the *Dean* plaintiff's prison was not among those reviewed in the reports, took on dispositive significance. *Id.* at 238. Because that prison was not among those described in the *Lippert* reports, moreover, the *Lippert* report could not provide notice of the specific problems the *Dean* plaintiff claimed had caused the inadequate care that he received. *Id.*

8

Wexford seeks to export *Dean*'s holding to this case, arguing that *only* Wexford's policies and practices at Lawrence Correctional Center, the facility where Mr. Reed was housed, can permissibly give rise to a *Monell* claim—and that therefore discovery regarding Wexford's delivery of care of other inmates can *only* be gathered from medical care provided at Lawrence CC specifically. Wexford makes this argument not only with respect to information relating in some way to the *Lippert* reports, but for *all* evidence relating to Plaintiff's *Monell* claim. Thus, on the strength of the language in *Dean*, Wexford has objected to the scope of discovery—and to a *Monell* theory at all—to the extent it includes evidence outside the walls of Lawrence CC.

*Dean*'s point, however, is exactly the opposite: by failing to "introduce any substantive evidence of a pattern or practice of similar violations," the *Dean* plaintiff *obligated* the court not to consider widespread-practice evidence about the delivery of defective healthcare across the IDOC, and instead forced the court to consider the *Dean* plaintiff's immediate experience only. *Dean*, 18 F.4th at 237. The very point of Plaintiffs' *Monell* discovery is to discover "substantive evidence of a pattern or practice of similar violations," the very thing that *Dean* held was missing at the *Dean* plaintiff's trial, and whose absence circumscribed the scope of the court's *Monell* analysis to the facility where the *Dean* plaintiff was imprisoned.

Wexford's objection attempts to use *Dean*'s holding about the lack of admissible widespread practice evidence *at trial* to prevent the Plaintiffs here from gathering such evidence *in discovery*. In this case, and in this discovery motion, Plaintiffs are seeking to gather the very evidence that was missing in *Dean*: substantive evidence that Wexford has widespread policies and practices—throughout the IDOC—pursuant to which its employees fail to diagnose or treat cancer in a timely manner, driven by the widespread failure to refer patients offsite for diagnosis and treatment of serious medical conditions. That is the policy and practice Plaintiffs allege in

their complaint, *cf.* ECF 77 at 2 ("Relevant to the motion to compel is [the *Reed* plaintiffs'] claim that [] Wexford . . . had widespread policies across IDOC facilities of failing to diagnose and failing to adequately treat patients under its care who were suffering from cancer"), and it is constitutive of *Monell* de facto policy claims in the Seventh Circuit and across the country. *See, e.g.*, *Wiley v. Young*, No. 21-CV-599-JPG, 2022 WL 488144, at *4 (S.D. Ill. Feb. 17, 2022) ("Plaintiff alleges that Wexford maintained a de facto policy/practice . . . of providing inadequate health care to IDOC inmates throughout the state, which amounted to deliberate indifference.  In this context, [the decedent's] transfer from Pinckneyville to Danville has no effect on Plaintiff's claim against Wexford."); *Broaddus v. Wexford Health Sources, Inc.*, No. 15-CV-1339-SCW, 2018 WL 1565603, at *6 (S.D. Ill. Mar. 30, 2018) (identifying inadequate care at multiple facilities as "evidence a well-established and widespread policy" by Wexford); *Reco Reed v. Wexford Health Sources, Inc.*, No. 18-CV-01182-JPG, 2022 WL 4483940, at *7 (S.D. Ill. Sept. 27, 2022) (*Monell* claim supported by inadequate treatment at different facilities); *Flournoy v. Est. of Obaisi*, No. 17-cv-7994, 2020 WL 5593284, at *13 (N.D. Ill. Sept. 18, 2020) (same).  Indeed in the case of private correctional healthcare providers like Wexford, such evidence is relevant even where the facilities at issue are in different jurisdictions.  *See, e.g.*, *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 744 (6th Cir. 2015) (noting with respect to a *Monell* plaintiff's "argument that a pattern of tortious or unconstitutional conduct . . . existed, evidence about similar incidents of inmate deaths in jail facilities served by [private healthcare vendor] SHP may be relevant to whether SHP acted with deliberate indifference to the medical needs of inmates with whom its nurses came into contact at HCDC [the jail where plaintiff's decedent was housed]."); *Herr v. Armor Corr. Health Servs.*, Inc., No. 6:19-cv-394, 2019 WL 12021672, at *5 (M.D. Fla. Sept. 9, 2019) (holding that alleged incidents of inadequate care by private jail

