047782/19344/TPD/RCW

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LENNISHA REED and LENN REED JR., as Co-Administrators of the Estate of LENN REED, SR., #B28789,<br><br>　　　　Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, STEPHEN RITZ, and FAIYAZ AHMED,<br><br>　　　　Defendants. | Case Number  3:20-cv-01139-SPM<br><br>Judge Stephen P. McGlynn |

## MOTION FOR PROTECTIVE ORDER OR TO BIFURCATE PLAINTIFFS' *MONELL* CLAIM

COME NOW Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and STEPHEN RITZ, D.O., by and through their attorneys, CASSIDAY SCHADE LLP, and for their Motion for Protective Order or to Bifurcate, state as follows:

### INTRODUCTION

Plaintiff filed this case on October 28, 2020.  (Doc. 1).  After several extensions of time, the current close of discovery is January 27, 2023, in three weeks.  (Doc. 78).  On November 18, 2022, Plaintiffs filed a 21-page Motion to Compel raising several *Monell* discovery disputes and seeking documents and communication spanning over a decade that could not be fully produced in six months, let alone three weeks.  (Doc. 81).

As Defendants have previously briefed, Plaintiffs are proceeding on a claim for a delay in cancer diagnosis based on facts they know to be false and without evidence in support.  Mr. Reed's treating oncologist explained there was no evidence of a delay either in Mr. Reed's case or in the 13 years he has been treating cancer patients from Lawrence Correctional Center.  In the face of

this evidence, Plaintiffs have failed to even identify an expert witness in support of their claims. The original expert deadline in this case, agreed to by the parties, was March 22, 2022, but Plaintiffs received extensions amounting to more than seven months. (Doc. 27-1). Despite these extensions, **Plaintiffs' November 4, 2022 expert disclosure deadline passed and now, more than two months later, Plaintiffs have disclosed no expert witnesses in this case.**

Conversely, in addition to identifying several treating oncologists as experts, including Dr. Saba, Defendants retained an oncologist to review the records in this case. Oncologist Dr. William Moriconi reviewed the medical records and depositions in this matter and prepared a lengthy report explaining that he does "not agree that the Defendants deviated from the standard of care in the diagnosis and treatment of Mr. Reed." (Exhibit A, Defendants' Expert Disclosures and Report of Dr. Moriconi, Report p. 11). Far from deliberate indifference, all expert testimony in this matter confirms that Defendants' care of Mr. Reed was appropriate.

Plaintiffs cannot proceed on their state law claims without a medical expert and cannot proceed on their federal claims of deliberate indifference by delaying a diagnosis or treatment without verified medical evidence of a substantial harm caused by the alleged delay. 735 ILCS 5/2-622; *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). Plaintiffs' claims are legally and factually meritless. Defendants would be prejudiced by continuing "broad" and extensive discovery on Plaintiffs' *Monell* claim when the underlying claims lack merit and are futile.

Defendants have raised these concerns previously and the Court directed Defendants to file a motion on this issue. Defendants respectfully request the Court grant Defendants a protective order from further *Monell* discovery as any further discovery would lack a good faith basis in fact and law. Alternatively, and for the same reasons, Defendants request the *Monell* claim in this case

be bifurcated and stayed until after there is a ruling on the dispositive motion for the underlying claims. Dr. Ahmed has no objection to this request.

## LEGAL STANDARD

### I. Protective Order

A party may move for a protective order and the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including forbidding the disclosure or discovery, forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters. FRCP 26(c)(1).

"The court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." FRCP 26(b)(2)(C).

Furthermore, "a party may move to terminate or limit it [a deposition] on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. The motion may be filed in the court where the action is pending or the deposition is being taken." FRCP 30(d)(3).

Federal Rule of Civil Procedure 11 prohibits litigation "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation" and requires all "claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and] the factual contentions have evidentiary support."

## II. Bifurcation

Federal Rule of Civil Procedure 42(b) provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."  The Seventh Circuit has emphasized that only one of the above criteria needs to be satisfied for a court to grant bifurcation "as long as doing so will not prejudice the non-moving party or violate the Seventh Amendment." *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007).  In considering bifurcation, the district court must be mindful that the Federal Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." *Rockett v. Renth*, 2016 U.S. Dist. LEXIS 30177, *3-5, 2016 WL 913262, quoting Fed. R. Civ. P. 1.

