IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Lennisha Reed *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>Wexford Health Sources, Inc., *et al.*,<br><br>  Defendants. | Case No. 3:20-cv-01139-SPM<br><br>Judge Stephen P. McGlynn |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**MOTION FOR PROTECTIVE ORDER OR BIFURCATION**

Plaintiffs, by their undersigned counsel, hereby respond to Wexford's motion for protective order or for bifurcation. ECF 94.

Wexford argues that this Court should stay further discovery or bifurcate this case because Wexford's *Monell* liability depends entirely on a finding of individual liability for the individually-named defendants. This contention is wrong, both as matter of Plaintiff's factual allegations, the evidence gathered thus far, and the governing law. For the reasons set forth herein, Wexford's motion should be denied.

### BACKGROUND

There are multiple motions currently pending in this case, *see* ECF 81, 92, 94, 101, and the Court will be generally familiar with the facts. As relevant to the present motion, Plaintiffs allege that Lenn Reed Sr. began to complain of abdominal pain in early February 2018. ECF 63 (First Am. Compl.) ¶ 10. He returned complaining of abdominal pain on February 21, March 22, April 12, May 3, June 6, July 2, and July 16repeatedly telling medical staff he felt "pressure in his rectum" and that "something [was] blocking his rectum." *Id.* ¶¶ 11-18. Over the course of these appointments his weight, which medical staff recorded repeatedly, dropped more than 50

pounds. *Id.* Yet at each of these appointments Wexford medical staff never made serious attempts to diagnose the cause of Mr. Reed's symptoms, "assessing" him with this or that minor medical condition. *Id.*

Wexford medical staff finally referred Mr. Reed to a prison physician—defendant Dr. Shah—on July 26. *Id.* ¶ 19. From that point forward, the problem shifted to the unhurried and confused manner in which Wexford secured that care, in a mounting series of delays that cumulatively sealed Mr. Reed's fate. On July 26 Dr. Shah made a "collegial review" request for a CT scan but did not identify it as an emergency, meaning that Wexford's "collegial review" approval process added nearly a week to the actual taking of a CT scan, which did not occur until August 10. Id. ¶ 20. When the CT scan indicated a likelihood of cancer, Dr. Shah made simultaneous collegial review requests for Mr. Reed to be seen both by an oncologist, urologist, and a gastroenterologist, and for him to have a colonoscopy—an attempt at differential diagnosis, to eliminate multiple potential types of cancer, given the urgent nature or Mr. Reed's symptoms. *Id.* ¶¶ 22. In collegial review Dr. Ritz rejected this approach, insisting that only the oncologist be consulted first—and thereby creating a diagnostic bottleneck that further slowed down Mr. Reed's care. *Id*.

The effect of that delay built on the previous delays, as Mr. Reed was not seen by an outside oncologist until September 12. *Id.* ¶ 23. That oncologist, Dr. Saba, ordered a lymph node biopsy instead of a colonoscopy, but he appears to have done so without the benefit of communication from Wexford about Mr. Reed's symptoms—including that Mr. Reed repeatedly complained of feeling as though there was blockage in his rectum, or that, in the last week of August, Wexford medical staff had recorded blood in Mr. Reed's stool—both signs of colon

cancer that would call for a colonoscopy, but neither of which is noted in Dr. Saba's September 12 assessment notes with Mr. Reed.

On Mr. Reed's return visit on October 9 Dr. Saba assessed that cancer, and adenocarcinoma, was "not curable but probably treatable," *id.* ¶ 25, but would need an immediate port placement to begin palliative chemotherapy promptly.[1] The complaint recounts what happened next. Dr. Saba ordered the urgent placement of a chemotherapy port, but Wexford staff again delayed that request with a collegial review. *See* ECF 63 ¶¶ 25-26. Then, once the port was in place, Dr. Saba repeatedly attempted to call the prison in the first two weeks of November, to begin chemotherapy, but he was unable to get through to anyone at the prison. (And there is no evidence that anyone at the prison attempted to contact Dr. Saba to see what should be done next to treat Mr. Reed's cancer.) *Id.* ¶¶ 27-30.

