UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LENNISHA REED and LENN REED JR., as Co-Administrators of the Estate of LENN REED, SR., #B28789, | |
| Plaintiff, | Case Number 3:20-cv-01139-SPM |
| v. | Judge Stephen P. McGlynn |
| WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, STEPHEN RITZ, and FAIYAZ AHMED, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and STEPHEN RITZ, D.O., by and through their attorneys, and pursuant to Federal Rule of Civil Procedure 56 and SDIL-LR 7.1(D), and hereby submit their Memorandum in Support of their Motion for Summary Judgment, stating as follows:

## INTRODUCTION

Plaintiffs filed their Complaint on October 28, 2020. (Doc. 1). Currently operative is Plaintiffs' First Amended Complaint alleging deliberate indifference against all Defendants, failure to intervene against all Defendants, wrongful death and survival action against all Defendants, and state law *respondeat superior* against Wexford, stemming from allegations that Mr. Lenn Reed's colorectal cancer was untimely diagnosed and treated resulting in his death. (Docs. 25; 63). After discovery, including the depositions of Plaintiffs' retained witnesses, it is undisputed that Mr. Reed had terminal stage 4 cancer at his first presentation of symptoms. Specifically, at the first appointment with Dr. Shah, he referred Mr. Reed for a CT scan, which revealed metastatic cancer. There is nothing Defendants could have done to change Mr. Reed's

prognosis or life expectancy as, unfortunately, there was no cure for his colon cancer. Mr. Reed was referred to an oncologist who made all treatment decisions for palliative chemotherapy, but Mr. Reed's cancer was aggressive, causing numerous complications for treatment and, sadly, causing his death within a year of his first symptom.

Cancer is a dreaded diagnosis for any patient as it can be asymptomatic until it is terminal, it can be evasive from diagnosis, and it can be aggressive in growth, despite available medical interventions. The undisputed material facts show Plaintiffs cannot set forth admissible evidence of their claims against Defendants. Setting aside the course of the disease and looking at the opportunity and actions of the Defendants, there was no loss of chance, no loss of recovery, and no loss of life. Therefore, for any one of these reasons, this Court should grant summary judgment in Defendants' favor.

## UNDISPUTED MATERIAL FACTS

1. Mr. Reed complained about constipation for the first time at the healthcare unit on February 8, 2018 at nurse sick call. He complained of gas pain at a 5 out of 10. He reported no prior similar episodes. His abdomen was soft and non-tender. He had bowel signs at all four quadrants. He was 40 years old, weighed 212 pounds, and was active, playing basketball and lifting weights. He was given Milk of Magnesia, Fiber Tabs, and Colace, and instructed to return to sick call if the symptoms persisted after three days or if they worsen in severity. (Exhibit D, Mr. Reed's IDOC Medical Records, 777-779).

2. Mr. Reed returned to the healthcare unit on February 21, 2018 for assessment for constipation at nurse sick call. He had not lost weight. Although he had a bowel movement that day, he was referred to the medical provider. (Ex. D, 781).

3.     In February 2018, Mr. Reed did not complain about constipation to Plaintiffs and Mr. Reed looked healthy.   (Exhibit B, Deposition Transcript of Lenn Reed, Jr. 28:22-29:22); (Exhibit C, Deposition Transcript of Lennisha Reed, 16:4-10).

4.     On March 1, 2018, Mr. Reed refused a medical appointment with the medical provider.  (Ex. D, 782; 809).

5.     Despite the refusal, Mr. Reed was rescheduled to see a medical provider, and on March 22, 2018, he was seen by Nurse Practitioner Sara Stover.  Mr. Reed explained that he was not really constipated but, for about a month, he would get bloated and have gas after meals.  He weighed 211 pounds.  His abdominal examination was normal.  Mr. Reed was given medication to address his complaints, and Ms. Stover ordered a follow-up in three weeks to see if the treatment was effective.  (Ex. D, 783).

6.     Ms. Stover saw Mr. Reed on three occasions from April through June of 2018.  Mr. Reed asked that Ms. Stover be his primary care provider and she obliged because she would have obliged if she had the same request in the community.  She ordered an abdominal x-ray and different medication to address his complaints of abdominal pain and new reports of urinary complaints.  The x-ray showed constipation but no other medical conditions, including that there was gas in the bowel inconsistent with a bowel obstruction.  At each appointment, she performed a physical examination, including a rectal examination.  He had external hemorrhoids and BPH (Benign prostatic hyperplasia).  (Ex. D, 9-16; 719; 784); (Exhibit G, Deposition of Sarah Stover, 38:25-41:13; 46:23-47:19; 89:4-18); (Exhibit V- Report of Dr. Slish, 3-4).

7.     Ms. Stover remembers Mr. Reed very well.  She recalls at the June 5, 2018 or July 2, 2018 appointment, she told Mr. Reed that he needed to see the Medical Doctor.  She did not believe that Mr. Reed had cancer, in part due to his age and healthy appearance, but thought a

doctor might provide more insight into what was causing his symptoms. Mr. Reed refused to see a doctor because he wanted Ms. Stover to be his primary care provider due to her attentiveness. However, on July 16, 2018, she convinced Mr. Reed that he needed to see the Medical Doctor, who had an advance degree, specifically noting his "steady decrease in weight." (Ex. D, 9-16); (Exhibit F, Deposition Transcript of Dr. Ahmed, 27:3-28:14); (Ex. G, 34:15-35:8; 54:20-55:13; 82:12-84:11; 90:22-25).

8. Although Mr. Reed had been slowly losing weight, he was 154 pounds when he was first incarcerated in 1995. At his highest, 236 pounds in May 2017, he was diagnosed by Dr. Ahmed as "Exogenous Obesity," meaning it was medically recommended that he lose weight. (Ex. D, 5-8); (Ex. G, 50:21-52:22); (Exhibit J, IDOC Intake Records, PLAINTIFFS 000002).

9. The first time Dr. Shah saw Mr. Reed, he ordered a CT scan to rule out cancer. (Ex. D, 18-21); (Exhibit E, Deposition Transcript of Dr. Shah, 36:7-39:7; 44:2-47:17).

10. Specifically, on July 26, 2018, when Dr. Shah first evaluated Mr. Reed, Dr. Shah noted that Mr. Reed had lost weight. He assessed Mr. Reed for the most common indicators of weight loss: diabetes, hyperthyroid, and HIV and ordered testing for each. Even though cancer is rare for Mr. Reed's age, Dr. Shah also assessed that Mr. Reed may have some form of cancer (Dr. Shah suspected prostate cancer because he had an enlarged prostate) and he ordered a CT chest/abdomen/pelvic (CT C/A/P). (Ex. D, 18-21); (Exhibit E, Deposition Transcript of Dr. Shah, 36:7-39:7; 44:2-47:17); (Exhibit H, Report of Dr. Moriconi).

11. Dr. Shah was a Medical Doctor working part-time at Lawrence Correctional Center in 2018 and early 2019. He was not an oncologist. (Ex. E, 148:6-12).

12. The CT scan was approved on August 3, 2018 by Dr. Ritz and Dr. Ahmed (a Locum Tenens physician contracting through Consilium Staffing Agency). This diagnostic test was

performed on August 10, 2018, when the outside facility was available. The CT report was received at Lawrence Correctional Center on August 14, 2018. (Ex. D, 18-21; 25; 178-181; 705-718); (Ex. E, 57:6-58:6; 60:20-25); (Ex. F, 106:18-107:9).

13.     The CT report was highly indicative of cancer but did not indicate the origin of the cancer. Upon later learning that the origination of the cancer was in the colon, the report showed that Mr. Reed had incurable, stage 4 metastatic cancer on August 10, 2018. (Exhibit A, Deposition of Dr. Hanna Saba, 34:24-35:10).

14.     As the CT scan showed wide-spread cancer and knowing the nature of cancer, it is undisputed that Mr. Reed likely had incurable, stage 4 metastatic cancer when he first complained of constipation in February 2018, and certainly had incurable stage 4 cancer by the time he first saw Dr. Shah in July 2018. Thus, any chemotherapy would not be curative. (Ex. F, Deposition Transcript of Dr. Ahmed, 22:17-24:18); (Ex. H); (Exhibit N, Deposition Transcript of Dr. Schmidt, 121); (Ex. V).

15.     Dr. Ahmed received the CT scan results on August 14, 2018, and, the same day, requested a colonoscopy and oncology consult. On August 16, 2018, Dr. Ahmed and Dr. Ritz approved the oncology consult and deferred to the oncologist to direct further evaluation. (Ex. D, 27; 31; 183; 189; 191, 705-718); (Ex. E, 70:2-71:12; 126:2-23); (Ex. F, 51:5-52:20); (Ex. H).

16.     Dr. Ritz wanted to ensure that the security and transportation limitations in the IDOC did not delay the oncology appointment as that was the most important appointment given there was no obvious tumor diagnosis from the imaging. (Exhibit M, Deposition Transcript of Dr. Ritz, 52-54).

17.     On August 30, 2018, Dr. Saba's office scheduled Mr. Reed to be seen on September 12, 2018.  The same day, Dr. Shah ordered that Mr. Reed's CT scan and labs be sent to the oncologist for the upcoming visit. (Ex. D, 36-37); (Ex. E, 76:19-77:18; 81:8-15).

18.     When medical procedures or specialty care appointments are requested, the specialist's office schedules the appointment based on the specialist's availability.  In this case, Mr. Reed's first appointment with Dr. Saba was scheduled by Dr. Saba's office for when Dr. Saba was available.  (Ex. A, 59-61; 94; 148-149); (Ex. E, 143:23- 144:8); (Ex. F, 109:8-110:25).

19.     Dr. Saba (medical oncologist) saw Mr. Reed on September 12, 2018.  Dr. Saba assessed that Mr. Reed had no apparent neurological deficit, was not in distress, and had a normal abdominal examination.  Before examining Mr. Reed, Dr. Saba had reviewed the CT scan report, which showed extensive lung bulking and enlarged lymph nodes.  For Dr. Saba, the CT report, combined with the physical examination findings, Mr. Reed's age, and his weight loss was indicative of lymphoma (9 out of 10 times), not colon cancer.  Dr. Saba determined the most effective way to obtain a diagnosis was to perform an inguinal node biopsy with a follow-up appointment in three weeks for the results.  (Ex. A, 26:2-28:18); (Ex. D, 198-221).

20.     Even though it was confirmed that Mr. Reed had some form of cancer, Dr. Saba found it inappropriate to order chemotherapy before having a definitive diagnosis because different forms of cancer are treated differently.  (Ex. A, 28:19-30:19).

21.     On September 17, 2018, Dr. Ahmed referred Mr. Reed urgently for the ultrasound guided biopsy, and it was approved the next day.  Additionally, the follow-up appointment with Dr. Saba was approved on September 25, 2018 and timely scheduled.  (Ex. D, 42-44; 48; 50; 222; 228-233); (Ex. F, 76:18-77:5).

22.     Unfortunately, the biopsy revealed Stage 4, incurable, metastatic adenocarcinoma consistent with GI origin, i.e. colorectal cancer (CRC), not lymphoma. (Ex. A, 33:15-35:13).

23.     There are approximately 151,000 cases of CRC diagnosed each year. About 45,000 originate in the rectum and account for roughly 9% of cancer deaths. Many CRC tumors have molecular mutations that directly affect treatment options and adversely affect response to chemotherapy, duration of response to treatment, and overall survival.  (Ex. H).

24.     On October 3, 2018, Dr. Saba informed Mr. Reed of the results of the CT scan.  Dr. Saba did not order the molecular profile that would identify any cancer mutations, at this time. Instead, he recommended a referral to a surgeon for consultation for a colonoscopy with another biopsy, this time at the origin of the cancer for a definitive diagnosis.  Dr. Saba ordered laboratory tests and iron treatment.   Dr. Saba also recommended a portacath placement, which is how chemotherapy would be administered in the future, but he did not order chemotherapy yet.   Dr. Saba recommended a follow-up appointment in a week to get the results of the laboratory tests and to monitor Mr. Reed.  Dr. Saba's report was dictated on October 6, 2018, prepared on October 9, 2018, and received by the prison on October 11, 2018.  (Ex. A, 33:15-41:14); (Ex. D, 234; 240-1); (Ex. E, 92:15-24; 150:2-151:14).

25.     Dr. Ahmed requested approval of the recommendations of Dr. Saba, and they were timely approved, and Mr. Reed was scheduled to see Dr. Rosett, a GI surgeon, on October 11, 2018.  (Ex. A, 40:10-41:21); (Ex. D, 235-238; 242).

26.     Dr. Saba saw Mr. Reed on October 10, 2018, and ordered a molecular profile to identify if his cancer had any mutations.  Dr. Saba recommended a follow-up in one week.  Dr. Saba signed off on his report on October 16, 2018  (Ex. A, 41:22-43:1); (Ex. D, 243-252; 296); (Ex. E, 151:15-18).

27.     Mr. Reed saw Dr. Rosett at Richland Memorial Hospital in Olney, Illinois on October 11, 2018, for a consultation for a colonoscopy and portacath placement, which Dr. Rosett recommended. The decision to have a separate consultation before the procedure, and the scheduling of the procedure was directed by Dr. Rosett's office.  (Ex. A, 94); (Ex. D, 273-284); (Ex. E, 152:1-11); (Ex. F, 113:20-114:7).

28.     The one week follow up with Dr. Saba was approved and scheduled for October 17, 2018.  Dr. Saba learned that the procedures with Dr. Rosett were approved and scheduled for October 22, 2018, which Dr. Saba believed was appropriate.  Dr. Saba signed his October 17, 2018 report on October 29, 2018.  (Ex. A, 42:23-43:9); (Ex. D, 254-265; 286; 290-294; 298-310); (Ex. E, 151:19-23).

29.     The colonoscopy was rescheduled as Mr. Reed refused to do colonoscopy preparation on October 21, 2018; however, Dr. Rosett was able to perform the colonoscopy on October 23, 2018, at Richland Hospital, including a diverting colostomy to avoid a bowl obstruction, and a portacath placement for IV access.  (Ex. D, 56; 312-317; 748); (Ex. E, 115:10-166:18); (Ex. F, 114:17-117:9).

