UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LENNISHA REED and LENN REED JR., as
Co-Administrators of the Estate of LENN
REED, SR., #B28789,

                Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
VIPIN SHAH, STEPHEN RITZ, and FAIYAZ
AHMED,

                Defendants.

Case Number  3:20-cv-01139-SPM

Judge Stephen P. McGlynn

## **DEFENDANTS' MOTION TO BAR DR. VENTERS RETAINED BY PLAINTIFF**

COME NOW Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and

STEPHEN RITZ, D.O., by and through their attorneys, CASSIDAY SCHADE LLP, and pursuant to

Federal Rule of Civil Procedure 26(2)(B) and Federal Rules of Evidence 702 and 703, hereby submit

their Motion to Bar Dr. Venters, stating as follows:

### **BACKGROUND AND INTRODUCTION**

Dr. Venters is a doctor retained by Plaintiffs in this matter.  Dr. Venters' reports and testimony

should be barred for any one of a variety of reasons.  First, Dr. Venters has not treated a patient since

2017.  (Exhibit O, Transcript of Dr. Venters' Day 1 Deposition, p. 258).  Dr. Venters obtained his

M.D. in December 2003, within five years, he transitioned to a role as a Medical Director where he

treated patients 50% of the time.  (Ex. O, p. 169-170).  By August 2015, Dr. Venters only treated

patients 10% of his time or less, in very specific cases.  (Ex. O, p. 164-165).  The bulk of Dr. Venters'

career has not involved treating patients but instead has been administrative.  Dr. Venters has not

treated a patient in seven years and has not actively been a treating physician in nearly a decade.  Even

looking at his stale experience, he explained that he is not an expert in medical causation, cancer

epidemiology, prognosis based on earlier intervention, radiology, community standards, hospital

systems, healthcare reform, nursing standards, the frequency of endoscopy monitoring for hepatitis C

patients, or the scope of practice of a nurse practitioner.  (Ex. O, 90-93; 118; 120; 146-147; 185-186;

274-275; 281-282); (Exhibit P, Transcript of Dr. Venters' Day 2 Deposition, p. 22-25; 39-40; 84; 121; 175-176; 182; 196).

Second, Dr. Venters did not review sufficient data, including full medical records, any depositions, or any IDOC/Wexford guidelines, even though he testified that they would be part of his standard review process. (Ex. O, 228). While there may not have been deposition transcripts for the 14 non-party charts he reviewed, there were 12,000 pages of email communications about the patients that Dr. Venters did not review. Further, there were numerous available deposition transcripts concerning Mr. Reed and Mr. McCullough. Without a meaningful explanation, Dr. Venters did not read the deposition transcripts of treating oncologist Dr. Hanna Saba, Lennisha Reed, Lenn Reed Jr., Dr. Vipin Shah, Dr. Faiyez Ahmed, Sara Stover, Dr. Stephen Ritz, Trina Canada, Allyson Fiscus, Keyana Wiley, Dr. Justin Young, Justin Duprey, Dr. Michael Scott, Angel Rector, Lori Moton, Courtney Walker, Angela Wachtor, or Cynthia Ross. (Exhibit K, Report of Dr. Venters). Given both the volume of materials *not* reviewed and the pertinent subject matter of those materials, Dr. Venters did not review sufficient data in this case to provide opinions on the medical care provided to Mr. Reed, Mr. McCullough, or other non-parties.

Third, Dr. Venters was retained to provide an opinion as to system issues in the IDOC. The first of many issues with Dr. Venters "systemic" review is that Dr. Venters cannot lay the foundation for it. Dr. Venters admittedly did not perform an unbiased sampling of the IDOC population to obtain a fair cross-section of the population. Instead, Plaintiffs' counsel selected 25 patients for Dr. Venters to review from a pool of over 40,000 prisoners. Dr. Venters cannot lay the foundation for this sampling methodology as he did not conduct it and does not know how it was performed. However, he admits there are concerns that the pool of patients he reviewed could be biased as they were knowingly selected because they were discussed unfavorably in the *Lippert* reports. Next, Dr. Venters reviewed a spreadsheet of Plaintiffs' counsel's notes summarizing what Plaintiffs' counsel believed

2

the medical records meant and notes on some of the opinions of the *Lippert* monitors. From Plaintiffs'
counsel's descriptions, Dr. Venters hand-selected 14 non-party prisoner records to review (in addition
to Mr. Reed and Mr. McCullough). Dr. Venters could not articulate his methodology for this sub-
sampling. However, Dr. Venters admits that this is not the appropriate methodology for a review to
examine the prevalence of any perceived systemic deficiencies. As such, Dr. Venters concedes that
his opinions cannot be reliably generalized to the IDOC population to provide a reliable opinion that
practices exist in that population. Dr. Venters expressly testified that he cannot testify that any
widespread practice existed in the IDOC.

Not only does Dr. Venters admit that his review was not a reliable review of widespread
practices in the IDOC, but he also explained that he would have reviewed different data and applied
a different methodology if he were to review for widespread practices. Confusingly, Dr. Venters
came to opinions that he observed "systemic deficiencies." However, he explained that when he uses
the word "systemic" it does not mean system-wide and does not denote any degree of prevalence in
the IDOC. (Ex. O, 69; 170-172; 185); (Ex. P, 226-230). Dr. Venters expressly testified, twice, that
he could not say that any perceived "systemic deficiency" he outlined in his report was a widespread
practice because the review he did was insufficient for an such conclusion. (Ex. O, 69; 201; 206-
207); (Ex. P, 227-228).

To the extent Plaintiffs seek to offer his opinions as evidence of a widespread practice despite
Dr. Venters' testimony, Dr. Venters did not review sufficient data to draw such opinions. Dr. Venters'
review was not tailored to the facts of the underlying claims. For example, instead of looking at
practices within the relevant facilities, he almost exclusively reviewed records from patients in the
*Lippert* report. Yet, the IDOC consists of 30 different facilities and the *Lippert* monitors did not
review care at the relevant facilities here (Danville Correctional Center, Lawrence Correctional
Center, or even Pinckneyville Correctional Center). No scientific methodology has been provided to

show any opinions Dr. Venters holds about care at different facilities, evidence practices that existed where Mr. Reed or Mr. McCullough was treated. Further, his review was not tailored in time, but instead spanned nearly a decade. During the time frame of Dr. Venters' review, Wexford employed over 3,400 personnel. Additionally, the IDOC housed approximately 40,000 prisoners yearly. No methodology was provided for how Dr. Venters' review could possibly be sufficient for an assessment of systemic practices.

Even for the patients he selected, he did not conduct an analysis of the quality of care received. Several of the patient files were thousands of pages long as they received an abundant amount of medical care. Thus, for the 16 patients Dr. Venters selected, the IDOC produced over 15,000 pages of medical records and over 12,000 pages of email communication about the patients. However, Dr. Venters did not review the email communication.[1] He also did not review the full medical charts of the 16 patients. Instead, he allotted only *18 hours* for his review of Plaintiffs' counsel's 283 page excel spreadsheet, over 15,000 pages of records, over 1,600 pages of the *Lippert* reports, the preparation of his 40-page report, and all communication with counsel. (Ex. O, 19-21).

Next, Dr. Venters did not utilize any reliable methodology to come to reliable opinions in this matter that will help the jury. Dr. Venters explained that he only reviewed portions of the medical records provided to him, but he could not articulate which portions. Instead, he appears to have relied on a spreadsheet provided by Plaintiffs' counsel for his opinions. In doing so, Dr. Venters' report is unsupported by the medical records as he outlines purported facts that he cannot locate in the medical records. For example, he opines certain patients lost significant weight who did not. He then performed no analysis of the data to draw his conclusions. Dr. Venters conducted no analysis about which provider committed the perceived errors, who they were employed by, or what caused the

---

[1] Which begs the question why Plaintiffs compelled them from the IDOC at great expense and significantly delaying this matter.

4

perceived errors.  Instead, he self-limited his review to only three issues, instead of utilizing any reliable methodology to determine the cause of the adverse outcomes, overall adequacy of medical care, or preventability of outcomes.  (Ex. O, p. 32; 127-128; 201; 229).

Because the review of records was inaccurate and because no methodology was applied to determine what the data meant, when confronted with the records it was revealed that within the pool he reviewed, Dr. Venters' conclusions were based on 1-2 patients and not based on the vast majority of the care he observed.  Further, it was revealed, that all or nearly all of the errors he observed were caused by one non-party physician at Hill Correctional Center, who was terminated.  Meanwhile, his review revealed that Wexford did not deny one medically necessary referral for any of the patients.  Plaintiffs cannot meet their burden that Dr. Venters reviewed sufficient data and applied a reliable methodology to the data to form his conclusions and he should be barred.

In sum, Dr. Venters was given 16 patient files to review, hand-selected by Plaintiffs' counsel from sections of the *Lippert* reports.  From this broken foundation, Dr. Venters was set up for failure, even if he wanted to conduct a reliable review.  However, it is clear that Dr. Venters did not, as he knew the pool of patients was biased and insufficient, but proceeded, nonetheless.  Instead of conducting a review for widespread practice, analyzing of the care provided to the patients, and applying a methodology to come to opinions about causes or connections, Dr. Venters inaccurately cherry-picked examples to support his preconceived conclusions.  Dr. Venters cannot say that any error affected the patients' outcomes, deviated from the standard of care in the community, or was caused by a widespread Wexford practice in the IDOC.  Instead, Dr. Venters blames Wexford for the independent judgment of a select few employees, at different prisons, at different times, for treatment of different conditions.   FRE 702 was formulated to exclude expert opinions for any one of these reasons.  Allowing Dr. Venters to give opinions on "systemic deficiencies" that he cannot show are widespread practices, from a review Plaintiffs' counsel's notes and the *Lippert* reports, would mislead

the jury, would deny Defendants a fair trial, and would be a miscarriage of justice. Accordingly, Defendants' Motion to Bar should be granted.

## LEGAL STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); see also *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Federal Rule of Evidence 702, governing the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 requires that the trial judge ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Manpower, Inc. v. Ins. Co. of Pa*, 732 F.3d 796, 806 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 589); see also *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) (explaining the current version of Rule 702 essentially codified *Daubert* and "remains the gold standard for evaluating the reliability of expert testimony"). "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004), citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

The scope of an expert's qualifications is limited to the subject area(s) in which he possesses expertise. See *Untied States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witnesses' testimony." *Gayton v. McCoy*, 592 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Courts must "make the following inquiries before admitting expert testimony: first the expert must be qualified as an expert by knowledge, skill, experience, training, or education. Second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods. And fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees*, 714 F.3d at 521-22.  The court "…must look at each of the conclusions [an expert] draws individually to see if he has the adequate education, skill, and training to reach then." *Hall v. Flannery*, 840 F.3d 922, 929-930 (7th Cir. 2016), citing *Gayton*, 593 F.3d at 617.

"The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007), quoting *Kumho Tire Co.*, 526 U.S. at 152); *Lapsley v. Xtek Inc.*, 689 F.3d 802, 805 (2012). The "'measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary." *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002), quoting *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996)).  When the opinions contain "nothing more than a bare conclusion that adds nothing of value to the judicial process"

7

exclusion is proper. *Clark v. River Metals Recycling, LLC*, No. 3:15-cv-00447-JPG-RJD, 2018 U.S. Dist. LEXIS 105828, 2018 WL 3108891, at *6 (S.D. Ill. June 25, 2018) (quoting *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998).

In determining the relevance and reliability of the proposed expert's testimony, the party offering the expert bears the burden of proof. *Brown*, 765 F.3d at 772. If the potential expert does not possess the requisite qualifications to opine about a particular issue, the court need not address the expert's methodology. *Hall*, 840 F.3d at 930.

