**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LENNISHA REED ANDLENN REED JR., ) | |
| as co-Administrators of the Estate of ) | |
| LENN REED SR. ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | No.: 20-cv-01139-SPM |
| ) | |
| ) | |
| WEXFORD HEALTH SOURCES, INC, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT FAIYAZ AHMED, M.D.'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant, FAIYAZ AHMED, MD, by and through his attorney, Keith

B. Hill of HEYL, ROYSTER, VOELKER & ALLEN, P.C., and submits his Memorandum of

Law in Support of his Motion for Summary Judgment.

**I.     INTRODUCTION**

Lenn Reed Sr. ("Decedent") was an inmate in the Illinois Department of Corrections

housed at Lawrence Correctional Center ("Lawrence") between 2018 and 2019. In late-2018,

Decedent was diagnosed with stage 4 colorectal cancer, and subsequently died of cancer in

January 2019.

On June 2, 2022, Plaintiffs, Lennisha Reed and Lenn Reed Jr., co-Administrators of the

Estate of Decedent, filed their First Amended Complaint against Defendants, Wexford Health

Sources, Inc., Dr. Vipin Shah, , Dr. Stephen Ritz ("the Wexford Defendants"), and Dr. Faiyaz

Ahmed. Dr. Shah and Dr. Ahmed are physicians who worked for Wexford at Lawrence. Dr. Ritz

is an alleged corporate physician for Wexford. Plaintiffs allege, *inter alia*, the following: (1) a

denial of medical care by all Defendants under the Eighth Amendment and 42 U.S.C. § 1983 (Count I); (2) a failure to intervene by all Defendants under the Eighth Amendment and § 1983 (Count II); (3) a wrongful death action against all Defendants under 740 ILCS 180/1 (Count III); (4) a survival action against all Defendants under 755 ILCS 5/27-6 (Count IV); and (5) a respondeat superior claim against Wexford (Count V).

On December 20, 2024, the Wexford Defendants filed their motion for summary judgment and supporting memorandum. (Docs. 199, 200). For this Court's convenience in considering his and the Wexford Defendants' motions for summary judgment, Dr. Ahmed cites the same exhibits cited by the Wexford Defendants in their summary judgment motion. (Docs. 199, 200).

Dr. Ahmed is entitled to summary judgment as to Count I because Plaintiffs cannot establish that Dr. Ahmed exhibited deliberate indifference to Decedent's serious medical needs. Dr. Ahmed is entitled to summary judgment as to Count II because Plaintiffs cannot satisfy the requirements for a failure to intervene claim against Dr. Ahmed. Dr. Ahmed is entitled to summary judgment as to Counts I and II because Plaintiffs have no verifying medical evidence showing that any alleged delay was detrimental to Decedent. Dr. Ahmed is entitled to summary judgment as to Counts III and IV because Plaintiffs have no medical evidence of standard of care, breach of standard of care, and resulting injury. Dr. Ahmed is entitled to summary judgment as to Count III because Dr. Ahmed's alleged breach did not proximately cause Decedent's death.

## II.    STATEMENT OF MATERIAL FACTS

### A.    Initial encounters with Nurse Practitioner Sara Stover.

1.    On February 8, 2018, Decedent was seen in nurse sick call for constipation and indigestion/heart burn. The nurse gave Decedent Milk of Magnesia, fiber tabs, Colace, antacid tabs, and Pepcid. (Ex. D (IDOC Medical Records) at bates 777-79).

2.    On February 21, 2018, Decedent was seen in nurse sick call for constipation. The nurse referred Decedent to a provider. (Ex. D at bates 781).

3.    On March 1, 2018, Nurse Practitioner Sara Stover charted: "per security I/M [inmate] refused MD/NP call line." (Ex. D at bates 782).

4.    On March 22, 2018, Decedent saw NP Stover for constipation/stomach problems. NP Stover's assessment was gas. NP Stover prescribed Simethicone. Decedent was to follow-up in three weeks. (Ex. D at bates 783).

5.    On April 12, 2018, Decedent saw NP Stover for follow-up of constipation/stomach problems. NP Stover ordered an abdominal x-ray, and prescribed Ibuprofen, Simethicone, Omeprazole, and fiber tabs. (Ex. D at bates 784).

6.    On May 3, 2018, Decedent saw NP Stover for follow-up of abdominal x-ray. NP Stover's assessment was hemorrhoids and constipation. NP Stover prescribed Anu-Med suppository, hemorrhoid cream, and Colace. Decedent was to follow-up in one month. (Ex. D at bates 9).

7.    On June 5, 2018, Decedent saw NP Stover for one month follow-up of constipation. On rectal examination, NP Stover observed "healed hemorrhoid on outside of rectum, no internal hemorrhoids noted, prostate smooth but enlarged (upon questioning I/M is having urinary

symptoms such as increased urination [at bedtime], trouble [with] urine stream)." NP Stover's assessment was benign postage hyperplasia (BPH), pain, and constipation. NP Stover prescribed Flomax, and increased the strength of Decedent's Ibuprofen. Decedent was to follow-up in one month to sere if his symptoms were improving. (Ex. D at bates 12).

8.      On July 2, 2018, Decedent saw NP Stover for follow-up of prostate/Flomax. Decedent reported his urinary symptoms improved but he still felt pressure in his rectum. Decedent reported he was worried about prostatitis. NP Stover's assessment was "GI/GU symptoms, BPH." She prescribed Bactrim. Decedent was to follow-up in two weeks. (Ex. D at bates 14).

9.      On July 16, 2018, Decedent saw NP Stover for follow up of "GI/GU symptoms." NP Stover's assessment was unchanged. NP Stover's plan was to refer Decedent to Dr. Shah. (Ex. D at bates 16).

10.      NP Stover testified that she initially was Decedent's primary caregiver. (Ex. G (Stover Deposition) at 33).

11.      She explained that during her May 3, 2018 visit with Decedent, Decedent told her he did not want to be referred to a different provider. He wanted her to take care of everything. (Ex. G at 34, 37).

12.      She testified that Decedent did not mention Dr. Shah or Dr. Ahmed. He just liked her care. (Ex. G at 84).

13.      She testified she told Decedent that she would be his primary provider but she later changed her mind. (Ex. G at 39-40).

14.      She explained that after nothing she tried was making Decedent better, she told Decedent that it was probably better that he see a medical doctor. And he said he really did not want to. And she said, "Well, you kind of got to think about your health and put it first above

preference. I'm not saying … I'm going to forget about your healthcare. I'm just saying that he can order things that I can't." Stover testified that Decedent finally agreed to go and see Dr. Shah. (Ex. G at 82).

15.    NP Stover testified that she probably talked to Decedent about seeing Dr. Shah on July 2, 2018 but Decedent said no. And then she talked to him again on July 16, 2018, and he agreed. (Ex. G at 83).

16.    She testified that she did not talk to Dr. Shah or Dr. Ahmed about Decedent unless she was asking Dr. Shah about pain medication. (Ex. G at 67).

