## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Lennisha Reed, *et al*., | |
| Plaintiffs, | |
| v. | Case Number 3:20-cv-01139-SPM |
| Wexford Health Sources, Inc., *et al.*, | Judge Stephen P. McGlynn |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, by and through counsel, submit this Opposition to Defendants Wexford, Dr. Ritz, Dr. Ahmed, and Dr. Shah's Motion for Summary Judgment, and state as follows.

## INTRODUCTION

Mr. Reed was a 39-year-old man who presented with persistent and escalating abdominal pain, weight loss, and symptoms indicative of a serious medical condition. Despite repeated visits to Lawrence Correctional Center's infirmary and clear evidence of a deteriorating condition—including significant weight loss, severe pain, and persistent abdominal symptoms—Defendants failed to take timely and appropriate measures to diagnose and treat Mr. Reed. Instead, Wexford personnel repeatedly disregarded his pain and symptoms, repeated ineffective treatment, and failed to approve proper diagnostic testing or referrals for specialist care in a timely manner.

Defendant Dr. Ahmed's initial medical evaluation in May 2017 noted no gastrointestinal issues; however, by February 2018, Mr. Reed began reporting severe digestive problems. Over the following months, despite Mr. Reed's continued complaints of abdominal pain, weight loss, and worsening symptoms, Defendants consistently failed to provide adequate care. Defendants

1

delayed and denied key medical interventions that could have diagnosed the problem causing his symptoms, including basic diagnostic procedures like colonoscopies, CT scans, and consultations with specialists. This serious deviation from the standard of care caused Mr. Reed's cancer to metastasize throughout his body.

In particular, Wexford employees Dr. Ritz, Dr. Ahmed, Dr. Shah, and Nurse Practitioner Stover, among others, failed to act on Mr. Reed's rapid weight loss nor investigated the underlying cause of his symptoms, and instead conducted cursory examinations and prescribed repetitive, ineffective treatments–or no treatment at all. Dr. Ritz, in his role overseeing Wexford's collegial review process, repeatedly delayed or denied necessary referrals and diagnostic testing, contributing to the delay in Mr. Reed's diagnosis and treatment. Dr. Ahmed participated in the collegial review decisions, and Dr. Shah and Nurse Stover did nothing to ensure, expedite, follow-up on, or seek approval for care they knew was necessary for Mr. Reed.

By the time Defendants finally approved Mr. Reed to see an oncologist, his condition had progressed to advanced metastatic colorectal cancer, with significant metastases in his lungs, liver, bones, and lymph nodes. He received no palliative care, or wound care for his gaping wounds and infection from the cancer overtaking his body. The delays in diagnosis and treatment caused Mr. Reed's pain and suffering and ultimately, his untimely death on January 9, 2019, from septic shock and metastatic colon cancer.

Plaintiffs sued Defendants under federal and state law, alleging they were deliberately indifferent to Mr. Reed's serious medical needs in violation of the Eighth Amendment, resulting in unnecessary pain, discomfort, progression of his cancer, and shortened lifespan. Defendants moved for summary judgment, but genuine issues of material fact exist for each of Plaintiffs' claims. The Court should deny Defendants' motion.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

1.      Mr. Lenn Reed was 39 years old when he had a medical history taken at the Lawrence Correctional Center ("LCC") Illinois Department of Corrections on May 4, 2017 by Dr. Faiyaz Ahmed. Mr. Reed was 5'11" tall and weighed 236 pounds. He had no history of weight loss or diarrhea. (ECF 200-4 at Reed 5).

2.      Beginning on February 8, 2018, Mr. Reed began complaining to Wexford medical staff at LCC that he was suffering from abdominal pain and "digestive problems." (Ex. 3 (Ahmed Dep) at 26:4-11). Medical personnel prescribed him antacid and heartburn tablets. (ECF. 200-5 at Reed 0777) Medical personnel did not weigh Mr. Reed at this appointment or order any testing to determine the cause of the abdominal pain. (Ex. 3 (Ahmed Dep) at 26:4-11).

3.      Mr. Reed's symptoms persisted. On February 21, 2018, Mr. Reed went to the prison infirmary complaining of constipation and abdominal pain. (ECF. 200-5 at Reed 0781).

4.      On March 22, 2018, Mr. Reed returned to the infirmary with constipation and bloating. Mr. Reed weighed 211 pounds. (ECF. 200-5 at Reed 0783). There is no indication in the notes, however, that this measurement was compared against Mr. Reed's previous weight from May 2017 or that any testing was done to determine the cause of his symptoms. *Id.*

5.      On April 12, 2018, Nurse Practitioner Sara Stover saw Mr. Reed to evaluate his persistent abdominal pain that worsened when he had bowel movements. (Ex. 5 (Stover Dep.) at 47:23-48:14). She noted that Mr. Reed had a lot of anxiety about something being wrong with him. He weighed 209 pounds. There is no indication in the medical records that this weight was compared to previous measurements. NP Stover recommended omeprazole, simethicone, and an abdominal x-ray. (ECF 200-5 at Reed 0784).

6.      Mr. Reed underwent an abdominal x-ray on April 16, 2018, which showed a moderate amount of stool in the colon. The abdominal bowel gas pattern was nonspecific and non-obstructive. There is no indication that this x-ray identified the cause of Mr. Reed's abdominal pain and constipation, or that additional testing was ordered. (ECF. 200-5 at Reed 0719).

7.      On May 3, 2018, Mr. Reed returned to the infirmary and was seen by NP Stover again. Mr. Reed reported experiencing continued abdominal cramping and pain. He told NP Stover that he had a constant feeling that he had to go to the bathroom "but something is in the way." Mr. Reed weighed 206.6 pounds. There is no indication that this weight was compared to prior measurements. NP Stover determined that Mr. Reed had hemorrhoids and constipation. There is no indication in the notes that the hemorrhoid "diagnosis" resulted from a digital or visual examination of Mr. Reed's anus. (ECF. 200-4 at Reed 0009).

8.      There is also no indication from the records of this encounter that NP Stover attempted to exclude other possible causes of Mr. Reed's abdominal pain or constipation. NP Stover prescribed Anusol suppositories, Colace, and a one-month follow-up.  (ECF. 200-4 at Reed 0009).

9.      On June 5, 2018, Mr. Reed again returned to the infirmary and was seen by NP Stover. Mr. Reed reported experiencing persistent constipation and a feeling "like there is a blockage up higher in the rectum." He had abdominal pain and a throbbing pain in the lower rectum. Mr. Reed's weight had fallen to 198.8 pounds. There is no indication that this weight was compared to prior weight measurements. (ECF. 200-4 at Reed 0012).

10.      At this encounter, Mr. Reed also reported urinary symptoms, such as increased urination and trouble with his urine stream. NP Stover performed a digital rectal examination and

reported a healed hemorrhoid and a smooth but enlarged prostate. Thus, this examination ruled out hemorrhoids as the cause of Mr. Reed's abdominal pain, which was continuing. NP Stover again "diagnosed" Mr. Reed as having constipation, but the medical record does not reflect any attempt to exclude other possible causes of Mr. Reed's abdominal pain and related symptoms before arriving at a diagnosis, or an attempt to diagnose the cause of the constipation itself. NP Stover recommended Flomax and Ibuprofen, and ordered a one-month follow-up. (ECF. 200-4 at Reed 0012).

11. The medical record from this encounter also reflects a diagnosis of benign prostatic hyperplasia ("BPH"). This diagnosis only explained Mr. Reed's enlarged prostate and urinary symptoms, but not the constipation or abdominal/rectal pain. (ECF 200-4 at Reed 0012).

12. On July 2, 2018, Mr. Reed returned to the infirmary for his one-month follow-up with Ms. Stover. Mr. Reed's urinary symptoms had improved, but he still felt pressure in his rectum. Mr. Reed weighed 191.2 pounds. (ECF 200-4 at Reed 0014). Ms. Stover recommended Bactrim and to follow-up in two weeks. There is no indication that Mr. Reed's weight was compared to previous measurements or an attempt to diagnose the cause of Mr. Reed's abdominal pain and pressure in his rectum. (ECF 200-4 at Reed 0014).

13. On July 16, 2018, Mr. Reed went to the infirmary for his follow-up appointment and was again seen by Ms. Stover. He told Ms. Stover that he still felt like something was "blocking" his rectum. Mr. Reed weighed 186 pounds. For the first time in the record, Ms. Stover noted a decrease in Mr. Reed's weight. Ms. Stover recommended referral to Dr. Vipin Shah for assessment of Mr. Reed's abdominal symptoms. (ECF 200-4 at Reed 0016).

14. In the medical records reflecting the multiple encounters between Mr. Reed and Ms. Stover, there is no indication that Mr. Reed rejected or refused referrals to other

practitioners, or making any expression of a preference to be seen by Ms. Stover as opposed to other medical professionals. (Dr. Ahmed Dep at 28:7-22).

15.    On July 20, 2018, Dr. Shah saw Mr. Reed. Dr. Shah noted that Mr. Reed had lost 53 pounds since 2017. Mr. Reed now weighed 183.2 pounds and had persistent abdominal cramping. Dr. Shah recommended a complete blood count ("CBC"), PSA, and a CT scan of the chest, abdomen, and pelvic area. (ECF 200-4, at Reed 0018-0020).

16.    The CT was subject to the collegial review by Dr. Ritz, which did not occur until August 2, 2018. On that date, a CT was approved for Mr. Reed. (ECF 200-4 at Reed 0178).

17.    On August 9, 2018, Mr. Reed told a nurse that he had been dealing with the gastrointestinal symptoms since February, and indicated that his pain had increased. The nurse informed Mr. Reed that he would be sent out for a CT scan soon. (ECF 200-4 at Reed 0024).

18.    On August 10, 2018, almost three weeks (20 days) after it was recommended, Mr. Reed underwent a CT at Lawrence County Memorial Hospital. The CT suggested Mr. Reed had a primary cancer that had spread secondarily to the lungs and lymph tissues. The cancer had not yet spread to the bones and liver. There was mild nodularity (masses) along the posterior wall of the bladder and thickening of the colon and rectum wall, which suggested cancer. Colonoscopy and urology consult were recommended. (ECF 200-5 at Reed 0713-0718).

19.    Mr. Reed returned to the prison. On August 13, 2018, Mr. Reed went back to the infirmary with continued pain. Mr. Reed described to the staff that he felt a "blockage" in the rectum and reported that he had been straining with bowel moments since February 2018. A mass was palpated in the left lower quadrant of the abdomen. Slightly enlarged inguinal lymph nodes were palpated. Mr. Reed weighed 176.6 pounds. Results of the CBC 7/27/18 showing a

microcytic anemia with hemoglobin 10.7 gm/dL were noted. (ECF 200-4 at Reed 0026, 0028-0029).

20.     On August 14, 2018, a prison physician reviewed the CT from August 10th. The on-site physician recommended both a colonoscopy and oncology referral. (ECF 200-4 at Reed 0027) (ECF 200-5 at Reed 000718).

21.     Two days later, at Wexford's collegial review call, Dr. Ritz and Dr. Ahmed approved the oncology referral (ECF 200-4 at Reed 0189) but denied the referral for colonoscopy. Consultation with a urologist for evaluation of left hydronephrosis was recommended at LCC. (ECF 200-4 at Reed 0193-0194).

22.     Wexford did not conduct a collegial review until August 27, 2018 for the urology referral for Mr. Reed. On that date, on the non-urgent collegial review call, Dr. Ritz and Dr. Ahmed denied the colonoscopy and the urology referrals. (ECF 200-4 at Reed 035).

23.     The LCC medical staff did not contact oncologist Dr. Hanna Saba's office until August 29, 2018. On that date, Mr. Reed's information was faxed to Dr. Saba for review. (ECF 200-4 at Reed 0034).