healthcare vendor "around the country" supported a claim that the vendor "has a policy or custom of repeated delayed or denied medical care that directly resulted in the constitutional violation and Mr. Herr's death."); *Shields v. Prince George's County*, No. 15-cv-1736, 2016 WL 4581327 (D. Md. Sept. 1, 2016) (holding that because the defendant (Corizon) was a national prison healthcare vendor, "complaints regarding Corizon employees in 14 different states" supported a *Monell* claim because "Corizon is a company that provides healthcare services to state and county correctional facilities and jails nationwide. Thus, its activities in a variety of states can be, and in this case are, relevant to the issue of custom and policy here." *Id.* (quotations omitted)).

Plaintiffs' *Monell* claim is not that the medical personnel at Lawrence CC, where Mr. Reed was imprisoned, were particularly bad at diagnosing or treating cancer. Rather, Plaintiffs allege that in performing on its contract to deliver healthcare to people imprisoned by the IDOC, Wexford has adopted widespread customs of providing inadequate healthcare. The authorities outlined above make plain that evidence of Wexford's practices across the IDOC is relevant to proving that claim, and Plaintiffs' discovery is targeted at gathering substantive evidence to support the existence of such a widespread practice. The Court should reject Wexford's effort to restrict this discovery only to the particular facility where Mr. Reed was housed.

### C. Wexford refuses to respond to discovery about its policies and practices by ignoring Plaintiffs' discovery requests as they are written.

Plaintiffs have served Wexford with a trifecta of discovery requests (Request Nos. 30, 38, and 39) that seek production of documents relating to Wexford's written policies about the delivery of medical care, its actual practices regarding the delivery of medical care, and its efforts to identify any deficiencies in its written policies or actual practices. Wexford has substantively refused to respond to these requests. It does so on two grounds.

11

*First*, Wexford has re-interpreted the requests to refer to its written policies only. Based on this interpretation, Wexford has agreed to disclose only written policies, and has refused to produce documents going to its *practices*—or its efforts to identify potential problems with those practices—at all. These discovery requests, however, plainly call for such practice information, and Plaintiffs' counsel has repeatedly pointed out this incorrect interpretation during the parties' meet-and-confer process. Wexford, however, has refused to change its position.

The discovery operates as follows: Request No. 30 lists 15 "subjects," set out in subparagraphs, concerning the delivery of medical care.[6] Referring to these 15 subjects, Request No. 30 asks Wexford to produce certain written policy documents, training materials, and similar written "policies" concerning the 15 subjects. *See* Ex. 1 ¶ 30. Next, Request No. 38 refers to the same 15 subjects, and asks Wexford to produce documents "identifying any policymaker who was responsible for or had final policymaking authority for any policy, procedure, or practice on any of the [15] subjects". *Id.* ¶ 38. Finally, Request No. 39 asks Wexford to produce documents relating to any effort by such policymakers "to review, investigate, analyze, uncover, prevent, or determine the prevalence of any misconduct, deficiency, shortcoming, or other problem relating to any policy, procedure, or practice on any of the [15] subjects". *Id.* ¶ 39.

In responding to this discovery, Wexford has insisted on interpreting all three requests as concerning written policies only. On the strength of this interpretation, Wexford, after making some policy-related documents available in response to Request No. 30, identified only two Wexford policymakers going to Request No. 38: the late Dr. Thomas Lehman, Wexford's former medical director, who signed off on Wexford's written policies; or Dr. Steve Meeks, the

---

[6] The list includes subjects such as "Communications amongst and between medical staff regarding a prisoner's health, including any Complaints," ¶ 30(e); "Diagnosis, evaluation, and treatment for cancer," ¶ 30(*l*), and "Differential diagnosis," ¶ 30(o). *See* Ex. 1 ¶¶ 30(a)-(o).

medical director of the *IDOC* (not Wexford), on a theory that Wexford's written policies are ultimately superseded by any applicable IDOC written policies.  Based on its interpretation Wexford additionally refused to produce documents with respect to Request No. 39, on the grounds that changes would be limited to edits in written policies only.