A court's bifurcation decision will be overturned "only upon a clear showing of abuse." *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008); *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000).

## III. *Monell* claim

In order to establish an Eighth Amendment claim for deliberate indifference under 42 U.S.C. §1983, a plaintiff must establish (1) plaintiff had an objectively serious medical need; (2) defendant had actual knowledge of the serious medical need but disregarded it; and (3) plaintiff sustained substantial harm from such disregard. *Thomas v. Walton*, 461 F.Supp 2d 786, 793-795 (S.D. Ill. 2006); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

"Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).  Thus, a difference of opinions as to how to treat a medical condition does not give rise to a deliberate indifference claim. *Garvin v. Armstrong*, 236

4

F.3d 896, 898 (7th Cir. 2001). A court should examine the totality of care the prisoner received to determine whether he received "adequate medical care," not "unqualified access to health care." *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Johnson v. Doughty, et al.*, 433 F.3d 1001, 1013 (7th Cir. 2006). Deliberate indifference "is merely a synonym for intentional or criminally reckless conduct." *Thomas*, 461 F.Supp 2d at 793. Negligence or even gross negligence does not equate deliberate indifference. *Garvin*, 236 F.3d at 898; *Johnson*, 433 F.3d at 1012-1013. "Thus, an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Thomas*, 461 F.Supp 2d at 793. Further, "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) (quotation omitted)).

Additionally, a delay in medical care without a showing of substantial harm does not establish a deliberate indifference claim. *Thomas*, 461 F.Supp 2d at 794. In order to establish a deliberate indifference claim of delayed treatment, a prisoner "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *quoting Langston,* 100 F.3d at 1240. As Plaintiff cannot make this showing, Defendants' Motion for Summary Judgment should be granted.

A private corporation cannot be held liable under §1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). A corporation cannot be liable under the theory of *respondent superior* under §1983. *Id*. To establish an unconstitutional policy or custom, Plaintiff must show (1) he was deprived of a constitutional right, and (2) the deprivation was caused by a policy, custom, or practice of Wexford. *Monell v. Dept. of Soc. Svcs*., 436 U.S. 658,

5

694 (1978).  In *Glisson*, 849 F.3d at 381, the court reiterated that even after a showing that of a lack of policy, a plaintiff still has the hurdle of proving that the lack of a policy violated plaintiff's constitutional rights.  *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 381 (7th Cir. 2017).

## ARGUMENT

### I.     The Court Should Enter a Protect Order Against Further *Monell* Discovery.

The Court should issue a protect order from further *Monell* discovery in this case as there is no good faith basis to proceed against Defendants as the evidence is wholly unsupportive of Plaintiffs' allegations.  Persisting with expansive and voluminous discovery on the *Monell* claim when Plaintiffs could not even retain an expert to support their medical opinions is the epitome of needlessly increasing the cost of litigation and prosecution of claims unwarranted by existing law and evidentiary support.

Looking at the First Amended Complaint, Plaintiffs first allege that Dr. Shah saw Mr. Reed on July 26, 2018.  (Doc. 63, p. 5).[1]  At the very first appointment, Dr. Shah requested a CT scan, suspecting cancer.  (Doc. 63, p. 5-6).  The request was approved and occurred on August 10, 2018.  *Id.*  Mr. Reed was referred to oncological care, which was approved, and Dr. Saba scheduled him to be seen on September 12, 2018.  *Id.*  Looking at these allegations, it belies reason that Dr. Shah was deliberately indifferent to Mr. Reed's care when he ordered diagnostic imaging at first presentation and specialty care thereafter.

As it relates to Dr. Ritz, the allegation is that a request was also made for a colonoscopy but Dr. Ritz deferred the decision to the oncologist Mr. Reed was already approved to see. *Id.*  The only expert testimony explains that deferral to oncological judgment is common and within the

---

[1] Plaintiffs amended the Complaint because the original Complaint falsely stated that Defendants failed to take action to provide Mr. Reed outside medical care during a time Mr. Reed was inpatient at Carle Hospital in October 2018.  (Docs. 1; 63); (Ex. A).