After that delay, it became too late to save Mr. Reed. The cancer caused his medical condition to deteriorate to the point that he was unable to "tolerate any [chemo]therapy," and Dr. Saba lost the "widow of opportunity to start him on chemotherapy . . . to reverse the process and get his chemotherapy under control." *Id.* ¶¶ 30-32. By mid-December 2018 Dr. Saba assessed Mr. Reed's cancer as "terminal." *Id.* ¶ 31. Mr. Reed died a few weeks later. *Id.* ¶ 32.

---

[1] Notably, "palliative" care does not mean that a patient is terminal. At his deposition Dr. Saba was asked about this course of treatment, which he called "palliative" care. He explained that "[s]ome people may use [the term "palliative care"] . . . . incorrectly . . . . [to] mean comfort care [for terminal cancer], which is incorrect. . . . [P]alliative care usually mean[s] that we are treating disease that we cannot cure[, but t]he goal of the treatment is pretty much in general to control the disease. Patients live longer and better." Saba Dep. 7:13-22. Indeed, Dr. Saba confirmed, "when you order palliative chemotherapy, your expectation is that the chemotherapy likely will not cure the cancer, but will maybe slow it down and possibly provide a longer life span," *id.* at 13:21-14:1, such that the "patient can live with it for a decade or two or three, he may not die from [it]." *Id.* at 13:3-4. Wexford's suggestion that "palliative" care would not have prolonged Mr. Reed's life, *see* ECF 94 at 8-9, is flatly contradicted by Dr. Saba's own testimony.

Plaintiffs filed their complaint in October 2020, alleging that Mr. Reed's death was the result of widespread practices of delaying both diagnosis and treatment of cancer. *Id.* ¶¶ 61-62. To that end, Plaintiffs alleged Wexford had policies and widespread practices under which healthcare personnel fail to review relevant medical records as part of a patient's treatment plan, fail to follow appropriate diagnostic procedures, favoring cheaper procedures instead, fail to schedule or approve follow-up appointments, fail to take action to secure appropriate continuity of care for complicated and urgent conditions like cancer, and fail to arrange for prisoners to be treated in outside facilities even when doing so is medically indicated. *Id.* ¶ 63.

\* \* \*

The course of Plaintiffs' discovery prosecution is recounted in their pending motions to compel, *see* ECF 81 and ECF 92, and motion for extension of time, ECF 101. Among other things, in January 2022 Plaintiffs moved to compel the IDOC to produce a substantial number of documents relating to Plaintiffs' *Monell* theory against Wexford. ECF 44. In September the Court granted that motion, ordering the IDOC to produce responsive documents by November 11, 2022. ECF 77 at 12. Plaintiffs have since filed a follow-on motion, which remains pending, to enforce the Court's order. ECF 92. As Plaintiffs explained in their extension motion, Plaintiffs did not move for an extension of the expert disclosure date before November 4, 2022 due to an inadvertent clerical oversight, *see* ECF 101 at 6-7. In addition to moving to compel the IDOC to produce documents relating to Plaintiffs' *Monell* theory, on November 18 Plaintiffs moved to compel Wexford to produce documents responsive to their *Monell* discovery as well. ECF 81. Wexford opposed that motion to compel, *see* ECF 88, and has now filed the present motion to protect it from all discovery or, alternatively, to bifurcate discovery in this case, on grounds that Wexford's *Monell* liability is derivative of the liability of the individual defendants in this case and that the individual defendants are not liable. *See* ECF 94.

## ARGUMENT

Wexford argues that a stay of *Monell* discovery is appropriate now because Plaintiffs' the *Monell* discovery against Wexford would require months to complete and a lengthy extension of the discovery deadline in this case. ECF 92 at 13. Plaintiffs, however, were only able to file their motion to compel against Wexford after resolving numerous and changing discovery objects that Wexford asserted over the course of 2022. *See* ECF 81 at 1-3. What is more, even if the motion to compel Wexford were not at issue, the discovery period would need to be extended to permit the gathering of *Monell* evidence from the IDOC. Plaintiffs filed their motion to compel *Monell* discovery from the IDOC in January 2022. ECF 44. The Court granted that motion in September 2022, and set a date of compliance for November 11, 2022. ECF 77. Since then, the IDOC has requested multiple extensions to comply with the Court's September 2022 order, which the Court has granted. *See* ECF 95, 98. And now, Plaintiffs have filed a motion to enforce the Court's September 2022 order, which is still pending. ECF 92. An extension of the discovery deadline will be necessary to gather the IDOC evidence alone, even if no motion to compel *Monell* evidence from Wexford had ever been filed.