30.     Mr. Reed was not at the prison from October 22, 2018 until November 3, 2018, as he was inpatient at the hospital.  Dr. Shah does not direct the patient care when a prisoner is inpatient at the hospital, but instead the hospital physicians and specialists assume the care.  (Ex. E, 155:9-19; 157:21-158:3).

31.     Mr. Reed was approved to see Dr. Saba at his office, but Dr. Saba saw Mr. Reed on October 29, 2018 at Richland Hospital because Mr. Reed had not been discharged from the hospital. Dr. Saba informed Mr. Reed several times that his overall prognosis was poor, and he was unlikely to do well with the current knowledge and available treatment at the time.  Dr. Saba

found that Mr. Reed was not a candidate for chemotherapy at this time and needed to recover from surgery to become healthy enough to start chemotherapy. Dr. Saba mentioned that once Mr. Reed was discharged and in good enough shape, he wanted to start chemotherapy, but Dr. Saba could not say that Mr. Reed would be healthy enough for palliative chemotherapy in a week's time.[1] (Ex. A, 54:13-57:18; 136:10-13); (Ex. D, 319-321); (Exhibit I, Mr. Reed's Medical Records from Dr. Saba's Office, 180-182).

32. Due to hydronephrosis (swelling of kidneys) seen on a CT scan, ureteral stents were attempted to avoid acute renal failure, but were unsuccessful, and Mr. Reed was transferred to Carle Hospital on November 1, 2018, where bilateral percutaneous nephrostomies (artificial opening created between the kidney and the skin which allows for the urinary diversion) were performed. (Ex. A, 48:19-49:3).

33. Dr. Saba does not have privileges to practice at Carle Hospital, but Carle Hospital oncologists assumed the care of Mr. Reed, including the determination not to start chemotherapy. Additionally, at least one of the medications to treat Mr. Reed's condition could not be given until two weeks after any surgery, i.e. November 15, 2018. (Ex. A, 46:10-14; 47:21-48:16); (Ex. H).

34. Dr. Saba explained that he wanted to see Mr. Reed on a Monday because that was the only day of the week that his office could provide the type of chemotherapy needed. Dr. Saba explained that "all the way until Friday," he could be put on the schedule for Monday. However, Mr. Reed was discharged back to the prison infirmary on Saturday, November 3, 2018 and was scheduled to be seen by Dr. Saba the following week; however, Mr. Reed developed a spinal cord compression at T7, and on November 13, 2018, Dr. Shah sent him to the Richland ER, where he

---

[1] Dr. Saba's October 29, 2018 note, when he saw Mr. Reed at Richland Hospital, was not sent to the IDOC and Dr. Saba's office did not schedule him to be seen on November 5, 2018. (Ex. A, 148:5-150:11); (Ex. D); (Ex. I, 180-182).

was re-admitted for a suspected bowel obstruction.  (Ex. A, 152:9-153:21); (Ex. D, 60-61; 84-87; 328-361).

35.     Although collegial review happens every week, no collegial review is required for emergent care.  Specifically, Dr. Shah sent Mr. Reed to the hospital on November 13, 2018, without a collegial consult or approval.  (Ex. E, 156:16-157:1); (Ex. F, 35:3-12).

36.     Dr. Saba saw Mr. Reed at Richland Hospital on November 14, 2018.  Dr. Saba explained again to Mr. Reed that his cancer was not curable.  Although he had palliative treatment options, these treatment options were to potentially extend his life, assuming his cancer responded to any treatment, but could not cure his disease.[2]  (Ex. A, 8:1-9:2; 58:7-12); (Ex. D, 363-377).

37.     In Dr. Saba's November 14, 2018 note, he wrote that he had been trying to contact the correctional facility to get Mr. Reed down to the clinic.  Dr. Saba explained that since Mr. Reed was in-patient at Carle Hospital and Dr. Saba did not have privileges to practice there, his staff contacted the prison to learn when Mr. Reed was discharged from Carle Hospital to schedule him to be seen in Dr. Saba's office.  Dr. Saba is the main oncologist for Lawrence County, IL and he treats "many, many inmates" and his staff has had good ways of communicating with and reaching individuals at the Lawrence Correctional Center, in part because Dr. Saba's clinical manager used to work at the prison.  (Ex. A, 59:19-61:23; 110:13-111:4); (Ex. D, 363-377).

38.     Also in Dr. Saba's November 14, 2018 note, he wrote that he hoped that the oncologists at Carle Hospital would have started chemotherapy treatment, but they did not.  Dr. Saba explained that this was not a criticism of the care at Carle Hospital because Dr. Saba did not

---

[2] Dr. Saba's note read that Mr. Reed's "chance of survival is getting less and less," but Dr. Saba explained that he used "a wrong word" and didn't mean there was a change of survival or curing the disease.  (Ex. A, 67:22-68:13; 123:8-124:12).

know if Mr. Reed was a candidate for chemotherapy at that time and it was "[j]ust wishful thinking." (Ex. A, 65:8-67:4; 135:18-136:8); (Ex. D, 363-377).

39.     Mr. Reed was not a candidate for chemotherapy on November 14, 2018, and in order for Mr. Reed to be healthy enough to start chemotherapy in the next two weeks, his complications from cancer had to resolve. Unfortunately, his complications from cancer did not get better. (Ex. A, 67:10-20; 71:22-73:13); (Ex. D, 363-377); (Ex. H).

40.     From November 14, 2018 until December 6, 2018, Mr. Reed was inpatient at Carle Hospital. The oncologists treating Mr. Reed did not initiate chemotherapy. Dr. Saba explained that Mr. Reed received palliative radiation instead to try and shrink the spinal tumor, which takes priority over the role of palliative chemotherapy. Dr. Saba characterized his desire to start chemotherapy within two weeks as "wishful thinking" due to the ongoing complications and because palliative chemotherapy is not started during palliative radiation therapy. (Ex. A, 72:7-77:3); (Ex. D, 379-448); (Ex. E, 156:16-157:17); (Ex. H).

41.     The life expectancy of a patient with an incurable form of cancer is dependent on the type of cancer the patient has, including whether it responds to current chemotherapy drugs as not all types of cancer respond to chemotherapy. If the cancer is resistant to chemotherapy, it could end up hurting the patient. (Ex. A, 12:16-13:14; 70:19-71:2; 136:16-22); (Ex. H).

42.     Shortly after the November 14, 2018 appointment, Dr. Saba received the results of the molecular profile for Mr. Reed's cancer. Mr. Reed had multiple molecular mutations, including the NRAS and BRAF mutations. The NRAS mutation has been shown to have an adverse effect on first-line chemotherapy options and overall survival. This occurs in about 2-5% of cases. When a patient with CRC has an NRAS mutation, the biologic behavior is often much more aggressive. In earlier stages of the disease (Stage I-III), there is a higher propensity for

metastasis following surgical resection. In addition, patients with metastatic disease, which was the case for Mr. Reed, have a significantly shorter overall survival and decline faster after first-line chemotherapy than with NRAS unmutated tumors. His cancer was also MSI-stable, which further limited his treatment options. (Ex. A, 58:7-16; 77:16-81:13; 83:5-84:12; 102:9-103:20); (Ex. H).

43.     During this hospitalization, Mr. Reed encountered a number of medical complications, including infection, and an antibiotic regimen was prescribed through December 17, 2018. (Ex. D, 405-407); (Ex. H).

44.     The decision of when to initiate palliative chemotherapy, if at all, requires medical judgment based on the specifics of the patient as there are risks associated with chemotherapy. Some factors to consider against initiating palliative chemotherapy are whether the patient has an active infection, as chemotherapy can act as an immunosuppressant, and if the patient is undergoing palliative radiation. Mr. Reed had both factors. (Ex. A, 14:3-18:7; 21:18-22:22); (Ex. H).

45.     Ultimately, the decision to initiate chemotherapy is an oncologist's decision and it is not expected that a primary care physician would order chemotherapy. (Ex. N, 310); (Ex. O, 254).

46.     Mr. Reed was discharged back to the prison infirmary on December 6, 2018 and was scheduled to see Dr. Saba. (Ex. D, 88; 95-98; 462).

47.     On December 19, 2018, Dr. Saba ordered chemotherapy treatment for the first time, to be started in two weeks, which was approved through Collegial Review. (Ex. A, 81:14-20; 84:13-85:4); (Ex. D, 470-480; 485).

48. On January 2, 2019, Dr. Saba initiated Avastin/FOLFOX chemotherapy. Mr. Reed was sent back to the ER on January 4, 2019. On January 9, 2019, Mr. Reed's family was able to visit him at the hospital and he passed away later that day. (Ex. A, 86:6-11); (Ex. D, 176; 487; 489-503; 508; 517-520; 600).

49. Dr. Moriconi, an active oncologist in St. Louis, MO, reviewed the records in this case and found the Defendants were not negligent and did not deliberately disregard Mr. Reed. He also found that marking the requisition form "non-urgent" as opposed to "urgent" did not contribute to Mr. Reed's death. Instead, he found that Mr. Reed had incurable cancer when he had his first symptom, and he was provided appropriate medical care. (Ex. F, 105:9-13); (Ex. H).[3]

50. Dr. Saba has provided oncological services for Lawrence Correctional Center for 13 years and has not seen a pattern of delaying cancer care from the facility. (Ex. A, 6:3-7:24; 95:4-97:9).

51. Utilization Review is standard in the industry with almost all insurance companies. (Ex. F, 38:24-39:4); (Ex. H).

52. Dr. Moriconi found that the timing of the referrals in this case was comparable to community hospital systems. (Ex. H).

53. At no time did Dr. Saba delay starting Mr. Reed on chemotherapy because of any action or inaction by Wexford staff. (Ex. A, 77:5-15; 8920-90:2; 141:14-17).

54. All of Dr. Saba's recommendations were approved. (Ex. A, 77:5-15; 8920-90:2; 141:14-17).

---

[3] Defendants note that the undisputed issue is that this is Dr. Moriconi's opinion. The dispositive issue is not whether Plaintiffs agree with it and a disagreement as to medical care does not establish any of their claims.

55. Plaintiffs have not communicated with Wexford about Mr. Reed's medical care. (Ex. B, 35:7-9); (Ex. C, 30:6-32:4).

56. Plaintiffs retained two witnesses in this case: Dr. Schmidt and Dr. Venters. While Defendants challenge their foundation under 702, neither retained witness has opined that Dr. Shah or Dr. Ritz were deliberately indifferent to Mr. Reed or that their actions deviated from the applicable standard of care. Instead, most of their opinions relate to a non-party. (Exhibit K, Report of Dr. Venters); (Exhibit L, Report of Dr. Schmidt).

57. Plaintiffs' retained witness, Dr. Venters, reviewed the medical records for 16 prisoners, including Mr. Reed. While Defendants are concurrently moving to exclude his opinions, Dr. Venters could not find a single instance where a medically necessary request was denied by Wexford or any evidence that Wexford discouraged appropriate referrals. Far from it, his review showed that medically necessary referrals were consistently approved by Wexford. (Exhibit P, Deposition Transcript of Dr. Venters, Day 2, 24-25; 40; 48; 77; 126; 139-140; 151; 164; 166; 172-173; 182-183; 189; 204; 206; 220).

## LEGAL STANDARD

A court should grant summary judgment if the pleadings, discovery documents, and affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986).

The moving party bears the burden of producing "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Carett*, 477 U.S. 317, 323 (1986).  The moving party may meet their burden by "showing…an absence of evidence to support the non-moving party's case."  *Id.* at 325.  After the moving party has satisfied their burden, the non-moving party must plead specific facts to show a genuine issue exists.  Fed.R.Civ.P. 56; *Anderson*, 477 U.S. at 250.  Disputes that would not affect the outcome of the suit will not satisfy the requirement to show a genuine issue of material fact exists.  *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996).  If the plaintiff does not show evidence exists that would reasonably allow a fact-finder to decide in the plaintiff's favor on a material issue, the court must enter summary judgment against the plaintiff.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Summary judgment is designed "to weed out unfounded claims" or causes of action based on facts never alleged in the complaint. *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 688 (7th Cir. 2008); *Murphy v. White Hen Pantry Co.,* 691 F.2d 350, 353 (7th Cir. 1982) ("The district court is not required, however, to speculate over the nature of the plaintiffs' claim or to refuse to enter summary judgment for the defendant simply because the plaintiffs may, theoretically, be entitled to recover under a cause of action based on facts never alleged in the complaint.").

## ARGUMENT

### I.      Deliberate Indifference against All Defendants

In order to establish an Eighth Amendment claim for deliberate indifference under 42 U.S.C. §1983, a plaintiff must establish (1) plaintiff had an objectively serious medical need; (2) defendant had actual knowledge of the serious medical need but disregarded it; and (3) plaintiff sustained substantial harm from such disregard.  *Thomas v. Walton*, 461 F.Supp 2d 786, 793-795 (S.D. Ill. 2006); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

First, to be sufficiently serious "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997)(quoting *Farmer v. Brennan*, 511 U.S. 825 (1994). "A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation omitted).

Second, "[d]eliberate indifference implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it." *Thomas*, 461 F.Supp 2d at 793, citing *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). The Seventh Circuit has noted that the standard for deliberate indifference is a high hurdle…because it requires a "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012)(quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)).

"Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Thus, a difference of opinions as to how to treat a medical condition does not give rise to a deliberate indifference claim. *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). A court should examine the totality of care the prisoner received to determine whether he received "adequate medical care," not "unqualified access to health care." *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Johnson v. Doughty, et al.*, 433 F.3d 1001, 1013 (7th Cir. 2006). "A prisoner's dissatisfaction with a physician's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly

inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Johnson*, 433 F.3d at 1012-1013.

Deliberate indifference "is merely a synonym for intentional or criminally reckless conduct." *Thomas*, 461 F.Supp 2d at 793. Negligence or even gross negligence does not equate deliberate indifference. *Garvin*, 236 F.3d at 898; *Johnson*, 433 F.3d at 1012-1013. "Thus, an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Thomas*, 461 F.Supp 2d at 793.