## ARGUMENT

I.    **Dr. Venters' opinions should be barred as he is not qualified.**

A.  **Dr. Venters is not a treating physician.**

For any action in which the plaintiff seeks to recover damages for injuries or death due to medical, hospital, or other healing art malpractice, the plaintiff or their attorney must file an affidavit to the initial complaint. 735 ILCS 5/2-622. The affidavit must satisfy one of three options. *Id.* The first option requires the affidavit declare that the affiant, plaintiff or their counsel, has consulted with a health professional concerning the facts of the case, and the affiant reasonably believes that the healthcare professional:

(i)     is knowledgeable in the relevant issues involved in the particular action;

(ii)    practices or has practiced within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine that is at issue in the particular action; and

(iii)   is qualified by experience or demonstrated competence in the subject of the case; that the reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such action.

*Id.*

The requirement that the healthcare professional must have practiced within the last six years has been interpreted to mean that they have "actively practiced." *See Cuthbertson v. Axelrod*, 282 Ill.

8

App. 3d 1027 (referencing the affidavit, which states the practitioner has "actively practiced within the last six years," and explaining that the physician needs to state they have recent experience in the area of healthcare at issue); *see Cutler v. Northwest Suburban Cmty. Hosp., Inc.*, 405 Ill. App. 3d 1052 (citing *Cuthbertson* and reiterating that the physician needs to state they have had recent experience in the field at issue). The entire purpose of this requirement is to ensure the professional has had recent experience in the area of health care at issue, rather than a career in consulting work, such that they can provide a current and informed opinion on the merits of the state law claim.

Plaintiffs have not provided a 735 ILCS 5/2-622 affidavit. However, should they seek to utilize Dr. Venters' report, Dr. Venters is not a healthcare professional qualified to provide an opinion on the merits of the state law claims. Dr. Venters has not treated a patient since 2017. (Ex. O, p. 258-259). After 2017, he conducted forensic examinations as a non-treating doctor and has worked as a monitor in litigation. *Id*. Dr. Venters obtained his M.D. in December 2003. (Ex. O, p. 169-170). In 2008, his role as a Medical Director only required him to treat patients 50% of the time, and, by August 2015, he would only see very specific cases as he treated patients 10% of his time or less. (Ex. O, p. 164-165). In other words, Dr. Venters' experience treating patients full-time was limited to five years (2003-2008), largely in residency and in fellowship. Conversely, the bulk of Dr. Venters' career has not involved treating patients but involved administrative duties. Dr. Venters has not treated a patient in seven years and has not actively been a treating physician in nearly a decade.

Similarly, Dr. Venters is not a healthcare professional qualified to provide an opinion on the merits of the federal claims. Although the federal claims at issue do not have this express requirement, the Court should apply the same reasoning to the federal claims, in addition to the reasons set forth below. The requirement of active, relevant practice or teaching serves to ensure that the consulting healthcare professional has had recent exposure to the area of medicine at issue and knows the current state of the practice. Given Dr. Venters was an administrator and not an active treating physician,

Plaintiffs failed to establish his foundation to provide a current and informed opinions on the merits of the claims against current practitioners.  For these reasons, Dr. Venters is not qualified to provide an opinion as to the merits of each claim.

### B.  Dr. Venters is not an expert in the relevant fields needed to draw his opinions.

Dr. Venters explained that he is not an expert in medical causation, cancer epidemiology, prognosis based on earlier intervention, radiology, community standards, hospital systems, healthcare reform, nursing standards, the frequency of endoscopy monitoring for hepatitis C patients, or the scope of practice of a nurse practitioner.  (Ex. O, 90-93; 118; 120; 146-147; 185-186; 274-275; 281-282); (Ex. P, p. 22-25; 39-40; 84; 121; 175-176; 182; 196).  Yet, he seeks to opine in these areas, nonetheless.

First, given the nature of his opinions, the fact that Dr. Venters is admittedly unqualified to opine on medical causation should bar him from testifying in this case.  Dr. Venters' opinion is that he observed three practices that existed in the pool of patients he reviewed.  Dr. Venters then opines that the practices were "systemic," and he attributes them to Wexford without analysis.  Before diving into the foundational flaws of that review, Dr. Venters testified that he lacks foundation to testify that earlier intervention would have affected the outcome for any of the patients.  Further, he did no causal analysis to determine if the errors he purportedly saw in patient care had a common cause or connection.  As he did not conduct the analysis, he should be barred from drawing opinions that 1) any perceived practice proximately caused a patient harm and 2) that there existed any causal connection between the cases reviewed.

Second, Dr. Venters testified that he is not an expert in community standards, hospital systems, or healthcare reform.  Yet, he seeks to draw opinions as to "systemic deficiencies" for a company that provides certain healthcare professionals and services to the IDOC, across 30 facilities, with thousands of staff, to a 40,000 population.  Dr. Venters' purported foundation is that he was the

Medical Director at Rikers Island many years ago and he has since been a court monitor for unrelated issues. Dr. Venters has no experience assessing or providing opinions as to the adequacy of healthcare statewide. (Ex. O, p. 61-63). Instead, as a court monitor, he has reviewed "a small part of the care," like COVID protocols or solitary confinement. *Id.* He has never been retained to provide opinions concerning the provision of care to patients with cancer in a statewide system. (Ex. O, 63).

Similarly, Dr. Venters did not conduct any research to fill in his gaps. Particularly, Dr. Venters is not an expert in the standard of care outside of correctional medicine. As all of the patients were seen by medical professionals at the prison *and* outside of the prison, it is unclear how Dr. Venters can opine on some of their care but not others. It seems Dr. Venters creates a false distinction to discount his lack of experience in the community and to hold harmless any community physician without analysis.

Additionally, despite coming to "systemic" opinions, Dr. Venters conducted no investigation into the provision of medical care for patients with cancer in the community *or* in other prison systems to determine if the perceived deficiencies he observed were unique to the IDOC or unexpected. (Ex. O, p. 119-120; 147). In other words, Dr. Venters did not have any measure of comparison for the care he observed. For example, Dr. Venters has no evidence that Mr. Reed had delays in diagnosis or treatment longer than would be expected in the community. (Ex. O, p. 147). Dr. Venters did not conduct any research as to whether individuals in the IDOC with colon cancer have different rates of death or average lifespans than in the community. (Ex. O, p. 289). He cannot say that prisoners in Illinois die more quickly than in other prisons or in the community. (Ex. O, 289-290). This is important in two regards: determining the standard of care and whether there was a deviation from it.

Dr. Venters cannot say that if these patients were treated in the community that their care would be any different. In other words, he cannot testify to the minimum level of care that a healthcare provider is expected to provide based on their experience, education, and training, but

11

instead manufactures his own standard, only for correctional medicine, and based only on his very limited experience. Similarly, without an analysis or understanding of how conditions are diagnosed or treated in the community, particularly in the case of colon cancer, he cannot testify that a failure to diagnose was a deviation from common practices versus a known occurrence, despite prudent medical care, due to the nature of the disease process. For example, in Dr. Schmidt's report, she cited to an article titled, "Young-Onset Colorectal Cancer: A Review," from the Would Journal of GI Oncology 2021. She summarizes that medical literature reflects "there is a 7-week to 2-year delay in diagnosis of CRC (colorectal cancer) in adults under the age of 50. This is thought to be due to a low level of suspicion for CRC by clinical providers." (Exhibit L, Report of Dr. Schmidt, p. 16). In other words, it is common in the community that doctors consider different causes for symptoms when the patient is under 50. While Dr. Venters knows the adequacy of care is linked to community standards, he did not assess what is expected from a reasonable practitioner in the community. (Ex. O, 148-149). Dr. Venters explained that he is not qualified to assess community standards and, as such, he cannot testify that Defendants violated community standards. Instead, Dr. Venters found deviations from his personal standards.

In fact, Dr. Venters did not even consider how practitioners in the community treated the same incarcerated patients. For example, in his report, he discusses criticisms of L.C.'s nutritional workup after his diagnosis. Discussed below, this patient was being seen by a specialist (ENT). The specialist ordered a feeding tube, which the patient refused. The physician at the prison also ordered a soft food permit and Boost dietary supplements, ensuring he had meals that met his caloric needs. Yet, Dr. Venters wanted to see something more in the records. Not only does Dr. Venters fail to explain why he criticizes the physicians at the prison when the specialist did not make any further recommendations, but also, in the thousands of pages of medical records he was supposed to have reviewed, none of the patients that were treated in community hospitals were treated differently. Dr.

Venters was specifically asked about this.  Referring to when He.Co. lost significant weight while admitted in the community hospital, Dr. Venters was asked:

> Q: Did you see in the hospital them conduct that dietary analysis that you were talking about earlier that you would like to see when he was there for two months?
> A: I don't recall looking for that.
> Q: Do you recall them documenting anything about his nutrition at all?
> A: I don't recall seeing that.  I didn't look for that and I don't' recall how the hospital worked, who does that.
> Q: He did lose weight when he was in the hospital from January to March of 2018?
> A: I'm not disputing that.  I just don't recall those facts.

(Ex. P, 127).  So too, when Ho.Cu. was being treated by his oncologist and began to lose weight, the oncologist ordered Ensure, which is comparable to Boost.  (Ex. P, p. 132-133).  Dr. Venters neither considered the actions of community clinicians for determining their role in the patient's care, nor did he consider it for determining what the standard of care requires.  In other words, Dr. Venters was not comparing the care provided to prisoners with the expectations in the community.  He was comparing the care to prisoner with what he would have done, irrespective of the standard of care.  As a disagreement in medical opinion is neither negligence nor deliberate indifference, Dr. Venters' opinions, independent from any community standards, are wholly irrelevant and would confuse and mislead the jury.  Accordingly, Defendants' Motion to Bar Dr. Venters should be granted.

II.    **Dr. Venters' opinions regarding systemwide practices should be barred.[2]**

A.    **Dr. Venters did not use review sufficient data for his opinions on "systemic deficiencies."**

i.    **Plaintiffs lack foundation for Dr. Venters' review.**

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton,* 593 F.3d at 616 (internal quote and citation omitted).  The court

---

[2] In this section, Defendants focus on Dr. Venters' "systemic deficiencies" opinions and discuss his patient specific opinions in Section III below.

acts as a gatekeeper to ensure a witness is not only qualified to testify as an expert, but also that "his qualifications provide a foundation for [him] to answer a specific question." *Id.* at 617.

As to systemwide opinions, Dr. Venters was asked to draw opinions about practices in the IDOC based on a sampling of certain patients' medical records. The IDOC had a rotating population of approximately 40,000 prisoners yearly during this time.[3] Also, from 2013 to 2019, there were over 650 deaths in the IDOC. (Exhibit R, IDOC Death Spreadsheet, Filed Under Seal). Dr. Venters had a spreadsheet of all the deaths in the IDOC from 2000-2020, and he admitted he could have obtained a random sampling of deaths over a certain period of time or at a certain facility, but he did not.

Dr. Venters did not create a methodology for unbiased, sufficient sampling in the IDOC that was representative of the population. Instead, Dr. Venters allowed Plaintiffs' counsel, who are not and cannot be expert witnesses in this case, to hand-select 25 patients from *Lippert* reports, subpoena the medical records, review the medical records, and provide Dr. Venters with their notes. As such, Dr. Venters does not have firsthand knowledge and cannot lay the foundation for how the sampling methodology was created, let alone that the sampling methodology meets the rigors of FRE 702. *See Cnty. of Cook Ill. v. Wells Fargo & Co.*, No. 14 CV 9548, 2022 U.S. Dist. LEXIS 227309, 2022 WL 17752387, at *4 (N.D. Ill. Dec. 19, 2022)("Because no evidence from Dr. Lacefield or others establishes the reliability of the methodology chosen by the statisticians, and because that methodology underlies, and thus is central to the reliability of, Dr. Lacefield's delimiter opinions, those opinions are excluded"), citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2002). As Judge Dugan outlined in another matter where the plaintiff attempted to show systemic practices based on sampling 12 patient records, "[i]t seems obvious to the Court that the manner of selecting these patients would be ***essential*** to [the] systemwide review." *Jackson v. Wexford*, No. 3:20-cv-00900-DWD, 2023, S.D. Ill. Dec. 15, 2023, (Doc. 186, p11-12)(emphasis

---

[3] https://idoc.illinois.gov/reportsandstatistics/prison-population-data-sets.html

added).  Without testimony as to the sampling methodology for the patients selected, Plaintiffs cannot lay the foundation that it was scientifically and reliably performed and his opinions flowing therefrom should be barred.