17.    NP Stover testified that prior to referring Decedent to Dr. Shah on July 16, 2018, she did not have any conversation with Dr. Ahmed about Decedent. (Ex. G at 80-81).

18.    She testified that after she referred Decedent to Dr. Shah on July 16, 2018, she did not have any conversation with Dr. Ahmed about Decedent. (Ex. G at 81).

**B.    Referral to Dr. Vipin Shah, and referral for a CT.**

19.    On July 26, 2018, Decedent saw Dr. Vipin Shah on referral for gastrointestinal and genitourinary symptoms. (Ex. E (Dr. Shah Deposition) at 43-44).

20.    Decedent reported that he had lost weight. Decedent reported six months ago, he started with abdominal cramps and pressure in the stomach, difficultly eating, and urges for bowel movement 15 to 30 minutes after he eats. Decedent had nausea but no vomiting or diarrhea. Decedent reported he had a test last month and his prostate was enlarged two plus. He reported he was started on Flomax to help his urinary problem, especially the slow initiation. Dr. Shah asked if he had been tested for diabetes, and whether he was on insulin. Decedent reported his grandmother was diabetic and on insulin. Decedent reported he was not feeling hyperactive. (Ex. E at 44-45, 141-42).

21.     Dr. Shah checked Decedent's blood sugar; Decedent's blood sugar was 116. (Ex. E at 44). Dr. Shah testified that diabetes can cause unexplained weight loss. (Ex. E at 45-46).

22.     On physical examination, Decedent's liver and inguinal lymph glands were enlarged bilaterally. (Ex. E at 45-46).

23.     Dr. Shah's assessment was weight loss, probably prostate cancer. Dr. Shah ordered the following tests: CBC, CMP, hemoglobin A1c, TSH, and PSA. Dr. Shah ordered these tests to rule out diabetes or any liver or kidney issue. Dr. Shah also ordered a CT scan of the abdomen because he was not sure if Decedent had colon cancer. (Ex. E at 46-47).

24.     On July 26, 2018, Dr. Shah submitted a referral request for a CT scan. He noted "Abdominal pain chronic for six months. Patient losing weight 50 pounds in this time. No history of diabetes. BPH diagnosis." (Ex. E at 47-48).

25.     On August 2, 2018, a CT of Decedent's chest, abdomen, and pelvis was approved by Dr. Ritz with Dr. Ahmed. (Ex. D at bates at 178).

26.     On August 10, 2018, Decedent had a CT at Lawrence County Memorial Hospital. The impression was: "Mediastinal, hilar and retroperitoneal lymphadenopathy. Findings are concerning for malignancy, potentially metastatic or lymphoproliferative disease." (Ex. D at bates 713-718).

**C.      Decedent's first encounter with Dr. Ahmed for his symptoms, and referral to an oncologist.**

27.     On August 13, 2018, Decedent saw Dr. Ahmed. Decedent reported that he was developing a hernia. He also reported that he felt a blockage in his rectum and had straining bowel movements since February 2018. He also reported that his lower back was "killing" him. Dr. Ahmed charted that they were waiting on the report of Decedent's abdomen CT. Dr. Ahmed's plan

was stool occult, labs, x-ray of Decedent's lumbar spine, and for Decedent to return to the clinic in two weeks. (Ex. D at bates at 26, 28-29).

28.    On August 14, 2018, Dr. Ahmed reviewed Decedent's August 10, 2018 abdomen CT. Dr. Ahmed's plan was colonoscopy and oncology referral. (Ex. D at bates 27, 713-718).

29.    On August 14, 2018, Dr. Ahmed submitted a referral request for an oncology evaluation, and a GI evaluation and colonoscopy. (Ex. D at bates 183).

30.    Dr. Ahmed submitted his request as non-urgent. *Id.*

31.    Dr. Ritz testified that Wexford is contractually obligated to render a formal determination on an urgent referral request within three business. (Ex. M (Dr. Ritz Deposition) at 42-43).

32.    On August 16, 2018, Dr. Ahmed discussed his referral requests with Dr. Ritz. Dr. Ritz and Dr. Ahmed agreed to an alternative treatment plan of approving Decedent for an oncology evaluation and re-presenting the request for colonoscopy if needed after the oncology evaluation. (Ex. D at bates 191).

33.    Dr. Ritz testified that "it was agreed that having the oncology evaluation would be the most efficient way to get the patient the evaluation and further potential treatment needed." (Ex. M at 52-53).

34.    Dr. Ritz testified that the colonoscopy referral could have delayed the oncology referral, which is ultimately what needed to occur to determine the type of cancer, and the best, most expeditious form of further evaluation and management. (Ex. M at 53).

35.    He explained:

[w]e are dealing with a corrections environment where there are limited resources with respect to transportation and security. … [I]n my view, the oncology evaluation was really the most important and paramount evaluation here with respect to getting diagnosis and further treatment and management

recommendations. If the oncology visit is then, for lack of better term, delayed or because of limited resources put farther down the line, then that can be harmful to a patient.

(Ex. M at 54).

36.     Dr. Ritz also testified that from his many years of experience in primary care treating a lot of cancer patients, when there is not an obvious tumor diagnosis from the imaging, then it is most expeditious and efficient to send the patient to the oncologist and let them make the treatment recommendations. (Ex. M at 54).

37.     Dr. Ritz further testified that the oncologist may not want a colonoscopy. The oncologist may want a different service so it's best to let the oncologist determine and drive the remainder of the evaluation. (Ex. M at 57).

38.     Dr. Ritz testified that, based on his experience in corrections and in the community, the decision to approve the oncology consult first and then follow the recommendations from the oncologist in lieu of approving multiple different referrals was sound medical judgment that is accepted in the field of medicine. (Ex. M at 127).

39.     Dr. Ahmed testified that referring Decedent to an oncologist and waiting for the oncologist's recommendations was "the right way to do it" because the oncologist is a specialist. (Ex. F (Dr. Ahmed Deposition) at 53, 58-60).

40.     Dr. Ahmed explained that the right way is to send the patient to the oncologist and let the oncologist determine where the patient goes next. (Ex. F at 53).

41.     On August 29, 2018, a scheduling clerk called Dr. Hanna Saba's office (oncologist) at Carle Richland Hospital, and faxed information for his review. The clerk charted that she would wait for a return phone call to schedule. (Ex. D at bates 34).

42.     On August 30, 2018, a clerk charted that Decedent had been scheduled to consult with Dr. Saba on September 12, 2018. (Ex. E at 147); (Ex. D at bates 36).

43.     Dr. Shah testified that when a clerk at the prison calls a specialist to make an appointment, the specialist decides when to schedule the appointment. (Ex. E at 143-144).

44.     Dr. Shah testified that in this case, Dr. Saba's office put Decedent on Dr. Saba's schedule when Dr. Saba was available, and that he cannot make Dr. Saba see any patient quicker than his availability. (Ex. E at 144).