24.     The following day, medical records staff noted that Mr. Reed would be seen by Dr. Saba at Richland Hospital on September 12, 2018–seven months after Mr. Reed had unintentional weight loss, change in bowel habits, and persistent abdominal pain. (ECF 200-4 at Reed 0036).

25.     On August 30, 2018, an LCC physician noted that Mr. Reed needed a colonoscopy as soon as possible, along with the planned oncology consult. Mr. Reed weighed 173.6 pounds. (ECF 200-4 at Reed 0037).

7

26.     On September 12, 2018, Dr. Saba evaluated Mr. Reed for lymphadenopathy and weight loss. He noted that Mr. Reed was having irregular bowel movements, constipation, and rectal pressure. Mr. Reed had lost 60 pounds in one year. He was also anemic and iron deficient. (ECF 200-4 at Reed 0206-0214).

27.     During this exam with Dr. Saba, Mr. Reed's ECOG performance status was 0, meaning that he was fully active and had no performance status restrictions. He weighed 171 pounds. Dr. Saba was concerned about lymphoma given Mr. Reed's presentation. Dr. Saba ordered an ultrasound-guided biopsy of the inguinal node. (ECF 200-4 at Reed 0206–0214).

28.     A week later, Wexford's collegial review approved the biopsy that Dr. Saba ordered for Mr. Reed. The biopsy procedure was then scheduled for September 20, 2018. (ECF 200-4 at Reed 044, 0231).

29.     The lymph node biopsy showed metastatic moderately differentiated adenocarcinoma consistent with a gastrointestinal origin, according to a Mayo report opinion. (ECF 200-10 at Reed 0088).

30.     On October 3, 2018, Mr. Reed had a follow-up appointment with Dr. Saba. (ECF 200-4 at 50). Mr. Reed weighed 169 pounds. Dr. Saba discussed with Mr. Reed the biopsy results, including that the origin of the cancer was likely colorectal and the whole picture was "consistent with and almost diagnostic of metastatic colorectal cancer." (ECF 200-4 at Reed 243). Dr. Saba noted that Mr. Reed was not doing well and his cancer had spread to different regions. He was having a hard time having a bowel movement and had occasional blood in his stool. (ECF 200-1 at 33) (ECF 200-4 at Reed 243–50).

31.    During Dr. Saba's exam, he felt a higher rectal mass.  Dr. Saba recommended EGD/colonoscopy, molecular profiling of the tumor, a port-a-cath, and IV iron for Mr. Reed. (ECF 200-4 at Reed 0050).

32.    LCC medical staff scheduled an appointment for Mr. Reed with the surgeon, Dr. Phillip Rosett, for October 11, 2018. (ECF 200-4 at Reed 0053).

33.    On October 10, 2018, Dr. Saba saw Mr. Reed in the clinic again. He was given another iron infusion. Mr. Reed weighed 161 pounds. (ECF 200-10 at REED CCSOI (MR) 0024-0025).

34.    The next day, Dr. Phillip Rosett evaluated Mr. Reed. Mr. Reed told Dr. Rosett that he felt like he had a blockage from passing stool, blood in the stool, and difficult and painful bowel movements since February, but these symptoms had gotten worse lately. Dr. Rosett recommended an EGD/colonoscopy, port placement, possible diverting colostomy and possible repair of a ventral hernia. (ECF 200-4 at 00273-277).

35.    On October 17, 2018, Dr. Saba saw Mr. Reed for a follow up appointment. Mr. Reed reported feeling tired. The hemoglobin was improved to 11.3 gm/dL. Mr. Reed received a third dose of 510 mg of IV iron. Dr. Saba recommended to proceed with EGD/colonoscopy, port placement and colostomy if needed. (ECF 200-4 at Reed 00298-310).

36.    On October 23, 2018, Dr. Rosett performed an EGD/colonoscopy on Mr. Reed at Richland Memorial Hospital. The EGD revealed that there was an abnormal gastroesophageal junction and a hiatal hernia. The colonoscopy revealed a carcinoma that was near obstructing. A biopsy of the rectal mass showed moderate to poorly differentiated adenocarcinoma. Dr. Rosett recommended port placement and diverting colostomy. (ECF 200-10 at REED CCSOI (MR) 0097-102).

37.    On October 24, 2018, Dr. Rosett performed a sigmoid loop colostomy on Mr. Reed with repair of a supraumbilical midline ventral hernia at Richland Memorial Hospital. During the procedure, a tumor noted in the retroperitoneum and liver metastases were visualized. Dr. Rosett also found metastatic disease in Mr. Reed's pelvis and along the lower part of the sigmoid colon's outer surface. (ECF 200-10 at REED CCSOI (MR) 0099-10).

38.    Mr. Reed underwent a CT of his chest/abdomen/pelvis on October 29, 2018, which revealed numerous poorly defined, elongated soft tissue densities in both lungs. (ECF 200-10 at REED CCSOI (MR) 103–104, 132). The doctors suspected metastatic disease because of the multiplicity. The CT scan showed abnormal and enlarged lymph nodes in the center of the chest and near the lungs; a suspicious spot on the L4 vertebra (lower back), likely from cancer spread; and, severe swelling in both kidneys caused by large, abnormal lymph nodes in the back of the abdomen. Mr. Reed's cancer had spread to the T7 vertebra (upper back bone), extending into the space around the spinal cord. (ECF 200-10 at REED CCSOI (MR) 103–104, 132).

39.    On that same day, Dr. Saba consulted on Mr. Reed's care at Richland Hospital. (ECF 200-1 at 53–54). Dr. Saba reviewed the recent CT. Dr. Saba told Mr. Reed that his overall prognosis was poor. Treatment would be palliative, which Dr. Saba explained meant prolonging Mr. Reed's life through chemotherapy. (ECF 200-1 at 55). Dr. Saba noted that "once he is discharged and in good enough shape, we should start systemic chemotherapy, hopefully next Monday." Additionally, Dr. Saba requested a tumor molecular profile and recommended bilateral ureteral stent placement. (ECF 200-10 at REED CCSOI (MR) 103–104).

40.    Mr. Reed was admitted at Carle Foundation Hospital on October 31, 2018 through November 3, 2018. (ECF 200-13 at 11) (ECF 200-4 at Reed 328). Interventional radiology was consulted for bilateral nephrostomy tube placement, which was done shortly after admission.

(ECF 200-10 at REED CCSOI (MR) 0170-72). There was concern that the stoma looked necrotic, so surgery was consulted. The surgeon changed the colostomy appliance and the superficial congestion resolved.

41.    On November 1, 2018, Dr. Vamsi Vasireddy, an oncologist, consulted on Mr. Reed's care. He informed Mr. Reed that the treatment goal was to control the disease in order to extend his life and to prevent disease related symptoms, which might take two to three months of therapy. He recommended that Mr. Reed follow up with Dr. Saba. Dr. Vasireddy recommended IV iron for Mr. Reed's iron deficiency anemia. (ECF 200-10 at REED CCSOI (MR) 126).

42.    On November 3, 2018, Mr. Reed returned to LCC and was re-admitted to the infirmary. (ECF 200-4 at Reed 062). After admission, Mr. Reed's colostomy bag started leaking and nurses changed it. Mr. Reed was also experiencing back pain and left shoulder pain.

43.    On November 12, 2018, Dr. Shah recommended Norco and Boost for Mr. Reed. (ECF 200-4 at Reed 083).

44.    On November 13, 2018, Dr. Shah noted that Mr. Reed had had no colostomy output for some time. (ECF 200-4 at Reed 061-083).  Suspecting Mr. Reed had a bowel obstruction, Dr. Shah recommended Mr. Reed be transferred to the emergency room at Richland Memorial Hospital. (ECF 200-4 at Reed 359).

45.    Later that day, Mr. Reed was admitted to Richland Memorial Hospital due to an intestinal blockage. A CT scan of Mr. Reed's abdomen and pelvis showed the following:

      i.    A lymph node in the right lung area remained the same size.
     ii.    There were multiple small solid areas in both lower lungs, likely due to cancer spread.
   iii.    Cancerous spots on the lining of the right mid-chest had not changed.
   iv.    A 2.4 cm mass in the right liver lobe remained stable, with additional spots in the liver.

v.    The small intestine contained multiple loops filled with gas, while the large intestine had gas and stool, which could indicate a blockage or slowed movement.

vi.    Tubes had been placed in both kidneys to help with drainage, which resolved swelling in the right kidney but not in the left.

vii.    Swollen lymph nodes in the abdomen, pelvis, and groin had not changed since the last scan.

(ECF 200-I at REED CCSOI (MR) 00336-45).

46.    On November 14, 2018, Dr. Phillip Rosett consulted with Mr. Reed. (200-4 at Reed 363–367). He noted that Mr. Reed was admitted with abdominal distention and weakness. Mr. Reed could not feel his legs or lower abdomen, which he started experiencing approximately 10 days prior. Mr. Reed was unable to walk due to leg weakness. Dr. Rosett recommended an MRI of the lumbar spine. (ECF 200-4 at Reed 363–67).

47.    Mr. Reed underwent an MRI of the lower back with contrast, which showed two areas of cancer spread that were breaking down parts of his spine. The first was a damaged area at the left side of the lower back bone, measuring about 2.6 cm by 2.3 cm. This area had a soft tissue mass that was pushing through nearby muscles. Second, a larger damaged area at the L5 vertebra (lower spine), measuring about 3.4 cm by 2.6 cm by 3.3 cm. This also had a soft tissue mass that was spreading into muscles on both sides of the spine. (ECF 200-4 at Reed 368-70).

48.    Dr. Saba also consulted on Mr. Reed's case on November 14, 2018. He noted that the biopsy at the recent colonoscopy confirmed the diagnoses of metastatic rectal cancer. Mr. Reed required a diverting colostomy to prevent bowel obstruction. Mr. Reed developed bilateral hydronephrosis from obstructing lymphadenopathy and was transferred to Carle Clinic for bilateral nephrostomy tube placement. His molecular profile was pending. Dr. Saba wrote, "I have been trying to contact the correction facility for the last couple of weeks to try to get him down to the clinic. I was afraid he was doing poorly with obstructive bowels and obstructive

12

uropathy, and severe weight loss and needs to be started on systemic chemotherapy ASAP. I was afraid that we have a short window of opportunity to get some treatment and start getting things reversed, otherwise he will be in a position where he won't be able to tolerate any therapy." (ECF 200-4 at Reed 0369).

49.     Dr. Saba noted that Mr. Reed looked cachectic. Mr. Reed had an NG tube in place. Dr. Saba thought that Mr. Reed needed FOLFOX as soon as possible. Dr. Saba said, "I just hope his obstruction resolves quickly so he can be discharged and start treatment as an outpatient." (ECF 200-4 at Reed 0373).

50.     On November 14, 2018, Mr. Reed's Molecular Intelligence mutation profile was finished and reported. The profile revealed that Mr. Reed's tumor was MSI stable, TMB low (6), KRAS negative, NRAS mutated, BRAF mutated and PDL1 negative. (ECF 200-10 at 133–178).

51.     On November 15, 2018, Mr. Reed was admitted to Carle Hospital. (ECF 200-4 at Reed 409). Additionally, Mr. Reed's urine culture came back positive for enterobacter, meaning he had a urinary tract infection upon admittance. (ECF 200-10 at 171).

52.     Dr. Rosett ruled out a bowel obstruction for Mr. Reed and suggested that he be transferred to Carle Clinic for further evaluation and management, including neurological evaluation. Dr. Saba suggested Mr. Reed start chemotherapy while in the hospital. (ECF 200-10 at 171).

53.     On that same day, Dr. Rosett met with Mr. Reed about his care and condition. Mr. Reed was unable to move his lower extremities and his legs were insensate. He discussed hospice care with Mr. Reed, but Mr. Reed indicated that wished to try chemotherapy and other means to prolong his life. Thus, Dr. Rosett recommended transfer to Carle Hospital for neurological assessment and possible in-patient chemotherapy. (ECF 200-4 at REED 363).