Wexford's insistence on interpreting Request Nos. 30, 38, and 39 as concerning only its *written* policies, and not its practices, is improper.  "A party responding to a discovery request should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in the discovery requests*." Sols. Team v. Oak St. Health, MSO, LLC*, No. 17 CV 1879, 2021 WL 3022324, at *4 (N.D. Ill. July 16, 2021).  In this case, Request No. 30 itself makes clear that the 15 topics listed in the subparagraphs of Request No. 30 are "subjects."  Ex. 1 ¶ 30 (requesting production of policies, guidelines, training materials, etc. "regarding the following *subjects*" (emphasis added)).  Request No. 38, in turn, asks for identification of policymakers responsible for "any policy, procedure, or *practice* on any of the *subjects* identified in [Request No. 30]." (emphases added)).  Request No. 39, likewise, asks for production of documents relating to efforts by Wexford policymakers to investigate, prevent, or determine the prevalence of "any misconduct, deficiency, shortcoming, or other problem relating to any policy, procedure, or *practice* on any of the *subjects* identified in [Request No. 30]." (emphases added)).  The references in the discovery to "practices" and to "subjects" are set out in plain English.  And to dispel any possible doubt, Plaintiff counsel explained to Wexford's counsel that the discovery concerned Wexford's written policies *and* its practices.

There is every reason to believe that Wexford possesses documents responsive the requests in this discovery concerning its *practices*.  In a 2020 request-for-proposals response submitted to the Kansas Department of Corrections, for example, Wexford states that has

"centralized" the function of "quality management" in its Pittsburgh corporate headquarters, *see* Ex. 4 at 16 (excerpt),[7] identifies Elaine Gedman, Wexford's chief administrative officer, as responsible for "quality management," *see id.* at 17, and states that it "maintain[s] a full-time Quality Management department comprised of CCHPs (Certified Correctional Healthcare Professionals), CPHQs (Certified Professionals in Healthcare Quality), and ACA auditors who will be responsible for monitoring the activity and 'quality' of" Wexford's continuous quality improvement programs. *See id.* at 298-99.  Wexford asserts that this "monitoring and evaluation process is designed to identify, assess, and resolve issues that impact the delivery of health care services, thereby continually improving patient care services," and includes things like review of "processes and outcomes," "policies and procedures," and "the effectiveness of the program." *Id.* at 299.  These representations, made shortly after the events giving rise to the claims in this complaint, indicate that Wexford both has particular policymakers responsible for various aspects of its actual delivery of healthcare, and for identifying potential shortcomings in Wexford's practices.  They indicate, in other words, that Wexford has created a substantial number of documents that are responsive to Request Nos. 30, 38, and 39.  Wexford cannot evade those requests by reinterpreting them to seek written policies only.

**Second**, Wexford objects that the requests are vastly overbroad and therefore unduly burdensome.  To make this argument, it focuses on certain subparagraphs of Request No. 30.  For example, Wexford has pointed to ¶ 30(b), which concerns "Provision of medical and care to prisoners."  Wexford argues that requests concerning such subjects effectively demand that Wexford produce "everything" in its possession, since provision of medical care to prisoners is

---

[7]   An online copy of the KDOC response can be found here: https://admin.ks.gov/media/cms/d8ca703e-94fd-4a2a-87e7-80c4aeeada92.pdf.

Wexford's entire business.  On the strength of this objection, Wexford has broadly refused to respond to Request Nos. 30, 38, and 39.

A refusal to respond to the discovery on the strength of this objection is improper as well. As Plaintiffs have pointed out to Wexford during the meet-and-confer process, Rule 34(b)(2)(C) provides that "[a]n objection to part of a request must specify the part and permit inspection of the rest."  Wexford has never claimed that each of the 15 topics set out in the subparagraphs of Request No. 30 is overly broad in scope, nor could it.  A number of subject matters in Request No. 30 go directly to Plaintiffs' claims, including "Communications amongst and between medical staff regarding a prisoner's health," *see* Ex. 1 ¶ 30(e), "Diagnosis, evaluation, and treatment for cancer," *id.* ¶ 30(*l*), "Differential diagnosis," *id.* ¶ 30(o), and the like.  To the extent that any of the 15 subjects are potentially overbroad, moreover, that concern can be resolved in the first instance both through a basic investigation by Wexford counsel of documents likely to be in its possession, as well as narrowing of the subject matter by use of search terms and other aspects of an ESI protocol, which would entail further meet-and-confer conferences between the parties.  Plaintiffs initially proposed such a protocol, but in light of the numerous threshold objections Wexford has since asserted (which are discussed throughout this motion), the protocol has not been used to narrow the focus of the requests.