6

standard of care. (Ex. A, Report p. 5; 10). Of note, Dr. Saba, Mr. Reed's treating outside oncologist and non-defendant, did not order a colonoscopy at first appointment, but instead recommended a biopsy of the inguinal lymph nodes, incorrectly thinking Mr. Reed had lymphoma, and the biopsy was approved. *Id.* Unfortunately, on October 7, 2018, the biopsy revealed terminal, metastatic colon cancer. *Id.* at 7. Subsequently, Dr. Saba recommended a colonoscopy, and it was approved. *Id.* Similarly, there was no denial of Mr. Reed's chemotherapy medication but instead it was not recommended by Dr. Saba until December 19, 2018, due to complications with Mr. Reed's cancer course. *Id.* When it was recommended, it was approved, and (contrary to Plaintiffs' representations to the Court) chemotherapy treatment was initiated. *Id.* Accordingly, as it relates to the pled allegations, neither Dr. Shah nor Dr. Ritz denied or delayed Mr. Reed's cancer diagnosis but approved him for imaging at first presentation and oncological care at first request.[2]

Ultimately, Plaintiffs' allegations rest on the ***days*** it took for referrals to be approved. However, the only expert testimony in this case explains that there was no unreasonable delay. (Ex. A). There is no evidence that had Defendants acted a day or two faster Mr. Reed's prognosis would have changed, and he would have survived. Far from it, all evidence shows that there was no curative treatment for his disease. *Id.*

The Court need not only rely only on Defendants' retained expert but should also consider that Plaintiffs could not retain an expert to opine in support of their allegations. Furthermore, Mr. Reed's treating oncologist is unsupportive of Plaintiffs' allegations. Defendants deposed Mr. Reed's (non-Wexford) treating oncologist, Dr. Saba, to provide an expert education and explanation of Mr. Reed's care. Specifically, Plaintiffs' Amended Complaint rests on a note from Dr. Saba on November 14, 2018, explaining that there was a small window for chemotherapy to

---

[2] Defendants note that for the same reasons, the claim against Dr. Ahmed is futile as he saw Mr. Reed after Dr. Shah. (Ex. A).

7

get started.  However, when directedly asked about this note, Dr. Saba explained he did not use the correct wording because Mr. Reed's cancer was terminal at first presentation and all treatment was palliative only, not curative.  (Doc. 73-1, p. 65-74).  Dr. Saba testified as followed regard that note:

> p. 67
> 10· · · · ·Q.· · Okay.· And then when you saw him on
> 11· November 14th, he had been re-admitted into Richland
> 12· with some new complications, including that he was --
> 13· had no feeling in his lower extremities; is that right?
> 14· · · · ·A.· · Apparently, yes.
> 15· · · · ·Q.· · For your assessment and plan number one,
> 16· you said:· At this point, he has to get better, and I
> 17· hope his obstructive symptoms resolve.
> 18· · · · ·Did Mr. Reed's complications get better from
> 19· this point forward?
> 20· · · · ·A.· · I don't think so.
> 21· · · · ·Q.· · But if -- okay.
> 22· · · · ·And then number two, you said you're afraid his
> 23· overall prognosis is extremely poor, his chance of
> 24· survival is getting less and less.
> p. 68
> ·1· · · · ·**Now, I want to ask you what you meant by that**
> **·2· when you said his chance of survival is getting less**
> **·3· and less.· Before, you testified that his condition was**
> **·4· incurable?**
> **·5· · · · ·A.· · Yes.**
> **·6· · · · ·Q.· · Okay.· How -- how would a person with an**
> **·7· incurable disease have a survival chance?**
> ·8· · · · · · · ·MR. WEIL:· Object to form, asked and
> ·9· answered.
> **10· · · · ·A.· · Well, language wise, this is a wrong word,**
> **11· but I didn't mean his chance of survival meaning a**
> **12· chance of curing his disease.· I meant his chance of**
> **13· having any meaningful remission was less and less.**
> **15· · · · ·Q.· · Okay.· Okay.· That makes sense.· You said:**
> **16· We still have a window of opportunity to start him on**
> **17· chemotherapy, hoping to reverse the process and get his**
> **18· cancer under control, shrink some of his lymph nodes,**
> **19· and then things can get better.**
> **20· · · · ·Is that still the palliative therapy that we**
> **21· were talking about before?**
> **22· · · · ·A.· · Yes.· This is the whole goal of the**