Wexford next argues that *Monell* discovery should be stayed because there is no substantive merit to Plaintiff's claims against any of the individual defendants. That makes *Monell* discovery pointless, Wexford argues, because Plaintiffs' *Monell* claims against Wexford depend on the viability of their claims against the individual defendants. ECF 94 at 9-11. This argument is wrong, misunderstanding the procedural posture of this case, the nature of Plaintiffs' allegations and the evidence gathered so far, and the governing law.

*First*, Wexford suggests that Plaintiffs have not submitted an expert report because their claims in the case lack substantive merit, claiming that "Plaintiffs could not even retain an expert

to support their medical opinions" regarding the care that was provided to Mr. Reed. ECF 94 at 6. Plaintiffs have explained, however, that they did not move to extend the November 4, 2022 date for expert disclosures because of an incorrect understanding of the deadlines resulting from a clerical oversight. ECF 101 at 6-7. There is no reason to think that this oversight means there is a lack of substantive merit to Plaintiffs' claims.

*Second*, Wexford argues at length that there is no merit to the claims against the individual defendants. ECF 94 at 9-13. As an initial matter, this argument ignores Plaintiffs' allegations regarding Mr. Reed's care before July 2018, when Wexford's recounting of the facts begins. No individual is sued for the failure to diagnose Mr. Reed during this period, but that individual liability is not necessary to establish *Monell* liability. *Cf. Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (rejecting as "unreasonable" a *Monell* defendant's proposed "rule that requires individual officer liability before a municipality can ever be held liable for damages under *Monell*," and noting that under *Monell*, the plaintiff could have succeeded if he had "only sued [the municipality]".)

More important, Wexford's argument misunderstands the governing law. Wexford claims that its liability under *Monell* is "dependent" on the liability of the individual defendants for deliberate indifference to Mr. Reed's medical needs. *See* ECF 94 at 13. But as the Seventh Circuit explained in *Thomas*, "[t]he actual rule" is that "a municipality can be held liable under *Monell*, **even when its officers are not**, unless such a finding would create an *inconsistent* verdict." *Thomas*, 604 F.3d at 305 (first emphasis added). *See also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc) ("[A]n organization might be liable even when its individual agents are not."). Thus a Wexford policy can cause a constitutional deprivation even if a jury finds its individual employees are not liable for the deprivation themselves. Cases like this

one, in which a jury could easily find a policy caused a constitutional deprivation without finding misconduct by a particular Wexford employee, are different in kind from cases where municipal liability is premised on a particular employee's individual misconduct—*e.g.*, a police officer's use of force—such as *Los Angeles v. Heller*, 475 U.S. 796 (1986).

In this case, *Monell* liability is plainly possible without a finding of individual responsibility. Setting aside the wholesale failure to diagnose Mr. Reed's condition between February and July 2018, which Wexford's motion does not address, in July 2018 Mr. Reed presented with an exceptionally grave and emergent condition: severe abdominal pain and rectal blockage, accompanied by 50 pounds of weight loss. Those symptoms indicated an advanced cancer, and given the progressive and deadly nature of that disease, they called for a carefully coordinated and rapid workup so that Mr. Reed could receive chemotherapy in time to save his life. Instead, Mr. Reed's care was subjected to Wexford's excruciatingly slow collegial review process and uncoordinated system of care, resulting in a series of delays that accumulated until, inexplicably, Mr. Reed had still not received chemotherapy by mid-November when his cancer became so advanced that chemotherapy became impossible. Consider:

- When Dr. Shah noted that Mr. Reed likely had cancer on July 26, he could not refer him to an outside hospital for an immediate CT scan to validate that diagnosis. Instead, Wexford policy required that he seek approval through the collegial review process, such that the CT scan confirming likely cancer did not occur until August 10.
- When the August 10 CT scan corroborated a cancer diagnosis, Dr. Shah appears to have attempted to quickly identify the source of the cancer, simultaneously requesting a gastroenterologist consult, urological consult, colonoscopy, and oncological consult. Wexford's utilization management policies, however, are designed to minimize costs, *id.* ¶ 26, and so only the oncological consultation was approved—and the approval, marked as non-urgent, resulted in Mr. Reed's first oncology consult occurring on September 12, more than seven weeks after Dr. Shah determined Mr. Reed likely had cancer.
- Wexford appears to lack a policy of substantive coordination with outside providers, meaning that when Dr. Saba first saw Mr. Reed, he did not know Mr. Reed had

- experienced blockage in his rectum and blood in his stool. Dr. Saba therefore did not identify Mr. Reed as likely having colon cancer, delaying the colonoscopy further.