"There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway v. Delaware Cty. Sheriff,* 700 F.3d 1063, 1073 (7th Cir. 2012)(citation omitted). For that reason, a medical professional is entitled to deference in treatment decisions so long as they are based on professional judgment and unless "no minimally competent professional would have so responded under those circumstances." *McGee v. Adams,* 721 F.3d 474, 481 (7th Cir. 2013)(citing *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011)); *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) (quotation omitted)). "By definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood,* 836 F.3d 800, 804 (7th Cir. 2016).

"Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *See Rasho v. Jeffreys,* 22 F.4th 703, 710 (7th Cir. 2022) (citing *Farmer,* 511 U.S. at 844); see also *Sinn v. Lemmon,* 911 F.3d 412, 423-424 (7th Cir. 2018); *Rosario v. Brawn*, 670 F.3d at 821–22 ("[T]he officers may escape liability even if they did not take perfect action."). Similarly, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional

violation." *Rasho,* 22 F.4th at 710 (citation omitted).

Third, a mere delay in medical care without a showing of substantial harm does not establish a deliberate indifference claim. *Thomas*, 461 F.Supp 2d at 794. In order to establish a deliberate indifference claim of delayed treatment, a prisoner "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *quoting Langston,* 100 F.3d at 1240. In other words, a plaintiff must show that s/he was experiencing a serious injury requiring immediate care. *Id*. As Plaintiff cannot make this showing, Defendant's Motion for Summary Judgment should be granted.

"[M]edical expert testimony may be necessary to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care." *Whiting v. Wexford Health Sources, Inc.,* 839 F.3d 658, 662-63 (7th Cir. 2016) (affirming district court's grant of summary judgment for the defendant when "no expert testified that [defendant's] chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony."); *See Pearson v. Prison Health Serv.,* 850 F.3d 526, 536 (3d Cir. 2017).

## A.     Dr. Shah was not deliberately indifferent.

As an initial matter, Defendants do not dispute that Mr. Reed had a serious medical need when he presented to Dr. Shah for the first time on July 26, 2018. Certainly, his stage 4 metastatic cancer constituted a serious medical need. Although Dr. Shah was unaware of Mr. Reed's ultimate diagnosis, he did have concerns that Mr. Reed may have cancer, possibly prostate cancer, and based on those concerns, he ordered a CT scan at their very first appointment. The CT scan was

approved, scheduled, and performed. Based on the CT scan results, it was evident that Dr. Shah's assessment was correct, and Mr. Reed had cancer. From there, Dr. Ahmed referred Mr. Reed to an oncologist, which was approved and scheduled. Dr. Saba, an oncologist, then assessed, followed, and treated Mr. Reed for his cancer for the remainder of his life.

First, Plaintiffs' Amended Complaint complains about the timing of the August 10, 2018 CT scan, because the Amended Complaint alleges that Dr. Shah did not mark the July 26th referral as "urgent." Yet, the referral was marked "urgent." (Ex. D, 180). It was approved on August 2, 2018. Plaintiffs' claim fails as a matter of law because Dr. Shah did mark the referral form "yes" in response to whether it was urgent. While the box for "no" is also checked, Plaintiffs' retained witnesses do not find fault in the manner that Dr. Shah filled out his referral. No evidence has been put forth that the manner in which Dr. Shah filled out the referral form was improper or affected Mr. Reed's course of care, let alone that no reasonable physician would have acted similarly.

Furthermore, in her report, Dr. Schmidt misread the timing of Dr. Shah's first appointment and referral and believed that Dr. Shah submitted the referral on July 20th, instead of July 26th. Based on this misreading, Dr. Schmidt incorrectly opined that the approval took two weeks, and the CT scan took three weeks. (Ex. N, 122-123; 260)("Q. Your opinion about the timing of this, was based on your understanding that Dr. Shah recommended the CT on July 20th, 2018, instead of July 26th, 2018? A. I think that's correct."). Dr. Schmidt's report contains no other criticisms of Dr. Shah. (Ex. L). As Dr. Schmidt was simply mistaken as to the dates, there is no genuine issue of fact and the claim against Dr. Shah fails as a matter of law.

Nonetheless, Plaintiffs' claim of a delay in approving and/or scheduling the CT scan rests on the assumption that there was an earlier available appointment for a CT scan for Mr. Reed.

However, no research or investigation was conducted to determine if this assumption was plausible, let alone probable. (Exhibit O, Deposition Transcript of Dr. Venters, 246-248).[4] This is especially true as Mr. Reed was a prisoner, and, as all retained experts agree, additional security measures must be put in place to schedule a prisoner for an appointment in a hospital or doctor's office in the community. No evidence has been presented that if the referral had been approved a few days earlier Mr. Reed would have obtained a CT scan earlier.

Ultimately, no one has testified that this amount of time in obtaining the approval or the CT scan was grossly negligent or that an earlier CT scan in August 2018 was even possible. Instead, when asked, Dr. Venters explained that he did not provide any opinions that Dr. Shah (or Dr. Ahmed) deviated from the standard of care in this case. (Ex. O, 123-125). As deliberate indifference requires something more than negligence, Plaintiffs' failure to produce evidence of negligence undermines their deliberate indifference claim.

Second, the Amended Complaint complains about the referral for an oncologist, but the initial referral for an oncologist was submitted by Dr. Ahmed, not Dr. Shah, and it was approved within two days. Dr. Saba also testified that the scheduling is based on his office's availability, not some action by Dr. Shah. Additionally, Dr. Shah is not involved in the scheduling of outside appointments. Nonetheless, as discussed below, Dr. Saba also testified that there was no delay in Mr. Reed's case by the medical staff at the prison. In fact, even Plaintiffs' retained witness, Dr. Schmidt, could not testify that the timing in scheduling Mr. Reed to see Dr. Saba breached the standard of care. (Ex. N, 360-361)("No, I don't think it breached the standard of care.").

Nonetheless, assuming *arguendo* that the referral for the CT scan was approved a couple days earlier or the referral to the oncologist was approved one day earlier, there is no evidence that

---

[4] The amount of time from the referral to the approval was one week and the amount of time from the approval to the imaging was one week.

any purported delay falls outside what is reasonably expected from physicians or that it caused Mr. Reed lasting harm. Far from it. Looking at Mr. Reed's clinical course, it is clear that the amount of time it took to schedule the CT scan and oncologist appointment was reasonable. When looking at the scheduling by Dr. Saba, Dr. Rosett, and the Carle physicians, it is clear that the physicians that acted the most promptly were actually the physicians working at Lawrence Correctional Center. Additionally, Dr. Saba explained that the process of working up a patient takes time, not just for prisoners, but for all his cancer patients. Dr. Saba testified, under oath, that he saw no unreasonable delay in Mr. Reed's care. (Ex. A, 94-96).

Dispositively, Mr. Reed's cancer was undeniably terminal in July 2018. Neither Dr. Schmidt nor Dr. Venters could say that one day or a week in August or September 2018 affected Mr. Reed's life expectancy. Instead, they focus their criticism on care provided by others at different times. Only Dr. Schmidt provided an opinion for Plaintiffs on life expectancy. While Defendants have moved to bar Dr. Schmidt's opinions on life expectancy because she did not meet the standards in FRE 702, even looking at her improper opinions, Dr. Schmidt does not opine that any purported delay by Dr. Shah constituted lasting harm. Instead, she explains in her report that regardless of whether Mr. Reed was diagnosed in April or November 2018, that Dr. Schimdt assessed his median survival was April 2020. (Ex. L, 24). In other words, Mr. Reed's life expectancy was no shorter in November 2018 because of any alleged action or inaction by Dr. Shah in July, August, or September 2018 than it would have been in April 2018. Without any evidence that a purported delay caused Mr. Reed lasting harm, Plaintiffs' claim against Dr. Shah fails as a matter of law.

Lastly, to the extent Plaintiffs' Amended Complaint argues that Dr. Shah failed to provide Dr. Saba with blood test results, this is wholly unsupported by the evidence. On August 30, 2018,

Dr. Shah ordered that Mr. Reed's CT scan and labs be sent to the oncologist for the upcoming visit. (Ex. D, 36-37); (Ex. E, 76:19-77:18; 81:8-15). Dr. Saba testified that he was not waiting on anything from the prison for his decision of when, and if, he would initiate chemotherapy. Instead, at the first appointment, Dr. Saba did not suspect Mr. Reed's cancer originated in his colon based on his presentation and the CT scan report. Additionally, Dr. Saba knew and considered that Mr. Reed was anemic and had iron deficiency, which were the results of the blood tests. (Ex. D, 198). Further, colon cancer is not diagnosed via blood test and Dr. Saba did not testify that he would have done anything differently based on the results of the blood test. Plaintiffs' retained witnesses do not hold this criticism of Dr. Shah, but instead, the only criticism Dr. Schmidt provided concerning the September 12, 2018 appointment was that Dr. Saba (not Dr. Shah) did not perform a rectal examination based on the CT scan results he reviewed. (Ex. N, 359-360).

In actuality, Plaintiffs want to hold Dr. Shah responsible for the actions of other providers, specifically, Ms. Stover, Dr. Saba, and other community providers. Yet, "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a [Section] 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983); *see also Agrawal*, 06-CV-0945, 2009 U.S. Dist. LEXIS 9307, 2009 WL 309990, at *7 (granting summary judgment in favor of a defendant with no personal involvement in the alleged denial). Similarly, *Respondeat superior* is not a viable claim under deliberate indifference. *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). Plaintiffs cannot proceed on a claim against Dr. Shah for the actions or inactions of Ms. Stover, Dr. Saba, or any other provider. Specifically, while Defendants deny any wrongdoing by Ms. Stover within her scope of practice, it is undisputed that if Ms. Stover made a poor medical judgment, it cannot create a breach of Dr. Shah's duty to Mr. Reed. There is no evidence that Dr.

Shah was actually aware of Mr. Reed's condition prior to their first appointment and there is no evidence that Dr. Shah was deliberately indifferent to Mr. Reed at any time. Similarly, to the extent that Plaintiffs want to hold Dr. Shah accountable for the timing of Mr. Reed's cancer workup and treatment, these allegations are wrongly placed. It is undisputed that the decision of if and when to order chemotherapy is within the scope of practice of an oncologist, and Dr. Shah was not an oncologist. (Ex. N, 310; "Q. You agree with me that Dr. – it was appropriate for Dr. Shah to defer to Dr. Saba for when to order chemotherapy? A. Yes."); (Ex. O, 254). Instead, the decision was the responsibility of Dr. Saba and the oncologists at Carle Hospital. Dr. Saba expressly denied the allegation that he was waiting on something from the prison before he ordered chemotherapy. Instead, Mr. Reed was not an earlier candidate for chemotherapy because of the complications of his cancer.

Even from a layperson's perspective, the evidence could not support a claim of deliberate indifference against Dr. Shah. Dr. Shah addressed Mr. Reed's serious medical need at the first presentation. He did not deliberately disregard this need or persist in an ineffective course of treatment, but immediately referred Mr. Reed for the appropriate outside imaging for diagnostic purposes. Plaintiffs' retained witnesses do not take issue with Dr. Shah's actions and, even if they did, a disagreement as to the appropriate course of action does not support a deliberate indifference claim. *Pyles,* 771 F.3d at 409. Even taking the evidence in the light most favorable to Plaintiffs, there is no evidence that "no minimally competent professional" would have acted similarly. *Id*. Far from it, Dr. Moriconi and Dr. Slish explained that Dr. Shah acted appropriately and within the standard of care. When talking about Dr. Shah, Plaintiffs' retained witnesses used Dr. Shah as an example of what is expected from physicians, and they did not lodge allegations of deliberate indifference against him. (Ex. N, 374); (Ex. O, 78-79; 123-125)("Just while it is great that there

is a good doctor who does the right thing…"). Accordingly, Plaintiffs' claim against Dr. Shah fails as a matter of law and Defendants' Motion for Summary Judgment should be granted.

### B. Dr. Ritz was not deliberately indifferent.

Dr. Ritz was a member of the Wexford Utilization Management. He was not Mr. Reed's treating clinician. In conjunction with the treating professionals, Dr. Ritz reviewed certain requests for specialty care for medical necessity and clinical appropriateness. Here, Dr. Ritz, in conjunction with Dr. Ahmed approved the CT scan, oncology referral, and all subsequent recommendations by Dr. Saba. The essence of Plaintiffs' claim against Dr. Ritz is that Dr. Ahmed and Dr. Shah referred Mr. Reed for a colonoscopy, but during the collegial review on August 16, 2018, it was agreed that since the oncology referral was already approved, it would be most efficient to defer further evaluation to the oncologist to determine the origin of the cancer and further examination of Mr. Reed. The collegial comments specifically directed the provider to re-present the referral if needed after the oncology evaluation. (Ex. D, 191, 226). This decision was made to ensure that the security and transportation limitations in the IDOC did not delay the oncology appointment as that was the most important appointment given there was no obvious tumor diagnosis from the imaging. (Ex. M, 52-54). As it turns out, Dr. Saba did not first request a colonoscopy but instead requested a CT guided lymph node biopsy, which was timely approved. On the same day Dr. Saba subsequently recommended a colonoscopy, October 3rd, the individuals at the prison secured a consultation with Dr. Rosett for October 11th, which was approved and timely occurred. (Ex. D, 234; 242).

Plaintiffs' Amended Complaint flies in the face of the undisputed evidence. Dr. Ritz did not refuse Mr. Reed a colonoscopy. Instead, as he testified, he wanted to ensure Mr. Reed received timely outside care, and that the workup was directed by the specialist. Dr. Moriconi explained

that this is often the case in the community as primary care providers defer to the specialists for their recommendations and treatment plans. (Ex. H). Dr. Venters explained that he did not see a delay in specialty care for Mr. Reed. (Ex. O, 255-258). Similarly, Dr. Schmidt's report did not opine that Dr. Ritz deviated from the standard of care. (Ex. L). Like with the above, even if Plaintiffs' retained witnesses would have done it differently, a difference of opinion does not establish deliberate indifference. Further, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Rasho,* 22 F.4th at 710 (citation omitted). However, it defies logic that Dr. Ritz sending Mr. Reed, a patient with cancer, directly to the oncologist is cruel and unusual punishment.