### ii.    Dr. Venters conducted no sampling methodology.

Defendants retained a methodologist to assess whether a scientific and reliable methodology was utilized by Dr. Venters (and the *Lippert* monitors).  As a foundational matter, Mr. Heidari explained, "[t]he sample size is an important factor that affects the accuracy and precision of the conclusions based on a study. A sample size that is too small may not capture the variability made and diversity of the population, leading to biased and unreliable results."  (Exhibit S, Precision Reports).  "To determine an appropriate sample size, several factors need to be taken into account including the population size, the sampling method, and the desired precision level. Once these factors are determined, there are mathematical equations that are used in the field to measure an appropriate sample size based on the confidence level, probability, and margin of error.  For qualitative assessments, approaches like data saturation are used to guide the process of calculating the appropriate sample size… without these considerations, the findings cannot be said to be representative of the entire population." *Id.*

Dr. Venters does not dispute the need for these methodologies in conducting a review to identify practices to any degree of prevalence.  However, Dr. Venters did not perform a statistical power analysis, determine the P value, or conduct any other analysis to determine if the pool of patients he reviewed was a sufficient and reliable cross-section of the population so that his conclusions could be generalized for the whole population.  (Ex. O, 176-179).  Instead, the only computation that Dr. Venters performed was that he would not have enough time to review the 25 sets of medical records; thus, he would need to sub-sample the 25 patients.  Dr. Venters further limited the pool of patients for review due to his time constraints.  Plaintiffs' counsel then reviewed the

15

medical records, in lieu of Dr. Venters, and created a spreadsheet outlining Plaintiffs' counsel's lay opinions about what the medical records showed.  From there, Dr. Venters selected 14 patients based on what he thought would be "relevant" to Mr. Reed and Mr. McCullough.  Interestingly, having colon cancer, being housed at the same facility, being treated near in time, and being treated by Defendants were not the "relevance" factors.  Thus, the pool of patients Dr. Venters reviewed consisted of patients who were treated between 2013 and 2020, at different prisons, by different providers, for different conditions.  Dr. Venters cannot testify that his review was scientifically reliable given the size of the population, because he conducted no analysis to determine if his review was sufficient.[4]  (Ex. O, 197-200).

There is no evidence that the opinions generated from a review of 16 patient files can reliably represent the care provided across the IDOC.[5]  In fact, Dr. Venters twice admitted that he cannot testify that any practices he purportedly observed were widespread practice.  While Dr. Venters uses the term "systemic deficiency" in his report, he explained in his deposition that a systemic deficiency is not a widespread practice.  (Ex. O, p. 201).  Instead, the best description Dr. Venters could give is that it is not isolated.  (Ex. O, p. 185).  He did not consider the number of providers, patients, passage of time, or facilities in his review.  (Ex. O, p. 74-75; 199).  In fact, it was not his goal to opine as to widespread practice.  Dr. Venters admitted that the type of review he performed could not show prevalence of any practice as it did not meet industry standards for this type of review, and, in order to conduct a review for prevalence or widespread practices, he would have had to do an entirely different review.  (Ex. O, 69-; 170-171; 206-207; 218-219).  Dr. Venters expressly testified that he

---

[4] Notably, Dr. Venters professes to have the qualifications to conduct a peer-review level assessment of prevalent practices in a system and claims to have done them before, but he chose not to here.  As there is no foundation for the methodology of his review, Defendants' Motion to Bar should be granted.

[5] No methodology was used to determine whether 16 was a sufficient number of patients to review given either the population of the IDOC (over 40,000 yearly) or given the number of deaths during the years of interested (650).

cannot opine that any practice he observed in his review was sufficient to state that a widespread practice existed in the IDOC. (Ex. O, 227-228). Dr. Venters admits he did not review sufficient data or apply a scientific and reliable methodology to opine on the prevalence of any "systemic deficiency." Allowing Dr. Venters to testify to "systemic deficiencies" that are not widespread practices can only serve to confuse and mislead the jury into believing that his opinions support the existence of widespread practices when they admittedly do not. Defendants' Motion to Bar Dr. Venters should be granted.

**B.    Dr. Venters' review is not the product of reliable principles and methods.**

**i.    Biased Sampling**

A "representative sample is one that reflects the characteristics and diversity of the population as closely as possible." (Ex. S). "A biased sample is one that systematically favors or excludes certain groups or characteristics from the population. In such situations, some members of a population are more likely to be selected in a sample than others, undermining the validity and generalizability of the results. As with the lack of an appropriate sampling size, without an unbiased sampling method the findings cannot be said to be representative of the entire population." *Id.*

Plaintiffs' counsel sent Dr. Venters the medical records of patients from the monitors' reports in *Lippert v. Ghosh* (a class-action against the IDOC). Notably, Plaintiffs' counsel only selected patients where the monitors complained about aspects of the care received. As Plaintiffs are the proponent of the evidence and must lay the foundation for their evidence, Defendants need not dispositively prove that the methodology utilized in selecting which patients Dr. Venters reviewed was biased; however, it is apparent Plaintiffs' counsel hand-selected the cases for Dr. Venters' review because there were known complaints about their care, with no other meaningful connection. From there, Dr. Venters conducted "purposeful" sub-sampling with the assistance of Plaintiffs' counsel's notes, to select which 14 patients he had time to review. (Ex. O, 177).

Dr. Venters admits that sampling errors can create selection bias, and a biased sample does not accurately represent a cross-section of the general population. It does not take a statistician to understand the inherent bias in selecting a pool of patients with known complaints for a review of systems. It does not take expert testimony to understand if you almost exclusively review cases where there were known complaints about the care received, you will disproportionately find complaints with the care. This is why Dr. Venters explained that if he were doing a review to determine whether practices existed to any degree of prevalence, he would not have conducted this review, but instead would have conducted an entirely different study. (Ex. O, 206). His reason for not conducting a scientific and reliable study was because he did not have enough time. *Id*. Shockingly, instead of turning away Plaintiffs' counsel, Dr. Venters chose to conduct a review that he knew was biased and insufficient anyway.

Plaintiffs will likely try to dispute that Dr. Venters needed to perform statistical analysis to validate his study. However, Dr. Venters lacks even an explanation as to how reviewing 16 patients from lawsuits is a reliable review of the IDOC to **any** degree. Dr. Venters performed no analysis to determine his review was a representative cross-sample of the population. Instead, cherry-picking data for a specific outcome is unreliable and unscientific. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1089 (N.D. Ill. 2022)("non-random sample might undermine the reliability of the statistics" and collecting cases); *Chavez v. Ill. State Police*, 251 F.3d 612, 643 (7th Cir. 2001).

Dr. Venters admitted his review in this case is not fit for peer review as it would not meet the standards required. A review of the delivery of medical services statewide, including sufficient and unbiased sampling, is either based on science or industry standards. There is no separate standard for legal cases that allows experts to review intentionally biased, insufficient samples to generalize their findings for a 40,000 population, nor should there be. Dr. Venters' theory that he can intentionally perform reviews below peer-reviews standards, rely on lawyers to conduct his methodology and

medical records review, not for a legitimate reason but because he thinks he can get away with it, cannot meet the requirements of FRE 702.

Lastly, barring Dr. Venters' opinions is the just remedy.  Not only has Dr. Venters prepared a patently unreliable report, necessitating the review of tens of thousands of pages of irrelevant records and nearly 20 hours of deposition time at his hourly rate, at great time and expense to Defendants, but also it is in the interest of the Court and the public that attorneys be prohibited from interjecting themselves into the foundation of their expert's review to create a framework that can only lead to opinions in support of their claims/defenses.  This type of meritless conclusion based "review" costs the parties and the Court an exorbitant number of resources and leads to the prosecution of frivolous claims.  This is one of those frivolous claims.  As outlined in the Memorandum in Support of Summary Judgment, it is undisputed that Mr. Reed had terminal, stage 4 colon cancer before he ever met Dr. Shah or Dr. Ritz ever received a referral.  At the first appointment with Dr. Shah, he ordered a CT scan, which revealed the cancer.  There was no action that Defendants could have taken to cure Mr. Reed's condition or extend his life by any reliable measure.  Despite knowing this, Plaintiffs' counsel obtained numerous extensions of time for years for their *Monell* expert report.  Plaintiffs' counsel retained Dr. Venters months before the disclosure deadline and had to provide Dr. Venters a spreadsheet summarizing the medical records because Dr. Venters did not allot the time to read them. Allowing Dr. Venters to testify as an expert in front of a jury to give opinions on systemic practices when he undertook no scientific or reliable efforts to perform an unbiased review of the practices, but only comes to the opinion Plaintiffs' counsel literally outlined for him, would utterly undermine the plain language and the purpose of FRE 702 and would be fundamentally unfair to Defendants.

###    ii.    Dr. Venters failed to apply a reliable methodology.

Even looking past the broken foundation for his opinions, an expert has to apply a reliable methodology to the data to meaningfully assess what the data shows.  FRE 702.  When looking at Dr.

Venters' explanation of what a reliable methodology looks for a review of medical care in a system, he states, "The Centers for Disease Control and Prevention identifies systemic problems in health care as ones that involve the interplay between policies, procedures, infrastructure, spending decisions and human actions; and detecting this interplay requires multiple sources of information." (Ex. K). He continued, "I relied on this methodological approach to review medical records, interview data, and policies to identify systemic areas needing improvement in care." However, Dr. Venters did not conduct an analysis of the interplay between policies and procedures. He did not review Wexford guidelines or the IDOC directives. There is no evidence he assessed infrastructure, spending decisions, or human actions. He did not review interview data, electronic communication, grievance records, or deposition testimony. As discussed below, Dr. Venters did not review 18 deposition transcripts from treater and Defendants, including the oncologist who saw all cancer patients from Lawrence Correction Center for 13 years. Instead, he reviewed some of the medical records for the 16 patients and/or Plaintiffs' counsel's notes, and he reviewed the 2014 and 2018 *Lippert* reports. Even if his methodology was otherwise sound, his review in this case did not follow his own methodology and Plaintiffs cannot lay the foundation that his methodology was scientific or reliable.

Furthermore, it remains unclear what Dr. Venters' methodology was as his deposition testimony showed that the "systemic deficiencies" he professed existed were not seen in the medical records. Dr. Venters' report says that the medical records revealed practice of unaddressed significant weight loss, abnormal test results that were not acted on, and delays in specialty care. As discussed in depth below, Dr. Venters was confronted with the medical records and repeatedly admitted that the records did not reveal unaddressed significant weight loss or abnormal lab results. Further, Dr. Venters testified to delays that either did not exist or were caused by outside providers. Other times, Dr. Venters cannot recall material facts either in the records or from his own report. *Williams,* 2023 U.S. Dist. LEXIS 17867, at *56-57 (in barring the plaintiff's psychiatrist the court agreed with the

defendant that Dr. Adhia was "unclear on his own opinions and startlingly unfamiliar with the records," including "background information integral to his report, basic information related to Dontrel's incarceration and care, or the specifics of his own opinions").

In upholding the exclusion of a physician's opinions, the Seventh Circuit explained, "factual deficiencies or discrepancies the district court identified are the result of [the expert's] faulty methods and lack of investigation. The district court used the gaps in [the expert's] analysis as illustrative examples of the perils inherent in applying subjective experience instead of a proper scientific approach." *Brown v. Burlington N. Santa Fe Ry. Co.,* 765 F.3d 765, 773 (7th Cir. 2014). "Trained experts commonly extrapolate from existing data," and therefore, "[t]he critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data only by the ipse dixit of the expert ... that is properly excluded under Rule 702." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (internal citation and quotation marks omitted).