**D.     Decedent's first encounter (September 12, 2018) with oncologist Dr. Hanna Saba, and referral for biopsy.**

45.     On September 12, 2018, Decedent saw Dr. Saba. (Ex. A (Dr. Saba Deposition) at 23); (Ex. D at bates 206-214).

46.     Dr. Saba assessed that Decedent was not in acute distress, and Decedent had a normal abdominal exam. (Ex. A at 26).

47.     Dr. Saba reviewed the report of Decedent's CT, and thought the picture was highly concerning and consistent for lymphoma. (Ex. A at 26-27).

48.     Dr. Saba explained that lymphoma is a lymph node cancer. (Ex. A at 27). It is a blood cancer; it is "like liquid cancer." (Ex. A at 32).

49.     Dr. Saba testified that 9 out of 10 patients with lymphoma present like Decedent. (Ex. A at 27).

50.     Dr. Saba ordered a core needle biopsy of the inguinal lymph nodes to confirm the etiology, and wanted to see Decedent again in about three weeks. (Ex. A at 28); (Ex. D at bates 206-214).

51. Dr. Saba testified that it was "absolutely not" appropriate to give Decedent chemotherapy at this time "[b]ecause cancer is not one disease. Cancer is like 100, 200 different illnesses, so each is treated differently." (Ex. A at 28-29).

52. Dr. Saba testified "we don't order treatment for any cancer before we document the cancer." (Ex. A at 30).

53. Dr. Saba explained the steps in working up a patient for cancer as follows: "First, you see what's suspicious, then you try to get down to the bottom of the problem, which is knowing exactly what type of cancer the patient has, and then you need to know the stage and you need to decide about the goal of the treatment, and then you decide what would be the best treatment for the patient." (Ex. A at 30-31).

54. Dr. Shah testified that once Decedent was referred to Dr. Saba, Dr. Saba was the decision-maker for Decedent's cancer treatment. (Ex. E at 148).

55. Dr. Shah observed that Dr. Saba's plan for Decedent to return in three weeks was more time than it took for Decedent's prior specialty referrals to be approved. (Ex. E at 144-45).

56. Dr. Shah testified that Dr. Saba did not order chemotherapy at his first visit with Decedent, and that it is not appropriate for him to order chemotherapy when the oncologist has not because the oncologist is the specialist, and he is not. (Ex. E at 147-48).

57. On September 17, 2018, Dr. Ahmed appears to have charted Dr. Saba's diagnosis and plan into Decedent's medical records. (Ex. D at bates 42-43).

58. On September 17, 2018, Dr. Ahmed submitted referral requests for Decedent to follow-up with Dr. Saba, and for Decedent to have a biopsy. (Ex. D at bates 222-23).

59. On September 18, 2018, Dr. Ahmed's request for biopsy was approved, and Decedent was scheduled for September 20, 2020. (Ex. D at bates 44, 231).

60.     On September 20, 2018, Decedent had a biopsy at Richland Memorial Hospital. (Richland Memorial Hospital records[1], attached hereto as Exhibit 1, at bates 43-47).

61.     On September 21, 2018, a pathology report was completed. The report indicates a diagnosis "consistent with metastatic adenocarcinoma." (Ex. I (Medical Records of Dr. Saba) at 0083-84).

62.     The specimens were forwarded to Mayo Clinic for immunohistochemical staining and consultation. *Id*.

63.     On September 20, 2018, Dr. Ahmed's request for oncology follow-up was approved. (Ex. D at bates 232).

64.     On September 24, 2018, Decedent saw Dr. Ahmed. Decedent was in no distress. Dr. Ahmed's assessment was lymphadenopathy, waiting biopsy report. (Ex. D at bates 0039). 46

65.     On October 2, 2018, the Mayo Clinic issued a report stating that the morphologic features and immunohistochemical staining pattern are most consistent with metastatic adenocarcinoma from GI tract (both lower and upper GI tracts). (Ex. I at 0088).

**E.     Decedent's October 3, 2018 encounter with Dr. Saba, and referral for colonoscopy and biopsy.**

66.     On October 3, 2018, Decedent saw Dr. Saba. (Ex. D at bates 243-250).

67.     Dr. Saba saw Decedent back three weeks later with the result of the biopsy. (Ex. A at 33).

68.     The biopsy showed it was not lymphoma. It came back diagnostic with metastatic adenocarcinoma. (Ex. A at 33).

69.     Dr. Saba explained that adenocarcinoma is a solid tumor cancer. (Ex. A at 33-34).

---

[1] Decedent's Richland Memorial Hospital records are 1,077 pages. Rather than attach all pages, most of which are not material to this motion, Dr. Ahmed is attaching only material pages.

70.     Because the biopsy was from the metastatic side – the lymph nodes – Dr. Saba needed to figure out where the cancer came from. (Ex. A at 34).

71.     Dr. Saba explained that the type of adenocarcinoma can be narrowed down with immunohistochemical staining. (Ex. A at 33-34). In this case, staining was more consistent with GI origin, probably colorectal. (Ex. A at 33-34).

72.     Dr. Saba's plan was to move forward with definitive diagnosis by proceeding with GI workup especially colonoscopy and biopsy of any abnormal lesions to confirm primary cancer and then order molecular testing and profile on the tumor to help determine treatment choices. (Ex. D at bates 243-250).

73.     Although at that time, Decedent did not have a definitive diagnosis, Dr. Saba testified that Decedent's presentation was very suggestive of – and later confirmed – stage 4 rectal cancer. (Ex. A at 35, 39).

74.     Stage 4 meant it was incurable. (Ex. A at 35).

75.     Dr. Saba explained that Decedent's cancer was incurable when he first saw Decedent because at that time, Decedent had "excessive multiple spread to multiple lymph nodes everywhere in addition to liver and lung multiple nodules." (Ex. A at 102-03).

76.     Dr. Saba testified that it was still too early to begin treatment. Decedent needed a colonoscopy for definitive diagnosis, and port placement for chemotherapy. Also, Decedent was severely anemic, and Dr. Saba was concerned that Decedent also had an infection like HIV. Dr. Saba had to test for HIV, and treat Decedent's anemia. As explained by Dr. Saba, "There was so much to take care of, so there's like priority here." (Ex. A at 39-40).

77.     Dr. Saba scheduled Decedent to see Dr. Phillip Rosett on October 11, 2018 for consult for colonoscopy, EGD, and port placement for chemotherapy. (Ex. A at 40-41); (Ex. D at bates 240).

78.     On October 3, 2018, Dr. Ahmed appears to have charted Dr. Saba's assessment and plan into Decedent's medical records. Dr. Ahmed's plan was appointment with Dr. Rosett on October 11, 2018 for consult for colonoscopy, EGD, port placement for chemotherapy. (Ex. D at bates 50).

79.     On October 8, 2018, Dr. Ahmed submitted referral requests for Decedent to follow-up with Dr. Saba, and for Decedent to see GI or surgeon for colonoscopy and EGD. (Ex. D at bates 237-38).