54.     There was concern that Mr. Reed had developed sepsis from the urinary tract infection and his antibiotic was switched to Meropenem. Interventional radiology was consulted to change the nephrostomy tubes. Mild hypercalcemia was treated with IV fluids. Mr. Reed had developed a stage 2 pressure ulcer on his buttocks. (ECF 200-4 at 458, 433) (ECF 200-13 at 13).

55.     On November 16, 2018, another oncologist consulted on Mr. Reed's care. This oncologist recommended an urgent MRI of the cervical and thoracic spine as well as radiation oncology consult and palliative care consult. (ECF 200-4 at 367) (ECF 200-13 at 13).

56.     On this same date, Mr. Reed underwent an MRI of the cervical and thoracic spine. The scan revealed that the cancer spread to several areas of Mr. Reed's spine, including the C3 vertebra, the left side of C5, and a mass on the right side of T2, with some spreading into nearby soft tissue. A large tumor affecting the T7 vertebra, extending to T6 and T7, causing severe narrowing of the spinal canal and pressing on the spinal cord.

57.     Mr. Reed was urgently started on Decadron for spinal cord compression. Radiation oncologist Dr. Daniel Barnett noted that Mr. Reed presented with paraplegia secondary to malignant epidural cord compression at T7. He said that Mr. Reed started to notice loss of motor function beginning around November 3rd. Mr. Reed also had been experiencing left shoulder pain due to a lytic left scapula metastases. (ECF 200-4 at 351, 393, 491) (ECF 200-13 at 13).

58.     Neurosurgery said that neurosurgery was not indicated. Mr. Reed started receiving radiation to T6-8 and the left shoulder on November 16, 2018.

59.     Medical oncologist Suparna Manttha MD consulted 11/18/18. She said that Mr. Reed was still interested in palliative chemotherapy. Dr. Manttha said that it was unlikely that

chemotherapy would change his neurologic situation. She said chemotherapy could happen as an outpatient once he completed his palliative radiation therapy.

60.     Medical oncologist Dr. Varnsi Vasireddy consulted on Mr. Reed's case and recommended a dose of IV iron and to follow up with Dr. Saba after hospital discharge. (ECF 200-10 at REED CCSOI (MR) 125-130; ECF 200-13 at 14).

61.     On November 25, 2018, a CT of the abdomen/pelvis showed no evidence of bowel obstruction. However, the CT showed extensive metastatic disease. The liver metastases had enlarged since the prior study. There was also extensive osseous metastatic disease in the lumbar spine and pelvis. (ECF 200-4 at Reed 433).

62.     Blood cultures from 11/23/18 grew Bacteroides. Infectious disease (ID) consulted 11/27/18 and recommended to stop the Zosyn and start Ertapenem. Blood cultures from 11/26/18 were negative.  (ECF 200-4 at Reed 433).

63.     Mr. Reed completed radiation on November 29, 2018. (ECF 200-10 at REED CCSOI (MR) 0036)

64.     ID followed up 11/30/18 and said the source of the bacteremia could be secondary to bowel translocation or the sacral ulcer. Surgery debrided the sacral ulcer close to the bone 11/30/18 but not down to the bone and recommended treatment as a skin soft tissue infection.  ID recommended to broaden the antibiotics to Zosyn/Vancomycin.

65.     On December 6, 2018, Mr. Reed was discharged back to Lawrence. (ECF 200-4 at Reed 409).

66.     On the following day, NP Stover saw Mr. Reed and performed a dressing change for his pressure ulcer. (ECF 200-4 at Reed 0098).

67.     On December 10, 2018, Dr. Daniel Barnett wrote a letter to LCC regarding Mr.

Reed's life expectancy. He reviewed the clinical course including the recent radiation therapy.

Dr. Barnett noted that Mr. Reed had marked improvement in left shoulder pain with radiation

and unimproved sequela from the chronic malignant epidural spinal cord compression. (ECF

200-4 at Reed 458).

68.     In late November, Dr. Barnett said Mr. Reed's ECOG performance status was 3,

which meant he was now capable of only limited self-care and confined to bed or chair for more

than 50% of waking hours. Dr. Barnett said his prognosis without cancer-directed therapy was

one or two months. However, he felt that with cancer-directed therapy he may live six months or

more if his colorectal cancer responds to treatment. (ECF 200-4 at Reed 458).

69.     On December 19, 2018, Dr. Saba saw Mr. Reed and reviewed his mutation

analysis. Dr. Saba felt that Mr. Reed had a poor prognosis and was doing very poorly. Mr.

Reed's ECOG performance status was 4, meaning he was now completely disabled and was

totally confined to bed or chair. Mr. Reed weighed 169 pounds. Dr. Saba explained that Mr.

Reed had two options for care: comfort care or palliative chemotherapy. Mr. Reed opted for

chemotherapy. Dr. Saba informed Mr. Reed that with his weakness and debility, he was also

more likely to have more toxicity from chemotherapy. Dr. Saba recommended Mr. Reed return

in two weeks for his first FOLFOX-Avastin treatment. (ECF 200-4 at Reed 470-478).

70.     On January 2, 2019, Mr. Reed received his first and only FOLFOX-Avastin. Mr.

Reed weighed 160 pounds. (ECF 200-4 at Reed 508-09, 489).

71.     On January 4, 2019, The LCC RN noted that Mr. Reed was having labored

breathing and decreased responsiveness. The on-call LCC physician recommended Mr. Reed be

sent to the emergency room. (ECF 200-4 at Reed 174).

72.    At Richland Memorial Hospital, Mr. Reed weighed 150 pounds. His oxygen was 95% and his pulse was elevated at 139. He had a productive cough, chills, and malaise. He was afebrile with low blood pressure. He was in moderate respiratory distress. The chest x-ray showed increasing bilateral pulmonary infiltrates consistent with pneumonia or metastatic disease. Mr. Reed was given IV antibiotics, IV Morphine and IV fluids. (ECF 200-4 at Reed 532-567).

73.    On January 5, 2019, Mr. Reed's blood pressure dropped and he required Levophed. His oxygen levels were only 90% on two liters of oxygen. Surgery consulted and noted that Mr. Reed now had a large pressure ulcer on his lower back with obvious gross osteomyelitis. Surgery was not an option. (ECF 200-4 at Reed 568-577).

74.    On January 6, 2019, Mr. Reed underwent a CT of his abdomen/pelvis. The CT demonstrated that Mr. Reed had pulmonary metastases with lymphangitis, which had worsened since the previous CT. There were extensive skeletal metastases with epidural metastases, which were also worse. (ECF 200-5 at Reed 580-582).

75.    On January 8, 2019, Mr. Reed was found unresponsive and a CT of his head showed a mass impressing upon the right frontal lobe anteriorly and superiorly. (ECF 200-5 at Reed 591-593).

76.    On January 9, 2019, Mr. Reed was actively dying. After discussion with Mr. Reed's family, his code status was changed to Do Not Resuscitate with comfort measures only. He died later that day. Mr. Reed's cause of death was septic shock due to pneumonia and metastatic colon cancer. (ECF 200-5 at Reed 595-598).

**Dr. Stephen Ritz's Role in Mr. Reed's Care While in IDOC Custody**

1.      Dr. Ritz was not involved in the provision of care to those in IDOC custody. (Ex.
2 (Ritz Dep.) at 15:20-16:1). Rather, he reviewed the medical necessities and clinical
appropriateness of referrals submitted by clinicians seeing IDOC inmates. (*Id*. at 17:23-18:1).

2.      After viewing Mr. Reed's records, Dr. Ritz did not recall that Mr. Reed needed
care that was not provided to him. (*Id*. at 18:15-19:1)

3.      Mr. Ritz further recalls that Mr. Reed had complaints of abdominal pain in 2018.
(*Id*. at 20:9-18)

4.      When Dr. Ritz would review request forms, cost was not a part of the review but
was not entirely irrelevant. If there were two equivalent courses of action, the least costly option
was considered (*Id*. at 35:22-36:4)

5.      When assessing the clinical appropriateness of a medical request, Dr. Ritz would
consider many variables including: requirements of the IDOC contract, administrative directives,
relevant policy guidelines and his medical experience. (*Id*. at 38:1-11). In making a clinically
appropriate decision on referral requests, sometimes alternative treatment plans would be
recommended if different care should be provided. (*Id*. at 39:13-22).

6.      A referral dated July 26, 2018, requesting a CT scan for Mr. Reed was marked
urgent and non-urgent by the referring practitioner, Dr. Shah. ECF 200-4 at Reed 0180; Ex. 6
(Shah Dep.) at 50:5–54:18; Ex. 2 (Ritz Dep.) at 41:1–42:3, 43:20–42.

7.      On August 3, 2018, Dr. Ritz approves the CT requested for Mr. Reed (ECF 200-4
at Reed 0178). The time lapse between the initial request on July 26th and approval on August
3rd indicates a timeframe consistent with a non-urgent request. (Ex. 2 (Ritz Dep) at 41:18-
42:42:3).

8.      After Mr. Reed's CT scan results showed concern for cancer, three separate referral requests were submitted to Dr. Ritz for review: a follow-up with an oncologist, urologist and request for a colonoscopy. (Ex. 2 (Ritz Dep) at 48:14-49:3).

9.      Dr. Ritz and Dr. Ahmed discussed the request in Wexford's collegial review process and denied the requests for a colonoscopy and urologist visit. They approved the oncology visit, and called the denial of the colonoscopy and urology visit an "ATP" (alternative treatment plan). In the comments, they noted that Mr. Reed "lost 53 pounds since 5/4/17" and there were "concern[s] for malignancy, potentially metastatic or lymphoproliferative disease." (ECF 200-4 at Reed 0193).

10.     In his deposition, Dr. Ritz's hindsight justification for the treatment denial was that generally, prisons are in short supply of transportation and security resources. However, Mr. Ritz acknowledges that he cannot say if that was the case for Lawrence Correctional Center where Mr. Reed was being housed at the time of these requests. (Ex. 2 (Ritz Dep) at 55:25-56:20).

11.     On August 24, 2018, an appeal of the requested colonoscopy was delivered to Dr. Ritz for re-review. (ECF 200-4 at Reed 0193).

12.     On December 13, 2018, less than a month before Mr. Reed passes away, a nutrition supplement request for BOOST is submitted as it helps those battling cancer maintain caloric intake, fat and protein. (Ex. 2 (Ritz Dep) at 67:8-68:1). The clinician caring for Mr. Reed requested three cartons, twice daily, however, Dr. Ritz only approves for two cartons, twice a day if Mr. Reed is eating. (*Id*. 69:2-11) Upon questioning why that medical decision was made by Dr. Ritz, he states that since an appeal to his decision was not submitted, the clinicians must have agreed with his approach (*Id*. 71:10-18 and 79:1-8). This explanation of an appeal

contradicts what Dr. Ritz previously explained an appeal to be as it was then described as a follow-up to referrals to ensure they do not slip through the cracks (*Id*. 61:15-62:2).

13.     On December 13, 2018, an urgent referral requested wound care for Mr. Reed who had a gaping ten-by-ten inch wound. (ECF 200-4 at Reed 0464). On the referral request form, the practitioner noted Mr. Reed's colon cancer and said he had a "huge wound with gaping, losing muscle [illegible]." (ECF 200-4 at Reed 0464). The practitioner marked the request urgent and wrote, "[A]ll surface [illegible] and needs immediate care." *Id.* Dr. Ritz denied the wound care stating it would not heal given Mr. Reed's circumstances (*Id*.; Ritz Dep 80:17-82:5).

14.     Dr. Ritz denies that expense plays a role in the wound care denial (Ritz dep 83:5-6). A couple weeks later a new request for Dakin solution was submitted, which is a solution used in wound care (Ex. 2 (Ritz Dep) at 83:7-16). Ritz said he would approve the Dakin solution for wound care unless "cost prohibitive". (Ex. 1 Reed Wex at 174-175). When asked if he would try to identify a more effective alternative for Mr. Reed's wound care, Dr Ritz stated, "Not necessarily, no." (Ex. 2 (Ritz Dep) at 84:4-86:7).