Request Nos. 30, 38, and 39 seek discovery of documents that are relevant to this case, are likely to be found in Wexford's possession, and can be gathered and produced in a proportional manner conforming with Rule 26(b)(1).  The Court should overrule Wexford's objections and order it to produce responsive documents.

### D. Wexford's assertion of a "peer review" or Medical Studies Act privilege is improper because this is a federal question civil rights case.

Wexford has refused to produce or search for documents in response to multiple requests on grounds that all responsive documents are protected by a "peer review" privilege, encoded in the Illinois Medical Studies Act, 735 ILCS 5/8-2101 ("IMSA"). This includes: Request No. 25, which seeks documents relating to deaths of prisoners from cancer, including mortality reviews; Request 39, which seeks continuous quality improvement studies and similar documents relating to Wexford's efforts to identify potential deficiencies or shortcomings in its provisions of medical care; and Request Nos. 48-53 and 55-60, which concern Wexford's responses to the assessments in the *Lippert* reports that criticized Wexford's delivery of healthcare, including the company's inquiry into its delivery of healthcare in light of the criticisms in the *Lippert* reports.

Wexford asserts that the documents responsive to these requests are all protected from disclosure by the peer review / IMSA privilege. That argument is wrong. This is a federal-question case brought pursuant to laws designed to vindicate rights secured under the United States Constitution. The Supreme Court and the Seventh Circuit—and every other Circuit Court to consider the issue—have determined that a peer-review privilege does not exist in litigation over federal civil rights. The peer review privilege does not exist in such cases. In *University of Pennsylvania v. EEOC*, the Court refused to recognize a peer-review privilege that was substantively identical to the state-law privilege that Wexford asserts here. 493 U.S. 182, 189-90 (1990). In *University of Pennsylvania* the Court recognized that confidentiality is "important to the proper functioning of [a] peer review process" in any institution, yet it held that rooting out violations of federal law outweighed any interest in maintaining confidentiality of the peer-review process, and that "if there is a 'smoking gun' to be found . . . it is likely to be tucked away in peer review files." *Id.* at 193. The Seventh Circuit has said the same thing. In *Memorial*

16

*Hospital for McHenry County v. Shadur*, 664 F.2d 1058 (7th Cir. 1981), decided before *University of Pennsylvania*, the Seventh Circuit had expressly declined to recognize any state-law peer-review privilege in a federal-question case.  Anticipating the Supreme Court, *Memorial Hospital* ruled that the public interest in enforcing federal claims outweighs the interest in maintaining confidentiality of a peer-review process. *Id.* at 1063.  As the Court of Appeals later put it in *Hamdan v. Indiana University Health North Hospital, Inc.*, "[t]his court has declined to recognize a federal peer-review privilege, reasoning that the need for truth outweighs the state's interest in supplying the privilege." 880 F.3d 416, 421 (7th Cir. 2018) (collecting cases, including *Memorial Hospital*).  *Hamdan*, to say nothing of *University of Pennsylvania*, is binding on this Court.  And *Hamdan*'s holding is in line with every circuit court to have considered the issue.  *See Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278, 2017 WL 3084953, at *4 (D. Md. June 19, 2017) ("Every circuit court that has addressed the issue of a federal medical peer review privilege has flatly rejected the assertion." (collecting cases)).