23· palliative therapy…

(emphasis added).  Dr. Saba also testified that Mr. Reed's cancer was incurable, yet he underwent surgery and palliative radiation and chemotherapy.  Most notably, Dr. Saba testified that in the 13 years he has treated prisoners at Lawrence Correctional Center for cancer he, **"cannot say there is a pattern of delay or bureaucracy like with delayed cancer care over there."**  (Doc. 73-1, 94-97:9)(emphasis added).  Dr. Saba expressly testified that he was not waiting on any approval from Wexford (the medical team at the facility) during this time.  He further explained that Mr. Reed's molecular profile of his cancer showed that his cancer was very high risk and resistant to treatment with an extremely poor prognosis and chemotherapy could have made his condition worse.  Nonetheless, at Mr. Reed's request, he first ordered chemotherapy on December 19, 2018 to begin in two weeks, which Mr. Reed received on January 2, 2019.  (Doc. 73-1, 45-48; 54-57; 65-77; 81-86; 89-90; 136).

In light of all of the above, Plaintiffs produce no evidence that Defendants' care of Mr. Reed's colorectal cancer was inappropriate, let alone that no minimally competent provider would have acted similarly.[3]  Plaintiffs' claims against Defendants are frivolous and Plaintiffs are so aware but persist, nonetheless.  Of note, Plaintiffs don't persist on the claims against the individual Defendants as discovery is complete as it relates to those claims.  Instead, Plaintiffs persist in the dependent *Monell* claim, arguing for "broad" discovery spanning over a decade of privilege communication and documentation.  There is no justification for Plaintiffs' Motion to Compel

---

[3] In Plaintiffs' Reply to their Motion to Compel (Doc. 93), Plaintiffs publicly disclose portions of IDOC quality improvement records marked for attorney's eyes only. Furthermore, the IDOC has indicated that no such records were produced by them in this matter, so an investigation is ongoing as to the origin of the documents. In the meantime, Defendants have requested it be struck and will raise this issue separately if the parties cannot resolve it without Court intervention. However, even looking at this inadmissible quality improvement records, they do not establish anything. It is unclear who "Mary" is and she has not been identified as a witness in this case, let alone an expert witness. Nonetheless, these internal assessments do not come to conclusions about Defendants' care.

further *Monell* discovery in light of the above. Defendants seek a protective order to preclude *Monell* discovery.

## II.     Alternatively, the Court Should Bifurcate the *Monell* Claim

The trial court has discretion over whether to bifurcate and should determine if, separate trials (1) would "prevent prejudice to a party or" (2) would "serve the purpose of judicial economy, though only one of these criteria need be met." *Id.*, *citing Chlopek v. Federal Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007); *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir.1999).

As this framework indicates, the "decision to bifurcate centers on a balance of equities." *A.L. Hansen Mfg. Co. v. Bauer Prod., Inc.*, No. 03- cv-3642, 2004 WL 1125911, at *2 (N.D. Ill. May 18, 2004). As such, "courts must evaluate each motion on its own merits," *Saunders v. City of Chicago*, 146 F. Supp. 3d 957, 968 (N.D. Ill. 2015), and "balance considerations of convenience, economy, expedition, and prejudice, depending on the peculiar facts and circumstances of each case." *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008).

In *Los Angeles v. Heller*, 475 U.S. 796, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986), the Supreme Court determined that a municipality could not be held liable for constitutional violations on a *Monell* claim based on the actions of one of its police officers after the jury found that the individual officer did not inflict any constitutional harm. *Los Angeles v. Heller*, 475 U.S. at 799.

To determine whether a municipality's liability is dependent on the actions of its officers, the court should consider: (1) the nature of the constitutional violation that the plaintiff alleges; (2) the theory of municipal liability that supports the *Monell* claim; and (3) the defenses that the individual defendants have asserted. *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir.2009).