- Dr. Saba then recommended that a chemotherapy port be placed on Mr. Reed, but even this obvious step had to go through Wexford's collegial review process—causing yet more delay before the port could be placed.

- After the port was placed Mr. Reed was ready to begin receiving chemotherapy, but after two weeks of trying up through November 14, Dr. Saba was unable to reach Mr. Reed's Wexford doctors in order to get the therapy started. *Id.* ¶ 30. In a case requiring careful and prompt coordination of medical care, Dr. Saba had no phone number to call to reach the primary care doctor responsible for ensuring that Mr. Reed's care ran smoothly.

- Throughout the steps described above, Mr. Reed's collegial review referral requests were marked non-urgent, each time adding \ delay in the completion of the steps necessary to start Mr. Reed's chemotherapy.

What the Seventh Circuit said in *Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014) applies in this case: "[I]t appears that Wexford structured its affairs so that no one person was responsible for [the plaintiff's] care, making it impossible for him to pin responsibility on an individual." 746 F.3d at 795. Indeed, correctional medical cases like this one reflect "a common scenario: an institution 'structured its affairs so that no one person was responsible for [the inmate's] care,' and such diffused responsibility can make it very difficult to show individual responsibility for health care failures." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Shields*, 746 F.3d at 795). *Cf. Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655 (7th Cir. 2021) ("Through a bureaucracy that diffuses individual responsibility and accountability, healthcare in a prison or jail may be delivered (or not delivered) so that it is difficult or even impossible to assign the individual responsibility for deliberately indifferent failure that offers the simplest path to § 1983 liability.");

None of this is to say that there is insufficient evidence to show that the individual defendants in this case were deliberately indifferent to Mr. Reed's urgent medical needs. Rather, it is that individual liability is does not determine the viability of Plaintiffs' *Monell* claims. The

Court of Appeals has repeatedly held that in cases of diffused responsibility—particularly in the context of medical care in correctional facilities—no individual liability need be found where an institution's policy or practice caused the injury. *See Daniel*, 833 F.3d at 734 (holding plaintiff need not "hold any one doctor responsible for his injury" if the plaintiff proves "instead that the delays and confusion that caused his injury were caused by systemic problems in the health care system for the Cook County Jail that reflect deliberate indifference to inmates' health needs as a matter of official custom, policy, or practice."); *Shields*, 746 F.3d at 799 (plaintiff may be "the victim not of any one human being's deliberate indifference but of a system of medical care that diffuse[s] responsibility for his care to the point that no single individual [is] responsible for seeing that he receive[s] the care he need[s] *in a timely way*" (emphasis added)) This is particularly so where a prisoner suffers from a "serious illnesses that required comprehensive and coordinated care." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655 (7th Cir. 2021) (noting viability of systemic claim where "no single individual" is responsible for providing the care).

## CONCLUSION

Mr. Reed's care, both before and after Wexford staff knew he had cancer, was confused was subject to numerous incremental delays that eventually proved fatal to him. Because Wexford had diffused responsibility for his care across numerous employees, nobody was responsible for his care. Wexford seeks to take advantage of that diffusion, and contends there can be no *Monell* claim against it unless the various employees among whom responsibility was divided were deliberately indifferent as well. But "[t]he law should not reward divided responsibility and deliberate ignorance by those who control prisoners' only access to health care." *Howell*, 987 F.3d at 655 (quotation and ellipses omitted). Under Seventh Circuit

precedent, Wexford's *Monell* liability does not depend on the liability of the individual defendants. The stay and bifurcation Wexford proposes would serve no purpose other than to delay resolution of this case. The Court should deny Wexford's motion.

Dated: February 4, 2023                                         Respectfully submitted,

                                                                /s/ *Stephen H. Weil*
                                                                Stephen H. Weil
                                                                Counsel for Plaintiffs

Jon Loevy
Stephen H. Weil
Maria Makar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
weil@loevy.com