Next, Plaintiffs' Amended Complaint falsely states that Dr. Shah submitted a non-urgent referral for an oncologist "pursuant to Dr. Ritz's instructions." There is no good faith basis for this allegation. Dr. Ahmed first referred Mr. Reed to an oncologist based on the results of the CT scan that he received the same day. There is absolutely no evidence that Dr. Ritz advised Dr. Ahmed or Dr. Shah to submit any referral without urgency. Furthermore, Dr. Ritz and Dr. Ahmed approved the referral within two days, *i.e.*, within the time frame for an urgent request. Should any physician determine that outside care is emergent, no collegial review is required, at all.

Nonetheless, any alleged delay in approving the colonoscopy did not affect Mr. Reed's outcome. Again, Mr. Reed's cancer was terminal at first symptom. The colonoscopy referral was first presented on August 16, 2018. As of September 12, 2018, Dr. Saba was the recommending specialist, and it was his decision not to recommend a colonoscopy at that time as he did not think Mr. Reed had colon cancer. As discussed above, according to Dr. Schmidt, Mr. Reed did not lose any life expectancy from April to November 2018. Mr. Reed had the colonoscopy within this window. However, Dr. Saba did not order chemotherapy and, in fact, only ordered the molecular

profile (to learn what resistances his specific cancer had) on October 10th, and did not receive the results until weeks after the colonoscopy was performed. Again, the decision to initiate chemotherapy was Dr. Saba's and he testified that he was not waiting on anything from the prison in order to make his decision.

Like with the above, Plaintiffs' claims assume that a patient with cancer receives immediate testing and treatment, but that is not the reality for any cancer patient. Just like the other cancer patients that Dr. Saba sees in the community, the process takes time to complete and there are other patients with cancer that need imaging and treatment, as well. Additionally, as Dr. Schmidt outlined in her report, a colon tumor commonly passes through stages at about a year per stage. There is simply no evidence that any alleged delay in approving a colonoscopy, in order to ensure Mr. Reed saw an oncologist without further delay, was akin to criminal negligence or shortened Mr. Reed's life.

Lastly, to the extent Plaintiffs allege the collegial review process itself is unconstitutional, the Seventh Circuit explained that this claim fails as a matter of law. *Howell v. Wexford Health Sources, Inc.*, 2021 U.S. App. LEXIS 3297, 2021 WL 405006, at *3 (7th Cir. Feb. 5, 2021). Plaintiffs' Amended Complaint alleges Wexford discourages outside referrals, yet Dr. Venters reviewed the medical records for 16 prisoners, including Mr. Reed, he could not find a single instance where a medically necessary request was denied or any evidence that Wexford discouraged appropriate referrals. Far from it, his review showed that medically necessary referrals were consistently approved by Wexford. (Ex. P, 24-25; 40; 48; 77; 126; 139-140; 151; 164; 166; 172-173; 182-183; 189; 204; 206; 220). Plaintiffs' allegations are not only unsupported, but they are also demonstrably false. Again, taking the evidence in the light most favorable to Plaintiff, there is no evidence that "no minimally competent professional" would have acted

similarly to Dr. Ritz. *Pyles,* 771 F.3d at 409. There is no evidence that Dr. Ritz deliberately disregarded Mr. Reed's (or any other patient's) cancer. Accordingly, Plaintiffs' claim against Dr. Ritz fails as a matter of law and Defendants' Motion for Summary Judgment should be granted.

## C. Wexford was not deliberately indifferent.

A private corporation such as Wexford Health Sources, Inc., cannot be held liable under §1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). A corporation cannot be liable under the theory of *respondent superior* under §1983. *Id*; *Dean v. Wexford Health Sources, Inc.,* 18 F.4th 214, 235 (7th Cir. 2021). In order to establish an unconstitutional policy or custom, Plaintiff must show (1) he was deprived of a constitutional right, and (2) the deprivation was caused by a policy, custom, or practice of Wexford. *Monell v. Dept. of Soc. Svcs*., 436 U.S. 658, 694 (1978).

To prove the second element, a plaintiff must show that his constitutional rights were violated by the corporation's own actions. *Pyles v. Fahim,* 771 F.3d 403, 409–10 (7th Cir. 2014) (citation omitted). There are at least three recognized types of corporate action that may give rise to liability under *Monell:* "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Dean,* 18 F.4th at 235. Plaintiff also must show that the corporate action was the "moving force" behind his constitutional injury. *Daniel v. Cook Cnty*., 833 F.3d 728, 734 (7th Cir. 2016) (citation omitted).

"The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 381 (7th Cir. 2017) *(en banc)*.

*Monell* claims based on a widespread practice require proof of "a series of violations." *J.K.J. v. Polk Cty.,* No. 18-1498, 2019 WL 2610999, at *9 (7th Cir. June 26, 2019) (quoting *Palmer v. Marion Cty.,* 327 F.3d 588, 596 (7th Cir. 2003)). "[P]roof of isolated acts of misconduct will not suffice." *Id.* at *9 (quoting *Palmer,* 327 F.3d at 596). Plaintiff "must show more than the deficiencies specific to his own experience," *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) (citation omitted). Plaintiff must demonstrate "there is a policy at issue rather than a random event." *Thomas v. Cook County Sheriff's Dep't.*, 604 F.3d 293, 303 (7th Cir. 2009). To establish deliberate indifference under a theory of unconstitutional staffing, "a plaintiff must show that 'there are such systematic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'" *Id.* Additionally, even if there are such deficiencies, for a *Monell* claim to prevail, Plaintiff must show that a policy-making official knows about the deficiencies and fails to correct them. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Wellman*, 715 F.2d at 272).

The Seventh Circuit has emphasized "that the word 'widespread' must be taken seriously." *Phelan v. Cook Cty.,* 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760 (7th Cir. 2016). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan,* 463 F.3d at 790. "The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

### i.     No Constitutional Violation

As an initial matter, since Plaintiffs failed to establish Mr. Reed was deprived a constitutional right, their claim against Wexford fails as a matter of law.  Particularly, when a plaintiff fails to provide evidence that the medical treatment received was inadequate, a claim against Wexford related to that treatment also fails. *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673 (7th Cir. 2023); *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013) (it is unnecessary to determine what Wexford's policy was where the plaintiff failed to establish a constitutional problem with his treatment and did not suffer actionable injury from the policy he attributed to Wexford); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *See Lee v. Armor Corr. Health Servs.*, No. 21-2702, 2022 U.S. App. LEXIS 17579, * 6, 2022 WL 2298973 (7th Cir. June 27, 2022) (noting that a plaintiff failed to establish this element of *Monell* liability because there was no constitutional injury found against the individually-named defendant medical provider); *Johnson v. Prentice,* 29 F.4th 895, 905 (7th Cir. 2022) ("the *Monell* claim against Wexford itself suffers from two deficiencies: there is no proof of an underlying constitutional violation by any individual Wexford defendant…").

Here, Dr. Shah referred Mr. Reed for a CT scan at their first appointment.  Mr. Reed was then referred and seen by the (non-Wexford) oncologist, who made all treatment decisions for Mr. Reed, independently.  Similarly, although Dr. Ahmed was not a Wexford employee, there is no evidence that his actions deviated from the standard of care or caused Mr. Reed lasting harm, but instead he referred Mr. Reed to an oncologist the same day he received the CT scan results.  All subsequent requests by Dr. Saba were timely submitted, scheduled, and performed.

To the extent Plaintiffs allege the constitutional violation was due to the actions of Ms. Stover, it is not so pled, and Plaintiffs should not be allowed to amend the complaint at summary

judgment. "It would defeat the purpose of summary judgment if Plaintiff were allowed to proceed to trial on a claim whose contours she has never clearly articulated." *M.R. v. Burlington Area Sch. Dist.,* JPS-21-1284, 2023 U.S. Dist. LEXIS 86134, 2023 WL 3510642, at *28 (E.D. Wis. May 17, 2023). The Seventh Circuit "routinely enforces this stricture against plaintiffs who wait until summary-judgment briefing to raise a new claim." *Reed v. Columbia St. Mary's Hospital,* 915 F.3d 473, 479 (7th Cir. 2019)(collecting cases).

Furthermore, the statute of limitations for actions brought pursuant to 42 U.S.C. §1983 is governed by the personal injury statute of limitations of the state where the alleged injury occurred. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). Therefore, the relevant statute of limitations for the §1983 and state law claims is two years. 735 ILCS 5/13-202; *Kalimara v. Illinois Dep't of Corrections*, 879 F.2d 276, 277 (7th Cir. 1989). As Ms. Stover referred Mr. Reed to Dr. Shah in July 2018 and no longer was assessing his complaints, a claim concerning her actions began to run in July 2018. Plaintiffs filed their Complaint on October 28, 2020 and did not name Ms. Stover as a defendant. (Doc. 1). Had Plaintiffs named Ms. Stover, the claim would have been barred by the two-year statute of limitations. So too, any claim based on the conduct of Ms. Stover should be deemed barred by the statute of limitations, especially here when no such claim has even been pled.

Nonetheless, the evidence is that Ms. Stover did recognize Mr. Reed's weight loss and was working him up for his complaints, but she did not believe he had cancer because of his age and general health. On note, Plaintiffs are unaware of a family history of cancer. All Mr. Reed's siblings, including his twin brother, are alive with no known cancer. (Ex. B, 19:1-20); (Ex. C, 19:4-6). Mr. Reed did not have abnormal labs, bloody stool, or a family history of colon cancer. He was a young man, at a healthy weight, who was having constipation and then urinary

complaints. When Ms. Stover, a nurse practitioner, believed Mr. Reed needed a broader scope of assessment, she referred him to the Medical Doctor. Ms. Stover remembers Mr. Reed vividly and continued to care for him until the end of his life. Even if Plaintiffs believe her medical judgment was in error, there is no evidence that she deliberately disregarded a known serious risk of harm in a manner that no other nurse practitioner would have. Instead, even Dr. Saba, an oncologist, explained that Mr. Reed's presentation was highly unusual for colon cancer, and he initially missed the diagnosis.

Similarly, there has been no evidence presented that any individual acted or failed to act because of a Wexford policy or practice. In other words, there is no evidence that the providers acted appropriately within their ability but could not provide Mr. Reed adequate care because Wexford restricted their ability to assess or refer Mr. Reed. Far from it, the evidence is that Wexford approved all medically necessary referrals and there is no evidence they discouraged medically necessary referrals. Because there is no underlying constitutional violation, Plaintiffs' *Monell* claim fails as a matter of law.

### ii.    Final Policymakers

While the Amended Complaint alleges in a conclusory fashion that unknown providers had final policymaking authority for Wexford, no such showing has been made and it is Plaintiffs' attempt to backslide into *respondeat superior*. The Seventh Circuit has identified a number of factors that can shed light on whether an official is a final policymaker, including (1) relevant laws, ordinances, rules and regulations, and operational practices; (2) whether the official's decision-making is constrained by policies of other officials or legislative bodies; (3) whether his decisions are subject to review by a higher official or other authority; and (4) "whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Milestone*

*v. City of Monroe, Wis.,* 665 F.3d 774, 780 (7th Cir. 2011); *Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 675 (7th Cir. 2009).

Plaintiffs have produced nothing in support of this allegation. In fact, Wexford answered Plaintiffs' interrogatory concerning final policymakers and did not identify the Defendants. (Exhibit W, Wexford's Answer to Plaintiffs' Interrogatories).[5] Dr. Shah was a part time physician at Lawrence and Dr. Ritz was part of the utilization management team. There is no evidence in support of Plaintiffs' claim that they were authority to make any policy, let alone had final policymaking authority. Lastly, as stated above, neither Dr. Shah nor Dr. Ritz violated Mr. Reed's constitutional rights and Defendants' Motion for Summary Judgment should be granted.

### iii. Express Policies

"The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005)(citing *Monell*, 436 U.S. at 658). Alternatively, the claim could allege the lack of an express policy. Either way, "the claim requires more evidence than a single incident to establish liability."

---

[5] "Defendant states that policies and procedures governing provision of medical care services at Lawrence Correctional Center are generally those issued by the Illinois Department of Corrections ("IDOC") in the form of administrative directives and institutional directives. Wexford has prepared policies and procedures manuals, but for the purpose of provision of medical care to inmates at Lawrence Correctional Center, the IDOC administrative directives and institutional directives, where applicable, supersede Wexford policies and procedures manuals. Administrative directives and institutional directives are subject to change by the IDOC and do change over time and are maintained by the IDOC. The IDOC possesses the applicable set of policies for the time of interest to Plaintiffs.

Wexford further responds by stating that it published Medical Guidelines for its practitioners in the State of Illinois that were effective in 2018, during the events stated in the Complaint. A portion of those guidelines pertained to screening for colorectal cancer and recommended using fecal occult blood testing in adults at certain ages to do such screening. Other guidelines pertained to steps a provider may take when the patient demonstrates blood in their stool, including considering a potential malignancy. Wexford written medical guidelines are expressly intended to serve as a reference tool for clinicians and do not replace sound clinical judgment nor do they strictly apply to all patients. Whether and how to apply the guidelines are decisions made by the practitioner accounting for individual circumstances. The Medical Guidelines for practitioners in the State of Illinois that were effective in 2018 were reviewed and approved by the late Dr. Thomas Lehman."

*Id*. at 381 ("This is because it is necessary to understand what the omission means. No government has, or could have, policies about virtually everything that might happen.").