Here, Dr. Venters repeatedly had factual discrepancies on material facts in his report that evidence a lack of sound methodology. Because he wrote that patients lost significant weight that did not, it is clear that Dr. Venters' findings are not data driven. Because his findings are not data driven, his opinions cannot be based on a proper scientific approach. Similarly, Dr. Venters admitted he performed no analysis to determine the cause of his purported practices. Yet, again, he calls practices "systemic" based on his say-so and without connection to the existing data.

In *Williams*, in granting the defendants' motion to bar a correctional administrator and psychiatrist in a wrongful death case, Magistrate Judge Beatty collected the following cases outlining Rule 702 requirements for an expert to show the connection between the facts to their opinions:

> It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). "[E]xperts cannot offer opinions based merely on their say-so." *Smith v. Nexus RVs, LLC,* 472 F. Supp. 3d 470, 480 (N.D. Ind. 2020) (citing

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)). See *Kumho*, 526 U.S. at 137 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (citation omitted). Rather, the expert's report must be "complete and detailed" and set forth the "basis and reasons" for their opinions and conclusions. *Ciomber v. Cooperative, Plus*, 527 F.3d 635, 641 (7th Cir. 2008) (citing FED. R. CIV. P. 26(a)(2)(B)(i)). See also *Salgado v. General Motors*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor . . . . [It] must include 'how' and 'why' the expert reached a particular result, and not merely the expert's conclusory opinions."). The expert's opinion must offer more than a 'bottom line.'" *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) (quoting *Wendler & Ezra, P.C. v. Am. Int'l Group, Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (per curiam)). "An expert who supplies nothing but a bottom-line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (internal citations omitted). *See also Mamah*, 332 F.3d at 478 ("As we have observed, 'experts' opinions are worthless without data and reason.'") (citation omitted).

*Williams v. Ill. Dep't of Corr.*, No. 3:19-CV-739-MAB, 2023 U.S. Dist. LEXIS 17867, at *44-45 (S.D. Ill. Feb. 2, 2023). The court barred both plaintiff's experts and, as to the correctional administrator, found, "Brady seemed to take the position that the deficiencies in the IDOC's mental health services were so severe and pervasive that [decedent] must have been impacted. But this opinion regarding causation amounts to nothing more than an inferential leap, untethered from any explanation or facts regarding [decedent's] own personal experience." *Id.* at 46-47, citing *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (expert testimony cannot "be based on subjective belief or speculation.").

Here, Dr. Venters admittedly did not perform a root cause analysis to learn the cause of any perceived error in the patients' care. Dr. Venters admittedly did not perform any preventability analysis, that if a different action occurred then the patients' outcomes would have been different. Dr. Venters did not perform any analysis as to the prevalence of any perceived practices. Dr. Venters cannot explain what a "systemic deficiency" is, let alone any threshold by which it is reached, but he admits a "systemic deficiency" is not a widespread practice. (Ex. O, 71-75). Yet, Plaintiffs seek to argue that unwritten widespread Wexford practices existed, which caused Mr. Reed's outcome. Dr. Venters' testimony cannot be used to support this argument.

Aside from the fact that Dr. Venters' opinion that practices existed is unsupported by the data, Dr. Venters also has no evidence tying any perceived issue to Wexford. Far from it, a true review of the records would have undeniably reached a different result. Nearly every medical error that Dr. Venters identified that was shown in the medical records was from one non-party physician at Hill Correctional Center. This physician was disciplined, re-trained, demoted, supervised, and terminated. Dr. Venters testified that instilling a corrective action plan and disciplining the physician was an appropriate way for Wexford to confirm that it did ***not*** adopt any practices of delaying or denying adequate medical care, but Dr. Venters did not consider it in forming his opinions. (Ex. P, p. 63-4, 171-2, 206-7).

Dispositively, Dr. Venters could not find a single instance where a medically necessary request was denied by Wexford or any evidence that Wexford discouraged appropriate referrals. Far from it, his review showed that medically necessary was consistently approved by Wexford. (Ex. P, p. 24-25; 40; 48; 77; 126; 139-140; 151; 164; 166; 172-173; 182-183; 189; 204; 206; 220). It is astounding that Dr. Venters put no consideration into the fact that in a pool of patients of known complaints, he found no corporate denials of appropriate care.

In other words, Dr. Venters went on an issue spotting mission in Plaintiffs' counsel's notes and penned a report without any analysis as to comprehensive patient care or outcomes. He then opined that the actions of the medical providers were due to a Wexford practice with no consideration whatsoever for who the provider was, let alone who s/he worked for, or an analysis why s/he acted. Dr. Venters reviewed no documentation or communication that Wexford discouraged identification of significant weight loss, appropriate action to laboratory values, or utilization of specialty care. As such, Plaintiffs have failed to lay the foundation for any of the elements of FRE 702 and Dr. Venters' opinions on "systemic deficiencies" should be barred.

Of note, Plaintiffs' counsel set up the review for Dr. Venters and reviewed the medical records for him, providing not just a summary of objective facts, but also a summary of opinions that Dr. Venters should come to.  (Exhibit T, Plaintiffs' Counsel's Spreadsheet for Dr. Venters).  Ample authority exists requiring the exclusion of an expert opinion when it merely parrots the opinion of other experts and is formed without independent investigation. "[T]he entirety of an expert's testimony cannot be the mere repetition of 'the out of-court statements of others . . . .'" *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014)) (citations omitted). "An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *Accord Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("Rule 703 'was not intended to . . . allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005))); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . . such expert must make some findings and not merely regurgitate another expert's opinion."); *see also Schoen v. State Farm Fire & Cas. Co.*, No. CV 21-00264-JB-N, 2022 WL 16579767, at *6 (S.D. Ala. Nov. 1, 2022) (collecting cases in which experts were excluded for parroting the opinions of other experts or wholesale adopting other experts' opinions without independent analysis).  Here, Dr. Venters is not relying on the opinions of other experts but is relying on the lay opinions of Plaintiffs' counsel.  This should be barred in all instances, but also, as discussed below, it led to inaccurate findings and unreliable opinions concerning objective facts in the medical records.  As such, Dr. Venters' opinions must be barred.

### III.    Dr. Venters' opinions regarding the 14 patients should be barred.

#### A.    Dr. Venters is not qualified to give opinions on the preventability of patient outcomes.

As discussed above, Dr. Venters admitted he did not perform any preventability analysis. However, in his report there are sections that appear to give opinions that certain outcomes could have been prevented.  As Dr. Venters clearly testified that he was not attempting to give opinions on preventability of outcomes, these opinions must be barred.  He testified that he is not holding himself out as an expert in causation and he cannot give opinions that earlier intervention would have extended any patient's life.  (Ex. P, p. 22:12-23).

> **B.** **Dr. Venters' testimony concerning patient care is not based on a review of sufficient facts or data and is not the product of reliable principles and methods.**

Regardless of whether Dr. Venters is qualified by training, a trial judge has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597. "To do so, the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011), quoting Fed. R. Evid. 702.  This task requires the district court to rule out "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 597; *Porter v. Whitehall Labs., Inc*., 9 F.3d 607, 614 (7th Cir. 1993). The Seventh Circuit has offered the following admonition regarding expert testimony on medical causation:

> An expert witness cannot guess or base an opinion on surmise or conjecture, . . ..
> **Moreover, courts must be particularly wary of unfounded expert opinion testimony when medical causation is the issue**. As we have previously noted, "There is not much difficulty in finding a medical expert witness to testify to virtually any theory of medical causation short of the fantastic."

*Cella v. United States*, 998 F.2d 418, 423 (7th Cir. 1993) (citations omitted) (criticized on other grounds in *Mars v. United States*, 25 F.3d 1383 (7th Cir. 1994) (emphasis added).

In holding that a physician expert did not possess the requisite qualifications to opine about one of the medical conditions at issue, the *Hall* court found that a physician expert's Google search

to retrieve several papers explaining the condition did not demonstrate that he had the knowledge and related experiences to qualify him to opine on the issue. *Hall*, 840 F.3d at 930; citing *Dura Auto Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (remarking that a surgeon "would be competent to testify that the cancer was too advanced for surgery," but that "in offering the additional and critical judgment that the radiologist should have discovered the cancer sooner he would be, at best, just parroting the opinion of an expert in radiology"); also citing *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999) (holding that district court should have barred a material scientist from testifying about conclusions that "were rooted in medical knowledge and training which [he] did not have" and that were "derived primarily, if not completely" from a physiologist). *Hall*, 840 F.3d at 930.

Expert opinions must be barred when formed without sufficient review of the relevant records. Even if the court finds a witness is a "supremely qualified expert," that witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). In *Sommerfield*, the Court found the methodology of an expert lacking where he failed to exhaust the records and independently verify the accuracy and *completeness* thereof prior to forming his opinion. *Sommerfield v. City of Chi.*, 254 F.R.D. 317, 327 (N.D. Ill. 2008). The courtroom is not the place for guesswork. *See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010). The principle behind excluding such testimony is the lack of reliability of the method, not as a punishment for an expert's willful neglect. *Sommerfield v. City of Chi.*, 254 F.R.D. 317 (N.D. Ill. 2008). Similarly, an expert cannot assume the facts that he was called to prove. *Clark,* 192 F.3d at 759.

Furthermore, ignoring evidence that does not fit the expert's opinion is improper and is grounds for exclusion. *Barber v. United Airlines, Inc.,* 17 Fed. Appx. 433, 437 (7th Cir. 2001) (excluded expert opinions because he "did not adequately explain why he ignored certain facts and

data, while accepting others"); *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 263 F. Supp. 3d 705,

714 (N.D. Ill. 2017, aff'd 881 F.3d 587 (7th Cir. 2018); *see also Makor,* 02 C 4356, 2010 U.S. Dist.

LEXIS 62114, at *15-16.

### i.   Mr. Reed and Mr. McCullough

Dr. Venters did not review sufficient data for his opinions as to the medical care provided to

Mr. Reed or Mr. McCullough.  Collectively, there were 18 fact depositions taken (Dr. Hanna Saba,

Lennisha Reed, Lenn Reed Jr., Dr. Vipin Shah, Dr. Faiyez Ahmed, Sara Stover, Dr. Stephen Ritz,

Trina Canada, Allyson Fiscus, Keyana Wiley, Dr. Justin Young, Justin Duprey, Dr. Michael Scott,

Angel Rector, Lori Moton, Courtney Walker, Angela Wachtor, or Cynthia Ross), but Dr. Venters

reviewed none of them.  In *Makor*, the Northern District of Illinois excluded an expert's opinion

where he failed to sufficiently review and address deposition testimony opposing his opinion and

instead chose to focus only on finding support for his preconceived theory. *Makor Issues & Rights,*

*Ltd. v. Tellabs, Inc.*, No. 02 C 4356, 2010 U.S. Dist. LEXIS 62114, at *15-16 (N.D. Ill. June 23,

2010).

Defendants are not suggesting that an expert must read each and every deposition in every

case.  However, in these cases, there were eight Defendant depositions, specifically concerning the

medical care provided to Mr. Reed and Mr. McCullough, and Dr. Venters did not review a single one.

Dr. Venters formed his opinions without consideration of what any Defendant had to say.  When the

question concerns the medical judgment of the provider, it is necessary to fully understand the medical

provider's thought process.  Motivation, rationale, experience, education, and training are not fully

contained within the medical records.  A prime example of this is Ms. Stover, who remembers Mr.

Reed in great detail, testified about her encounters with Mr. Reed and Mr. Reed's requests to remain

her patient.  Based on this, she did not refer Mr. Reed sooner to the Medical Doctor.  She also testified

that, like the article Dr. Schmidt cited, she did not believe Mr. Reed had cancer because of his young

age and apparent health.  Further, when questioned about how Wexford affected her decision to refer a patient, Ms. Stover testified "I worked there for three-and-a-half years, and I never seen them not send somebody out because of the cost."  (Ex. G, p. 26).  This was common testimony from the fact witnesses.