80.     On October 9, 2018, Decedent saw Dr. Ahmed. Decedent reported that he was "messed up," and coughing a lot. Dr. Ahmed's assessment was reactive airway disease. His plan was Duoneb for six weeks. (Ex. D at bates 52).

**F.     Decedent's October 10, 2018 encounter with Dr. Saba.**

81.     On October 10, 2018, Decedent followed-up with Dr. Saba. (Ex. D at bates 255-265).

82.     Decedent was doing okay. He felt better after IV iron last week. Decedent was going to see Dr. Rosett the next day. (Ex. A at 40).

83.     Dr. Saba ordered a molecular profile on the lymph node biopsy. (Ex. A at 41-42).

**G.     Decedent's October 11, 2018 encounter with surgeon Dr. Rosett.**

84.     On October 11, 2018, Decedent saw Dr. Rosett. Dr. Rosett's assessment was abdominal pain-colorectal cancer. His plan was EGD and colonoscopy, insertion Port-A-Cath,

possible diverting colostomy and possible repair of ventral incisional hernia. (Ex. D at bates 273-277).

85.     On October 15, 2018, Decedent saw Dr. Ahmed after seeing Dr. Rosett on October 11. Decedent wanted strong pain medication and Ensure. Dr. Ahmed's plan was to refer to Dr. Rosett for EGD/colonoscopy and port placement for chemotherapy, Tylenol, and Boost. (Ex. D at bates 53).

86.     On October 15, 2018, Dr. Ahmed submitted referral requests for Decedent to have an iron infusion, and to see Dr. Rosett for EGD/colonoscopy. (Ex. D at bates 286).

**H.     Decedent's October 17, 2018 encounter with Dr. Saba.**

87.     On October 17, 2018, Decedent saw Dr. Saba. (Ex. D at bates 298-310).

88.     Dr. Saba charted Decedent had seen Dr. Rosett, and was scheduled for colonoscopy and EGD on October 22 and port placement and possible colostomy on October 23. (Ex. A at 42-43).

89.     On October 19, 2018, Dr. Ahmed charted the dates of  Decedent's surgeries, and that Decedent was to prepare for the colonoscopy by drinking GoLYTELY. (Ex. D at bates 0046). 55

90.     On October 21, 2018, a nurse charted that Decedent refused a call pass to drink GoLYTELY. (Ex. D at bates 56).

91.     On October 22, 2018, Decedent's procedure was cancelled and rescheduled to October 23 because prep was not completed. *Id.*

92.     On October 22, 2018, Decedent completed GoLYTELY as ordered. *Id.*

## I. Decedent's admission to Richland Memorial Hospital for colonoscopy, port placement, etc.

93.     On October 23, 2018, Decedent was admitted to Richland Memorial Hospital for EGD, colonoscopy with cold biopsy, port placement, and colostomy. (Ex. I at 097-100).

94.     The colonoscopy found carcinoma colon with metastatic disease to liver and lungs. (Ex. D at bates 315-317).

95.     During Decedent's surgeries, Dr. Rosett observed metastatic disease in Decedent's pelvis and along the distal sigmoid colon serosal surface. There was also tumor in the retroperitoneum and liver metastasis visualized.  (Ex. I at 0099-100).

96.     Colonic biopsies confirmed Decedent had rectal cancer. (Ex. A at 45); (Ex. I at 0101-02).

97.     On October 25, 2018, Dr. Ahmed submitted a referral request for Decedent to follow-up with Dr. Saba. (Ex. D at bates 321).

98.     On October 29, 2018, while at Richland Memorial Hospital, Decedent had a CT of chest, abdomen, and pelvis. The impression was: 1) Multiple ill-defined soft tissue densities in both lungs. Metastatic disease is suspected. 2) Mediastinal and hilar lymphadenopathy probably due to lymph node metastasis. 3) Skeletal metastasis involving T7 with epidural metastasis. There may be metastasis at the L4 level as well. 4) Severe bilateral hydronephrosis. 5) Bulky retroperitoneal lymphadenopathy probably due to lymph node metastasis. 6) Suspect liver metastasis. (Ex. I at 0103-04).

## J. Decedent's October 29, 2018 encounter with Dr. Saba at Richland Memorial Hospital.

99.     On October 29, 2018, while at Richland Memorial Hospital, Decedent saw Dr. Saba for a consultation. (Ex. I at 180-82).

100.     Dr. Saba's assessment was metastatic poorly differentiated colorectal cancer with extensive disease, retroperitoneal adenopathy as well as lymph nodes, bones, probable lungs and possible liver metastasis. Decedent's prognosis was poor. Treatment was palliative with systemic therapy that usually includes chemo plus/minus biological agent. *Id.*

101.     Decedent also had severe bilateral hydronephrosis (both kidneys become stretched and swollen as the result of a build-up of urine inside them). *Id.*

102.     Dr. Saba's plan was 1) supportive care until recovered from his surgery and then discharge back to the facility; 2) once discharged and in shape good enough, start systemic chemotherapy "hopefully next Monday"; 3) molecular profile testing of cancer; 4) consider bilateral ureteral stent. *Id.*

103.     Dr. Saba told Decedent several times that his overall prognosis was poor. (Ex. A 54).

104.     Dr. Saba explained that Decedent had a "relatively very bad cancer at a bad stage that's incurable," and "[he] wasn't very optimistic at that time of any good outcome." (Ex. A at 54-55).

105.     Dr. Saba charted that Decedent's treatment was palliative, and would depend on the cancer's molecular profile. (Ex. A at 55).

106.     Dr. Saba testified that when he uses the term "palliative care," he means cancer treatment that is not curative, and the goal of treatment is to control it. (Ex. A at 8-9).

107.     Dr. Saba testified that Decedent could not have received chemotherapy while inpatient at Richland Memorial Hospital. (Ex. A at 55-56).

108.     Dr. Saba explained that Richland Memorial Hospital does not have an in-hospital inpatient oncology service. (Ex. A at 45-46, 55-56). Also, "in general, any patient who is in the

hospital because he's sick … this patient in general is not a candidate for chemotherapy. He's too sick to take chemotherapy … The chemo is more likely going to cause more damage than help." (Ex. A at 56-57).

109.    Dr. Saba testified that, at that time, he hoped for Decedent to get better enough to be discharged from the hospital so that they could start the chemo as an outpatient but that was before Decedent started having other complications. (Ex. A at 57).

110.    Dr. Saba testified that Decedent started having some complications with his kidneys. (Ex. A at 48-49). Dr. Saba explained that Decedent had obstructive uropathy of both kidneys. The extensive lymph nodes bulky disease from his cancer blocked the ureters of the kidneys where the kidneys could drain to the bladder, causing urine to be trapped in the kidneys and acute kidney failure. (Ex. A at 48-49).

111.    On October 30, 2018, Dr. Saba completed a Tumor Profiling Requisition form for Decedent's tumor. (Ex. I at 0111).

112.    On October 31, 2018, placement of bilateral ureteral stents was attempted at Richland Memorial Hospital but unsuccessful. During the procedure, a friable tumor just inside the bladder neck was seen. The ureteral orifices could not be identified, and ureteral stent placement was aborted. (Ex. I at 0123-24).