**Dr. Ahmed's Role in Mr. Reed's Care While in IDOC Custody**

15.     In 2017, Dr. Ahmed began working for Wexford and became Mr. Reed's primary care physician. (Ex. 3 (Ahmed Dep.) at 20:15-20).

16.     Dr. Ahmed's employment at Wexford also involved a medical directorship position. (Ex. 3 at 21:1-6).

17.     Dr. Ahmed acknowledged that colon cancer needs quick treatment. (Ex. 3 at 22:17-19)

18.     For stage IV colon cancer patients, Dr. Ahmed testified that treatment may prolong a patient's life by a few days, weeks, or months. (Ex. 3 at 24:12-18)

19.     Every week, a collegial review involving Dr. Ahmed and Dr. Ritz occurred by phone call where outside referrals for patients are discussed. (Ex. 3 at 35:10-24)

20.     These collegial review meetings also include what Wexford calls "utilization" reviews. (38:18-39:4),

**Facts Relating To Wexford's _Monell_ Liability**

1.      Medical care provided by Wexford was more limited than medical care in the community. Wexford has a policy: "the general rule is that you see a nurse three times before you get to see a doctor unless the -- your symptoms might be more serious than you'd see a doctor right away." (Ex. 10 (Tammy Welty Dep.) at 40:11-17).

2.      Whenever a patient needed a test or procedure that Wexford did not offer onsite, the medical staff had to recommend to a doctor that the doctor request the service in Wexford's collegial review. (Ex. 9 (Heather Ellison Dep.) at 69:20-70:12). The onsite nurses and doctors did not have the ability to send a patient offsite. _Id._

3.      Recurrent abdominal pain is a sign of cancer and other serious conditions. (Ex. 8 (Schmidt Rep.) at 20).

4.      Because involuntary weight loss can indicate multiple serious medical conditions, it is the standard of care to measure and document a patient's weight at virtually every routine, patient encounter. (Ex. 7 (Venters Rep.) at 23). Moreover, it is the standard of care that at an appointment, the provider will review the patient's weight and compare it to previously recorded weights. _Id._

5.      After reviewing the medical records of Mr. Reed, Mr. McCullough, and fourteen other patients under the care of Wexford in IDOC facilities, Dr. Venters—an expert on correctional healthcare administration, internal medicine, and epidemiology—concluded that care under Wexford is grossly deficient in several key areas. Specifically, Dr. Venter concluded that Wexford's systemic deficiencies include the (1) failure to recognize/act on weight loss; (2) delay in specialty care/failure to exclude; and (3) failure to act on abnormal test results. (*Id*. at 23, 24).

6.      Additionally, Dr. Venters opined, "These deficiencies appear to be systemic; they span across numerous facilities and across time and types of care." (*Id*. at 23).

7.      According to Dr. Venters from his review, "there is a broad pattern of patients returning over and over to see medical personnel who, over time, show histories of weight loss. And consistently, such weight loss is not noted, investigated, or acted upon. Involuntary weight loss is a red flag for numerous serious medical conditions, including cancer." (*Id*. at 23).

8.      Dr. Venters opined that "across multiple patients and often among multiple practitioners seeing the same patient, weight loss is not noted or acted upon, often until their serious illness had progressed so severely that they are experiencing other red flag symptoms that reach catastrophic levels. This reflects a serious departure from the standard of care, and it indicates a systematic problem with the review and response to information that Wexford health staff collects." (*Id*.at 23).

9.      Based on his review of several patients' IDOC medical records, Dr. Venters determined that Wexford's failure to recognize/act on weight loss is not the result of variations in individual clinical judgment but of "systemic problems with delivery of care." (*Id*. at 23,24).

10.     Regarding a delay in specialty care/failure to exclude, Dr. Venters opined, "over and over, patients exhibit symptoms that call for referral to specialty care, including symptoms like repeated abdominal pain, but limited efforts are made to diagnose them…patients are seen and returned to their housing areas without a clear diagnosis, or with a presumed diagnosis that does not exclude potentially serious causes of a condition, even when the patient presents with the symptoms multiple times."  (*Id*. at 24).

11.     Moreover, Dr. Venters concluded that Wexford's "diagnostic efforts are often limited and inconclusive, but are essentially abandoned without excluding potentially serious causes of a symptom…even in the face of diagnoses or indications of a serious condition, the records indicate slow or improper follow-up, often with the result that needed care is delayed and the patient's outcomes worsen." (*Id*. at 24).

12.     Notably, these delays in specialty care occurred across different facilities and different patients, including on multiple occasions and multiple practitioners with the same patient.  (*Id*. at 24). Thus, Dr. Venters concluded that repeated instances of such dramatic departures from the standard of care indicate a systematic problem with the provision of adequate medical care. (*Id*. at 24).

13.     Conducting timely follow up for patients with abnormal test results is a basic element of any primary care practice and critical for identifying and preventing against the worsening of serious medical conditions. (*Id*. at 25).

14.     For patients in Wexford's care at IDOC facilities, abnormal test results are often not followed up on in a timely manner. (*Id*. at 25). This indicates "another dramatic departure from the standard of care." *Id.*

15.    According to Dr. Venters's review of these cases and several other patients' records, the deficiencies related to Wexford's failure to act on abnormal test results is not the result of variations in individual clinical judgment, "but systemic problems with delivery of care." (*Id*. at 23, 24.)

16.    Dr. Venters confidently opined that systemic problems of care exist amongst Wexford's medical care in IDOC facilities concerning unaddressed weight loss, abnormal test results missed/ignored, and delays in providing specialty care. (*Id*. at 38.)

17.    The 2014 and 2018 Lippert Reports arose from a pending injunctive class action case where the court periodically appointed different experts in correctional medicine to examine and monitor IDOC's delivery of healthcare. Dr. Venters reviewed the reports' findings on systemic deficiencies related to how worsening health problems are ignored or addressed incompetently. Venters concluded that these reports "indicate grave and systemic problems in the care provided by Wexford, and an alarming failure to address these deficiencies once reported to them in the initial report." (*Id*. at 30, 31.)

18.    Dr. Venters reviewed the Lippert reports data for details regarding deaths with the presence of the following three variables: unaddressed weight loss, abnormal test results missed/ignored, and specialty care delay. (*Id*. at 31.)

      i.    In the 2014 report, Venters found 21 total deaths with one of these 3 problems, which represents 33% of the total deaths reviewed, but 56% of the deaths with serious deficiencies. (*Id*. at 32.)

     ii.    In the 2018 report, Venters found 24 total deaths with one of these 3 problems, which represents 55% of the total deaths reviewed, but 95% of the deaths with serious deficiencies. (*Id*. at 32.)

19.    Upon review of Wexford's senior leadership's interrogatory responses, Dr. Venters concludes that Wexford leadership did not use the information in the Lippert reports "to improve the quality of care and address the systemic problems with care identified in those

reports." If this conclusion is true, Wexford ignored an identification of serious deficiencies in its delivery of care that "would be a substantial departure from the standard that is expected in the administration of correctional medical care." (*Id*. at 36-37).

## LEGAL STANDARD

At summary judgment, the moving party must establish that the case presents no genuine issues of material fact which require a trial to resolve. *Ponsett v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). When deciding whether a genuine dispute of fact exists, the Court must view the facts in the light most favorable to Plaintiff, resolving all evidentiary conflicts and credibility issues in her favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *see also Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding which inference to draw from [a] conversation is the task of a fact finder."). Circumstantial evidence is entitled to equal weight. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*).

## ARGUMENT

To prevail on her claims, Plaintiff must prove that Reed suffered from an objectively serious medical condition, and that Defendants acted with deliberate indifference to the condition. *Petties*, 836 F.3d at 728 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A serious medical condition is one that either a physician has diagnosed as mandating treatment or is so obvious that even a lay person would know a doctor's attention is required. *See Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017). Extreme pain is an objectively serious medical condition. *Gutierrez v. Peters*, 111 F.3d 1364, 1369-72 (7th Cir. 1997) (significant pain may constitute objectively serious medical condition) (collecting cases); *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir.1996) (objectively serious medical condition requires an "illness or injury . . . [which] is sufficiently

serious or painful to make the refusal of assistance uncivilized") (emphasis added); *see also Johnson v. Corizon Med. Servs. Inc.*, 2015 WL 1648208, at *5 (S.D. Ind. Apr. 14, 2015) ("Severe pain constitutes a serious medical need sufficient to satisfy the first element of the deliberate indifference test.") (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

In this case, Defendants do not dispute that Mr. Reed's stage 4 metastatic cancer constituted a serious medical need. Mem. at 18. Defendants' motions center solely on whether they acted with deliberate indifference to Reed's serious medical need. Deliberate indifference requires a factfinder to inquire into the Defendants' subjective state of mind, a topic particularly ill-suited for resolution at summary judgment. *Conley*, 796 F.3d at 747 ("[S]tate of mind is an 'inquiry that ordinarily cannot be concluded on summary judgment.'"). To establish deliberate indifference, a plaintiff must show that a defendant was aware of and disregarded a substantial risk of harm to the plaintiff. *Farmer*, 511 U.S. at 835; *Ortiz v. Webster*, 655 F.3d 731, 734 (7th Cir. 2011). Because prison officials "[r]arely if ever" admit that they acted with deliberate indifference, prisoners typically establish it through circumstantial evidence. *Petties*, 836 F.3d at 728.

The Seventh Circuit has identified multiple ways that a plaintiff can prove deliberate indifference through circumstantial evidence. First, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer,* 511 U.S. at 842). A prisoner may also show deliberate indifference through evidence that "the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice,'" providing an inference that "no exercise of professional judgment actually occurred." *Diggs v. Ghosh*, 850 F.3d 905, 909 (7th Cir. 2017). And when medical staff persist in a course of treatment they know is ineffective, choose an "easier and less efficacious treatment [,]" or refuse to follow advice from a specialist, an inference of deliberate

26

indifference at summary judgment is appropriate. *Petties*, 836 F.3d at 729–30; *Arnett v. Webster*, 658 F.3d 742, 753–54 (7th Cir. 2011).

Finally, an "inexplicable delay in treatment" which "exacerbate[s] the [plaintiff's] injury or unnecessarily prolong[s] [his] pain" warrants denial of summary judgment. *Petties*, 836 F.3d at 730-31; *see also Grieveson v. Anderson*, 538 F.3d 763, 779-80 (7th Cir. 2008) (delay in providing care actionable under the Eighth Amendment if evidence permits inference that plaintiff endured "many more hours of needless suffering for no reason").

Several of these situations indicating deliberate indifference are present here. At this stage, the Court must view the evidence, as well as all reasonable inferences drawn from that evidence, in the light most favorable to Plaintiff. Based on the record, Defendants were deliberately indifferent to Reed's pain and cancer symptoms in the years leading up to his death. The Court should deny Defendants' motions for summary judgment.

## I.    The jury must decide whether Wexford is liable under *Monell*.

Wexford offers five reasons why it is entitled to summary judgment on Plaintiff's Eighth Amendment claim:

First, Wexford argues that there was no constitutional violation supporting the Eighth Amendment claim against Wexford because Plaintiff cannot establish an underlying constitutional violation by any individual defendant. Second, Wexford argues that the alleged constitutional violation was due to non-defendant actions that fall outside the statute of limitations and that, in any event, involved appropriate medical care. Third, Wexford argues there is no evidence that any person acted or failed to act because of a Wexford policy or practice. Fourth, Wexford argues that none of Mr. Reed's providers are final policymakers to support *Monell* liability. Fifth, Wexford argues that Plaintiff has not shown evidence of a constitutionally deficient policy or pattern that was the moving force behind Mr. Reed's injuries. Each argument fails.