Courts issuing these various decisions have afforded due consideration to the interests served by the peer review privilege, but they have held, unequivocally, that the need for discovery in Section 1983 cases involving unconstitutional denials of medical care outweighed the policy interests advanced by the states in creating these state-law privileges. *See, e.g., Dunn v. Dunn*, 163 F. Supp. 3d 1196, 1206-08 (M.D. Ala. 2016) (noting that the "importance of public scrutiny of medical and mental-health care . . . in the prison and jail contexts" overrides the peer review privilege); *Johnson v. Cook Cnty.*, No. 15-cv-741, 2015 WL 5144365, at *5 (N.D. Ill. Aug. 31, 2015) ("Congress used the power of the Fourteenth Amendment to set aside concerns over state sovereignty and authorize the federal courts to vindicate deprivations of liberty carried out under color of state law. . . .  Should the Court recognize the Illinois peer review privilege

17

here, it would come at a substantial cost to federal policy. The Court declines to extend the IMSA privilege to this federal cause of action." (quotation and brackets omitted)).  What is more, as the courts have noted, Congress has repeatedly considered whether to recognize the peer review privilege under federal law but declined to do so, strongly indicating that Congress does not intend a peer-review privilege to be recognized as a matter of federal law.  *See Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005).

The balance of interests in this case strongly favors discovery notwithstanding Wexford's peer review / IMSA privilege claim.  Mr. Reed was a prisoner.  He died under Wexford's care, and Plaintiffs have asserted that his death was the result of *de facto* unconstitutional policies pursuant to which Wexford and its employees, acting under color of law, violated the constitutional rights of people like Mr. Reed.  Discovery of peer review documents is critical in this case, which not only concerns claims related to Mr. Reed individually, but also a *Monell* claim charging that Wexford was on notice that its employees broadly provided inadequate medical care, but was indifferent to that fact.  Repeatedly, courts have permitted exactly the discovery Plaintiffs seek here for *Monell* discovery. *See, e.g., Bost*, 2017 WL 3084953, at *2; *Johnson*, 2015 WL 5144365, at *4-5; *McLaughlin v. Tilden*, No. 13-CV-1600, 2015 WL 888921, *2 (C.D. Ill. Feb. 27, 2015).  Binding precedent, and the consensus of federal courts, flatly rejects Wexford's assertion of a federal peer-review privilege.  This Court should do the same.

### E.  Wexford has refused to produce third-party PHI notwithstanding the Court's entry of a HIPAA-qualified protective order.

Over Wexford's objection, the Court has entered a HIPAA-qualified protective order in this case.  *See* ECF 41.  That order protects the private health information ("PHI") of third parties, in this case other people imprisoned by the IDOC who were under Wexford's care.  *Id*.

Despite the Court's entry of the HIPAA-qualified protective order, Wexford still refuses to produce of third-party PHI.  It argues that HIPAA order notwithstanding, discovery regarding the PHI of other prisoners intrudes into their privacy, and as such production of third-party PHI is not appropriate in this case.  This refusal affects Request Nos. 23, 25, 27, 29, 31, 39, 41, 46, and 47-60, all of which potentially call for Wexford to produce PHI of other prisoners.

Plaintiffs agree that these third parties have an important interest in the confidentiality of their PHI.  But that interest is protected by the HIPAA-qualified protective order that the Court has entered in this case, which forbids their identities from being revealed, and confines the use of their PHI to this case only.  Wexford has already argued that "[t]he Reeds' subpoenas request that . . . IDOC provide information that would strip the confidentiality away from [third-party] inmates."  ECF 47 at 8.  But this Court has rejected that argument out of hand, noting that "Defendants have not offered any arguments for why the Protective Order in this case, which designates all protected health information as 'Attorneys' Eyes Only,' is insufficient to protect the privacy interests of inmates who are not parties to this action."  ECF 77 at 7.  That truth holds here as well.  The HIPAA protective order entered in this case protects the privacy of other Wexford patients whose PHI is responsive to Plaintiffs' discovery.  With that order in place, discovery of third-party PHI should be permitted.

### Conclusion

For the reasons set forth above, Plaintiff respectfully requests this Court to grant his motion to compel.

Dated: November 18, 2022                         Respectfully submitted,


                                                 /s/ *Stephen H. Weil*
                                                 Stephen H. Weil

Counsel for Plaintiff

Jon Loevy
Steve Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
weil@loevy.com

## CERTIFICATE OF SERVICE

I, Stephen H. Weil, an attorney, hereby certify that on November 18, 2022, I filed the foregoing motion using the Court's CM/ECF system, which effectuated service on all counsel of record.

/s/ Stephen H. Weil

*One of Plaintiff's Attorneys*