10

"It is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [the plaintiff's] constitutional rights." *Howell v. Wexford Health Sources,* 987 F.3d 647 (7th Cir. 2021)(upholding a judgment notwithstanding the verdict for the corporate defendant when the jury found in favor of the individual defendant); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (reversing judgment as to the municipal corporation after a jury found the employee officer was not liable for using excessive force and holding, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Montague v. Wexford Health Sources, Inc.*, 615 Fed. Appx. 378, 379 (7th Cir. Ill. 2015); *Thompson v. Boggs,* 33 F.3d 847, 859 n.11 (7th Cir. 1994); *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014)("Petty's *Monell* claim fails because he did not suffer a constitutional injury and so has no basis to support a *Monell* claim."); *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."); *King ex rel. King v. E. St. Louis Sch. Dist*. 189, 496 F.3d 812, 817 (7th Cir. 2007). Accordingly, District courts have found that bifurcation of a *Monell* claim from the underlying claim is warranted and proper when the municipal defendant's liability is dependent upon an individual defendant's liability. *See, e.g., Hunter v. Sood,* 2014 U.S. Dist. LEXIS 52439, *8-9, 2014 WL 1613024 (N.D. Ill. April 14, 2014).

In *Kitchen v. Burge*, the plaintiff brought claims against both police officers and the City of Chicago, and the plaintiff's *Monell* claim was based on the theories that, "(1) the facilitation of torture and coerced confessions by a police 'code of silence' which amounted to a *de facto* municipal policy and practice; and (2) 'the concealment of the pattern of torture under

11

Burge.'" *Kitchen v. Burge*, 2012 U.S. Dist. LEXIS 158088, *11.  The *Kitchen* court found that the *Monell* claim against the City could be bifurcated from the case against the officers.  The court noted that both of the theories of liability "hinge[d] on allegations that the plaintiff was, in fact, falsely arrested and imprisoned, tortured, and subjected to coercive interrogation." *Id*.  The *Kitchen* court explained if the officers in question did not wrongfully coerce a confession and then cover it up, then the claim against the City for having de facto policies to engage in such behavior was unsupported.  *See id.*  "Unlike *Thomas*, this is not a case where there is any possibility that a jury might conclude that well-intentioned municipal employees failed the plaintiff only because they were thwarted by the operation of impermissible municipal policies." *Kitchen v. Burge*, 2012 U.S. Dist. LEXIS 158088, *11.

Here, the court's reasoning in *Kitchen* is applicable.  Plaintiffs' *Monell* claim here is dependent on the claims against the individual Defendants, including a showing that Mr. Reed's prognosis would have been different but for actions of the individual Defendants.  Plaintiffs' *Monell* claim is based on the allegation that Wexford and the IDOC maintained certain "policies and practices" that caused Decedent's death, to wit:

> 67. Mr. Reed's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

(First Amended Complaint, Doc. 63, at p. 17).  Plaintiffs listed the alleged "policies and practices" that they allege caused Decedent's death as follows:

> 63. Specifically, there exist policies or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or follow up on complaints by prisoners about their health status; (2) healthcare personnel fail to review relevant medical records as part of a patient's treatment plan; (3) healthcare personnel fail to follow appropriate diagnostic procedures, favoring instead cheaper procedures even if they are demonstrably ineffective; (4) healthcare personnel fail to schedule or approve follow-up

> appointments deemed appropriate by members of the medical staff; (5) healthcare personnel fail to take action to secure appropriate continuity of care for complicated and urgent conditions like cancer within the IDOC and other healthcare providers; (6) inadequate levels of health care staffing are maintained; and (7) healthcare personnel fail to refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

(First Amended Complaint, Doc. 63, at pp. 15-16). Plaintiffs' *Monell* allegations are, essentially, that the individual treaters delayed care to Decedent, to the extent that the delay qualifies as deliberate indifference to Decedent's colon cancer. If the individual Defendants did not display deliberate indifference to the condition and/or if any alleged delay did not affect Mr. Reed's prognosis, the *Monell* claim must fail. In other words, Plaintiffs allege that Wexford has policies and practices that allow for delays. Absent a finding, however, that Mr. Reed's cancer care was unreasonably delay to the extent that it changed his prognosis and/or resulted in his death, the claim against Wexford for policies resulting in delays is futile.