### a. The *Lippert* reports must be disregarded as they are inadmissible.

Plaintiffs alleges that Wexford's Utilization Management policy was implemented to create harmful delays to prisoners, particularly those with cancer. (Doc. 63, 11-12). Plaintiffs' allegation is based on the monitor's findings in a class-action lawsuit called *Lippert v. Ghosh*. However, it is well-settled that any mention of or reference to the *Lippert* reports should be barred as they are inadmissible hearsay that can only be used to unduly prejudice Defendants. FRE 802; See *Shawn Lucas v. Dr. Fenolgia and Wexford Health Source, Inc.*, SDIL, 14-1008, (Doc. 123); See *Diaz v. Chandler,* 2016 U.S. Dist. LEXIS 35450 (N.D. Ill. Mar. 18, 2016); *Armbruster v. Illinois Department of Corrections et al.,* 3:16-cv-00544-SMY-MAB, SDIL (Doc. 230); *Thornton v. Lashbrook et al,* 3:17-cv-00761-SMY-RJD, SDIL (Doc. 235).

Plaintiffs may argue they intend to use the records as evidence of notice. There are several issues with this argument. First, when addressing this same argument, the 7th Circuit explained the notice argument "sounds like the truth of the matter." *Dean v. Wexford Health Sources, Inc*., 18 F.4th 214, 232-233 (7th Cir. 2021). Hearsay is an out of court statement offered to prove the truth of the matter asserted and it is inadmissible. FRE 801(c). Conversely, an out of court statement that is ***not*** being used for the truth of the matter asserted may not be hearsay. *Id*. The first threshold question for determining whether a statement is hearsay is whether the accuracy of the content of the statement is relevant. If the accuracy of the content is irrelevant, the statement is not hearsay but is being used for another purpose. This is an exclusion from hearsay. *Id*. For example, if a person remembers they were wearing a jacket on a particular day because they were

told it was raining, if it is immaterial whether it was raining but relevant to what the person was wearing, the statement may be non-hearsay.

Conversely, if the probative value of the statement is tied to the statement being true, it is being offered for the truth of the matter and it is inadmissible hearsay. There is no exception from hearsay for notice evidence that is also being offered for the truth of the matter asserted. FRE 803. For example, if a person remembers that it was raining on a particular day because they were told it was raining, the out of court statement that it was raining is hearsay. Even if the party wants to use the statement to *also* show that the person was on notice that it was raining, because that purpose is tied up in the truth of the statement, it is hearsay. Accordingly, the dispositive issue is whether the content of the statement is being proffered as truth. If so, it is hearsay.

Here, it is undeniable that Plaintiffs intend to use the *Lippert* reports for the truth of the matter asserted. Plaintiffs seek to include language from the *Lippert* reports to establish 1) that the *Lippert* monitors findings were true; 2) that Wexford had notice of the truthful findings; and 3) that Wexford had a constitutional duty to respond to the *Lippert* monitors findings. Caught up in Plaintiffs' argument is that the findings are true, and they are attempting to use the findings as substantive evidence to further Plaintiffs' claims and the reports must be barred.

Furthermore, in *Dean*, the Seventh Circuit considered the argument that the *Lippert* reports were relevant as to Wexford's knowledge at the time, particularly as it relates to the collegial review process. *Dean*, 18 F.4th 214 at 232-3. Again, the Seventh Circuit found that this argument sounded in inadmissible hearsay. *Id*. Furthermore, the Seventh Circuit explained that the *Lippert* reports, particularly the 2018 *Lippert* report that discusses collegial review, "did not say or even suggest that Wexford had knowledge of such issues at the time." *Id*. Furthermore, as discussed in detail in the Motion to Bar Dr. Venters, incorporated by reference as if fully stated here, it is

undisputed that the *Lippert* monitors were repeatedly incorrect about objective facts in the medical records. On several occasions the reports profess that either a denial occurred when it did not, that a specialist made a referral that they did not, that a patient did not see a specialist when s/he did and/or that a patient did not have a test when s/he did. Not only are the conclusions of the monitors hotly disputed and have not been subjected to cross-examination, but also the purported facts they outline about patient care are unreliable and they should be barred. From the information available about the *Lippert* reports, they neither speak to Wexford's knowledge, nor do they present indicia of reliability, and they should be barred.

Second, for the purposes of this motion, evidence of notice cannot constitute substantive evidence in support of Plaintiffs' claims, because it is not being offered for the truth of the matter asserted. Yet, in the Amended Complaint, Plaintiffs seek to use language in the *Lippert* report to evidence that a policy existed and that it was unconstitutional. Thus, even if the Court allows Plaintiffs to argue language from the *Lippert* reports as evidence of notice, it cannot meet Plaintiffs' burden of production that a policy actually existed, that it was unconstitutional, or that it was a moving force in Mr. Reed's care. Accordingly, Plaintiffs have a duty to produce substantive evidence that the Utilization Management policy was unconstitutional, Plaintiffs have failed to meet that burden, and summary judgment should be granted in favor of Defendants.

Third, Plaintiffs' notice argument does not pass muster as the 2018 *Lippert* report is irrelevant. FRE 402. The 2018 *Lippert* report was not finalized until October 2018, after Mr. Reed was under the care and treatment of Dr. Saba. Again, looking to mandatory precedent, the 2018 *Lippert* report could not have put Wexford on notice prior to Wexford receiving the report. *Dean,* 18 at 233 (7th Cir. 2021)("a person acting in 1972 could not have known what conclusions a historian would reach in 2002."). In *Dean*, because the plaintiff was attempting to use the 2018

*Lippert* report to argue that Wexford was aware of its findings before the report was even finalized, the Seventh Circuit found the 2018 *Lippert* report was irrelevant to plaintiff's claims and the district court abused its discretion in admitting it. *Id*. at 233. Thus, there is no evidence any Defendant was on notice of the allegations in the October 2018 Lippert report when Mr. Reed was seen by Dr. Shah in July 2018 or when Mr. Reed's collegial referrals were assessed in August 2018. Like the analysis used by the Seventh Circuit in *Dean*, the report only puts the recipient on notice if it is true and only after there was actual notice of it. *Id*.

As it relates to the 2014 *Lippert* report, the Seventh Circuit has already resolved this issue as well. First, the Seventh Circuit noted that the facility that Dean was incarcerated in was not a facility addressed in the 2014 *Lippert* report and "Dr. Shansky acknowledged that his finding of systemic delays was somewhat facility specific." *Id*. Like Dean, Mr. Reed was housed in a prison (Lawrence Correctional Center) that was not addressed in the 2014 *Lippert* report. Second, the Seventh Circuit explained that "the collegial review policy in effect when Dr. Shansky conducted his review did not have an exception for urgent or emergent cases. In that respect, it differs from the policy in effect for nearly all events relevant to this lawsuit." *Id*. Likewise, here, the policy in place at Lawrence Correctional Center in 2018 was that emergent cases did not require collegial approval. (Ex. O, 250-251; 284). Similarly, the Seventh Circuit has also already determined that Utilization Management is not in and of itself unconstitutional. *Howell v. Wexford Health Sources, Inc*., 2021 U.S. App. LEXIS 3297, 2021 WL 405006, at *3 (7th Cir. Feb. 5, 2021). Thus, like in *Dean*, whether Dr. Shansky disagreed with a policy in place in 2014 that was different that the policy in place at Lawrence is wholly irrelevant and must be excluded.

Fourth, as Wexford is not a defendant in *Lippert*, in the event this case survives summary judgment use of *Lippert* would confuse the jury and prejudice Wexford by the implication that

there were findings against Wexford in a class action. In *Dean*, the 7th Circuit explained the prejudice in admitting the *Lippert* reports for notice is "like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom." *Dean*, 18 F.4th at 234; quoting *United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring). It is quite apparent that the prejudice to Defendants is the jury would decide the case based on the allegations in *Lippert* or the care provided to non-parties instead of the claims against Defendants. The *Lippert* reports should be deemed inadmissible for any purpose.

**b. Plaintiffs failed to provide evidence of an express unconstitutional policy.**

The evidence in this case does not support Plaintiffs' claim that Utilization Management was an unconstitutional policy in 2018. Neither Dr. Schmidt nor Dr. Venters even reviewed the Wexford guidelines that were produced in this case. Accordingly, neither gave opinions about Wexford's written guidelines. (Ex. K); (Ex. L).

Instead, Dr. Venters reviewed the medical records for 16 prisoners, including Mr. Reed. While Defendants are concurrently moving to exclude his opinions, Dr. Venters could not find a single instance where a medically necessary request was denied by Wexford or any evidence that Wexford discouraged appropriate referrals. (Ex. O, 255-258; 284); (Ex. P, 24-25; 40; 48; 77; 126; 139-140; 151; 164; 166; 172-173; 182-183; 189; 204; 206; 220). Thus, Plaintiffs' assertion in the Amended Complaint that Wexford dissuaded practitioners from referring patients or that it denied medically necessary care due to cost-saving measures is roundly refuted, and the only evidence is that Wexford approves medically necessary referrals.

Particularly, in Mr. Reed's case, Dr. Shah testified that cost was not a factor in the collegial reviews he was a part of, and Ms. Stover testified, "I worked there for three-and-a-half years, and I never seen them not send somebody out because of the cost." (Ex. E, 140-141; 165); (Ex. G, 26).

Even more compelling, Dr. Saba has provided oncological services for Lawrence Correctional Center for 13 years and has not seen a pattern of delaying cancer care from the facility. (Ex. A, 6:3-7:24; 95:4-97:9). Instead, he explained that, unlike Plaintiffs' unsupported allegations, cancer workup does not take a matter of weeks, for prisoners and non-prisoners alike. Dr. Saba never waited on collegial review and his recommendations were all timely approved. In fact, the first appointment with Dr. Rosett was scheduled prior to the collegial review for the referral. Dr. Venters explained that he did not see a delay in specialty care for Mr. Reed. (Ex. O, 255-258).[6] Thus, the facts in this case undermine Plaintiffs' claim that collegial review improperly delayed specialty care.

Lastly, Plaintiffs' Amended Complaint complains that there is no policy or practice to rule out cancer as a possible symptom. To the extent Plaintiffs argue that a written policy should have existed, Plaintiffs' retained experts do not so opine in their reports. Instead, Dr. Venters explained that he did not assess whether the screening protocols for colon cancer were utilized in the IDOC met community standards and guidelines. (Ex. O, 150-152). Dr. Schimdt testified that, even currently, the screening guidelines for colon cancer in the US apply to individuals 45 years of age and older, and it is undisputed that Mr. Reed was younger than 45 years of age and had no known family history of colon cancer. (Ex. L); (Ex. N, 50; 128). Plaintiffs have produced no evidence that Mr. Reed's care was constitutionally deficient because of a lack of an express policy. Instead, as addressed below, Plaintiffs' retained experts argue that certain practitioners missed signs and symptoms of cancer that a reasonably prudent practitioner would have worked up the patient differently. When turning back to the pivot question for a *Monell* claim, "is the action about which

---

[6] Dr. Schmidt did not attempt to address Wexford policies or practices. (Ex. L).

the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor," Plaintiffs' retained experts opine towards the latter. *Glisson,* 849 F.3d at 381.

Simply put, there is no evidence of an express Wexford policy that was constitutionally deficit, let alone the moving factor in Mr. Reed's death and any such claim should be dismissed. Either because Plaintiffs failed to produce evidence of their claim or because their claim is not properly a *Monell* claim, but instead is complaints about the medical judgment of certain non-party practitioners, Plaintiffs' *Monell* claim fails and summary judgment should be granted in Wexford's favor.

### iv.  No Widespread Practices

*Monell* claims based on a widespread practice require proof of "a series of violations." *J.K.J. v. Polk Cty.,* No. 18-1498, 2019 WL 2610999, at *9 (7th Cir. June 26, 2019) (quoting *Palmer v. Marion Cty.,* 327 F.3d 588, 596 (7th Cir. 2003)). "[P]roof of isolated acts of misconduct will not suffice." *Id.* at *9 (quoting *Palmer,* 327 F.3d at 596). Plaintiffs "must show more than the deficiencies specific to his own experience." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) (citation omitted). Plaintiffs must demonstrate "there is a policy at issue rather than a random event." *Thomas v. Cook County Sheriff's Dep't.*, 604 F.3d 293, 303 (7th Cir. 2009).

Additionally, for a *Monell* claim to prevail, Plaintiffs must show that a policy-making official knew about the deficiencies and failed to correct them. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Wellman*, 715 F.2d at 272). The Seventh Circuit has emphasized "that the word 'widespread' must be taken seriously." *Phelan v. Cook Cty.,* 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760 (7th Cir. 2016). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan,* 463 F.3d at 790. "The

plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* The standard is "rigorous" because the plaintiff must show that the municipality's action, versus the underlying individual's action, was the "moving force" behind the claimed federal rights violation. *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 987 (7th Cir. 2021)(emphasis added). This "rigorous" standard exists in order to prevent "against backsliding into *respondeat superior* liability." *Id.*

### a. No evidence of widespread practices alleged in the Amended Complaint

Plaintiffs allege the following policies or widespread practices in her Amended Complaint:

(1) healthcare personnel commonly fail to respond or follow up on complaints by prisoners about their health status; (2) healthcare personnel fail to review relevant medical records as part of a patient's treatment plan; (3) healthcare personnel fail to follow appropriate diagnostic procedures, favoring instead cheaper procedures even if they are demonstrably ineffective; (4) healthcare personnel fail to schedule or approve follow-up appointments deemed appropriate by members of the medical staff; (5) healthcare personnel fail to take action to secure appropriate continuity of care for complicated and urgent conditions like cancer within the IDOC and other healthcare providers; (6) inadequate levels of health care staffing are maintained; and (7) healthcare personnel fail to refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

(Doc. 63, 16). Plaintiffs also alleged patients complaining of problems are seen by nurses, not doctors. (Doc. 63, 10). Plaintiffs' "widespread practices" essentially amount to allegations that Wexford employees are using poor judgment in their practice, in other words, *respondeat superior*, and Plaintiffs' *Monell* claim must fail. *LaPorta*, 988 F.3d at 987. Plaintiffs present no evidence that the actions of "healthcare personnel" are either widespread or motivated by a Wexford practice.