Dr. Venters also did not review the depositions of seven non-party treaters.  Particularly egregious is Dr. Venters' failure to review the transcript of Mr. Reed's treating oncologist, Dr. Saba.  Not only did Dr. Saba provide context and clarification as to his medical records, his office's communication with the prison, and his medical judgment for when to initiate chemotherapy that was not contained in his medical records, but also Dr. Saba has provided oncological services for Lawrence Correctional Center for 13 years and has ***not*** seen a pattern of delaying cancer care.  (Exhibit A, Deposition of Dr. Hanna Saba, 6:3-7:24; 95:4-97:9).  If Dr. Venters was assessing systemic practices related to cancer diagnosis and treatment, Dr. Saba's firsthand experience treating all cancer patients at Mr. Reed's facility, and patients in the community, for 13 years is material and invaluable.[6]  Instead of reviewing the sworn testimony of the oncologist for Lawrence Correctional Center, Dr. Venters reviewed two court monitor reports from a class-action that did ***not*** assess or discuss Lawrence Correctional Center (or Danville or Pinckneyville).  The only rational explanation is that Dr. Saba's transcript was not provided to Dr. Venters, or he chose not to review it, because it undermines Plaintiffs' case.

Given both the volume of materials *not* reviewed and the pertinent subject matter of those materials, Dr. Venters did not review sufficient data in this case to provide opinions on the medical care provided to Mr. Reed or Mr. McCullough and Defendants' Motion to Bar should be granted.

---

[6] Undersigned counsel even offered to provide Dr. Venters with the transcript for him to review between day 1 and 2 of his deposition, but he refused.

Lastly, Dr. Venters testified that he found three issues in Mr. Reed and Mr. McCullough's care, which led him to look for those issues in the other prisons' medical charts.  However, Mr. McCullough did not have significant weight loss in 2016-2018.  Both Mr. Reed and Mr. McCullough had significant weight loss approximately a month before they were sent out for assessment.  In both cases, the weight was documented and was part of the reason for the referrals.

According to Dr. Venters, neither man had abnormal laboratory results that were unaddressed, and it is baffling why this alleged practice is in Dr. Venters report at all.  Mr. McCullough was sent to the ER due, in part, to abnormal labs and Mr. Reed simply did not have any abnormal labs. (Ex. O, 244; 267).

Dr. Venters' purported practice concerning a delay in specialty care is unclear whether he found a scheduling delay or a delay by the provider in seeking a referral.  Nonetheless, Mr. McCullough was sent to the ER without any collegial pre-approval.  Similarly, Mr. Reed's referrals were approved timely and, in fact, the medical providers at the prison acted with a greater sense of urgency than the outside providers.  In reality, Dr. Venters believed that non-party, Ms. Stover delayed in referring Mr. Reed, but he is not an expert is her scope of practice, he referred to Dr. Shah as a "good doctor," he had no evidence that not marking a referral as urgent caused any delay in his access to specialty care, and he was unsure of nature of the collegial process or how the appointments were made.  (Ex. O, p. 78-79; 120-125; 249-254).

For Mr. McCullough, Dr. Venters acknowledges that an ultrasound is a viable diagnostic tool for kidney stones, which is what he was being assessed for in 2016, not cancer, and there are no complaints about his care over the following years until a few weeks before he was sent to the ER, due to his deterioration.  (Ex. O, 265-267; 279-280).  At the ER, the physicians also did not suspect cancer as the cause of his symptoms until an incidental finding was made on a chest x-ray assessing for a new cough.  (Ex. O, 272-274).  During the time that the Defendants saw both men, they each

had aggressive, terminal cancer that did not respond to chemotherapy. Instead of acknowledging that cancer caused the men's unfortunate demises, Dr. Venters blames medical providers for not curing an incurable disease. Dr. Venters further cannot explain the harm in delaying chemotherapy when the patients' cancer did not respond to chemotherapy. (Ex. O, 281-282). For any of the various reasons stated herein, Defendants' Motion to Bar should be granted.

### ii.    The 14 Other Patients

Dr. Venters reviewed some of the medical records for 14 other prisoners. However, Dr. Venters cannot articulate which portion of the 15,000 pages of records he reviewed. Because Dr. Venters only afforded 18 hours total to all aspects of this case, Plaintiffs cannot lay the foundation that Dr. Venters meaningfully considered these records. Dr. Venters did not review any training records, personnel files, mortality records, or email communications (12,000 pages of which were produced) concerning these patients. This is particularly important here as Dr. Venters concludes that care was not given, or symptoms were not considered because he did not see documentation confirming it. However, opinions based on "the absence of explicit statements in the limited records he reviewed" required a thorough investigation of the records. *Smith v. Union Pac. R.R.,* No. 11-cv-986, 2017 U.S. Dist. LEXIS 94501, at *16 (N.D. Ill. June 20, 2017). For example, Dr. Venters came to the opinion that medical staff did not address nutritional needs of patients, but he did not review the email communication from the doctor concerning the patient's nutritional needs. Dr. Venters came to opinions about Wexford practices, but he failed to review any Wexford guidelines, employee personnel files, training records, or mortality reviews. In other words, Dr. Venters assumed Wexford did nothing because Dr. Venters did not review anything Wexford did. As discussed above, this foundational flaw is two-parted: 1) Dr. Venters did not review sufficient data and 2) the methodology that no action was taken because he did not review the full or proper records is not scientific or reliable.

A witness's methodology is unreliable and should be barred when the witness "uniformly treated all evidence that undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence." *Fail-Safe, L.L.C. v. A.O. Smith Corp*., 744 F. Supp. 2d 870, 889-890 (E.D. Wis. 2010)(citing *Cf. Minasian v. Standard Chtd. Bank, P.L.C.*, 109 F.3d 1212, 1216 (7th Cir. 1997)(finding that an expert's submission to the court exemplified "everything that is bad about expert witnesses in litigation" because it was "full of vigorous assertion ... carefully tailored to support plaintiffs' position but devoid of analysis.")). "Cherry pick[ing]" the data is "another strong reason to conclude that the witness utilized an unreliable methodology." *Id.* (citing *Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) (holding that a "selective use of facts fails to satisfy the scientific method and *Daubert*.")).

Dr. Venters admitted that he did not review the full medical records but reviewed them through his unclear "relevance" filter and/or relied on Plaintiffs' counsel's notes about what they believed the medical records meant. While Plaintiffs may attempt to cast this deficiency as a credibility issue, it is Plaintiffs' burden to show that Dr. Venters met the requirements of FRE 702. One of the most obvious signs that Dr. Venters' review was unscientific, unreliable, and unsupported by any methodology is that Dr. Venters repeatedly reported objective facts about the medical care wrong.[7] These opinions are not judgment calls but objective facts that Dr. Venters missed, ignored, or relied on Plaintiffs' counsel's notes for instead of the medical records.

### a. J.A.

This individual was incarcerated at Stateville Correctional Center and treated by non-defendants. (Ex. P, p. 8-9). He was 80 years old at his death in 2016. (Ex. P, p. 10). He had end-stage dementia and was bedridden, but Dr. Venters does not know what end-stage dementia is and

---

[7] Defendants note that this Motion challenges Dr. Venters' foundation under FRE 702. Defendants are not addressing Dr. Venters' interpretation of the records, but instead highlight his failure to either review the records, failure to account for records, or his false statements regarding what the records say.

did not know J.A. was bedridden.  (Ex. P, p. 11-12; 25-26).  Dr. Venters does not know if this patient died from cancer or his other co-morbidities.  (Ex. P, p. 21-22).  Dr. Venters' criticism is that he did not see the patient's weight being monitored *after* he was diagnosed with cancer.  However, Dr. Venters also saw no evidence of weight loss, no missed abnormal labs, no specialty delays, and this patient was diagnosed with cancer a year prior to his death.  (Ex. P, p. 19-25).  There were no collegial denials of appropriate care, but, instead, there were several collegial approvals.  (Ex. P, p. 24-25).

**b.  R.B.**

This patient was incarcerated at Pontiac Correctional Center and treated by non-parties.  (Ex. P, p. 26).  He was timely diagnosed with brain cancer in 2009, without any unappreciated weight loss. (Ex. P, p. 26-27).  He was regularly seen by an oncologist and after the abnormal MRI, he saw the oncologist again within 6 days (February 20, 2013).  (Ex. P, p. 28-30).  The oncologist did not order chemotherapy but referred R.B. to a neurosurgeon, which was approved and R.B. saw the neurosurgeon on March 20, 2013.  *Id.*  There is no evidence that an earlier neurosurgery appointment was available.  (Ex. P, p. 30-31).  The neurosurgeon recommended a biopsy, but did not recommend it urgently or otherwise indicated it needed to be scheduled within a specific window of time.  (Ex. P, p. 32-33). The same day, March 20, 2013, the biopsy was scheduled for April 12, 2013; however, R.B. was hospitalized prior to the biopsy and subsequently passed away in the hospital.  (Ex. P, p. 33-34).  R.B. lived two months from his positive MRI finding.  In that time, he saw the oncologist, neurologist, and was scheduled for a biopsy.  (Ex. P, p. 34).  Dr. Venters has no reason to believe that R.B. was not given the earliest availability when he was scheduled outside of the prison.  (Ex. P, p. 38). There were no collegial denials of appropriate medical care.  (Ex. P, p. 40).

**c.  J.C.**

J.C. was incarcerated at Hill Correctional Center and was treated by non-defendants. (Ex. P, p. 41).  He was timely diagnosed with a peritoneal mass in 2016, without unappreciated weight loss.[8] (Ex. P, p. 41-47; 53).  Dr. Venters discusses J.C.'s anemia but was unaware of his history of a blood transfusion.  (Ex. P, p. 47-48).  J.C. was seen by many specialists and there was no collegial denial of appropriate medical care.  (Ex. P, p. 48; 55-56; 77).  There was no specialist's recommendation that was not approved.  (Ex. P, p. 56).

Dr. Venters is critical of the follow-up from the doctor after a chest x-ray and an elevated alkaline phosphatase lab.  First, the patient refused the follow-up chest x-ray, but Dr. Venters did not include this in his report.  (Ex. P, p. 51).  The patient was subsequently sent to the ER for a pleural effusion where he was treated and discharged.  (Ex. P, p. 54-55).  As it relates to the elevated alkaline phosphatase result at a different time, Dr. Venters explained that this is a non-specific finding and could be related to a variety of different causes and his subsequent labs were normal.  (Ex. P, p. 56; 61-62).  Dr. Venters acknowledges that J.C. was housed in the infirmary at this time and was already diagnosed with cancer, but because of the documentation, Dr. Venters does not know that the doctor integrated these findings into the treatment plan.  (Ex. P, p. 57-60).  However, the medical records showed a pattern of this patient refusing care related to his cancer, but Dr. Venters did not include this in his report.  (Ex. P, p. 59-60).  In fact, there were emails produced by the IDOC to Plaintiffs' counsel evidencing that this patient refused an appointment with his specialist in April 2017, but Dr. Venters did not review them.  (Ex. P, p. 111-113).

Dr. Venters believes that this physician was grossly deficient.  (Ex. P, p. 62-3).  In other words, labs were received and assessed but the doctor got it wrong.  (Ex. P, p. 65-71).  However, Dr. Venters did not know, even though the records were subpoenaed by Plaintiffs' counsel, that this

---

[8] While this patient had weight loss related to his death, this was approximately a year *after* his diagnosis and as a result of his disease process.  (Ex. P, p. 53).

physician was placed on a corrective action plan and subsequently terminated. (Ex. P, p. 63-4). Dr. Venters does not know what caused this patient's death or if it was related to cancer. (Ex. P, p. 71-2; 76-77).