**K.      Decedent's transfer to Carle Hospital for bilateral nephrostomy catheters placement.**

113.    On October 31, 2018, Decedent was transferred to Carle Hospital in Urbana, Illinois where he had bilateral nephrostomy catheters placement. (Ex. I at 0170-72).

114.    Carle Hospital in Urbana has an in-hospital inpatient oncology service. (Ex. A at 46).

115.    Dr. Saba does not have privileges at Carle Hospital in Urbana. (Ex. A at 47).

116.     While Decedent was at Carle Hospital in Urbana, Decedent's cancer was overseen by oncologists at Carle. (Ex. A at 47).

117.     While Decedent was inpatient at Carle Hospital in Urbana, the decision to initiate chemotherapy resided with the oncologists at Carle that were overseeing his care. (Ex. A at 48).

**L.     Decedent's November 3, 2018 return to Lawrence, and subsequent care.**

118.     On November 3, 2018, Decedent returned to Lawrence, and Dr. Shah admitted him into the infirmary. (Ex. D at bates 61).

119.     Decedent was not at Lawrence from October 22, 2018 to November 3, 2018; he was at the hospital. (Ex. E at 154-55).

120.     During that time, oncologists at the hospital or Dr. Saba decided Decedent's cancer treatment. (Ex. E at 155).

121.     On November 13, 2018, Dr. Shah ordered Decedent to Richland Memorial Hospital via an ambulance. (Ex. D at bates 85).

122.     Subsequently, a nurse charted that they were notified by the hospital that Decedent had intestinal blockage and was being admitted. (Ex. D at bates 86).

**M.     Decedent's November 13, 2018 admission to Richland Memorial Hospital.**

123.     On November 13, 2018, Decedent was seen in the Emergency Room at Richland Memorial Hospital for complaints of abdominal pain. A CT of the abdomen found extensive metastatic disease throughout the lower chest, abdomen, and pelvis. (Exhibit 1 at bates 336-45).

124.     On November 14, 2018, Decedent reported that since discharge from the hospital on November 3, 2018, he could not feel his legs and lower abdomen. He reported it had slowly gotten worse and he had been having abdominal distension. Decedent reported he was unable to walk. (Ex. D at bates 363-67).

125.    On November 14, 2018, Decedent had an MRI of his lumbar spine with a history of decreased ostomy output with increasing abdominal distension and inability to walk and unable to feel lower extremities times several days. (Exhibit 1 at bates 368-70).

**N.    Decedent's November 14, 2018 encounter with Dr. Saba at Richland Memorial Hospital.**

126.    On November 14, 2018, while at Richland Memorial Hospital, Decedent saw Dr. Saba for a consultation. (Ex. A at 57-58).

127.    For his assessment and plan, Dr. Saba charted, in part: "At this point, he has to get better and I hope his obstructive symptoms resolve." (Ex. A at 67).

128.    Dr. Saba testified that he does not think Decedent's complications ever got better. (Ex. A at 67).

**O.    Decedent's November 15, 2018 transfer to Carle Hospital.**

129.    On November 15, 2018, Decedent was transferred to Carle Hospital in Urbana for further evaluation of sepsis secondary to UTI, obstructive uropathy, ileus with abdominal distension, poorly functioning left-sided percutaneous nephrostomy tube, and malignant epidural spinal cord compression from mass centered in T7 spine leading to flaccid paralysis of bilateral lower extremities. (Ex. D at bates 458).

130.    Decedent was treated with urgent palliative external beam radiotherapy to T5-T8 spine, and left shoulder. At the completion of radiotherapy, he had marked improvement of left shoulder pain, some improved pain to thoracic spine but had unimproved sequela from chronic malignant epidural spinal cord compression at the level of T7. He was to return to infirmary care within IDOC. *Id.*

131.    Dr. Saba testified that he would not start chemotherapy on a patient with acute spinal cord compression who needs palliative radiation therapy. He explained: "Number one, we

don't give chemotherapy at the same time with radiation therapy that's given for palliative purpose, because it's short and quick. Number two, it's far more important to deal with the spinal cord compression. Spinal cord compression constitutes one of the very few oncological emergencies, and it takes priority over everything else because it leads to permanent paralysis and damage ...." (Ex. A at 76-77).

**P.      Decedent's December 6, 2018 return to Lawrence.**

132.    On December 6, 2018, Decedent was discharged from Carle Hospital, returned to Lawrence, and readmitted into the infirmary. (Ex. D at bates 97).

**Q.      Decedent's December 19, 2018 encounter with Dr. Saba, and subsequent care.**

133.    On December 19, 2018, Decedent saw Dr. Saba. (Ex. A at 81).

134.    Dr. Saba reviewed the molecular profile on Decedent's colon cancer. (Ex. A at 77).

135.    The molecular profile showed that Decedent's cancer had NRAS, BRAF, and APC mutations. (Ex. I at 0133-49).

136.    D. Saba found the profile "consistent with a profile that we usually see with a very aggressive cancer with a worst overall prognosis than other average colon cancer and kind of more resistant to traditional chemotherapy." (Ex. A at 77).

137.    Dr. Saba charted, "[Decedent's] disease is very high risk and resistant to treatment with extremely poor prognosis especially with the BRAF mutation. The presence of NRAS mutation also makes it less likely to respond to treatment with EGFR. His response to therapy in general is very limited. Life expectancy is very short. Treatment options are only palliative that may prolong his life for months but with significant toxicity." (Ex. A at 84); (Ex. I at 0035-38).

138.    Dr. Saba told Decedent that options for treatment are supportive care only and comfort care versus palliative chemotherapy. (Ex. A at 81).

139. Dr. Saba explained that Decedent was doing "much, much poorly" than prior visits, so he made it clear to Decedent that Decedent had the option of not doing anything and just getting comfort care, because at that time, Dr. Saba had very little hope that palliative chemotherapy would work. (Saba Dep at 82).

140. Decedent chose palliative chemotherapy. (Ex. A at 84).

141. Dr. Saba planned to start Decedent on chemotherapy in two weeks. This is the first time that Dr. Saba ordered chemotherapy. (Ex. A at 84-85).

142. On January 2, 2019, Dr. Saba started Decedent on palliative chemotherapy. (Ex. A at 86).

**R. Decedent's January 4, 2019 admission to Richland Memorial Hospital, and subsequent death.**

143. On January 4, 2019, Decedent was sent to the emergency room at Richland Memorial Hospital. (Ex. D at bates 175-65).

144. Decedent was admitted and placed in the intensive care unit. (Ex. D at bates 532-545).

145. On January 8, 2019, Decedent had an acute change in his mental status. He was found to be unresponsive on morning rounds with a lack of right sided corneal reflex. (Exhibit 1 at bates 718).

146. A stat CT head was performed and showed a right frontal calvarium metastasis that was causing mass effect on the right frontal lobe. There was also concern for potential tumor invasion into the brain parenchyma. *Id*.