Private corporations like Wexford are subject to the standard for section 1983 liability articulated in *Monell v. Department. of Social. Services*, 436 U.S. 658 (1978). *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). A reasonable jury could conclude that Mr. Reed's death was caused by Wexford's policies and practices of providing inadequate medical care, despite being on notice of its dangerous practices. (Ex. 7 (Venters' Rep.) at 39). Plaintiff's claim against Wexford must proceed to trial.

### A. A reasonable jury could find Wexford liable regardless of the individual Defendants' liability.

Wexford argues that it cannot be liable under *Monell* because Plaintiff has failed to establish Mr. Reed was deprived of a constitutional right by any individual defendant. Mem. at 29–31. As explained below, however, a reasonable jury could find that Dr. Ritz, Dr. Shah, and Dr. Ahmed were deliberately indifferent. Accordingly, Wexford cannot obtain summary judgment on this ground.

Even if the individual defendants were not deliberately indifferent, moreover, a reasonable jury could find Wexford liable based on non-defendant Wexford employees' conduct. Plaintiffs introduced expert evidence that in early February 2018, several Wexford employees violated the standard of care by failing to use diagnostic tools, not making effort to diagnose Mr. Reed or find the cause of his symptoms, and failing to record his weight. ECF 200-13 at 19–21. This includes the care provided by Wexford employee Nurse Stover. *Id.* Defendants ask the Court to disregard this portion of the record because Nurse Stover's constitutional violation was "not so pled" in the complaint. Plaintiff's position at summary judgment is fully consistent with the pleadings, as discussed below.

Wexford's argument also fails for a more fundamental reason. It is possible that Wexford could be found liable under Monell even if no Wexford employee is individually liable for an

Eighth Amendment violation. The Seventh Circuit explained why *Monell* organizational liability does not rise and fall with individual liability, in *Glisson v. Indiana Department of Corrections*:

> [T]his case well illustrates why an organization might be liable even if its individual agents are not. Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional polices are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.

849 F.3d 372, 378 (7th Cir. 2017) (en banc). Accordingly, it is only where "the plaintiff's theory of *Monell* liability rests entirely on individual liability"—such as when a plaintiff alleges that the defendant is a final policymaker and offers no other *Monell* theory—that "negating individual liability will automatically preclude a finding of Monell liability." *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 664 (7th Cir. 2016). That is not the case here.

In sum, there are triable issues as to Dr. Ritz, Shah, and Ahmed. But even if a jury ultimately concludes that the individual defendants acted reasonably given the facts known to them at the time, that jury could still reasonably conclude that Wexford's unconstitutional practices and customs still created constitutional liability. *See* ECF 145 at 7 (Order Denying Defendants' Motion to Bifurcate Plaintiff's *Monell* Claim) ("Wexford may be liable under Monell, even where the Individual Defendants are not.") (citations omitted).

## 1. A reasonable jury could find that Wexford's practices and customs were deficient.

Wexford argues that Plaintiff has not adduced evidence of a policy, custom, or practice sufficient to satisfy *Monell*. But a reasonable jury could find several Wexford practices or customs that contributed to Mr. Reed's prolonged pain, delayed diagnosis, decreased lifespan, and death. These include Wexford's policies, customs, and practices of: (1) leaving weight loss unaddressed, (2) ignoring/missing abnormal test results, (3) delaying in specialty care and diagnostic testing, (4)

repeating ineffective treatment, (5) failing to escalate care based on symptoms, (6) failing to document and treat pain and persistent symptoms, (7) neglecting red flags for serious illness, (8) a lack of comprehensive patient evaluation, (9) institutionalized apathy toward patient complaints, (10) failing to follow standard medical protocols, and (11) having structural barriers to accessing adequate healthcare. By these policies, customs, and practices, Wexford delivered inadequate healthcare, increased patient pain, and shortened patients' lifespan due to deficient care, all despite being on notice of its dangerous practices. Dr. Venters explains these systemic issues in his report:

> Review of the deaths of Mr. Reed and Mr. McCullough show that both men repeatedly sought health care and that red flags for serious illness and malignancy were ignored, even as they lost weight and their symptoms progressed. Failure to act on abnormal test results and delays in specialty care and diagnostic tests outside the prison system also contributed to the pain and spread of malignancy for both men, worsening their chance for survival, as reflected in the expert reports offered by Dr. Schmidt. Review of medical records for additional patients also reveals gross deficiencies and deviations from the standard of care similar to those in the two aforementioned cases. Specifically, these cases exhibited gross deficiencies in the following areas;
>
> - Unaddressed weight loss
> - Abnormal test results missed/ignored
> - Specialty care delay
>
> Review of the basic findings in the *Lippert* reports reveals similar and systemic problems with care. My own review of the 2014 and 2018 *Lippert* reports shows that over half of the deaths involving serious deficiencies in care included at least one of these three problems. Many cases included two or three of these problems. One of the central issues in many of these cases is that patients report a health problem and when the initial assessment and treatment doesn't resolve their issue, Wexford staff simply repeat the same assessment and treatment without stopping to reconsider what the problem is or what the effective treatment should be. For people who received one inconclusive x-ray after another, or those who had persistent gastrointestinal symptoms treated repeatedly with medications for indigestion, the consequences of these gross deficiencies in care include delay of identification and treatment of their malignancy, increased pain and suffering and shortened lifespan. My review of the available information in the cases of Mr. Reed and Mr. McCullough, including their own medical records, my review of 14 additional sets of medical records, as well as review of the *Lippert* reports and my own assessment of the three specific problems in *Lippert* report death cases makes clear that these problems in care are systemic in nature and that these deficiencies

increase the risk of morbidity and mortality among their patients.

PSOF 1; (Venters' Report at 39).

Each of those practices came to bear in Mr. Reed's own case, which showed evidence of unaddressed weight loss, denied specialty care (urology and colonoscopy), and other deficiencies identified by Dr. Venters.

Wexford argues that Dr. Venters' review cannot evidence a widespread practice because he "sub-sampled only 14 cases to review" and found "1–2" examples of Wexford's systematic deficiencies in addition to Mr. Reed and Mr. McCullough's cases. Mem. at 47. That is factually inaccurate: Venters' review revealed these problems in several cases. Venters includes pages of summaries of other patients' cases evidencing Wexford's systematic deficiencies. For example:

- H.C: "This patient had multiple reports of gastrointestinal and abdominal complaints starting in October 2017 before he was finally assessed and diagnosed with cancer in 2018.14 During this time, the patient reported nausea and vomiting with eating and during his multiple sick call encounters, he was noted to have significant weight loss, including 20 lbs. in one month from late October to late November 2017. Despite these concerning clinical signs and laboratory tests that indicated some metabolic or gastrointestinal process, medical staff attempted to treat the patient with manual hernia reduction instead of obtaining further imaging of his gastrointestinal tract. After this approach failed to resolve the patient's symptoms, he was sent to a local emergency room where CT scan showed inflammation of the small intestine and recommended follow up with a surgeon. The patient continued to have multiple encounters with health staff who documented ongoing weight loss, now 30 lbs. by Jan 2018. He was seen by a surgeon on the 25th of January 2018, which resulted in observation that he was jaundiced and that he has liver function tests consistent with an abdominal pathology. He was sent for inpatient admission and diagnosed with cholangiocarcinoma and treated as an inpatient for 2 months but returned to the prison setting with a terminal diagnosis due to metastatic malignancy. The care of this patient was grossly deficient in that his significant weight loss, lack of appetite, and abnormal laboratory tests in late November should have prompted admission for a more thorough diagnostic assessment. This patient was discussed in the 2018 Lippert Report as Dixon Patient Identifiers – Infirmary - Patient #2.
- C.J. This patient was diagnosed with likely pancreatic cancer in October 2016, during a hospitalization. She was subsequently transferred to prison where her she was informed that her initial biopsy had not contained adequate sample. The Wexford medical staff failed to order an urgent repeat biopsy or specialist

encounter, resulting in an approximately three month delay. This patient was confirmed to have pancreatic cancer, which is both extremely aggressive and associated with severe pain, requiring careful pain management. At one point, the physician documents "Consider CT guided biopsy when she is stronger." This patient's known pancreatic mass and inadequate biopsy should have resulted in immediate repeat of her biopsy, even if achieving this required inpatient hospital admission. This patient was discussed in the 2018 Lippert Report as IDOC Mortality Review Patient Identifiers - Patient #20.

- John Joynt. (Hill CC) This patient's medical records show that he experienced weight loss over several years with difficulty eating. He was known to have an esophageal abnormality that made swallowing difficult and despite his weight dropping approximately 100 lbs., half of his body weight, over several years without surgical intervention. During this time, medical staff gave him dietary supplements but failed to refer him for surgical repair, which is the standard of care when symptoms are moderate to severe. This condition is amenable to dietary management when mild, but in cases as severe as this patient's, surgical intervention should have occurred far earlier.

Ex. 7 (Venters Report) at 11-22.

Taking a step back, moreover, Wexford's argument misapprehends what the law requires here. It is well settled that there is no magic number of cases Dr. Venters needs to identify to opine about a systemic deficiency. *Glisson*, 849 F.3d at 382 ("There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent." (citing *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004) ("CMS does not get a 'one free suicide' pass.")). *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) (instructing there is no "bright-line rule" as to the "quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*"); *see also Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[W]e do not adopt any bright-line rules defining a 'widespread custom or practice[.]'"); *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) (similar). [1]

---

[1] In addition, given that Wexford took the position that *Monell* discovery should be limited is irrelevant and burdensome, this Court should bar Wexford from making any contrary argument now or at trial. The Supreme Court has explained that judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks omitted) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not

In addition, Dr. Venters conducted a review of the *Lippert* reports, which revealed even more instances of the Wexford patterns he opined contributed to Mr. McCullough's death. *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert."). The Federal Rules of Evidence confirm that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.

### 2. Plaintiff has introduced sufficient evidence from which a jury could find that Wexford's practices and customs were deficient.

Dr. Venters conducted a review of Mr. McCullough's case, Mr. Reed's case, and 14 other patients (selected from 25 patients) and concluded that, similar to Mr. Reed, Wexford had repeatedly failed to provide adequate care because of the systemic issues listed above. Further, although Wexford attacks Dr. Venters' review for not following arbitrary statistical standards, *see* Mem. at 44, statistical evidence is ***not*** required for a *Monell* claim to proceed to trial. To "survive summary judgment," the Seventh Circuit has stressed, a plaintiff "need not present a full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to establish a widespread practice or custom." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006). Instead, "it is enough that a plaintiff present competent evidence tending to show a general pattern of repeated behavior." *Id.* That is what Plaintiff has done here.

---

thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."). Estoppel applies when the party to be estopped—here Wexford—takes a later position that is "clearly inconsistent" with it earlier one; persuades a court to adopt the earlier position; and would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire*, 532 U.S. at 750-51).

Relying on these principles, district courts in this Circuit have denied summary judgment in cases like this one, where Plaintiff has provided evidence of other incidents where patients received constitutionally inadequate medical care. In *Awalt v. Marketti*, 74 F. Supp. 3d 909, 939 (N.D. Ill. 2014), the district court denied summary judgment to HPL, a private medical care company, after the plaintiff provided evidence of six other detainees who were provided inadequate medical care. Similarly, in *Piercy v. Warkins*, 2017 WL 1477959, at *12-13 (N.D. Ill. Apr. 25, 2017), the district court denied summary judgment to ACH, another private medical care company, after the plaintiff provided evidence that seven other detainees were denied adequate medical care.