Given that Plaintiffs' claim against Wexford is dependent on the claims against the individual treaters, it would preserve judicial economy to address the dispositive motions for the underlying claims as an initial matter and sever the *Monell* claim until after a ruling is made on the underlying claims. This is especially true here where there are three weeks remaining in discovery and Plaintiffs now seek extensive *Monell* discovery. As addressed in their response to Plaintiffs' Motion to Compel (Doc. 88), the breadth of Plaintiffs' *Monell* requests are so vast that it would necessitate an alteration of the current scheduling order, likely for more than a year. Before requiring Defendants and the Court to absorb the excessive delay, and Defendants to absorb the astronomical expense of the "broad" *Monell* discovery that Plaintiffs seek, the Court should sever the *Monell* claim and first determine if Plaintiffs are able to make the initial showing of an underlying violation by individual Defendants in Mr. Reed's care. Plaintiffs cannot be prejudiced by such a ruling as the dispositive deadline is forthcoming and a ruling would follow. In fact,

13

Plaintiffs are the ones seeking to delay resolution of this matter with mountainous *Monell* discovery, when discovery on the underlying claims is near completion. Furthermore, any delay to Plaintiffs by severing the *Monell* claim cannot overcome the good faith showing Defendants have presented to the Court showing that Plaintiffs' underlying claims are futile and requiring Defendants to engage in exceptionally voluminous *Monell* discovery would deny them timely resolution of this case in the least burdensome and expensive manner.

Lastly, Defendants note that a finding that Plaintiffs' claims would not survive summary judgment is not necessary to grant Defendants' Motion. Defendants' dispositive motion will be forthcoming in a matter of weeks, which will call for such a finding. At this stage, Defendants ask the Court to preclude further *Monell* discovery and postponements of this matter given the concerns listed above. Should Defendants be incorrect in their assessment, Plaintiffs could seek *Monell* discovery after a ruling on summary judgment in their favor. This would not delay the matter any further than what would be required to comply with the *Monell* discovery Plaintiffs seek in their current Motion to Compel.

## CONCLUSION

In the two years since Plaintiffs initiated this litigation, Plaintiffs have failed to produce any evidence in support of their claim that Mr. Reed's cancer care was unreasonably delayed causing a change in his prognosis. Instead, all evidence, including Mr. Reed's treating oncologist and Defendants' retained oncologist, explains that Mr. Reed had terminal cancer at first presentation, he was timely assessed and treated, but all treatment options were palliative and not curative. Plaintiffs cannot support their medical malpractice claims or their deliberate indifference claims without expert testimony and yet Plaintiffs have failed to secure an expert witness. With only three weeks remaining in discovery, the time for dispositive motions is on the horizon and

for judicial economy, fundamental fairness, and to avoid increasing the cost of frivolous litigation, the Court should either enter a protective order against further *Monell* discovery or sever the *Monell* claim, to be addressed in the unlikely event Plaintiffs' underlying claims survive summary judgment.

WHEREFORE, for the above reasons, Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and STEPHEN RITZ, D.O., respectfully request this Honorable Court grant a protective order, or alternatively, sever the *Monell* claim, and for such further relief deemed appropriate.

CASSIDAY SCHADE LLP

By: /s/ Jaclyn Kinkade
One of the Attorneys for Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and STEPHEN RITZ, D.O.

Jaclyn Kinkade
ARDC No. 6333722
CASSIDAY SCHADE LLP
100 North Broadway, Suite 1580
St. Louis, MO 63102
(314) 241-1377
(314) 241-1320 (Fax)
jkinkade@cassiday.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2023, I electronically filed the foregoing with the Clerk of the Court for the Southern District of Illinois using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

ATTORNEYS FOR DEFENDANT, FAIYAZ AHMED, M.D.:
Keith Hill
Heyl, Royster, Voelker & Allen, P.C.
105 West Vandalia, Suite 100
Edwardsville, IL 62025
Telephone 618.656.4646
Facsimile 618.656.7940
khill@heylroyster.com

ATTORNEY FOR DEFENDANT, ILLINOIS DEPARTMENT OF CORRECTIONS:
Tara Barnett
Assistant Attorney General
201 West Pointe Dr., Ste. 7
Swansea, IL 62226
(618) 236-8781
tara.barnett@ilag.gov


ATTORNEYS FOR PLAINTIFFS:
Jon I. Loevy
Stephen H. Weil
Loevy & Loevy
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
jon@loevy.com
weil@loevy.com

/s/ Jaclyn Kinkade