For example, there has been no evidence that Mr. Reed's diagnosis and/or treatment was delayed due to staffing issues. Similarly, there has been no evidence that Mr. Reed's diagnosis and/or treatment was delayed due to continuity of care concerns. Instead, Plaintiffs' complaint is

that Ms. Stover did not refer Mr. Reed sooner to Dr. Shah. Ms. Stover explained her rationale: 1) she did not believe that Mr. Reed had cancer because he was young and seemingly healthy with no family history and 2) Mr. Reed wanted to stay under her care. There has been no evidence that Ms. Stover made any treatment or referral decision based on a Wexford practice. Again, she testified that she never saw a patient be denied necessary care due to cost saving measures. There's been no evidence or even suggestion that a Wexford employee failed to review relevant medical records, failed to follow-up, or failed to schedule.

Next, Plaintiffs allege that Wexford encouraged misconduct, failed to adequately train or supervise its employees, or failed to adequately punish or discipline misconduct. (Doc. 63, 16). However, Plaintiffs failed to provide any evidence in support of these allegations, let alone that one or more of these alleged practices was the moving force in Mr. Reed's care. Plaintiffs' retained witnesses did not review the personnel files, peer reviews, or training records of the Defendants (or any other Wexford employee). (Ex. K); (Ex. L). Dr. Venters did not even review the deposition transcripts in this case. *Id.* Accordingly, neither provided an opinion on the supervision, training, or disciplinary practices of Wexford. Similarly, Plaintiffs' vague allegations of "healthcare personnel" fail to evidence a connection to Wexford employees. See *Hildreth v. Butler*, 960 F.3d 420 (7th Cir. 2020)(upholding the dismissal when the plaintiff did not present evidence defendant employed the nurses). While Plaintiffs assume that all healthcare personnel are under the purview of Wexford, they know that medical staff at Lawrence Correctional Center consists of non-Wexford employees, including Dr. Ahmed.

Notably, the only evidence of disciplinary practices was raised, not by Plaintiffs, but by the Defendants. In Dr. Venters' review of 15 other prisoners' medical records, several of the patients were treated by one doctor at Hill Correctional Center, who is not a party to this case.

Produced in this case was evidence that the physician was put on a corrective action plan, went through additional training, was being supervised by Regional Medical Directors, was demoted, and then was terminated.  Dr. Venters fails to review these materials but admitted that these steps would be appropriate and would reflect that Wexford did *not* endorse or acquiesce to delays in diagnosis or treatment.  (Ex. P, 63-64; 171-172; 206-208).  As it relates to the Defendants in this matter, there was no evidence presented that Dr. Shah should have been supervised, disciplined, or trained differently, which would have avoided Mr. Reed's outcome.  Instead, both Dr. Schmidt and Dr. Venters acknowledge that Dr. Shah ordered a CT scan at his first appointment with Mr. Reed, and they failed to provide any critique of his medical judgment, let alone his competency to practice medicine independently.

In sum, Plaintiffs' Amended Complaint took a shotgun approach complaining generally about the provision of medical care.  However, in order to survive summary judgment, Plaintiffs have to produce evidence of an identifiable practice that they allege was the moving force in Mr. Reed's care.  In *Williams*, the plaintiff sought to establish a claim against Wexford by essentially complaining that mental health staff acted inappropriately.  The court noted, "[t]he question then becomes what is the allegedly widespread practice or custom at issue? Plaintiff never specifically identified the exact practice or custom that allegedly caused Dontrell's injury [ ], which is 'critical' to properly analyzing whether summary judgment is appropriate. *Williams v. Ill. Dep't of Corr.,* No. 3:19-CV-739-MAB, 2023 U.S. Dist. LEXIS 17867, at *80 (S.D. Ill. Feb. 2, 2023)(citing *Levy v. Marion Cnty. Sheriff,* 940 F.3d 1002, 1011 (7th Cir. 2019)).  In granting summary judgment for defendants, the Court explained:

> At this late stage of litigation, neither the Court nor Defendants should have to speculate as to what, exactly, Plaintiff is claiming. A primary purpose of summary judgment is "to weed out unfounded claims." *Gates v. Caterpillar, Inc*., 513 F.3d 680, 688 (7th Cir. 2008). It would defeat this purpose if Plaintiff were allowed to proceed to trial on a claim whose

contours she has never clearly articulated. See *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982) ("The district court is not required, however, to speculate over the nature of the plaintiffs' claim or to refuse to enter summary judgment for the defendant simply because the plaintiffs may, theoretically, be entitled to recover under a cause of action based on facts never alleged in the complaint.").

*Id*. at *81. This case has been pending for over four years. Plaintiffs cannot articulate a widespread practice that was the moving force in Mr. Reed's care, let alone present evidence that creates a genuine issue of fact. As such, Defendants' Motion for Summary Judgment should be granted.

### b. No evidence of widespread practice in Mr. Reed's care

As discussed in more detail below, Dr. Venters prepared a report that claimed to have identified three practices in his review of records. There are numerous foundational flaws in his review and report discussed below and in Defendants' Motion to Bar Dr. Venters. However, as an initial matter, Dr. Venters' three practices (failure to identify unintentional weight loss, failure to respond to abnormal labs, and a delay in specialty care) were not alleged in the Amended Complaint. A "claim which is not raised in the complaint . . . is not properly before the court" and "defendants cannot be expected to address a claim that has not been properly raised." *Jones v. Wexford Health Sources, Inc.*, 2021 U.S. Dist. LEXIS 18569, *8, 2021 WL 323792 (quoting *Cutrera v. Bd. of Supervisors of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)). Similarly, "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment" as defendant "had not received the fair notice required by the federal pleading rules." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012)(citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)); see also *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023)(suggesting a court could use its discretion in allowing a plaintiff constructively amend the complaint at summary judgment, but refusing to do so and explaining "[i]t will rarely be appropriate to do so."). This notice includes "sufficient detail to give the

defendant fair notice of what the claim is and the ground upon which it rests." *Id;* (collecting cases and citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). These new allegations four years into the litigation after all fact discovery had been completed, should be disregarded. Defendants were denied fact discovery in response to these new allegations because Defendants were not on notice of these alleged practices in order to produce and elicit evidence to refute them.

Nonetheless, to the extent that Plaintiffs are allowed to raise new allegations of widespread practices in August 2024 by virtue of Dr. Venters' report, Plaintiffs still fail to meet their burden of production for their *Monell* claim. First, Dr. Venters admitted that he conducted no root analysis to determine the cause for the practices he purported to observe. Dr. Venters testified, "I would need to do a root cause analysis to declare what I think the causes are. But I haven't done that for this case." (Ex. O, 126-128). Similarly, Dr. Venters expressly stated that, "I don't have specific critiques of the clinical implications of delays for each specific cancer or the years of life lost." (Ex. O, 264). Dr. Venters explained that he does not have the expertise to determine whether Mr. Reed could have lived any longer if he had received chemotherapy any earlier. (Ex. O, 263). As such, assuming *arguendo* that a practice existed, Plaintiffs cannot meet their burden that any practice observed by Dr. Venters was caused by Wexford, or that it affected Mr. Reed's outcome.

Second, Dr. Venters testified that Mr. Reed did not have any abnormal laboratory results that were not appropriately acted upon. (Ex. O, 244). It is unclear why this alleged practice was discussed as it is wholly irrelevant to this case. His opinions on responses to abnormal laboratory results are unconnected to the allegations or facts in this case and could only prejudice Defendants by raising unpled purported bad acts unrelated to Mr. Reed's care.

Third, Dr. Venters' opinion concerning a delay in specialty care was that he believes the CT scan and initial oncology referral should have been marked urgently. As discussed above, the

referrals were either marked urgent or approved urgently and this criticism is unsupported. Furthermore, Dr. Venters did not review any depositions to learn how the referral process worked or how the scheduling was made. (Ex. O, 246-248). Accordingly, he did not read that Dr. Saba's office controlled his scheduling and Dr. Saba did not find a delay in diagnosis. *Id.* Similarly, Dr. Venters conducted no investigation into the availability of CT scans and has no reason to believe that there was an earlier appointment for a CT scan or oncology visit for Mr. Reed. *Id.* As such, Plaintiffs failed to show that any alleged delay in scheduling Mr. Reed was caused by a Wexford employee, let alone a Wexford practice. Instead, the testimony was that the referral form had an option to have it urgently reviewed or physicians could send a patient for emergency care without pre-approval. Thus, Wexford provided access to timely referrals. Should Plaintiffs believe that a physician filled out the form incorrectly or misjudged the urgency, which is a complaint against the practitioner, not the company.

Fourth, Plaintiffs cannot show that Mr. Reed's weight loss was not appreciated by Ms. Stover, let alone that it was due to a Wexford practice. Instead, Ms. Stover documented Mr. Reed's weight and noted weight loss but simply did not believe it was caused by cancer because of Mr. Reed's age, apparent health, and lack of history. In fact, all experts agree that metastatic colon cancer is exceedingly rare in men in their 30s. Conversely, Dr. Shah, a Wexford employee, assessed Mr. Reed's weight loss and placed a referral for a CT scan. There was no Wexford practice preventing Ms. Stover from acting, but instead Plaintiffs' complaint is with her medical judgment. Not only is one instance by one provider insufficient as a matter of law for a widespread practice, but here Dr. Shah acted appropriately by recognizing the weight loss and making the referral. Accordingly, even if the Court determines that Plaintiffs have produced evidence of the

remaining elements of a *Monell* claim, it is undisputed that the evidence does not show a widespread practice and Plaintiffs' *Monell* claim must be dismissed.

### c. Dr. Venters' review of other patients cannot evidence a widespread practice.

In this case, Plaintiffs' counsel hand-selected 25 cases, largely from the *Lippert* reports, to create a pool of patients for Dr. Venters to review. Dr. Venters lacks foundation to opine that this was a scientific or reliable methodology. The only evidence presented is that this sampling failed to meet industry standards for reliability. (Exhibit S, Precision Reports). From there, Dr. Venters was given Plaintiffs' counsel's notes about what they interpreted the medical records to say. (Exhibit T, Plaintiffs' Counsel's Notes Spreadsheet). Using Plaintiffs' counsel's notes, Dr. Venters sub-sampled only 14 cases to review because he only allotted 18 hours for the entirety of his work in this case (review of 15,000 pages of medical records, review of 1,600 pages of the *Lippert* reports, communications with counsel, and preparation of his 40-page report).

There are many foundational flaws with Dr. Venters' review of other patients' medical records in this case. Defendants contemporaneously file a *Daubert* motion to bar Dr. Venters' testimony and these arguments are incorporated herein as if fully stated. However, regardless of the Court's ruling on the Motion to Bar, Defendants are entirely to summary judgment in their favor as Dr. Venters cannot testify that he observed widespread practices.

While Dr. Venters uses the term "systemic deficiency" in his report, he explained in his deposition that a systemic deficiency is not a widespread practice. (Ex. O, 201). Instead, the best description Dr. Venters could give is that a "systemic deficiency" is not isolated. (Ex. O, 185). He did not consider the number of providers, patients, passage of time, or facilities in his review. (Ex. O, 74-75; 199). This is because it was not his goal to opine as to widespread practices. Dr. Venters admitted that the type of review he performed could not show the prevalence of any

practice as it did not meet the necessary industry standards. In fact, in order to conduct a review for prevalence of a widespread practice he would have had to do an entirely different review as the one he did here would not suffice. (Ex. O, 69-; 170-171; 206-207; 218-219). Dr. Venters expressly testified that he cannot opine that any practice he observed in his review was a widespread practice in the IDOC. (Ex. O, 227-228).

Nonetheless, in an abundance of caution, Defendants address his review of other patients' medical records. First, Dr. Venters did not find the three "systemic deficiencies" in every case. In fact, as outlined in the Motion to Bar Dr. Venters, he found one case where unintentional, significant weight loss was not acted on, one case where an abnormal lab was not acted on, and two cases where there was an alleged delay in specialty care. ***All of these instances*** involved one physician at Hill Correctional Center, who was disciplined, re-trained, and terminated. Thus, Plaintiffs have not provided 16 examples of any one widespread practice, but one example of Wexford training and supervising appropriately. Even if these instances were not connected to one practitioner, when looking at the size and scope of the IDOC, Plaintiffs' purported evidence of 1-2 other examples, hand-selected from *Lippert*, cannot constitute a widespread practice, and Dr. Venters agrees.

Nonetheless, even if Dr. Venters professed one substantially similar practice across all 16 cases, it is insufficient in this context to establish a widespread practice. In *Armbruster*, the plaintiff attempted to establish a widespread practice with 11 other prisoner grievances during nine months from the same facility purportedly grieving insufficient care of a similar condition. *Armbruster v. Shah*, No. 3:16-CV-544-SMY-MAB, 2019 U.S. Dist. LEXIS 151375, *50-60, 2019 WL 5874335 (S.D. Ill. July 23, 2019)(adopted September 5, 2019). In dismissing the *Monell* claim against Wexford, Judge Beatty explained,

Even if the Court assumes these ten other inmates did, in fact, receive inadequate medical care, Armbruster has not put forth evidence sufficient to establish it was due to a widespread practice. The Seventh Circuit has emphasized "that the word 'widespread' must be taken seriously." *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan,* 463 F.3d at 790. "The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* If Armbruster's evidence is credited, there were eleven instances of inadequate medical care over the course of nine months, including his own (January to September 2014). But there is no evidence as to how many inmates were at SWICC during the relevant time period, or how many of them sought medical care. Without those numbers to provide some context, the Court cannot infer that eleven instances of inadequate medical care constitutes a widespread practice or systemic failure.