### d. L.C.

This patient was housed at Logan and Lawrence Correctional Center and treated by non-defendants. (Ex. P, p. 77-78; 102). When he first complained of a lump around his head/neck, in February 2016, he had not lost significant weight (i.e. 5% of his weight) and in April 2016, immediately prior to his diagnosis, he had lost seven pounds. (Ex. P, p. 78-80). Dr. Venters does not know if this swollen lymph node was related to his subsequent diagnosis of head and neck cancer as the lump went away in March and April 2016, after treatment with antibiotics. (Ex. P, p. 79-83). Further, Dr. Venters could not recall details about the mass, including its precise location. *Id.* Dr. Venters believed a referral should have been made at the first appointment, not due to weight loss or abnormal labs, but because this patient had a history of smoking. (Ex. P, p. 79-83l 113). Yet, Dr. Venters could not identify where he observed that history and he could not identify the frequency or duration of his smoking history. (Ex. P, p. 83-84). Nonetheless, this patient was sent to the ER on May 15, 2016, four months after his first reported swollen lymph node. (Ex. P, p. 92). Four days later, he was seen by a specialist. (Ex. P, p. 92-93). Dr. Venters cannot say that L.C.'s cancer prognosis changed during this time or that the cancer grew more than on a microscopic level. (Ex. P, p. 109).

Dr. Venters' only subsequent complaint related to L.C.'s nutrition *after* his diagnosis. (Ex. P, p. 108).[9] However, for some unclear reason, Dr. Venters lays the criticism at the physician at the

---

[9] While his report could be read to complain about the timing of L.C.'s radiation therapy, Dr. Venters clarified that he was not offering that criticism. (Ex. P, p. 108). He also could not recall that this patient was radioactive and refusing his feeding tube, which affected the specialist's recommendation for radiation. (Ex. P, p. 98-100).

doctor at the prison instead of the specialist treating L.C.  Further, Dr. Venters failed to review email communication specifically addressing L.C.'s diet.  (Ex. P, p.  101-103).    Dr. Venters also disregarded the soft food permit that was ordered by the doctor at the prison for this patient, and attested he did not know what implications it would have for L.C.'s diet. (Ex. P, p.  95; 97-98).  Dr. Venters further disregarded the fact that this patient was admitted to the infirmary for monitoring and care.  (Ex. P, p. 110-111).  Even worse, Dr. Venters disregarded this patient's refusal of a feeding tube for a month and how it contributed to his nutritional complications.  (Ex. P, p. 100-101).    Dr. Venters does not know this patient's outcome.  (Ex. P, p. 78; 111).  However, he agrees that there were no denials of appropriate medical care, no specialty recommendations were missed due to documentation issues, but instead all specialty recommendations were approved.  (Ex. P, p. 100; 111).

### e.   He.Co.

This patient was incarcerated at Dixon Correctional Center and treated by non-parties.  (Ex. P, p.  113).  Dr. Venters does not know what type of cancer this patient had, gallbladder versus pancreas.  (Ex. P, p. 114; 117).    He first complained of new constipation, without any other indications of cancer, in October 2017.  (Ex. P, p. 114-116).  In the prior months, he had gained 20 pounds and was active playing basketball.  (Ex. P, p. 114-115).  Dr. Venters did not consider this patient's age, despite the testimony of the rarity of cancer in 30-year-olds. (Ex. P, p. 116).  Dr. Venters agreed that his first presentation would not warrant an outside referral and agreed that constipation is not a red flag for pancreatic cancer.  (Ex. P, p. 116-118).

This patient reported a diagnosis of Crohn's disease, which could cause the same or similar symptoms, but Dr. Venters was unaware of this patient's reported medical history.  (Ex. P, p. 119-120).  Additionally, this patient was being assessed for a hernia and in November 2017, he was sent to the ER to rule out an incarcerated hernia, but Dr. Venters was not aware of this.  (Ex. P, p. 120-121).  He had a CT scan at the ER, which did not reveal a tumor.  (Ex. P, p. 121).  He was referred to

a surgeon and Dr. Venters has no critique about the selection of the specialist in this case or others. (Ex. P, p. 121-123). However, Dr. Venters admits that the discussion with collegial about the selection of a specialist was appropriate and what the doctors should have been doing. (Ex. P, p. 123). In other words, this is an example of the utility and benefit of collegial review.

Dr. Venters' report incorrectly stated that this patient lost 20 pounds in one month, but when confronted with the records, Dr. Venters admitted this was incorrect. (Ex. P, p. 118-119). While this patient subsequently lost weight, Dr. Venters admits that it was acted on and the doctors were sending this patient to specialists to obtain a diagnosis and treatment. (Ex. P, p. 124-125). Dr. Venters was also forced to admit that the only abnormal laboratory result for this patient was also acted on and this patient was immediately sent to the ER, where he was admitted for assessment and treatment. (Ex. P, p. 125-126). When he was discharged, the prison staff sent this patient *back* to the ER for his weight loss, but Dr. Venters could not recall this fact either. (Ex. P, p. 126). There was no Wexford denial of appropriate care for this patient. (Ex. P, p. 126).

### f.  Ho.Cu.

This patient was incarcerated at Menard Correctional Center and treated by non-parties. (Ex. K, p. 16); (Ex. P, p. 127-128). He had a pre-existing diagnosis of prostate cancer that was followed by oncology and treated with chemotherapy. (Ex. P, p. 128-129). However, his cancer recurred and/or metastasized in 2016. (Ex. P, p. 128-129). He continued to be treated by oncology and all recommendations were approved. (Ex. P, p. 129). He did not have significant weight loss, and, again, he was already diagnosed with cancer and was being followed by an oncologist when he had insignificant weight loss. (Ex. P, p. 129-131). Further, he was sent to the ER in November 2016, when the abdominal mass was discovered. (Ex. P, p. 131). In addition to no significant weight loss, this patient did not have abnormal laboratory results that were not followed up on. (Ex. P, p. 131).

Dr. Venters' report appears to lay criticisms on doctors at the prison for not ordering a biopsy, but Dr. Venters admitted that this patient was referred back to his oncologist and the oncologist, not the doctors at the prison, was the appropriate person to order a biopsy of the mass. (Ex. P, p. 131-132). This is another example of Dr. Venters appearing to lay criticism where he knows it is not warranted. When the oncologist recommended the biopsy, it was deemed urgent and approved the same day. (Ex. P, p. 132). All recommendations were approved, and no recommendation was missed due to documentation. (Ex. P, p. 133).

### g. B.H.

This patient was incarcerated at Stateville Correctional Center and treated by non-parties. (Ex. P, p. 134). Once in 2014 and once in 2015, B.H. reported chest pain/pressure. (Ex. P, p. 134-135). He did not have significant weight loss. (Ex. P, p. 136; 142; 146-150). Dr. Venters admitted that it was appropriate to work up his chest pain as a cardiac issue, especially as this patient had a history of heart stents. (Ex. P, p. 135; 138-139). Although Dr. Venters did not know if this patient's chest pain was associated with his subsequent esophageal mass, and even though this patient did not have any of the other common symptoms of an esophageal mass, including trouble swallowing, Dr. Venters believes this patient should have been worked up for esophageal cancer. (Ex. P, p. 135-137). Dr. Venters could not explain how an esophageal mass would cause chest pain at two discreet times across a year, instead of chronically. (Ex. P, p. 136-137).

He subsequently developed urinary problems and was referred for specialty care for a suspect prostate nodule. (Ex. P, p. 139-140). He did not have abnormal laboratory results that were not acted on. (Ex. P, p. 140).

In January 2015, he was also referred to a neurologist and urologist. (Ex. P, p. 141). The patient did not show up for the next appointment, which Dr. Venters excludes from his report even

though he claims there was a delay at this time.[10]  (Ex. P, p. 142).  He returns in April 2015, for low back pain and epigastric pain.  (Ex. P, p. 142).  He did not report chest pain at this time.  (Ex. P, p. 142-144).  This patient first reported difficulty swallowing on May 4, 2015.  (Ex. P, p. 146).  He was seen several times by medical professionals, who ordered urgent laboratory tests.  (Ex. P, p. 146). Although the patient reported that he lost 20 pounds, had Dr. Venters reviewed the documented weight at this time, he would have learned that this patient had ***not*** lost significant weight.  (Ex. P, p. 146-147).  When shown the medical records, perhaps for the first time, he agreed that the medical records do not show that his weight decreased in the year beforehand.  (Ex. P, p. 146-150). Nonetheless, on May 17, 2015, he was sent to the ER; thus, the self-reported weight loss was acted on.  (Ex. P, p. 147).

This patient did not have abnormal labs that were not acted on.  (Ex. P, p. 149).  This patient did not have significant weight loss that was not acted on.  (Ex. P, p. 149-150).  Dr. Venters believes that there should have been more work-up done in January 2015 after he reported chest pain, but this patient was seen by specialists in January 2015 for his complaints and then did not show up to his next appointment.  Furthermore, Dr. Venters cannot say that a more thorough assessment in January 2015 would have resulted in some different outcome.  (Ex. P, p. 151).  There were no denials of appropriate care for this patient. (Ex. P, p. 151).

### h.  C.J.

This patient is a female that was incarcerated at Logan Correctional Center and treated by non-parties.  (Ex. P, p. 153; 161).  She was diagnosed with a pancreatic mass before she was incarcerated but failed to follow up with medical professionals in the community, purportedly due to transportation issues.  (Ex. P, p. 154-156).  When she was transferred to Cook County jail, a facility

---

[10] Meanwhile, his report includes the family's complaint about how they were notified of this patient's death, even though it is irrelevant to the medical professionals.  (Ex. P, p. 148-149).

that Wexford is not contracted to, she was hospitalized in October 2016 and a biopsy of the mass was ordered; however, notations in the records indicated that the sample was not sufficient. (Ex. P, p. 154-155). Dr. Venters does not recall seeing the biopsy results. (Ex. P, p. 155).

Dr. Venters did not know when this patient was first incarcerated in the IDOC but was refreshed with the records showing she arrived at Logan on November 9, 2018, just four months prior to her death. (Ex. P, p. 156). Yet, Dr. Venters does not know if this patient was terminal on November 9, 2018. (Ex. P, p. 156). On November 10, 2018, the doctor ordered the results of the biopsy. (Ex. P, p. 156-157). Dr. Venters' criticism is that the doctor waited to re-order the biopsy until the patient was feeling better as her appetite was starting to pick up. (Ex. P, p. 159).[11] Nonetheless, she was sent to the gastroenterologist on January 24, 2017. (Ex. P, p. 163). The GI also did not order a biopsy but ordered a less invasive CT scan. (Ex. P, p. 163). Dr. Venters did not consider why the GI did not order the biopsy, even though it is his sole criticism of the doctor at Logan. (Ex. P, p. 163-164).

All referrals were approved, including the CT scan. (Ex. P, p. 164). At the follow up GI appointment, the specialist explained that he was ***not*** ordering a biopsy and would order a biopsy only if chemotherapy was indicated. (Ex. P, p. 164). Instead, the GI referred her to an oncologist. (Ex. P, p. 165-166). Dr. Venters did not consider that the GI again did not order a biopsy. (Ex. P, p. 166).

This patient did not have significant weight loss that was missed. (Ex. P, p. 154; 165-166). There were no abnormal labs that were not acted on. (Ex. P, p. 166). Despite the *Lippert* report falsely stating that a biopsy referral was denied, Dr. Venters admits that there were no recommendations for a biopsy and no collegial denials. (Ex. P, p. 166-167). The *Lippert* report also falsely states that this patient went to the GI on a routine basis (it is unclear what routine GI appointments they are referring to) three weeks ***after*** she went to the GI for her pancreatic mass. (Ex.

---

[11] Subsequently, this patient refused an appointment in the healthcare unit in January 2017, which Dr. Venters did not include in his analysis. (Ex. P, p. 162-163).

P, p. 166). Dr. Venters did not mention in his report the multiple, material errors made by the *Lippert* monitors.

### i.  J.J.

This patient was incarcerated at Hill Correctional Center and treated by non-parties. (Ex. P, p. 169). He did not have cancer. He did not die of his condition. (Ex. P, p. 169). He did not have abnormal labs or a delay in diagnosis. (Ex. P, p. 169-170). Instead, the Hill doctor knew his condition but did not refer the patient for surgical repair until after the patient lost significant weight. (Ex. P, p. 169). In fact, Wexford agreed and this doctor, who is the same physician that treated J.C. at Hill Correctional Center, was placed on a corrective action plan, was directed to undergo further training, was supervised and demoted, and when he was terminated, this case was specifically referenced. (Ex. P, p. 170-171). This documentation was supplied to Plaintiffs by the IDOC, but it was not provided to Dr. Venters. Nonetheless, Dr. Venters agrees that these measures were ways for Wexford to show that it does ***not*** endorse delays in appropriate medical care. (Ex. P, p. 170-172). Further, there were no collegial denials. (Ex. P, p. 170-173). Yet, even when Wexford demands timely medical intervention of its employees, Dr. Venters disregards what Wexford did and blames them for any action of its former employees without analysis.