147. On January 9, 2019, Decedent's sister/healthcare power of attorney changed Decedent's code status to do not resuscitate. (Ex. D at bates 600).

148. Decedent expired on January 9, 2019. (Exhibit 1 at bates 718).

149.     Dr. Saba testified that he does not think that any of his recommendations for Decedent's care and treatment were denied by Wexford or Dr. Ritz or Dr. Shah or Dr. Ahmed. (Ex. A at 89-90).

150.     Dr. Saba testified that there was not significant delay in the treatment he recommended for Decedent. (Ex. A at 95).

151.     Dr. Saba testified that he has treated patients from Lawrence for 13 years, and "they [the providers at Lawrence] usually do whatever we request in reasonably timely fashion." (Ex. A at 96).

152.     Dr. Saba testified that he cannot say there is a pattern of delay at Lawrence. (Ex. A at 97).

153.     Dr. Shah testified that the length of time it took to approve specialty referrals and schedule appoints was reasonable. (Ex. E at 160).

154.     Dr. Saba testified that "it's not unusual to see young patient with aggressive colon cancer present with a Stage 4, part of that because of the aggressive nature of the cancer and part of that because it's just simply not in the mind of the patient or his doctor that they have colon cancer. They may have some symptoms, and everybody would think about common things, like common things are common, and they all of a sudden, you see them with Stage 4." (Ex. A at 129-30).

155.     Dr. Ahmed left Lawrence on October 30, 2018. (Ex. F at 34).

## III.   ARGUMENT

### A.   Dr. Ahmed is entitled to summary judgment as to Count I because Plaintiffs cannot establish that Dr. Ahmed exhibited deliberate indifference to Decedent's serious medical needs.

The Supreme Court has declared that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) *quoting Gregg v. Georgia*, 428 U.S. 153, 1973 (1976). In order to prevail on such a claim, a plaintiff must first show that his condition was "objectively, sufficiently serious" and secondly, that the "prison officials acted with sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotations omitted). With respect to the objective component of this inquiry, "[a] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005).

To establish deliberate indifference, a prisoner also must show that, subjectively, "prison officials acted with a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (citations and quotations omitted). "The inflection of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness," as that term is used in tort cases, is not enough, *Id* at 653. Put another way, a plaintiff must demonstrate that a prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists;" that official actually drew the inference, and then disregarded this risk. *Greeno*, 414 F.3d at 653 (internal quotations omitted).

While a series of negligent acts can evince a prison official's awareness of an inmate's exposure to a serious risk, "showing deliberate indifference through a pattern of neglect entails a heavy burden." *Zentmyer v. Kendall County*, 220 F.3d 805, 811 (7th Cir. 200) *quoting Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999).

Inmates are not entitled to demand specific treatment or even "to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [an inmate] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Moreover, "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). *See also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). At bottom, demonstrating deliberate indifference requires inmates to clear a high threshold. *Dunigan ex rel. Nyman*, 165 F. 3d at 590.

Dr. Ahmed first saw Decedent for his gastrointestinal symptoms on August 13, 2018. (Statement of Material Facts ("SMF") ¶ 27). Decedent reported that he felt a blockage in his rectum and had straining bowel movements since February 2018. *Id.* He also reported that his lower back was "killing" him. *Id.* Dr. Ahmed charted that they were waiting on the report of Decedent's abdomen CT. *Id.* Dr. Ahmed's plan was stool occult, labs, x-ray of Decedent's lumbar spine, and for Decedent to return to the clinic in two weeks. *Id.*

On August 14, 2018, Dr. Ahmed reviewed Decedent's August 10, 2018 abdomen CT, and submitted a referral request for an oncology evaluation, and a GI evaluation and colonoscopy. (SMF ¶ 28). On August 16, 2018, Dr. Ritz approved Dr. Ahmed's request for an oncology evaluation but denied Dr. Ahmed's request for a GI evaluation and colonoscopy. (SMF ¶ 32). Dr.

Ahmed was to represent his request for GI evaluation and colonoscopy if needed after the oncology evaluation. *Id.*

On August 29, 2018, a scheduling clerk called Dr. Saba's office, and faxed information for his review. (SMF ¶ 41). The clerk charted that she would wait for a return phone call to schedule. *Id.* On August 30, 2018, a clerk charted that Decedent had been scheduled to consult with Dr. Saba on September 12, 2018. (SMF ¶ 42).

On September 12, 2018, Decedent saw Dr. Saba. (SMF ¶ 45). Dr. Saba thought Decedent's picture was highly concerning and consistent for lymphoma, and he ordered a biopsy to confirm the etiology, and wanted to see Decedent again in about three weeks. (SMF ¶¶ 46-50). On September 17, 2018, Dr. Ahmed submitted referral requests for Decedent to follow-up with Dr. Saba, and for Decedent to have a biopsy. (SMF ¶ 58). On September 20, 2018, Decedent had a biopsy. (SMF ¶ 60).

On September 24, 2018, Decedent saw Dr. Ahmed. (SMF ¶ 64). Dr. Ahmed's assessment was lymphadenopathy, waiting biopsy report. *Id.*

On October 3, 2018, Decedent saw Dr. Saba with the biopsy results. (SMF ¶ 66). The biopsy showed it was not lymphoma. It came back diagnostic with metastatic adenocarcinoma. (SMF ¶ 68). Dr. Saba's plan was to move forward with definitive diagnosis by proceeding with colonoscopy and biopsy of any abnormal lesions to confirm primary cancer and then order molecular testing and profile on the tumor to help determine treatment choices. (SMF ¶ 72). Dr. Saba scheduled Decedent to see Dr. Rosett on October 11, 2018 for consult for colonoscopy, EGD, and port placement for chemotherapy. (SMF ¶ 77).

On October 8, 2018, Dr. Ahmed submitted referral requests for Decedent to follow-up with Dr. Saba, and for Decedent to see Dr. Rosett for colonoscopy and EGD. (SMF ¶ 79).

On October 11, 2018, Decedent saw Dr. Rosett. (SMF ¶ 84). Dr. Rosett's assessment was abdominal pain-colorectal cancer. His plan was EGD and colonoscopy, insertion Port-A-Cath, possible diverting colostomy and possible repair of ventral incisional hernia. *Id.*

On October 15, 2018, Decedent saw Dr. Ahmed after seeing Dr. Rosett on October 11. (SMF ¶ 85). Decedent wanted strong pain medication and Ensure. *Id.* Dr. Ahmed's plan was to refer to Dr. Rosett for EGD/colonoscopy and port placement for chemotherapy, Tylenol, and Boost. *Id.* On October 15, 2018, Dr. Ahmed submitted referral requests for Decedent to have an iron infusion, and to see Dr. Rosett for EGD/colonoscopy. (SMF ¶ 86).

On October 17, 2018, Decedent saw Dr. Saba. (SMF ¶ 87). Dr. Saba charted Decedent had seen Dr. Rosett, and was scheduled for colonoscopy and EGD on October 22 and port placement and possible colostomy on October 23. (SMF ¶ 88).