These cases, and many others, establish that summary judgment is unavailable where plaintiff presents other examples of deficient care—even when those allegations concern medical conditions not identical to the one at issue in the case. *See also Abreu v. City of Chicago*, 2022 WL 1487583, at *17 (N.D. Ill. May 10, 2022) (explaining that the Seventh Circuit has "warned against overstating Plaintiff's burden" and concluding that four complaints were sufficient to create a genuine issue in light of the record as a whole); *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 917 (N.D. Ill. 2016) (reiterating that there are no "bright-line rules" at summary judgment and explaining that a defendant's demand for statistical evidence of a widespread custom or practice "fails to persuade"); *Warfield v. City of Chicago*, 2009 WL 10739474, at *1 (N.D. Ill. Feb. 18, 2009) (holding that evidence of "up to nine witnesses who were allegedly mistreated" was sufficient to warrant trial and explaining that defendant's arguments that those incidents did not occur or were "isolated" and "outside of [their] control" are "not arguments amenable to summary judgment").

Accordingly, even if the Court were to count each patient as a single additional piece of

evidence in support of Plaintiff's *Monell* claim, summary judgment would be inappropriate. As Dr. Venters explains in detail in his report, each patient's medical record reflects *several* instances of inadequate medical care and *several* examples of the widespread practices that caused Mr. Reed's exacerbated symptoms and shortened lifespan. As Dr. Venters testified, a single patient's outcome, such as a missed cancer diagnosis, can be evidence of a systemic problem, not just an individual problem. (Venters' Dep. at 72:3–16) (describing a "never event"). Counting just the instances noted by Dr. Venters in his "Review of Wexford care to additional patients" (which does not include Mr. Reed or Mr. McCullough and does not come close to encompassing the total number of instances in which he identified inadequate care), Plaintiff has offered dozens of separate instances of the widespread practices she contends caused Mr. Reed's prolonged pain, delayed diagnosis, shortened lifespan, and death. There can be no meaningful dispute that dozens of examples of a widespread practice is enough.

### 3. A reasonable jury could find that Dr. Ritz and Shah were final policymakers and express policies led to Mr. Reed's death.

In moving for summary judgment, Wexford contends that Dr. Ritz and Shah are not final policymakers, and that Plaintiff has not identified any "express policies" responsible for Mr. Reed's death. Plaintiff does not need to prove either theory for a viable *Monell* claim. *See, e.g.*, *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) ("An unconstitutional policy can include both implicit policies as well as a gap in expressed policies."); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (entity's "actual practice," as opposed to its "written policy," was inadequate). And in any event, several express policies are at issue— including one of Wexford's barriers to healthcare: its collegial review process. In addition, there is ample evidence in the record that Dr. Ritz was a final policymaker as the Corporate Medical Director of Wexford and co-head of utilization management. And as explained herein, Dr. Ritz

'ratified' his subordinate's actions. Indeed, some medical care could not be provided without his say, as well as evidence he acted with deliberate indifference, as described herein.

### 4. A reasonable jury could find that Wexford's practices or customs were the moving force in Mr. Reed's death.

In addition to disputing that a custom or practice exists, Wexford claims that there is no evidence that the customs or practices Plaintiff has identified were the "moving force" in Mr. Reed's death. This is another question that the Court cannot resolve at summary judgment. "[C]ausation is not a mechanical exercise like working a math problem and getting an answer, but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and then reach reasonable conclusions about the effects of particular action and inaction" *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 384–85 (7th Cir. 2020) (en banc). Moreover, "there is no rule demanding that every case have only one proximate cause." *Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012).

Courts have recognized that "a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind" a plaintiff's injury in circumstances very similar to those here. *Dixon v. County of Cook*, 819 F.3d 343, 349 (7th Cir. 2016); *see also, e.g.*, *Daniel*, 833 F.3d at 740-42 (denying defendant's summary judgment motion where testimony from jail medical staff describing inadequate record-keeping practices and scheduling difficulties, "viewed in the light most favorable to Daniel, raise[d] a genuine issue of material fact as to whether his injury resulted from systemic, gross deficiencies in the Jail's medical care"); *Piercy*, 2017 WL 1477959, at *14 ("If a jail has a widespread practice of providing inadequate care, it is a highly predictable consequence that, faced with a possibly serious medical condition, medical personnel would fail to inquire further, provide necessary medications, or seek the assistance of a specialist."); *Roland v. Dart*, 2016 WL 4245524, at *7 (N.D. Ill. Aug. 11, 2016)

(denying defendants' motion for summary judgment on prisoner's *Monell* claim and noting that even where the "causation chain is a long one, and it may be difficult for a jury to conclude that Defendants were a but-for cause of Plaintiff's injury . . . a jury, not the court, should make the determination whether Defendants' policies or practices—whether understaffing or generally allowing delayed processing of HSR forms—were the cause and 'moving force' behind Plaintiff's injury"). Just as in these cases—systemic problems like documentation practices in *Daniels* and delayed processing of forms in *Roland*—Wexford's systemic problems caused Mr. McCullough's delayed and deficient care.

Likewise, with respect to Wexford's failure to implement policies and procedures to provide comprehensive patient care, a reasonable jury could find that the absence of such a policy made it likely and foreseeable that prisoners with persistent, red-flag symptoms, like Mr. Reed, would face grave risk of harm. *See Glisson*, 849 F.3d at 382 ("A jury could further conclude that Corizon had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless 'adopt[ed] a policy of inaction'").

Defendants' arguments also fail on the law, as argued in Plaintiff's opposition to Defendants' motions to bar Plaintiff's experts. ECF 213 and 214. Plaintiff reincorporates those arguments here. But as an example, Wexford cites *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1185 (7th Cir. 1993), for the proposition that patients whose care is "not substantially similar to Mr. Reed's care" are "inadmissible." Mem. at 49. *Ross* is a products liability case addressing when evidence of other accidents involving the product and post-dating the injury to the plaintiff can be admitted to show notice, existence, or cause. It has nothing to do with *Monell* liability (or, for that matter, Rule 702) or deliberate indifference.

Also inapposite, Wexford highlights the decision in *Armbruster v. Shah*, 2019 WL 5874335 (S.D. Ill. July 23, 2019), where Magistrate Judge Beatty granted summary judgment to Wexford on *Monell* claims—but not on "moving force" grounds. In *Armbruster*, the court found genuine issues of fact as to the treating Wexford physician and the nurse but granted summary judgment on the *Monell* claims because the plaintiff's evidence was not enough for a reasonable jury to find a widespread custom or practice. *Id.* at *15–17. In reaching this determination, the court contrasted the evidence in *Armbruster*—grievance records from ten other prisoners complaining that they had received inadequate medical care from the same physician—with the *Awalt* and *Piercy* cases discussed above, where the plaintiffs (as here) had hired physicians as expert witnesses to review medical files and records. The court explained that the plaintiff in *Armbruster* had "not offered any competent evidence regarding the quality of the medical care these ten other inmates received." *Id.* Here by contrast, Plaintiff has offered just such evidence from Dr. Venters. The Court should deny Wexford's motion.

Not only did the delay cause severe pain, but Dr. Schmidt opined that the Defendants' deviations from the standard of care shortened Mr. Reed's life by "months, and potentially many years." Ex. 8 (Schmidt rep.) at 18). These facts preclude summary judgment. *See Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012) (discussing "probabilistic harm" and "loss of chance" theory in the § 1983 context); *Moore v. Wexford Health Services, Inc.*, No. 19-cv-3892 2023 WL 4492118 (N.D. Ill., 2023) (denying summary judgment even where there was a "miniscule but possible" chance that treatment would have been more effective without the defendant's delay).

## II.    The claims against Dr. Ritz should proceed to trial.

Defendants argue that Dr. Ritz, the Corporate Medical Director at Wexford and head of Utilization Management, is entitled to summary judgment because he did provide Mr. Reed some

care. But Dr. Ritz's scant attention to Mr. Reed was woefully inadequate: he delayed in providing Mr. Reed oncology care, denied him a colonoscopy, and denied him any palliative care or medical care for his serious wound and infection.  A jury could find Dr. Ritz deliberately indifferent.

To be liable for deliberate indifference under section 1983, a defendant must have personal involvement, but that does not mean the defendant must have been physically present and providing care. Rather, it is enough if the defendant "create[d] the peril facing" the plaintiff," "increased the peril," or "made it harder for . . . anyone else[] to solve the problem." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009); *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("an official satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent") (cleaned up). "Direct participation" is not necessary, only a showing that the defendant "acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003).

Dr. Ritz denied Mr. Reed proper medical care on multiple occasions. On August 3, 2018, Dr. Ritz approved a CT request for Mr. Reed, but it can be inferred based on the time when he received the CT that Dr. Ritz ordered it as a non-urgent request. (ECF 200-4 at Reed 0178); (Ex. 2 (Ritz Dep.) at 41:18-42:42:3).

After Mr. Reed's CT scan results showed concern for cancer, three separate referral requests were submitted to Dr. Ritz for review: a follow-up with an oncologist, urologist consultation, and request for a colonoscopy. (Ex. 2 (Ritz Dep.) at 48:14-49:3). However, Dr. Ritz denied the requests for a colonoscopy and urologist visit.  He confirmed the oncology visit, but non-urgently. In his deposition, he affirms this decision by explaining that the two denied medical requests (colonoscopy and urology visit), would potentially end up postponing Mr. Reed's need

for an oncology visit. Dr. Ritz's hindsight logic for this is that prisons are generally in short supply of transportation and security resources, however, Mr. Ritz acknowledges that he does not know, and would not have known at the time, if that was the case for Lawrence Correctional Center where Mr. Reed was being housed at the time of these requests. Plaintiff's expert opined:

> These recommendations would have permitted multiple avenues for diagnosing the cause of Mr. Reed's symptoms and his CT scan, and were called for to make up for some of the time that had been wasted in failing to diagnose Mr. Reed and then in the slow process for obtaining the CT scan. Under these circumstances, rejecting these alternative diagnostic routes insisting that further diagnostic testing wait the setting of yet another appointment with an oncologist wasted yet more time and allowed the cancer to grow, in violation of the standard of care.

ECF 200-13 at 26. Plaintiff's expert evidence is that Mr. Reed's providers' violations of the standard of care shortened his life by "many months and potentially many years." *Id.* at 18–26.

Dr. Ritz's justifications for his refusal to move forward on these medical recommendations are flimsy at best. Contrary to Defendants' assertion of the facts, there is no evidence of any medical reason for Dr. Ritz's denial of a colonoscopy and urology consult. A jury could reasonably look past these justifications to find that what Dr. Ritz provided to Mr. Reed was not an "alternative treatment plan" but simply a denial of treatment. PSOF ¶¶ 34, 37. Dr. Ritz did not set a time frame, as he could have, to make sure the colonoscopy/urology services—which he now claims were secondary to the oncology services—would be followed up on.

Moreover, Plaintiff has presented evidence that Dr. Ritz acted with the culpable state of mind necessary to show deliberate indifference when he denied Mr. Reed wound care, since "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). That standard is satisfied whenever prison officials "unreasonably delay a prisoner's treatment such that it prolongs his suffering," or "contin[ue] a treatment known to be ineffective." *Foster v. Ghosh*, 4 F. Supp. 3d

974, 979-80 (N.D. Ill. 2013); *Estelle*, 429 U.S. at 103–04 ("denial of medical care" that results in

pain and suffering does not serve a penological purpose and violates the Eighth Amendment);

*Gulley v. Ghosh*, 864 F. Supp. 2d 725, 729 (N.D. Ill. 2012) (stating "[o]bviously, the refusal to

provide access to a doctor or the denial of necessary medical treatment constitutes deliberate

indifference," in the context of failure to treat pain from sciatica); *Gil v. Reed*, 381 F.3d 649, 652

(7th Cir. 2004) (finding that there was a factual issue related to whether a prison doctor was

deliberately indifferent to a prisoner's medical needs when he did not follow a specialist's

recommendation for post-rectal-prolapse-surgery medication, allegedly prolonging the patient's

pain, rectal bleeding, and difficulty with urination and defecation for ten days).