*Id.* While *Armbruster* is helpful is seeing that a review of 11 cases over nine months is insufficient to establish a widespread practice at one facility, here, Plaintiffs and Dr. Venters did not limit their review by facility, cause of death, time frame, etc. Instead, Plaintiffs' counsel hand-selected patients from *Lippert*, at different times, treated by different individuals, with different causes of death. Plaintiffs did not tailor the review to practices at Lawrence or patients with colon cancer, but instead opened their scope statewide from 2013-2019 in a 40,000+ prisoner population. In fact, at Dr. Venters' disposal was a list of all deaths within the IDOC for approximately 20 years, including the facility, prisoner name, cause of death, and date of death. Dr. Venters not only failed to utilize it to create any methodology for his review (discussed more in the Motion to Bar), but also this spreadsheet shows that from 2013-2019 there were approximately 650 patient deaths in the IDOC. (Exhibit X, IDOC Death Spreadsheet). Dr. Venters cannot articulate why 25 patients were selected by Plaintiffs' counsel and he cannot lay the foundation for this sampling. Dr. Venters then intentionally selected 14 cases from Plaintiffs' counsel's notes to review. As 11 grievances of inadequate medical care in nine months does not constitute a widespread practice for one facility, then 16 alleged instances of different types over seven years, approximately 30 facilities,

of 40,000+ prisoners, treated by 3,462 different Wexford employees, cannot establish a widespread Wexford practice. (Exhibit Y, Declaration of Joe Ebbitt).

Plaintiffs also present no evidence any purported practice was known to Wexford policymakers. Especially given the scope of care provided in the IDOC throughout the time frame Dr. Venters reviewed, no reasonable jury could find that Dr. Venters' isolated instances were actually known to policymakers or so pervasive that the policymakers acquiesced to the practices. Again, the evidence shows that, years before Mr. Reed's care, Wexford learned of actions by one practitioner at a different facility and it addressed those issues.

In addition to these foundational issues, these cases are not substantially similar to Mr. Reed's care, and they are inadmissible. Well-settled law prohibits a plaintiff from introducing evidence of other incidents absent a clear demonstration of substantial similarity between plaintiff's claims and such claims or incidents. *See, e.g., Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1185 (7th Cir. 1993). Merely showing two cases involving complaints of inadequate medical care does not represent a clear demonstration of substantial similarity between a plaintiff's claims and other claims or incidents. *Id.* Here, the 15 other cases are dissimilar in condition, location, time, treater, and complaint. The most common connection is they were sent offsite for ER and/or specialty treatment. The second most common connection is they were the subject of litigation. The third most common connection is that the patients had (different) aggressive diseases with poor prognosis, regardless of the care provided. Dr. Venters cannot link their deaths. (Ex. O, 221). Dr. Venters also cannot say that any alleged deficiency caused one of their deaths. (Ex. O, 185-186); (Ex. P, 22). In other words, instead of providing evidence of other prisoners with Mr. Reed's condition that were treated similarly, establishing an unwritten corporate practice,

Plaintiffs pulled dissimilar examples out of the *Lippert* reports without connection to Mr. Reed's case. (Exhibit U, Report of Dr. Gage).

What Dr. Venters' review actually revealed was that Wexford consistently approved medically necessary care. Each patient was seen by one or more specialists. Dr. Venters did not find a shred of evidence that Wexford dissuaded, disallowed, or discouraged medically necessary referrals or care. Dr. Venters did not find a shred of evidence that Wexford incentivized delays or denials. Even though Plaintiffs tried to select cases where there was known criticism, the widespread practices shown in this case are that Wexford approves medically necessary care and when there are unacceptable delays by a practitioner they are addressed. Plaintiffs have failed to present evidence in support of their claim that a widespread Wexford practice existed, let alone that it was the moving force in Mr. Reed's death. Defendants' Motion for Summary Judgment should be granted.

## II.     Failure to Intervene against All Defendants

To state a failure to intervene claim under § 1983, the plaintiff must allege that a constitutional violation has been committed and the defendant had a realistic opportunity but failed to intervene to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 744 (7th Cir. 2005). In order to prevail on this claim, Plaintiffs must show that Defendants knew he was receiving constitutionally deficient medical care and had a realistic opportunity to prevent the harm from occurring but failed to do so. *Gill v. City of Milwaukee,* 850 F.3d 335, 342 (7th Cir. 2017) (citing *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994)).

Plaintiffs' claim is essentially that, assuming any Defendant was deliberately indifferent, the remaining Defendants failed to intervene. Plaintiffs' Amended Complaint fails to provide a singular instance in support of this claim. Instead, there has been no evidence that Dr. Shah was

informed of Ms. Stover's care prior to his first appointment with Mr. Reed. Additionally, the evidence disputes that Dr. Ahmed failed to act urgently when the referral for oncology was approved urgently. Nonetheless, Dr. Shah also submitted his own referrals for oncology and a colonoscopy, ensuring that they were submitted. (Ex. D, 186-187). Again, there are no allegations that Dr. Ritz was informed of Mr. Reed's care other than the collegial reviews discussed above. Thus, Plaintiffs' claim is duplicative of the deliberate indifference claim. As the undisputed material facts show that no Defendant was deliberately indifferent, for the same reasons mentioned above, Plaintiffs' claim here must also be dismissed.

### III. Wrongful Death and Survival Action against all Defendants and *Respondeat Superior* against Wexford

"To prove a claim of medical malpractice a plaintiff must show that (1) there was a standard of care by which to measure the defendants' conduct, (2) the defendant negligently breached that standard of care, and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *Cummings v. Jha*, 394 Ill. App.3d 439, 451 (5th Dist. 2009)(quoting *Alm v. Loyola University Medical Center*, 373 Ill.App. 3d 1, 6, 866 N.E.2d 1243, 310 Ill. Dec. 641 (2007). Proximate cause defined as "a cause that, in the natural or ordinary course of events, produced the plaintiff's injury." Illinois Pattern Jury Instruction, Civil, No. 15.

In Illinois, "[t]he general rule is that expert testimony is required to establish" the standard of care, breach, and causation. *Donald v. Wexford Health Sources, Inc.,* 982 F.3d 451, 461 (7th Cir. 2020)(citation omitted). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601, 855 N.E.2d 261, 305 Ill. Dec. 370 (2006); *Miranda v. Cnty. of Lake,* 900 F.3d 335, 348 (7th Cir. 2018) (quoting *Morisch v. United States,* 653 F.3d 522, 531 (7th Cir. 2011)); see also *Johnson v.*

*Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 846, 931 N.E.2d 835, 341 Ill. Dec. 938 (2010)

("The mere possibility of a causal connection is not sufficient to sustain the burden of proof of

proximate causation.").

Additionally, a plaintiff must produce an affidavit in accordance with 735 ILCS 5/2-622.

This affidavit must include that the plaintiff has consulted and reviewed the facts of the case with

a health professional who the affiant reasonably believes the health professional:

> (i) is knowledgeable in the relevant issues involved in the particular action; (ii) practices
> or has practiced within the last 6 years… in the same area of health care or medicine that
> is at issue in the particular action; and (iii) is qualified by experience or demonstrated
> competence in the subject of the case; that the reviewing health professional has determined
> in a written report, after a review of the medical record and other relevant material involved
> in the particular action that there is a reasonable and meritorious cause for the filing of such
> action; and that the affiant has concluded on the basis of the reviewing health professional's
> review and consultation that there is a reasonable and meritorious cause for filing of such
> action… A copy of the written report, clearly identifying the plaintiff and the reasons for
> the reviewing health professional's determination that a reasonable and meritorious cause
> for the filing of the action exists, must be attached to the affidavit, but information which
> would identify the reviewing health professional may be deleted from the copy so attached.
> 735 ILCS 5/2-622.

"In the event that multiple defendants are named in a single medical malpractice action,

the statute requires that a separate report shall be filed as to each defendant." *Cammon v. West*

*Suburban Hospital Medical Center*, 301 Ill. App. 3d 939, 948, 704 N.E.2d 731, 738, 235 Ill. Dec.

158 (1998), citing 735 ILCS 5/2-622(b). "A single report, however, may suffice as to multiple

defendants if the report is sufficiently broad, adequately discussing the deficiencies in the medical

care rendered by each defendant and containing reasons in support of the conclusion that a

reasonable and meritorious cause exists for filing an action against each defendant." *Id.* citing

*Comfort v. Wheaton Family Practice*, 229 Ill. App. 3d 828, 832, 594 N.E.2d 381, 171 Ill. Dec. 529

(1992)(additional citations omitted). "No report need be filed as to any defendant whose claimed

liability is wholly vicarious provided that a report in compliance with section 2-622 has been filed

as to the individuals whose conduct forms the basis of the vicarious liability." *Id*; citing *Comfort*, 229 Ill. App. 3d at 833-34.

### A.      Failure to Comply with 735 ILCS 5/2-622

Plaintiffs have failed to comply with 735 ILCS 5/2-622 and their state law claims must be dismissed. Plaintiffs provided no affidavit setting forth the statutory requirements. Defendants anticipate Plaintiffs will argue that the reports of Dr. Venters and/or Dr. Schmidt should suffice to meet 735 ILCS 5/2-622. However, the reports of Dr. Venters and/or Dr. Schmidt do not meet the requirements of 735 ILCS 5/2-622.

First, neither Dr. Schmidt nor Dr. Venters has practiced in the field in the last six years. Dr. Schmidt has not treated patients in over 10 years. In fact, she has not treated a patient with cancer since March 2011. She has not been a primary care physician for a patient since April 2010. (Ex. N, 32-35; 137-138). Instead, in the last decade, she has only provided consultations and second opinions and does not provide primary management. Meaning, Dr. Schmidt will review the medical records of care provided by other medical professionals and give her opinions on what should have been or should be done, but she does not treat any of the patients she consults with. Dr. Schmidt does not meet the requirement for 735 ILCS 5/2-622. Similarly, Dr. Venters has not treated a patient since 2017. (Ex. O, 258). Notably, in 2008, his role as a Medical Director only required him to treat patients 50% of the time, and by August 2015, he would only see very specific cases as he treated patients 10% of his time or less. (Ex. O, 164-165). As Dr. Venters obtained his M.D. in December 2003, his primary role as a treating clinician was during the five years of his residency and fellowship. (Ex. O, 169-170). In fact, the bulk of Dr. Venters' career has not involved treating patients but involved administrative duties. Dr. Venters has not treated a patient in seven years and has not actively been a treating physician in nearly a decade. As

neither Dr. Schmidt nor Dr. Venters have treated a patient or taught in the last six years, neither are qualified under 735 ILCS 5/2-622.  Accordingly, Plaintiffs' state law claims fail as a matter of law.

Second, Dr. Schmidt and Dr. Venters are not knowledgeable on the matters in this case.  As discussed more in-depth in the Motions to Bar them, both incorporated by reference, Dr. Venters is not an expert in causation, in the scope of practice of a nurse practitioner in Illinois, or in the medical practices or standards in the community.  Instead, because he was a Medical Director at a jail for a few years, he only holds himself out as a correctional medicine expert.  In this case, which involves the standard of care and care provided in carceral, clinic, and hospital settings, Dr. Venters is not a knowledgeable expert.  Similarly, as this is a wrongful death case, and Dr. Venters is not an expert in causation and attests that he cannot give an opinion on life expectancy or lifespan, he is not a knowledgeable expert on whether Plaintiffs' case is meritorious.

Similarly, either from a lack of practice or more nefarious reasons, Dr. Schmidt's deposition revealed that she is not a knowledgeable witness.  Dr. Schmidt could not answer a basic question like, "First, you'd agree with me that 43 is less than 47?" Dr. Schmidt did not know.  When pressed, "So 43 is the same as 47?" Dr. Schimdt did not know.  When asked whether both numbers are less than 50, Dr. Schmidt did not know.  (Ex. N, 156-162).

Then, Dr. Schmidt brought an article to her deposition that she relied on for her opinions, yet Dr. Schmidt could not read it.  The results of the article stated, "[f]ollowing progression of first-line chemotherapy, BRAF-mutant patients had a post-progression survival of 4.2 months."  Dr. Schmidt knows this means, "they survived 4.2 months after progression on chemotherapy."  (Ex. N, 74-80).  Dr. Schmidt also knows that the study found that the "**overall survival** in patients when they looked at all the patients with BRAF mutants… **[was] 10.9 months**."  *Id.* at 75.  Mr.

Reed's overall survival after his first symptom was approximately 11 months. Yet, Dr. Schmidt repeatedly misread one table in the study to argue that Mr. Reed **would have** lived 24 months based on his performance status.

As discussed in more depth in the Motion to Bar Dr. Schmidt, in the article she relies on, Table 3 shows that the largest group of patients with a BRAF mutation had a poor progression-free survival and a poor post-progression survival (36.5%). In other words, these patients' cancer progressed on chemotherapy within 6 months, and they survived only 2.3-7 months after the cancer progressed on chemotherapy. Table 3 says nothing about performance status. Dr. Schmidt mistakenly read PFS to mean performance status, even though the introduction stated, "progression-free survival (PFS)." Because Dr. Schmidt conflated progression-free survival with performance status, she incorrectly opined that Table 3 shows that patients with a good performance status would like 24 months. Table 3 actually says that only 24.3% of patients with the BRAF mutation had a median survival of 20.6-31.7 months.

Either Dr. Schmidt does not understand the terminology, or she is being intentionally misleading. Either way, the article's conclusion was that BRAF mutant cancer "confers a markedly worse prognosis independent of associated clinicopathological features," and "[p]ost-progression survival is markedly worse." (Ex. Q). Yet, Dr. Schmidt repeatedly testified that Table 3 meant Mr. Reed **would have** lived 24 months based only on his performance status, which it objectively does not. Dr. Schmidt is not knowledgeable enough in the field to understand the terms that were used in the publications she relied on.

Not only that, but only 24.3% of the patients with the BRAF mutation had a median survival of 24 months. When confronted with the fact that this was a minority of the patients with the BRAF mutation and not the likely outcome, she claimed she could no longer read Table 3.

Q: What's the percentage for PFS and poor P-PS?
A: 25.9. Good point.
Q: So he's more likely to have – Even if he has good performance status, he's more likely to have a poor post-progression survival, correct?
A: No. I don't know if those are statistically significant or not.
Q: So the data that you've supplied to us, you don't know it's statistically significant, but you provided it?
A: I don't know if 25.9 is different than 24.3, is all I'm saying. It's 46 patients…
Q: And according to this table, it is – they saw a higher percentage of patients that had good performance status but poor post-progression survival than they did of patients with a good performance status and good post-progression survival, correct?
A: I don't know if those are statistically different, is what I've said.
Q: My question is not what you think is statistically significant. I'm saying, what this table is telling us.
A: I'm not able to answer you any other way.
Q: You can't read this table in that way?
A: Correct.