### j.  L.L.-M.

This is a female patient that was incarcerated at Logan Correctional Center and treated by non-parties. (Ex. P, p. 173). This patient had a routine chest x-ray at her admission and a 6-millimeter nodule was seen on the chest x-ray. (Ex. P, p. 174). Despite false statements made by the *Lippert* monitors, the radiologist did ***not*** indicate that the nodule was suspicious for malignancy and did not recommend a CT scan. (Ex. P, p. 176-178). The physician had the ability to order a CT scan at that time but made the clinical decision to reorder the chest x-ray in three months. (Ex. P, p. 173-174). She did not have significant weight loss or abnormal labs. (Ex. P, p. 175).

40

Dr. Venters does not know if a CT scan would pick up a 6-millimeter nodule and does not know if the 6-millimeter nodule was cancer but acknowledges (after being confronted again with the medical records) that it did not grow in size on the chest x-ray after the three months. (Ex. P, p. 175-179; 182). The second chest x-ray *did* recommend a CT scan, and a CT scan was approved. (Ex. P, p. 180-181). The CT scan revealed a 2.5-centimeter primary lesion that was *not* on the x-ray ("previously obscured") due to the lung positioning. (Ex. P, p. 181). This patient was not responsive to chemotherapy and Dr. Venters does not know whether initiating chemotherapy three months earlier would have affected her outcome. (Ex. P, p. 182). There were no collegial denials and Dr. Venters failed to identify a single document discouraging ordering medically necessary CT scans. (Ex. P, p. 182-183).

In other words, this patient's lung cancer was diagnosed after routine intake assessment, due to an incidental finding of an asymptomatic nodule, which likely was not cancer but provoked further follow-up that revealed asymptomatic lung cancer. (Ex. P, p. 178-179). It is baffling how this is not an example of excellent care and goes to show the true motives of Dr. Venters (and the *Lippert* monitors).

### k.  D.P.

This patient was incarcerated at Centralia Correctional Center and treated by non-parties. (Ex. P, p. 183). This is one of the few patients that had colon cancer that Dr. Venters reviewed. This patient refused a rectal exam in 2016, but Dr. Venters limited his review to begin in 2018. (Ex. P, p. 184). When this patient's weight decreased from 330 pounds to 305 pounds, he was referred for a colonoscopy, which Dr. Venters believes should have been marked urgently. (Ex. P, p. 185). He has no further criticisms concerning this patient. (Ex. P, p. 185-189). The referral was approved in five days and scheduled for March 1st for GI consultation. The GI did not deem the colonoscopy urgent but scheduled it for May 15th. (Ex. P, p. 185-188). Dr. Venters acknowledges, when confronted,

that the purported delay here is due to the specialist's schedule and he has no evidence that earlier appointments were available but Wexford or its employees rejected them. (Ex. P, p. 186).

This is another example of Dr. Venters manufacturing standards that do not exist in the community and disregarding the actions of physicians in the community in coming to his opinions. There is no explanation for how the Centralia doctor was inappropriate for not marking a referral for urgent approval, when the GI then assessed the patient and determined that a colonoscopy can wait two months.

Also, remarkably, this is one of the few patients Dr. Venters assessed that was not discussed in the *Lippert* report, yet there was no delay in diagnosis or treatment. There were no abnormal labs that were not acted on. (Ex. P, p. 188). There was no collegial denial. (Ex. P, p. 189). While this patient lost weight, that weight was appreciated and was the reason this patient was referred for a colonoscopy. Of course, Dr. Venters cannot expect doctors to anticipate weight loss before it happens. His criticism is based on insufficient review of the medical records, without a scientific or reliable methodology, but instead his opinions are the only thing that deviated from the standard of care.

### l. E.P.

This patient was incarcerated at Menard Correctional Center and treated by non-parties. (Ex. P, p. 189). This patient was diagnosed with hepatitis C, but it is repeatedly documented that he refused any treatment. (Ex. P, p. 190; 197-199). This patient was in the hepatitis chronic clinic[12] and was being monitored, but Dr. Venters' criticism is that an earlier endoscopy was not ordered. (Ex. P, p. 193). Dr. Venters' criticism is based on his confusion about whether this patient refused the work up, as opposed to refusing treatment only. (Ex. P, p. 191). His confusion is not based off any evidence

---

[12] Dr. Venters knew this patient was seen by specialists but does not know about the role UIC hepatologists also play in the hepatitis clinic. (Ex. P, p. 193-195; 201).

that this patient consented to an endoscopy but based on Dr. Venters not usually putting consent to work up and consent to treatment together in his own mind. (Ex. P, p. 191-192; 203). He acknowledged though that the patient has the right to refuse both work-up and treatment. (Ex. P, p. 193-196).

Interestingly, the purpose of the endoscopy is to identify esophageal varices and, if necessary, to band them before they rupture. (Ex. P, p. 198). Not only does Dr. Venters have no evidence that this patient would have consented to an endoscopy or banding in 2015, but also this patient had a subsequent endoscopy in 2016, but Dr. Venters did not check to see if he had varices. (Ex. P, p. 198-202). The patient did not have ruptured varices. *Id*. Additionally, the laboratory testing was not abnormal but instead was inconsistent with this patient having esophageal varices. (Ex. P, p. 196-197; 204). Dr. Venters also is not knowledgeable about the qualifiers for the frequency of endoscopies for patients with hepatitis C. (Ex. P, p. 196). In other words, Dr. Venters' criticism is that the doctors did not force this patient against his will to have an endoscopy, even though the endoscopy did not affect this patient's care whatsoever.

This patient did not have significant weight loss that was not appreciated. (Ex. P, p. 203). This patient was not denied any medically necessary referral for assessment or treatment. (Ex. P, p. 204).

### m. L.S.

This patient was incarcerated at Hill Correctional Center and treated by non-parties. (Ex. P, p. 205). He had a non-cancerous lung disease. (Ex. P, p. 205). This patient was treated by the same Hill doctor discuss *supra* that was disciplined, re-trained, supervised, demoted, and terminated. The criticism is that his doctor did not work up the patient's cough appropriately and the Hill doctor should have referred L.S. to a pulmonologist sooner. (Ex. P, p. 206-207). Again, the corrective action plan showed Wexford's rejection of practices that delay timely referrals. (Ex. P, p. 207). Dr. Venters

admitted that the referral, and all subsequent recommendations, were approved. (Ex. P, p. 206-207). Dr. Venters was unable to articulate significant weight loss that went unappreciated. (Ex. P, p. 207). There were no abnormal lab results that were not acted on. (Ex. P, p. 208).

### n. T.W.

This patient was housed at Western, Stateville, Menard, and Illinois River and treated by non-parties. (Ex. P, p. 208). He was diagnosed with colon cancer. (Ex. P, p. 208). Dr. Venters was unaware of prior refusals for prostate screening and rectal exams. (Ex. P, p. 209). Dr. Venters' report claims he had significant weight loss in 2015, but when confronted with the actual medical records, Dr. Venters had to admit that this patient did not have any weight loss in 2015. (Ex. P, p. 209-210). The one time his laboratory value was abnormal, he was sent to the hospital. (Ex. P, p. 210-211; 219-220). The ER physician recommended a colonoscopy, but did not deem it emergent or urgent and did not provide a recommendation for when it needed to be scheduled. (Ex. P, p. 211-213). Dr. Venters' complaint is that the colonoscopy referral was not marked urgent. The colonoscopy was approved May 2nd and the GI set the colonoscopy for June 15, 2017. (Ex. P, p. 213). Dr. Venters has no reason to believe an earlier appointment was available. (Ex. P, p. 213). Regardless, the patient requested additional time to decide if he wanted any surgical treatment for his condition after his colonoscopy. (Ex. P, p. 213-215).

While it is already unclear what possible negative consequence could have come from the few days it took to approve an appointment weeks in the future, Dr. Venters' next criticism is astounding. Dr. Venters complains that this patient showed signs consistent with a blood clot and it was not properly assessed. This patient did *not* have a blood clot. (Ex. P, p. 215; 217). This patient also was ordered TED hose, which Dr. Venters thinks is not a preventative measure, even though the name literally means Thrombotic Embolism Deterrent. (Ex. P, p. 215-219). There were no collegial denials for this patient. (Ex. P, p. 220).

### o.      Summary of patient specific review[13]

The medical records fail to support Dr. Venters' opinion that the three practices were present to any degree of frequency. After being confronted with the medical records, Dr. Venters' testimony was:

| Patient | Failure to Recognize/Act on Significant Weight Loss | Failure to Act on Abnormal Labs | Delay in Specialty Care |
|---|---|---|---|
| J.A. | No | No | No |
| R.B. | No | No | No |
| **J.C.*** | No | **Yes** | No |
| L.C. | No | No | No |
| He.Co. | No | No | No |
| Ho.Cu. | No | No | No |
| B.H. | No | No | No |
| C.J. | No | No | No |
| **J.J.*** | **Yes** | No | **Yes** |
| L.L-M. | No | No | No |
| D.P. | No | No | No |

---

[13] Although not required for granting this Motion, the Court could also review the report of Moein Heidari (Precision Consulting Group), a statistician who helps create and conduct medical research and testing. Mr. Heidari explained the requirements for a scientific and reliable systemwide study that attempts to generalize findings from a pool into the entire population. Mr. Heidari analyzed Dr. Venters' report and concluded the sampling size was statistically insignificant, the sample was intentionally biased and unreliable, and the case reviews were conclusion based without any discernable methodology applied to the (incompletely) gathered data. (Ex. S). Mr. Heidari also conducted a review of the 2014 and 2018 *Lippert* reports Dr. Venters reviewed, which contains similar sampling size and methodology issues, similar lack of root cause analysis issues, and, most notably, is facially unreliable as the data reviewed and opinions drawn are largely inconsistent, contradictory, or incomplete. (Ex. S). However, as it is Plaintiffs' burden to lay the foundation for Dr. Venters and even a lay person can see that Dr. Venters' review is fundamentally flawed, the Court need not rely on Mr. Heidari's opinions to bar Dr. Venters in this matter.

| | | | |
|---|---|---|---|
| E.P. | No | No | No |
| **L.S.*** | No | No | **Yes** |
| T.W. | No | No | No |
| Total | 1 | 1 | 2 |

In most cases, Dr. Venters got the medical records wrong.  For example, Dr. Venters said there was weight loss when there was not (T.W., R.B., He.Co).[14]  The point of discussing significant weight loss in this case is in the context of the diagnostic process, yet Dr. Venters complained about weight loss of patients without cancer and/or after their diagnosis.[15] (J.C, He.Co., Ho.Cu., L.S., J.J.). Dr. Venters noted abnormal test results and weight loss but excluded that they were appropriately acted on; thus, he had to be confronted with the medical records again.  (D.P., T.W.).  He complained about monitoring for varices that a patient did not have.  He complains about blood clots that a patient did not develop.  He complains about monitoring weight for a patient who did not show any signs of weight loss (but was already being treated for cancer).  He repeatedly claimed there was a delay for imaging or procedures that were either not requested by the specialist, not deemed urgent by the specialist, or scheduled by specialists.  After review of Dr. Venters' deposition testimony, it is plain to a lay person that Dr. Venters did not meaningfully or fully review the medical records and, because he did not review or appreciate the medical records, his opinions are unsupported by evidence.