On October 19, 2018, Decedent last saw Dr. Ahmed. (SMF ¶¶ 89, 93, 118, 155). Dr. Ahmed charted the dates of Decedent's surgeries, and that Decedent was to prepare for the colonoscopy by drinking GoLYTELY. (SMF ¶ 89). On October 21, 2018, a nurse charted that Decedent refused a call pass to drink GoLYTELY. (SMF ¶ 90). On October 22, 2018, Decedent's procedure was cancelled and rescheduled to October 23 because prep was not completed. (SMF ¶ 91). On October 22, 2018, Decedent completed GoLYTELY as ordered. (SMF ¶ 92).

On October 23, 2018, Decedent was admitted to Richland Memorial Hospital for EGD, colonoscopy with cold biopsy, port placement, and colostomy. (SMF ¶ 93). Decedent did not return to Lawrence until November 3, 2018. (SMF ¶ 118). Dr. Ahmed left Lawrence on October 30, 2018. (SMF ¶ 155).

Plaintiffs take issue with the following related to Dr. Ahmed's involvement in Decedent's care: (1) the abdomen CT was approved on August 2 but did not occur until August 10; (2) Dr.

Ritz approved Dr. Ahmed's August 14 request for an oncology evaluation but denied Dr. Ahmed's request for a colonoscopy; (3) Dr. Ahmed marked his oncologist referral request as non-urgent, and Decedent was not sent to an oncologist until September 12; and (4) Dr. Ahmed marked his referral request for Decedent to see Dr. Rosett for colonoscopy and EGD as non-urgent. (Doc. 63 ¶¶ 20, 22, 26).

Plaintiffs have no evidence that Dr. Ahmed had any personal involvement in the scheduling of Decedent's abdomen CT at Lawrence County Memorial Hospital. Accordingly, there is no basis for holding Dr. Ahmed liable for any alleged damage for alleged delay in Decedent's abdomen CT. *See Thomas v. Gomez*, 659 F.Supp.3d 944, 950 (N.D.Ill. 2023); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019) ("nothing in the record suggests that Dr. Obaisi's actions or inaction caused any of the scheduling delays with Walker's appointments at UIC. Such a lack of personal involvement saves Dr. Obaisi from liability here.").

Dr. Ritz did not deny Dr. Ahmed's August 14 request for a colonoscopy. Dr. Ritz and Dr. Ahmed agreed to an alternative treatment plan of approving Decedent for an oncology evaluation and re-presenting the request for colonoscopy if needed after the oncology evaluation. (SMF ¶ 32). Dr. Ritz testified that sending Decedent to the oncologist and letting the oncologist make the treatment recommendations was the most expeditious and efficient way to get Decedent the evaluation and further potential treatment needed. (SMF ¶¶ 33-36). Dr. Ritz further testified that the oncologist may not want a colonoscopy. The oncologist may want a different service so it's best to let the oncologist determine and drive the remainder of the evaluation. (SMF ¶ 37). Dr. Ritz's and Dr. Ahmed's decision to defer the colonoscopy to determine what the oncologist wanted is a matter of medical judgment. Plaintiffs have no evidence that Dr. Ritz's and Dr. Ahmed's exercise of medical judgment departed significantly from accepted professional norms. Rather, Dr.

Ritz's and Dr. Ahmed's decision to defer the colonoscopy was validated by Dr. Saba who did not order a colonoscopy at the first visit. Dr. Saba wanted something different – an ultrasound-guided biopsy – as the first step for diagnosis. The fact that Dr. Saba did not order a colonoscopy at the first visit shows that Dr. Ritz and Dr. Ahmed's decision to defer the colonoscopy was not a significant departure from accepted professional norms.

Although Dr. Ahmed marked his August 14 oncology referral request as non-urgent (SMF ¶ 30)., the request was still approved within 2 days, which is within the time an urgent request must be determined. (SMF ¶ 31). Plaintiff has no evidence that the request would have been approved sooner had Dr. Ahmed marked it as urgent. Once Dr. Ahmed's oncology referral request was approved, Plaintiffs have no evidence that Dr. Ahmed had any personal involvement in the scheduling of Decedent's appointment with Dr. Saba. Accordingly, there is no basis for holding Dr. Ahmed liable for any alleged damage for alleged delay in Decedent seeing Dr. Saba. *See Thomas*, 659 F.Supp.3d 944 at 950; *Walker*, 940 F.3d at 966.

Additionally, the fact that Dr. Saba did not think it was medically necessary to see Decedent sooner than he did shows that Dr. Ahmed could not have been deliberately indifferent by allegedly delaying Decedent's care. The record shows that on August 29, 2018, a scheduling clerk at Lawrence called Dr. Saba's office, and faxed information for his review. (SMF ¶ 41). The clerk charted that she would wait for a return phone call to schedule. *Id.* On August 30, 2018, a clerk charted that Decedent had been scheduled to consult with Dr. Saba on September 12, 2018 – a wait time of 13 days. (SMF ¶ 42). Also, after seeing Decedent on September 12, 2018, Dr. Saba waited 21 days to see Decedent again. (SMF ¶¶ 50, 66). The fact that Dr. Saba waited 13 days to initially see Decedent and then 21 days to see Decedent again is fatal to Plaintiffs' claim that Dr. Ahmed was deliberately different by allegedly delaying Decedent's care. Decedent had a CT only 8 days

after Dr. Ritz and Dr. Ahmed approved Dr. Shah's referral request. (SMF ¶¶ 25, 26). A scheduling clerk called to schedule Decedent to see Dr. Saba only 13 days after Dr. Ritz and Dr. Ahmed approved Dr. Ahmed's referral request. (SMF ¶¶ 32, 41).

Plaintiffs have no evidence that any act or inaction by Dr. Ahmed caused any delay in Decedent's consultation with Dr. Rosett. Decedent's October 11 consultation with Dr. Rosett was scheduled by Dr. Saba during Dr. Saba's October 3 visit with Decedent, and Decedent saw Dr. Rossett on October 11 as scheduled by Dr. Saba. (SMF ¶¶ 77, 84).

Finally, Dr. Saba - who was Decedent's treating physician, and is not a party or a retained expert – testified that there was not significant delay in the treatment he recommended for Decedent. (SMF ¶ 150).

The record shows that Dr. Ahmed was not deliberately indifferent to Decedent's serious medical needs. Dr. Ahmed had no personal involvement in Decedent's care for his gastrointestinal symptoms until August 2 when he and Dr. Ritz approved Dr. Shah's referral request for an abdominal CT. (SMF ¶ 25). When Dr. Ahmed reviewed the results of Decedent's CT, he referred Decedent to an oncologist. (SMF ¶¶ 28-29). Thereafter, Dr. Ahmed followed the treatment decisions of the oncologist. (SMF ¶¶ 57-58, 78-79, 85, 89). Dr. Ahmed last saw Decedent on October 19 – days before Decedent's admission to the hospital for colonoscopy and other procedures. (SMF ¶¶ 89, 93). By the time Decedent returned to Lawrence on November 3, Dr. Ahmed had left Lawrence. (SMF ¶¶ 118, 155). Summary judgment should be entered in favor of Dr. Ahmed and against Plaintiffs as to Count I.