Specifically, on December 14, 2018, an urgent referral requested wound care for Mr. Reed

(Ex. 1 REED WEX) at 174-175. Dr. Ritz denied the wound care stating it would not heal given

Mr. Reed's circumstances Id. and Ex. 2 (Ritz Dep.) at 80:17-82:5. Then, two weeks later, a

provider submitted a new request for Dakin solution, a solution to treat Mr. Reed's wound. (Ex.

2 (Ritz Dep.) at 83:7-16. Dr. Ritz approved the Dakin solution for wound care unless "cost

prohibitive." When asked if he would have tried to identify a more effective alternative for Mr.

Reed's wound care, Dr Ritz stated, "Not necessarily, no". Ex. 2 (Ritz Dep.) at 84:4-86:7. The

jury could find this is evidence of Dr. Ritz's deliberate indifference. *Foster*, 4 F. Supp. 3d 974 at

984 ("Choosing a treatment for a prisoner based on cost and not efficacy is evidence of deliberate

indifference.").

A jury could find that by denying treatment for Mr. Reed's 10-by-10-inch wound, which

was causing infection, Dr. Ritz caused Plaintiff severe pain, severe discomfort, and prolonged

infection for the last month of his life. *See Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir.

2015) ("In other words, prisoner requests for relief that fall on 'deaf ears' may evidence deliberate

indifference"); PSOF 13-14; Ex. 1 (REED WEX at 174-175). "The decision of a medical professional to do nothing, even though she knows that a patient has a serious medical condition requiring prompt treatment that the professional is capable of and responsible for providing, amounts to deliberate indifference." *Dobbey v. Mitchell-Lawshea,* 806 F.3d 938, 940 (7th Cir. 2015).

Here, Dr. Ritz knew that providers were recommending wound care and that Mr. Reed was in pain. Dr. Ritz could have approved Mr. Reed for the wound care, but instead he did nothing, extending Mr. Reed's discomfort and pain for the last month of his life. A jury could find that this amounted to deliberate indifference–not just as to the wound but as to Mr. Reed's medical condition in general, since Dr. Ritz also denied other necessary evaluations that had been requested. *See Wilson v. Wexford Health Sources, Inc.,* No. 18-CV-498-RJD, 2022 WL 815124, at *9 (S.D. Ill. Mar. 17, 2022) (denying summary judgment to Dr. Ritz on claims that a three-month delay attributable to his collegial reviews constituted deliberate indifference); *Perez v. Fenoglio,* 792 F.3d 768, 777 (7th Cir. 2015) (deliberate indifference can occur when a prison official "delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering"). The Court should deny Dr. Ritz's motion.

### III.        The claims against Dr. Ahmed must proceed to trial.

Dr. Ahmad moved for summary judgment arguing (1) Dr. Ahmed had no personal involvement (2) Dr. Ahmed did not deny Mr. Reed a colonoscopy, but rather agreed with Dr. Ritz to an alternative treatment plan, and (3) Dr. Ahmed's conduct did not cause Mr. Reed a delay in treatment. ECF 207.

As mentioned, a defendant need not be physically present and providing care to be liable in a medical deliberate indifference claim. Rather, it is enough if the defendant "create[d] the peril

facing" the plaintiff, "increased the peril," or "made it harder for . . . anyone else[] to solve the problem." *Burks*, 555 F.3d at 596; *see also Gentry*, 65 F.3d at 561. "Direct participation" is not necessary, only a showing that the defendant "acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer*, 327 F.3d at 594.

Mr. Reed was under Dr. Ahmed's care during his stay at Lawrence. Upon entering the prison, Dr. Ahmed did Mr. Reed's intake medical evaluation. He failed to do a rectal exam. Every week, a collegial review call involving Dr. Ahmed and Dr. Ritz occurred where outside referrals for patients are discussed. Ex. 3 (Ahmed Dep.) at 35:10-24. These collegial review meetings also included utilization reviews. Ex. 3 (Ahmed Dep.) at 38:18-39:4. On August 10, 2018, and August 14, 2018, after there was a concern that Mr. Reed had abdominal cancer, the collegial review team marked his CT scan recommendation and other medical services referral (urology consult and colonscopy) *non-emergent*. Ex. 3 (Ahmed Dep.) at 45:7-22. In his deposition, Dr. Ahmed's justification was that prompt treatment would not have made a difference at this point to Mr. Reed due to his slow-growing cancer. Ex. 3 (Ahmed Dep.) at 46:3-16.

According to Ahmed, since Mr. Reed's cancer would have already spread to other areas without anywhere else to go, his condition was not considered an emergency and thus referred to the oncologist. Upon review of Mr. Reed's case, the oncologist did not take any urgency seriously and recommended that Mr. Reed return in two weeks. Ex. 3 (Ahmed Dep.) at 47:12-25. Dr. Ahmed had prevented other recommended steps as well, namely the urology consult and colonoscopy from being taken. But it would have been both reasonable and necessary to permit those steps, and doing so would have made a difference.

Plaintiffs' expert opined:

These recommendations would have permitted multiple avenues for diagnosing the cause of Mr. Reed's symptoms and his CT scan, and were called for to make up for some of the

time that had been wasted in failing to diagnose Mr. Reed and then in the slow process for obtaining the CT scan. Under these circumstances, rejecting these alternative diagnostic routes insisting that further diagnostic testing wait the setting of yet another appointment with an oncologist wasted yet more time and allowed the cancer to grow, in violation of the standard of care.

ECF 200-13 at 26.

Dr. Ahmed's justifications for his refusal to move forward on these medical recommendations, like Dr. Ritz's, could be perceived by a reasonable jury as pretextual. Viewing the facts in Plaintiff's favor, there was no medical reason for Dr. Ahmed to deny Mr. Reed the CT, colonoscopy, or urology consult. Plaintiffs' expert opined that, by doing so, Dr. Ahmed violated the standard of care and allowed the cancer to grow, exacerbating Mr. Reed's cancer symptoms and pain. *Id.* According to Dr. Schmidt, Mr. Reed's providers' violations of the standard of care shortened his life by "many months and potentially many years." *Id.* at 18–26. A jury could reasonably disregard Dr. Ahmed's justifications to find that Dr. Ahmed acted with the culpable state of mind necessary to show deliberate indifference. *Foster*, 4 F. Supp. 3d at 979–80; *Estelle*, 429 U.S. at 103–04 ("denial of medical care" that results in pain and suffering does not serve a penological purpose and violates the Eighth Amendment); *Gulley*, 864 F. Supp. 2d at 729 (stating "[o]bviously, the refusal to provide access to a doctor or the denial of necessary medical treatment constitutes deliberate indifference," in the context of failure to treat pain from sciatica); *Gil*, 381 F.3d at 652 (finding that there was a factual issue related to whether a prison doctor was deliberately indifferent to a prisoner's medical needs when he did not follow a specialist's recommendation for post-rectal-prolapse-surgery medication, allegedly prolonging the patient's pain, rectal bleeding, and difficulty with urination and defecation for ten days).

## IV.    The claims against Dr. Shah must proceed to trial.

Defendants argue that Dr. Shah is entitled to summary judgment because he provided adequate care that did not cause harm to Mr. Reed, and because Plaintiffs' claims are based on

other providers' conduct. Defendants' argument is based on a view of the record in their favor, rather than Plaintiff's favor, which is improper at summary judgment.

> Plaintiffs' expert Dr. Schmidt opined:

>> By the time Dr. Shah saw Mr. Reed 7/16/18, Mr. Reed had lost 53 pounds and weighed 183.2 pounds. These records, and Mr. Reed's parallel history of abdominal pain, were obvious indicators of a cancer that had been ignored and allowed to grow for many months. The standard of care called for emergent diagnosis and coordinated treatment of Mr. Reed's condition, because more elapsed time would allow a cancer to spread further, making it harder and harder to treat. Such emergent diagnosis and care was not provided, however. Dr. Shah assessed Mr. Reed as requiring a CT scan on July 20, but a review process to approve that recommendation did not occur for nearly two weeks, on August 2. Those two weeks represent time lost to the cancer. And a CT was not performed until August 10—three weeks after Dr. Shah determined that one was needed.

> Ex. 8 (Schmidt Report) at 21.

Plaintiffs have presented evidence that Dr. Shah acted with the culpable state of mind necessary to show deliberate indifference when he examined Mr. Reed, since "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Roe*, 631 F.3d at 857. That standard is satisfied whenever prison officials "unreasonably delay a prisoner's treatment such that it prolongs his suffering," or "contin[ue] a treatment known to be ineffective." *Foster v. Ghosh*, 4 F. Supp. 3d 974, 979-80 (N.D. Ill. 2013); *Estelle*, 429 U.S. at 103–04 ("denial of medical care" that results in pain and suffering does not serve a penological purpose and violates the Eighth Amendment); *Gulley*, 864 F. Supp. 2d at 729 (stating "[o]bviously, the refusal to provide access to a doctor or the denial of necessary medical treatment constitutes deliberate indifference," in the context of failure to treat pain from sciatica); *Gil v. Reed*, 381 F.3d 649, 652 (7th Cir. 2004) (finding that there was a factual issue related to whether a prison doctor was deliberately indifferent to a prisoner's medical needs when he did not follow a specialist's recommendation for post-rectal-prolapse-surgery medication, allegedly prolonging the patient's

pain, rectal bleeding, and difficulty with urination and defecation for ten days).

Viewing the facts in Plaintiffs' favor, a jury could find that Dr. Shah's denial of the colonoscopy and urology recommendations delayed Plaintiff's cancer diagnosis, causing his cancer to grow and exacerbating his cancer symptoms and pain. *Sherrod v. Lingle*, 223 F.3d 605, 611–12 (7th Cir. 2000). ("[W]hile the "deliberate indifference standard does not permit claims for mere negligence or claims alleging that a reasonable medical judgment unfortunately led to a bad result, a prisoner is not required to show that he was literally ignored."); *see also Smith*, 666 F.3d at 1040 (citations omitted) ("Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference."); *Lewis*, 864 F.3d at 563–64 (hour and a half was excessive delay when muscle spasms and back pain rendered prisoner immobilized); *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (citation omitted) ("[A] reasonable jury could have concluded from the medical records that the [six-hour] delay unnecessarily prolonged and exacerbated Williams' pain and unnecessarily prolonged his high blood pressure."); *Perez*, 792 F.3d at 778 (collecting cases involving two-day delays); *Brown v. Osmundson*, 38 F.4th 545, 554 (7th Cir. 2022) (instructing where treater is "aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising the attending physician or in initiating treatment may support a claim of deliberate indifference).

The Court should deny Dr. Shah's motion.

## V.    The jury must decide whether Defendants failed to intervene.

In Counts II, Plaintiff brings failure to intervene claims under section 1983 against all Defendants. ECF 32 ¶¶ 64–68.

The elements of a failure to intervene claim are that (1) a constitutional violation has been committed by a state actor; and (2) the defendant had a realistic opportunity to intervene to prevent

the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). "A failure to intervene claim generally presents questions of fact appropriate for the jury; a court should not decide it at summary judgment if the underlying [constitutional] claim remains unresolved." *Fleriage v. Village of Oswego*, 2017 WL 5903819, at *9 (N.D. Ill. Nov. 30, 2017).

Wexford makes two main conclusory arguments: (1) there is no evidence that Defendants were aware that Mr. Reed's constitutional rights were being violated and had an opportunity to intervene, and (2) Plaintiff's claim is duplicative of the deliberate indifference claim and no Defendant was deliberately indifferent.

First, a reasonable jury could find the Defendants were aware that Mr. Reed's Eighth Amendment rights were being violated, and that each had the opportunity to intervene, as argued above. There is ample evidence in the record that the Defendants failed to take action or provide the necessary information to enable effective lifesaving, or pain-reducing, treatment despite knowing of the serious risk of harm facing Mr. Reed (and knowing it was not being adequately addressed). Even if Defendants' failure to act was not deliberately indifferent, a reasonable jury could find that it amounted to an unlawful failure to intervene. *See Winchester v. Marketti*, 2012 WL 2076375, at *6 (N.D. Ill. June 8, 2012) (nurse was liable for failing to intervene when she knew doctor's response was inadequate to prevent patient harm and failed to confront or report him). Summary judgment on this claim is therefore unwarranted.