(Ex. N, 185-190). Again, the highest percentage of patients with the BRAF mutation had a median survival of 2.3-7 months. Dr. Schmidt knew, or should have known, that the study did not support an opinion that a patient with a BRAF mutation **would** live 24 months. While the subject matter is a complicated subject, it should not be for a knowledgeable oncologist. Dr. Schmidt disregarded the results of the study she relied on and misrepresented other portions of the study to say Mr. Reed *would have* lived longer, when she knew or should have known that the study did not support her opinion. For these and other reasons outlined in Defendants' Motion to Bar Dr. Schmidt, Plaintiffs cannot lay the foundation that Dr. Schmidt is knowledgeable or helpful to the jury.

Furthermore, Mr. Reed had an NRAS mutation, which Dr. Schmidt completely ignored, even though it is associated with a worse prognosis. None of Dr. Schmidt's research considered the fact that Mr. Reed's cancer had an NRAS mutation, and she has never treated a patient with Mr. Reed's specific mutations. (Ex. N, 10; 11-12; 41; 94-95; 99-102; 147; 153; 176-7; 315). Even though Dr. Saba, Mr. Reed's treating oncologist, explained the negative effects of the NRAS mutation, Dr. Schmidt disregarded his testimony. (Ex. N, 306; 325-6). She has no information as

to the overall survival ranges for patients with an NRAS mutation and MSI Stable and her opinions on survival ranges for patients without the NRAS mutation are unhelpful.

Third, even if the Court considers Dr. Venters or Dr. Schmidt qualified under 735 ILCS 5/2-622, they do not address the nature of the claims against the Defendants. Dr. Venters' report does not contain Dr. Shah's or Dr. Ritz's name. The only reference to Dr. Shah is that he is the provider who referred Mr. Reed for a CT scan. Dr. Venters did not read any deposition transcripts and did not review sufficient data to come to opinions as to the clinical judgment of Dr. Shah or Dr. Ritz. There are no allegations of deliberate indifference or medical negligence outlined against him in Dr. Venters' report. Similarly, as addressed above, Dr. Venters did not have any opinion as to the claim against Dr. Ritz and his report does not state that the claim against him is meritorious in any way, particularly as Dr. Venters admitted he cannot provide opinions on causation. As it relates to Wexford, as discussed in detail, Dr. Venters admitted he did not review sufficient data to opine to any widespread practice concerning Wexford and his report contains no opinions as to any claim of vicarious liability, nor did Dr. Venters conduct any research into who Wexford employed.

Dr. Schmidt's report contains no statements regarding the claim against Dr. Ritz. While there are some statements concerning Dr. Shah, as discussed above, it was based on her incorrect understanding of the day Dr. Shah referred Mr. Reed for the CT scan. When her error was identified, she expressed no further criticism. Additionally, Dr. Schmidt's opinion was that Mr. Reed should have been diagnosed in April 2018, *i.e.*, before Dr. Shah saw Mr. Reed, but that by September and likely November 2018, after Mr. Reed was under the care of an oncologist, that he could have had the same response to chemotherapy. Dr. Schmidt admits that Dr. Shah would not be expected to order chemotherapy but would rely on Dr. Saba's medical judgment as an

oncologist.  As such, this report cannot be read to reflect that there is a meritorious claim that Dr. Shah had a duty, breached that duty, and that his action proximately caused Mr. Reed's death.  Far from it, Dr. Schmidt admits that Mr. Reed was terminal in February 2018 and his death was unpreventable.  Similarly, Dr. Schmidt's report fails to outline a meritorious claim against Wexford, either institutionally or in a supervisory capacity.

For these reasons, there is no 735 ILCS 5/2-622 affidavit for the claims against Defendants and the state law claims must be dismissed.

### B.    Causation

To prove proximate cause in a medical malpractice case, the plaintiff must show that the alleged failure to adhere to the standard of care proximately caused injury. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424, 328 N.E.2d 301 (1975). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala*, 367 Ill. App. 3d at 601; see also *Guerra v. Advanced Pain Ctrs.*, 428 Ill. Dec. 336, 122 N.E.3d 345 (2018) (plaintiff failed to prove proximate cause as there was no expert evidence connecting the physician's failure to identify the patient's addiction to opioids and her suicide by overdoes).

It is undisputed that at Mr. Reed's first symptom in February 2018, his cancer was stage 4 and terminal.  All treatment options for him were palliative not curative.  In Illinois, a plaintiff must show the "to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 119, 223 Ill. Dec. 429, 679 N.E.2d 1202 (1997).  As there is no genuine issue of fact that Mr. Reed did not have a chance of recovery, but that his colon cancer was terminal, Plaintiffs' claims of wrongful death

must be dismissed as Mr. Reed's death was undeniably due to his terminal cancer and not proximately caused by Defendants. Plaintiffs' wrongful death claims must be dismissed.

Furthermore, Dr. Venters expressly did not come to causation opinions. He testified that he is not holding himself out as an expert in causation and he cannot give opinions that earlier intervention would have extended any patient's life. (Ex. P, 22:12-23). Dr. Schmidt's conclusion in her report is that Mr. Reed did not lose any potential life expectancy until November 2018 as Mr. Reed had the same life expectancy as he did in April 2018. By November 2018, Mr. Reed was followed by oncology, who Dr. Schmidt admits was the appropriate medical professional to make chemotherapy decisions. Dr. Saba did not order chemotherapy, and he testified that his decision was due to Mr. Reed's cancer complications and not due to any action or inaction by the Defendants.

Lastly, Dr. Schmidt's opinions are speculative at best. First, her opinions are on a more likely than not basis. (Ex. L, 24). Second, her opinions assume that Mr. Reed's cancer was responsive to chemotherapy. (Ex. N, 176). As discussed above, this opinion is based on Dr. Schmidt's misreading of an article that actually finds that patients with a BRAF mutation are not likely to respond to chemotherapy. Additionally, Dr. Schmidt's opinions are based on the wrong molecular profile. Dr. Schmidt presents no evidence of the life expectancy for a patient with Mr. Reed's molecular profile, including that his cancer was NRAS+ and MSI stable. But again, the dispositive issue is that the parties agree that Mr. Reed's cancer was terminal before he had a symptom and before he saw Defendants. As such, Plaintiffs' wrongful death claim must be dismissed.

### C. Dr. Shah and Dr. Ritz

"It is insufficient for plaintiff to establish a prima facie case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care." *Walski v. Tiesenga*, 72 Ill. 2d 249, 261, 21 Ill. Dec. 201, 381 N.E.2d 279 (1978), citations omitted. Specifically, whether a reasonably skillful treater should have considered a potential suicide risk requires expert testimony. See *Biundo v. Christ Community Hospital*, 104 Ill. App. 3d 670, 60 Ill. Dec. 394, 432 N.E.2d 1293 (1982) (directing the verdict in favor of defendant when plaintiff's expert found defendant doctor was guilty only of an "error in judgment.").

As discussed above, Dr. Schmidt's opinion as to Dr. Shah and Dr. Ritz is based on her misreading of the date of the CT referral. Once that date was corrected, she did not express any further criticism. Dr. Venters expressed no criticism of either Defendant. Dr. Venters explained that he did not provide any opinions that Dr. Shah deviated from the standard of care in this case. (Ex. O, 123-125). Regardless, Dr. Schmidt's and/or Dr. Venters' difference of opinions is insufficient for a medical negligence claim. Plaintiffs have failed to produce evidence that Dr. Shah or Dr. Ritz breached a duty of care owed to Mr. Reed that proximately caused him harm or caused his death. For the same reasons briefed for the deliberate indifference claims, Plaintiffs' state law claims fail as a matter of law and Defendants' Motion for Summary Judgment should be granted.

###     D.      Wexford

For the remaining state claims, an institution "may face liability under two separate and distinct theories: (1) vicarious liability for the medical negligence of its agents or employees; and (2) liability for its own institutional negligence." *Longnecker v. Loyola University Medical Center*, 383 Ill. App. 3d 874, 885 N.E.2d 954, 322 Ill. Dec. 663 (2008)(citation omitted).  Under either theory, the plaintiff has the burden of establishing the applicable standard of care, the unskilled or negligent manner in which the standard was breached, and a causal connection between the breach and the injury sustained. *Donald v. Wexford Health Sources, Inc.,* 982 F.3d 451, 461 (7th Cir. 2020) (citation omitted).  However, Plaintiffs have failed to produce expert testimony in support of their claim for either theory, and Defendant is entitled to summary judgment in its favor.

###     i.      Institutional Negligence

Institutional negligence involves an analogous standard of care; a defendant hospital is judged against what a reasonably careful hospital would do under the same circumstances. *Id.* citing Illinois Pattern Jury Instructions, Civil, No. 105.03.01.  "Liability is predicated on the hospital's own [institutional] negligence, not the negligence of the physician." *Jones*, 191 Ill. 2d at 292."

Plaintiffs do not clearly state an institutional negligence claim.  To the extent Plaintiffs sought to bring such a claim, Plaintiffs have produced no evidence of the duty of an institution, like Wexford, or a breach of such duty.  Wexford supplied medical care to Mr. Reed, and it appears his complaints are with the medical judgment of the practitioners.  There has been no evidence that Wexford, as a corporation, was involved in Mr. Reed's treatment decisions or prevented his treaters from treating him within the standard of care.  For the same reasons briefed on deliberate indifference, Defendants are entitled to summary judgment in their favor.

### ii.   *Respondeat* Superior

First, the Illinois Supreme Court has held *respondeat superior* is not a separate claim, but a theory of liability.  *Armbruster*, 16-cv-544-MRJ, 2017 WL 2619032 at *3 (citation omitted).  While Plaintiff can pursue this theory of liability in her wrongful death and survival act claims, Plaintiffs cannot proceed on a separate claim of *respondeat superior.  Jones v. UPS Ground Freight, Inc*. 2016 WL 826403 at *3 (N.D. Ill. March 3, 2016).  Accordingly, Count V must be dismissed.

Plaintiffs have also failed to produce evidence in support of their *respondeat* superior claim against Wexford.  Plaintiffs' Amended Complaint alleges that Defendants were negligent by ignoring Mr. Reed's request for medical attention.  However, there has been no such evidence.  Mr. Reed had numerous medical contacts for his symptoms. There has been no evidence that a medical request was ignored.  For the reasons stated above, Dr. Shah and Dr. Ritz were not negligent and did not ignore Mr. Reed.

Additionally, to the extent Plaintiffs' claim is based on the actions of someone other than Dr. Shah or Dr. Ritz, Plaintiffs have failed to state such a claim in the Amended Complaint as such allegations are not outlined.  For example, Plaintiffs' Amended Complaint does not allege the name of any other medical provider, let alone their employment status.  The Amended Complaint incorrectly states that Dr. Ahmed was a Wexford employee.  Dr. Ahmed was not a Wexford employee, but also there has been no evidence that Dr. Ahmed violated the standard of care in his treatment of Mr. Reed.  Neither Dr. Venters' nor Dr. Schmidt's report outline any such allegations.  Instead, as discussed above, Dr. Ahmed sought oncology care for Mr. Reed, which was approved.

Furthermore, to the extent that Plaintiffs bring a *respondeat superior* claim against Wexford for Ms. Stover failing to diagnose Mr. Reed, this claim is not properly brought, and the

Court should not allow Plaintiffs to constructively amend the Amended Complaint at this late juncture. Additionally, as Ms. Stover referred Mr. Reed to Dr. Shah in July 2018 and no longer was assessing his complaints, a claim concerning her actions began to run in July 2018. Plaintiffs filed their Complaint on October 28, 2020 and did not name Ms. Stover as a Defendant. (Doc. 1). Had Plaintiffs named Ms. Stover, the claim would have been barred by the two-year statute of limitations. 735 ILCS 5/13-202; *Kalimara v. Illinois Dep't of Corrections*, 879 F.2d 276, 277 (7th Cir. 1989). So too, any claim based on the conduct of Ms. Stover should be deemed barred by the statute of limitations, especially here when no such claim has even been pled.

Nonetheless, neither Dr. Venters nor Dr. Schmidt testified to the scope of practice for a nurse practitioner in Illinois. Dr. Venters explained that he could not testify to the scope of practice for a nurse practitioner. Dr. Schmidt's knowledge is based on working in the same office, but not directly, with an unqualified nurse practitioner for a month. (Ex. N, 26-30). Neither has set forward admissible expert testimony that Ms. Stover breached the standard of care within her scope of practice, proximately causing Mr. Reed harm, or causing his death. For any of the reasons stated herein, Defendants' Motion for Summary Judgment should be granted.

WHEREFORE, for the above reasons, Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and STEPHEN RITZ, D.O., respectfully request this Honorable Court grant their Motion for Summary Judgment and any such further relief as deemed appropriate.

CASSIDAY SCHADE LLP

By: /s/ Jaclyn Kinkade
      One of the Attorneys for Defendants
      WEXFORD HEALTH SOURCES, INC., VIPIN
      SHAH, M.D., and STEPHEN RITZ, D.O.

Jaclyn Kinkade
ARDC No. 6333722
CASSIDAY SCHADE LLP
100 North Broadway, Suite 1580
St. Louis, MO 63102
(314) 241-1377
(314) 241-1320 (Fax)
jkinkade@cassiday.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the Southern District of Illinois using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

ATTORNEYS FOR DEFENDANT, FAIYAZ AHMED, M.D.:
Keith Hill
Heyl, Royster, Voelker & Allen, P.C.
105 West Vandalia, Suite 100
Edwardsville, IL 62025
Telephone 618.656.4646
Facsimile 618.656.7940
khill@heylroyster.com

ATTORNEYS FOR PLAINTIFFS:
Jon I. Loevy
Maria Makar
Loevy & Loevy
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
jon@loevy.com
makar@loevy.com

<u>/s/ Jaclyn Kinkade</u>