When confronted with the medical records (as opposed to Plaintiffs' counsel's notes), Dr. Venters' opinion that he observed three practices is wholly dismantled.  Instead, Dr. Venters identified

---

[14] Of note, Dr. Venters did not include medical professionals' names or bates numbers in his report.  He rarely utilized treatment dates.  It appears that Dr. Venters and Plaintiffs' counsel assumed that his report would not be scrutinized or cross-referenced with the medical records, and, perhaps, intentionally made it harder to do so.

[15] It is unclear how a primary care physician can stop the consequences from cancer when an oncologist cannot.

one case where there was an abnormal laboratory value that he believes was ***not*** acted on (J.C.). This physician was terminated. In every other instance he reviewed, laboratory values were acted on. Out of the 14 non-party patients, Dr. Venters identified one case where the prisoner had unappreciated significant weight loss (J.J.). This patient did not have cancer, but this patient was treated by the Hill physician that was terminated. Dr. Venters identified many more cases where patients had weight loss that either was a byproduct of cancer, which is a known complication and is not entirely helpful, or he identified instances that medical professionals *acted* on weight loss. Lastly, out of numerous outside referrals, he identified two instances where he believes the referral was not timely made (J.J., L.S.). Both involved the same terminated Hill physician. After this review, where one physician was found committing errors of judgment and was terminated, Dr. Venters finds, without analysis, these errors were "systemic," and he blames Wexford. Meanwhile, every single medically necessary referral was approved by Wexford.

Dr. Venters did not utilize or apply any methodology in his review of these cases. He conducted no root cause analysis, and he created no system to cross-reference the cases to determine whether patterns existed, because that is not what he was actually attempting to do. Instead, he repeatedly ignored or misrepresented material records, in order to come to preconceived opinions about Wexford based on one physician at Hill.

Again, considering that Plaintiffs' counsel and Dr. Venters specifically sought out cases where they expected to find medical error and/or delay, the fact that Dr. Venters cannot come up with one corporate denial of medically necessary care, not only shows that Wexford did not deny care but also shows that they had an overwhelming practice of **APPROVING** medically necessary care. Dr. Venters admits that he failed to observe any action by Wexford to dissuade proper assessment of weight loss, proper response to abnormal laboratory results, or timely specialty referrals. (Ex. P, p. 182-183). He admits that he cannot opine that any practice he observed was prevalent to any degree,

let alone widespread. (p. 227-8). To allow Dr. Venters to testify that Wexford had such practices is not only baseless, but contrary to all the evidence. The only just outcome is barring his testimony as no foundation can be laid under FRE 702.

### C.    Dr. Venters' Characterization of Wexford Discovery Responses

Dr. Venters explained at his deposition that he reviewed certain Wexford discovery responses and Plaintiffs' counsel advised him what the discovery objections and responses meant. Thus, he came to opinions about what Wexford did in response to *Lippert* and their quality improvement measures, based solely on isolated discovery objections and responses and Plaintiffs' counsel's word.

Again, Dr. Venters did not review Wexford guidelines, mortality reviews, peer reviews, or any other quality assurance or improvement measures (which begs the question why they were compelled by Plaintiffs). (Ex. P, p. 221-224). As such, he has reviewed no data as to the guidelines and practices of Wexford. Furthermore, Dr. Venters was provided responses to the *Lippert* reports, which included Wexford's involvement in the assessment of the monitors' criticisms.[16] (Ex. P, p. 226). Dr. Venters knows there were ongoing multi-disciplinary quality improvement meetings with the IDOC and Wexford. (Ex. P, p. 233). In fact, Dr. Venters knows that over the course of time, staff have been disciplined, including termination, as a result of efforts to review the care provided. (Ex. P, p. 226). Dr. Venters wholly disregarded these measures and opined that Wexford's discovery responses were insufficient. When questioned, Dr. Venters admitted he did not understand the discovery responses, does not know what they mean, and does not know the scope of Wexford's response to *Lippert*. (Ex. P, p. 224-6).

Dr. Venters failed to investigate Wexford's response to *Lippert* by any measure and allowing him to testify as to the meaning of Defendants' discovery responses based on what Plaintiffs' counsel

---

[16] Dr. Ritz also testified that Regional Medical Directors reviewed each and every death identified by the *Lippert* monitors, but Dr. Venters did not review Dr. Ritz's deposition transcript.

told him is nothing more than becoming a mouthpiece for Plaintiffs' counsel's imagination. As discussed above, it is well-settled that the Court should exclude expert opinions when they merely parrot the opinion of other experts without independent investigation. *Brownlee*, 744 F.3d at 482. "An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *Accord*, 705 F.3d at 524; *Loeffel*, 387 F.Supp.2d at 808; *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . . such expert must make some findings and not merely regurgitate another expert's opinion."); *see also Schoen,* No. CV 21-00264-JB-N, 2022 WL 16579767, at *6. Again, Dr. Venters is being used as a parrot for Plaintiffs' counsel's characterization of objections to privilege and the meaning of discovery responses. Dr. Venters lacks foundation to interpret Wexford's discovery responses, let alone Wexford's discovery objections. He is not so qualified, has reviewed nothing in support of his opinions, but relied on Plaintiffs' counsel's say so. For any of these reasons, Defendants' Motion to Bar should be granted.

**D.      Dr. Venters' Review of the *Lippert* Monitors' Summaries**

Dr. Venters read the *Lippert* monitors' summaries and categorized the number of patients he believed fell within his three purported practices, based solely on the *Lippert* monitors' narratives. Dr. Venters did not review the medical records for these patients but assumed the *Lippert* monitors were accurate and complete. (Ex. P, p. 228- 230). Not only is this hearsay evidence without proper authentication, foundation, or degree of reliability, but also Dr. Venters knows the *Lippert* monitors are ***wrong***. In fact, he knows they are repeatedly wrong. Dr. Venters purports to have reviewed the medical records of 10 individuals discussed in the *Lippert* reports. In this small sample, the monitors made numerous, significant, material errors about the plain reading of the medical records.

In discussing R.B., the *Lippert* monitor stated that there was an "MRI on 2/1/13," "he was referred for neurosurgical consultation, but this was not scheduled until 4/10/13," they concluded that

R.B. did not receive a neurosurgery consultation before he died, and found "[a] two-month delay in the neurosurgery consult is excessive." (Page 30 of 2014 *Lippert* report). This summary is completely incorrect, and Dr. Venters admits as much. The MRI was performed on February 14, 2013, and it was provided to the prison on February 20, 2013. (Ex. P, p. 29; 36). R.B. was seen by an oncologist on February 20, 2013, which is entirely neglected by the monitors. The oncologist ordered the referral for neurosurgery consultation on February 20, 2013, which was approved on February 25, 2013 *and he was seen by the neurosurgeon on March 20, 2013.* (Ex. P, p. 30). The monitors put the incorrect date for the MRI results, excluded the oncology appointment, falsely concluded that this patient never had a neurosurgical consultation, and manufactured a non-existent two-month delay. (Ex. P, p. 34-37).

In discussing C.J., the monitors for the 2018 report stated, "[t]he doctor referred the patient for an ERCP and biopsy. Wexford denied this test; instead, they sent the patient to a gastroenterologist on a routine basis for evaluation. There was no clinical justification for this denial as this served only to delay evaluation. The patient went to the gastroenterologist in [sic] on 2/15/17, almost three months after arrival to Logan. The gastroenterologist recommended a biopsy." (Patient 20 of 2018 Lippert report). Yet again, the monitors are completely wrong about every objective fact in this section. *There was no Wexford denial.* (Ex. P, p. 166). C.J. was seen by the GI on January 25, 2017, and the GI did not recommend a biopsy. (Ex. P, p. 166-7). The monitors manufactured a delay and denial that did not occur. This is a prime example of why the *Lippert* reports should not be used in other litigation. It has not been subject to cross-examination and is riddled with errors.

In discussing L.L.-M., the 2018 *Lippert* monitors stated that after routine screening for tuberculosis on intake in January 2017, a "radiologist recommended obtaining a CT scan, as this was suspicious for cancer" and the monitors complain that the recommendation was not followed. The monitors state that a similar recommendation occurred on a second chest x-ray, but no CT scan was

ordered and, instead a third chest x-ray was ordered. (Patient #1, Hospitalization and Specialty Care 2018 *Lippert* Report). However, this again is patently untrue.  No such recommendation existed in January 2017.  (Ex. P, p. 173-8).  The repeated chest x-ray in April 2017 was the ***first*** time a CT scan was recommended, and it was ***ordered and approved***.  (Ex. P, p. 179-180).  The monitors continue to manufacture delays and denials that simply did not occur, and their summaries are not a reliable record of the care that did occur.

Thus, Dr. Venters' assessment whether the *Lippert* monitors noted weight loss in a certain number of their summaries is meaningless and cannot help a jury, because it can only begin to be relevant if it is true.  The reports are not self-authenticating.  They are not findings of fact or admissions.  They are hotly disputed because they are inaccurate.  Dr. Venters performed no verification of the *Lippert* summaries in his Table 1 and admits that his Table 1 is dependent on the *Lippert* monitors getting it right.  (Ex. P, p. 228-230).  But he knows they did not.  Dr. Venters admits that his review, including Table 1, is not a substitute for a peer-review level study and his Table 1 cannot be used to discern the prevalence of any practice, let alone that any perceived practice is widespread.  *Id*.  This inadmissible testimony is based on unsupported hearsay, lacks any scientific or reliable methodology or assessment, and could only be used to inflame and confuse the jury to unduly prejudice Defendants.  It must be barred.

### E.    New Opinions at the Deposition are Untimely

Dr. Venters testified to numerous opinions at his deposition for the first time.  Most of these opinions fell within two categories: 1) documentation practices, and 2) redundancy practices.  Dr. Venters' report cannot be read to provide notice of these opinions or all the facts in support of these opinions.  For example, in discussing L.C. at his deposition, Dr. Venters discussed different types of documentation practices for integration of different information and redundancies, largely for electronic medical records.  (Ex. P, p. 76).  First, Dr. Venters appreciates that Wexford, who is

contracted to provide certain medical services for the IDOC, cannot change the IDOC recordkeeping process or forcibly install electronic medical records programs. *Id.* Second, Dr. Venters' opinions in his report concern three purported practices, which do not include documentation practices or redundancies in monitoring. Third, Dr. Venters only reviewed the medical records provided to him and has no data concerning the redundancies in place to draw any conclusions about what existed, let alone what should have been implemented. (Ex. P, p. 172). In fact, he explained that his role was not to create recommendations for the IDOC or Wexford and he did not opine as to what alternative measures they should take. (Ex. O, p. 134-135). To allow Dr. Venters to opine as to practices, recommendations, or criticisms not contained in his written report would prejudice Defendants and deny them an opportunity to discover and defend any new allegations. For any of these reasons, Defendants' Motion to Bar Dr. Venters should be granted.

WHEREFORE, for the above reasons, Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and STEPHEN RITZ, D.O., respectfully request this Honorable Court grant their Motion to Bar Dr. Venters' Testimony and any such further relief as deemed appropriate.

Respectfully submitted,

CASSIDAY SCHADE LLP

By:  /s/ *Jaclyn Kinkade*
Defendants WEXFORD HEALTH SOURCES, INC., VIPIN SHAH, M.D., and STEPHEN RITZ, D.O.

Jaclyn Kinkade
ARDC No. 6333722
CASSIDAY SCHADE LLP
100 North Broadway, Suite 1580
St. Louis, MO 63102
(314) 241-1377
(314) 241-1320 (Fax)
jkinkade@cassiday.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the Southern District of Illinois using the CM/ECF system.  The electronic case filing system sent a "Notice of E-Filing" to the following:

ATTORNEYS FOR DEFENDANT, FAIYAZ AHMED, M.D.:
Keith Hill
Heyl, Royster, Voelker & Allen, P.C.
105 West Vandalia, Suite 100
Edwardsville, IL 62025
Telephone 618.656.4646
Facsimile 618.656.7940
khill@heylroyster.com

ATTORNEYS FOR PLAINTIFFS:
Jon I. Loevy
Maria Makar
Loevy & Loevy
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
jon@loevy.com
makar@loevy.com