**B.** **Dr. Ahmed is entitled to summary judgment as to Count II because Plaintiffs cannot satisfy the requirements for a failure to intervene claim against Dr. Ahmed.**

Plaintiffs also claim that Dr. Ahmed violated Decedent's constitutional rights by failing to intervene. The Seventh Circuit acknowledges a "failure to intervene" basis for a constitutional violation under the Eighth Amendment. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Failure to intervene is not a claim for relief; rather, it is way to prove the liability of a state actor who was not a direct participant in the challenged wrongdoing. *Fields v. City of Chicago*, 2014 WL 477394 (N.D.Ill. February 6, 2014). A failure to intervene claim requires evidence of the following: (1) the defendant knew of the unconstitutional conduct; (2) the defendant had a realistic opportunity to prevent the harm; (3) the defendant failed to take reasonable steps to prevent the harm; and (4) the plaintiff suffered harm as a result. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994).

Plaintiffs cannot satisfy the requirements for a failure to intervene claim against Dr. Ahmed. Plaintiffs have no evidence that Dr. Ahmed knew of any unconstitutional conduct prior to his direct participation in Decedent's care beginning on August 2, 2018. Nurse Practitioner Stover testified that prior to referring Decedent to Dr. Shah, Decedent requested that she be his primary caregiver, and she agreed. (SMF ¶¶ 11, 13). She also testified that she did not have any conversation with Dr. Ahmed about Decedent prior to or after referring Decedent to Dr. Shah on July 16, 2018. (SMF ¶¶ 16-18). And for the reasons discussed in Dr. Shah's and Dr. Ritz's motion for summary judgment (Docs. 199, 200), Dr. Shah and Dr. Ritz were not deliberately indifferent to Decedent's serious medical needs. Summary judgment should be granted in favor of Dr. Ahmed and against Plaintiffs as to Count II.

**C.  Dr. Ahmed is entitled to summary judgment as to Counts I and II because Plaintiffs have no verifying medical evidence showing that any alleged delay was detrimental to Decedent.**

Irrespective of any deliberate indifference, there is no evidence that Decedent suffered an injury. "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). An action for delay in the provision of medical care "will not lie unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay." *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009). In other words, the "plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). *See also Martinez v. Correct Care Solutions*, LLC, 2011 WL 13550616, *9 (N.D.Ill. 2011) (granting summary judgment where the plaintiff failed to present verifying medical evidence that alleged delayed detection of his cancer was detrimental).

Plaintiffs retained Dr. Judy Schmidt to opine that Dr. Ahmed breached the standard of care, and that Dr. Ahmed's breach of the standard of care shortened Decedent's life. The Wexford Defendants and Dr. Ahmed have moved to bar Dr. Schmidt's opinions. (Doc. 202). Dr. Ahmed joins and adopts the arguments in the Wexford Defendants' motion. For the reasons discussed in the Wexford Defendants' and Dr. Ahmed's motions, Dr. Schmidt should be barred. Without Dr. Schmidt's opinions, Plaintiffs have no verifying medical evidence that any alleged delay was detrimental to Decedent. Summary judgment should be granted in favor of Dr. Ahmed and against Plaintiffs as to Counts I and II.

**D.** **Dr. Ahmed respectfully requests that this Court grant summary judgment on Plaintiffs' remaining claims under Illinois law.**

After resolving all federal claims, this Court must also consider whether a "balance of the factors" favors retaining jurisdiction over Plaintiffs' state law claims. *Hansen v. Board of Trustees of Hamilton Southeastern School Corp.*, 551 F.3d 599, 608 (7th Cir. 2008).

> That the jurisdiction hook is eliminated before trial at best only preliminarily informs the balance; the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of juridical resources can and should make the difference in a particular case.

*Id. citing Timm v. Mead Corp.*, 32 F.3d 273 at 277 (7th Cir. 1994).

A balance of the factors listed above favors this Court retaining jurisdiction over Plaintiffs' state claims. This Court and the parties have already expended substantial judicial resources – litigation began in August 2022, and the parties have completed discovery. Furthermore, the correct disposition of the state claims against Dr. Ahmed is clear and does not entangle this Court in difficult issues of state law.

**1.** **Dr. Ahmed is entitled to summary judgment as to Counts III and IV because Plaintiffs have no medical evidence of standard of care, breach of standard of care, and resulting injury.**

In an Illinois medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: "the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care." *Purtrill v. Hess*, 111 Ill.2d 229, 241-242 (Ill. 1986). "Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from the standard." *Id.* at 242.

As discussed above, Plaintiffs retained Dr. Schmidt to opine that Dr. Ahmed breached the standard of care, and that Dr. Ahmed's breach of the standard of care shortened Decedent's life. For the reasons discussed in the Wexford Defendants' and Dr. Ahmed's motions (Doc. 202), Dr. Schmidt should be barred. Without Dr. Schmidt's opinions, Plaintiffs have no medical evidence of the standard of care, breach of standard of care, and resulting injury. Summary judgment should be granted in favor of Dr. Ahmed and against Plaintiffs as to Counts III and IV.

> **2. Dr. Ahmed is entitled to summary judgment as to Count III because Dr. Ahmed's alleged breach did not proximately cause Decedent's death.**

For their wrongful death count (Count III) against Dr. Ahmed, Plaintiffs have the burden of proving four elements: (1) Dr. Ahmed owed a duty to Decedent; (2) Dr. Ahmed breached that duty; (3) the breach of duty proximately caused Decedent's death; and (4) that pecuniary damages occurred to persons designated under the Wrongful Death Act. *See Rodgers v. Cook County, Illinois*, 2013 IL App (1st) 123460, ¶ 31. Dr. Ahmed is entitled to summary judgment because irrespective of breach, Dr. Ahmed's alleged breach did not proximately cause Decedent's death. Decedent had terminal stage 4 cancer at his first presentation of symptoms. (SMF ¶¶ 68, 73, 74, 75). Plaintiffs have no evidence that Decedent had any chance of survival. Summary judgment should be granted in favor of Dr. Ahmed and against Plaintiffs as to Count III.

## IV. CONCLUSION

Based on the foregoing, Defendant, FAIYAZ AHMED, M.D., respectfully requests that this Court enter an order granting summary judgment in his favor and against Plaintiffs.

FAIYAZ AHMED, M.D., Defendant,

/s/ Keith B. Hill

BY: _____

HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Keith B. Hill
ARDC #6277660

HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Suite 100, Mark Twain Plaza III
105 West Vandalia
Edwardsville, Illinois 62025 0467
Telephone  618.656.4646
Facsimile  309.420.0402
khill@heylroyster.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on **December 23, 2024,** the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

/s/ Keith B. Hill

_____

Keith B. Hill