## VI.        The state law claims must proceed to trial.

In Counts III and IV of the First Amended Complaint, Plaintiff brings wrongful death and survival claims against Defendants under the Illinois Wrongful Death Survival Acts. ECF 32 ¶¶ 69–82. Because a reasonable jury could find that Wexford, Dr. Ritz, Dr. Ahmed, and Dr. Shah violated Mr. Reed's Eighth Amendment rights, a jury necessarily could find that these Defendants were willful and wanton under the Wrongful Death Act and Survival Act as well. *See Williams v.*

*Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (stating that the "willful and wanton [standard] is 'remarkably similar' to the deliberate indifference standard"); *Bragado v. City of Zion/Police Dep't*, 839 F. Supp. 551, 554 (N.D. Ill. 1993) ("The definition of 'willful and wanton' [under Illinois law] is essentially the same as the definition of 'deliberate indifference' under the federal constitutional law.").

### A.    Wexford owed a duty to Mr. Reed and breached it.

Wexford concedes that Illinois permits institutional liability for medical negligence but claims that there is no evidence of Wexford's duty or breach. Mem. at 61. Dr. Venters and Schmidt both identify Wexford's institutional decisions affecting Mr. Reed's treatment, including the collegial review process denying him proper imaging. They also offer extensive evidence on the standards for adequate care in the correctional context and the ways in which Wexford's care of Mr. Reed fell short. As the *Longnecker* case cited by Wexford states, the standard of care "may be shown by a wide variety of evidence, including, but not limited to, expert testimony, hospital bylaws, statutes, accreditation standards, custom and community practice" and can "also be determined without expert testimony in some cases." *Longnecker v. Loyola Univ. Med. Ctr.*, 383 Ill. App. 874, 885 (Ill. 2008). And even if Plaintiff cannot proceed directly on an institutional negligence theory, Wexford remains liable for medical negligence by its agents and employees under the theory of *respondeat superior*.

Wexford's argument is that "[t]here has been no evidence that a medical request was ignored." Mem. at 62. Wexford also argues that Plaintiff should not be permitted to proceed on claims due to acts of non-defendants. But Illinois permits a plaintiff to maintain *respondeat superior* claims against an employer even if the responsible employees are not named. For instance, in a suit under state law where the plaintiff named an unknown police officer but failed

to identify the defendant before discovery closed, the Seventh Circuit held that the City of Chicago could not escape vicarious liability for the now-dismissed unknown officer's conduct. *Williams*, 509 F.3d at 509.

### B. **A reasonable jury could find causation.**

The proximate cause standard on the state law claims requires the plaintiff to show, through expert testimony offered to a "reasonable degree of medical certainty," that the defendant's failure to comply with the standard of care proximately caused an injury. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018). Wexford argues that there is no evidence that its agents or employees' conduct caused Mr. Reed's death. However, "[q]uestions concerning proximate cause are factual matters for the jury to decide." *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill.2d 107, 114 (Ill. 1995). There is ample evidence here that would permit a jury to find for Plaintiff.

In attempting to show otherwise, Wexford rehashes the arguments in their motions to bar Plaintiff's experts. As explained in Plaintiff's oppositions to those motions, her experts are qualified to offer cause of death opinions and opinions on proximate cause. Plaintiffs will not repeat every basis for that conclusion here but will offer an example.

Wexford asserts that Dr. Schmidt's opinions related to chemotherapy are "speculative at best." Mem. at 59. But Dr. Schmidt stated, "My opinions are stated within a reasonable degree of medical certainty, meaning more likely than not." ECF 200-13 at 34. Much less equivocal language has been found to be consistent with the relevant legal standard. *See Wise v. St. Mary's Hospital*, 64 Ill. App. 3d 587, 590 (1978) ("While medical testimony is usually couched in terms of art such as 'based upon a reasonable degree of medical certainty,' etc., it is not objectionable for the medical expert to testify in terms of percentages so long as it is clear that the opinion expressed is not the product of mere speculation or conjecture."); *Galvin v. Olysav*, 212 Ill. App. 3d 399, 405

(1991) (declining to exclude evidence where a "doctor testified in terms of percentages" without repeating the words "reasonable degree of medical certainty").

Wexford's substantive disagreements with Dr. Schmidt's conclusions present at most "a factual question for trial." *Jones v. Wexford Health Sources, Inc.*, 2021 WL 323792, at *7 (N.D. Ill. Feb. 1, 2021) (denying motion for summary judgment on causation grounds where "[t]he defendants frequently claim that [an expert] 'does not offer a single opinion to a reasonable degree of medical certainty'" but the expert's report "concludes by stating that his opinions are offered with 'a reasonable degree of medical and orthopedic surgical certainty'").

In sum, a reasonable jury could conclude that Wexford's misconduct amount to the proximate cause of Mr. Reed's death. *See, e.g.*, *Miranda*, 900 F.3d at 348 (expert opinion that "the medical defendants' inaction contributed" to the defendant's death was not "impermissibly conclusory" and was sufficient to find causation). Of course, Wexford is free "to cross-examine the experts about what led them to draw their conclusions." *Id.* (citing *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981)). But this is not an issue for summary judgment.

## VII.    Wexford's pleading arguments are meritless.

Finally, Wexford argues that the Court should disregard the factual record because it does not match the Amended Complaint. Mem. at 40. The Court should reject this argument.

### A.    Plaintiff's position at summary judgment is fully consistent with the pleadings.

Wexford argues that Dr. Venters identified systemic issues are "new allegations" not alleged in the Amended Complaint and "should be disregarded." Mem. at 44. Plaintiff alleged, among other things, that Mr. Reed died as a result of Wexford's systemic issues, including: "(1) healthcare personnel commonly fail to respond or follow up on complaints by prisoners about their health status; (2) healthcare personnel fail to review relevant medical records as part of a

patient's treatment plan; (3) healthcare personnel fail to follow appropriate diagnostic procedures, favoring instead cheaper procedures even if they are demonstrably ineffective; (4) healthcare personnel fail to schedule or approve follow-up appointments deemed appropriate by members of the medical staff; (5) healthcare personnel fail to take action to secure appropriate continuity of care for complicated and urgent conditions like cancer within the IDOC and other healthcare providers; (6) inadequate levels of health care staffing are maintained; and (7) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper , or even that the determination of a "probable intoxication" (which leaves room for other causes on its face) was correct." ECF 32 at ¶ 59. This is consistent with Venters' report.

Moreover, a plaintiff "need not plead detailed factual allegations" to support a claim at the start of a case. *Jackson v. Wexford Health Sources, Inc*., No. 20-CV-0900-DWD, 2021 WL 2456530, at *2 (S.D. Ill. June 16, 2021) (citing *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Federal Rules require only a "short and plain statement of the claim" (Fed. R. Civ. P. 8(a)) because a "full description of the facts that will prove the plaintiff's claim comes later, at the summary-judgment stage or in the pretrial order." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017); *see also Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (a complaint merely "limns the claim" and "details of both fact and law come later, in other documents"). Contrary to Wexford's current position, "elaborating on the complaint is exactly what plaintiffs are supposed to do in discovery." *Prayitno v. Nextep Funding LLC*, 2020 WL 3414955, at *5 (N.D. Ill. June 22, 2020). Defendants' argument is unpersuasive. *See Holt v. Lewsader*, 2020 WL 10976625, at *23 (C.D. Ill. Sept. 30, 2020) ("the court is not persuaded that Plaintiff is making the sort of 'new argument' that is impermissible at

summary judgment, because Plaintiff's position is firmly rooted in the Amended Complaint and in Plaintiff's and Lewsader's deposition testimony, so even if it reflects a change of tack, Defendants had fair warning of it, and the change is not the sort of fundamental alteration of the factual basis for the claim that puts the argument out of bounds").[2]

## VIII.    Plaintiffs' claims are timely.

Wexford asks the Court to bar any claims based on conduct by Pinckneyville practitioners as claims against those individuals would be barred by the statutes of limitation and repose. Mem. at 30. To start, Wexford waived the statute-of-limitations and -repose affirmative defenses in their Answers to the Amended Complaint. This Court should accordingly reject Wexford's statute-of-limitations arguments at the outset because they were expressly and knowingly waived. *See United States v. Gaona*, 697 F.3d 638, 641 (7th Cir. 2012) (waiver occurs when a defendant "intentionally relinquishes or abandons a known right").

Even if this Court does not enforce Wexford's waiver, the arguments fail. Under well-settled precedent, a "violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct." *Heard v. Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001). As in *Heard*, Mr.

---

[2] Here, of course, Plaintiff is not pursuing her factual theory for the first time in opposition to Wexford's motion. See supra p. 41-42. But even if Plaintiff were, the Court should simply allow constructive amendment, as there is no conceivable prejudice when Defendants have been able to conduct extensive fact and expert discovery on this issue. *See Schmees*, 77 F.4th at 490 (stating that, in deciding whether to allow constructive amendment at summary judgment, a court "should apply the familiar standards governing when leave to amend should be granted, paying particular attention to the potential for prejudice to other parties"); *Dealer Management Systems*, 680 F. Supp. 3d at 938 (even assuming the plaintiff was asserting a new factual basis, amendment would be permitted on the grounds of no prejudice where defendants' experts "had an opportunity to rebut" them, plaintiff's experts "were deposed extensively" and "subject to *Daubert* challenges," and defendants "have not identified any specific material that could have been revealed, had they explored those topics, and have not asked the court to reopen discovery on these topics"). Wexford has not articulated any prejudice, and has waived any prejudice argument. *Berkowitz*, 927 F.2d at 1384.

Reed's early death was "the consequence of a numerous and continuous series of events," and thus the entire series of events can therefore be the subject of suit. *Id.*; *see also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517 (7th Cir. 2019); *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). For a *Monell* claim, so long as the claim is filed timely, the plaintiff can and often does reach back before the start of the accrual date to prove an unconstitutional policy, practice, or custom. *See Golodner v. City of New London*, 2016 WL 1048746, at *6 (D. Conn. Mar. 11, 2016) ("[A]ny claim arising out of the 2006 and 2008 incidents is barred by the statute of limitations. But the 2006 and 2008 incidents can still be considered in deciding whether there was a policy of deliberate indifference that caused the 2011 incidents").

Indeed, it is "well established" as a general principle that conduct outside the limitations period can always be admitted if it is relevant "as background evidence in support of a timely claim." *Hum. Rts. Def. Ctr. v. Jeffreys*, 2022 WL 4386666, at *5 (N.D. Ill. Sept. 22, 2022); *Beard v. Don McCue Chevrolet, Inc.*, 2012 WL 2930121, at *3 (N.D. Ill. July 18, 2012) (although some alleged misconduct is not actionable under Title VII and § 1981 statutes of limitations, allegations are still relevant because time-barred prior acts can serve as background evidence); *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (explaining that a statute of limitations does not preclude the introduction of evidence from before the commencement of the statute of limitations that is relevant to events during that period). Accordingly, Wexford's arguments about the statute of limitations and repose are misplaced. All the evidence in the record is appropriately considered in deciding Plaintiff's claims. The Court should deny Wexford's motion.

**CONCLUSION**

The Court should deny Defendants' motion for summary judgment in its entirety.

Respectfully submitted,

/s/ Maria Makar

Attorney for Plaintiff

Jon Loevy
Maria Makar
Gianna Gizzi
LOEVY & LOEVY
311 N Aberdeen St. Ste 300
Chicago, IL 60607
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

  I, Maria Makar, an attorney, hereby certify on February 22, 2025, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.

<u>/s/ Maria Makar</u>
Attorney for Plaintiff
