IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LENNISHA REED,** *Co-Administrator of the Estate of Lenn Reed,* **and** **LENN REED, JR.,** *Co-Administrator of the Estate of Lenn Reed,* <br><br> **Plaintiffs,** <br><br> v. <br><br> **WEXFORD HEALTH SOURCES, INC.,** *et al.,* <br><br> **Defendants.** | Case No. 20-cv-01139-SPM |

# MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

This matter is before the Court on the Renewed Joint Motion to Strike Plaintiffs' 26(a)(2)(B) Disclosures and the Joint Motion to Strike Plaintiffs' 26(a)(2)(C) Disclosures filed by Defendants Wexford Health Sources, Inc. (Wexford), Shah, Ritz, and Ahmed. (Doc. 186, 198).

### BACKGROUND

Plaintiffs Lennisha Reed and Lenn Reed Jr., Co-Administrators of the Estate of Lenn Reed Sr., commenced this action on October 28, 2020, claiming constitutional violations pursuant to 42 U.S.C. § 1983 and violations of Illinois state laws. (Doc. 1, 63). Plaintiffs allege that while Lenn Reed Sr. (Reed) was incarcerated with the Illinois Department of Corrections, medical staff continued to mistreat his complaints of digestive problems and ignore signs of colon cancer. Once tests were performed and Reed was diagnosed with cancer, Plaintiffs assert medical staff proceeded treating and caring for Reed in an unhurried manner, and as a result, it became too late for Reed to receive effective treatment. Reed died of cancer in January 2019. Plaintiffs are proceeding with constitutional and state law claims against Defendants.

Discovery in this case has been a lengthy process, and despite Defendants' characterization, the Court finds that the delays cannot solely be attributed to Plaintiffs.[1] While it is true that Plaintiffs missed the November 4, 2022, deadline to disclose expert witnesses due to inadvertent error and Plaintiffs' Counsel having a family medical situation (*see* Doc. 78, Doc. 101, p. 6), Plaintiffs have not "repeatedly missed their expert disclosure deadlines." (Doc. 186, p. 2). Plaintiffs have sought, and the Court has granted extensions to the expert disclosure deadlines in this case. (*See* Doc. 60, 78, 116, 124, 147, 150, 154). Furthermore, due to the ongoing discovery disputes, on April 24, 2023, the Court altogether vacated the discovery and dispositive deadlines while the parties continued to engage in meaningful discovery. (Doc. 124). The deadlines were then not reset until January 16, 2024. (Doc. 156). After granting further motions for extensions, fact discovery was closed May 27, 2024. (Doc. 168, 174). Plaintiffs' expert reports were due August 5, 2024. After additional extensions were granted, Defendants' expert reports were due November 7, 2024, and all discovery was to be completed by November 18, 2024. (Doc. 176, 185, 191).

On August 7, 2024, Defendants filed an "Emergency Motion to Strike Plaintiff's 26(a)(2)(B) Disclosures," asking the Court to strike Plaintiffs' disclosures of two experts as untimely. (Doc. 178). In the motion, Defendants stated that on August 5, 2024, Plaintiffs produced Rule 26(a)(2) expert disclosures, identifying two retained experts, Dr. Schmidt and Dr. Venters, but Plaintiffs failed to supply the written reports as required by Federal Rule of Civil Procedure 26(a)(2)(B). (*Id.* at p. 3). The following day, on August 6, 2024, Defendants received Dr. Schmidt's written report, but the report was incomplete and did not include Dr. Schmidt's list of all other cases in which she has testified as an expert (testimony history). On August 7, 2024, Plaintiffs produced Dr. Venters' written report and Dr. Schmidt's testimony history. (*Id.*). Dr. Schmidt's

---

[1] For further discussion on the discover issues see the Court's Orders at Docs. 78, 142, and 147.

deposition was scheduled for August 15, 2024, in Montana, and believing that they did not have sufficient time to review Dr. Schmidt's report prior to the deposition, Defendants filed the emergency motion to strike to avoid unnecessary expense or delay. (*Id.* at p. 6).

Because excluding potential evidence from trial is a harsh sanction, the Court did not expedite ruling on the motion and informed the parties that it would set the issue for a hearing at a later date. (Doc. 180). The parties proceeded with the deposition of Dr. Schmidt, and later deposed Dr. Venters on September 25 and 26, 2024. On October 10, 2024, Defendants filed the Renewed Joint Motion to Strike Plaintiffs' 26(a)(2)(B) Disclosures, currently before the Court. (Doc. 186). The Court found the Emergency Motion to Strike moot in light of the renewed motion. (Doc. 187, 212).

On November 27, 2024, Defendants filed a second Joint Motion to Strike Plaintiffs' 26(a)(2)(C) Disclosures seeking to strike the disclosures of Dr. Shansky, Dr. Saylor, and RN Hewitt. (Doc. 198). Plaintiffs oppose both motions. (Doc. 193, 209). Defendants filed reply briefs. (Doc. 196, 211). After the reviewing the briefings, the Court finds that a hearing on the motions is not necessary. For the following reasons, the Renewed Joint Motion to Strike Plaintiffs' 26(a)(2)(B) Disclosures is denied and the Joint Motion to Strike Plaintiffs' 26(a)(2)(C) Disclosures is granted in part.

## MOTIONS TO STRIKE

Federal Rule of Civil Procedure 26 requires parties to disclose the identity of any expert witness who may testify at trial. *See Tibble v. Evangelides,* 670 F. 3d 753, 759; FED. R. CIV. P. 26(a)(2)(A). Along with providing the identity of the expert witness, a party must also produce a comprehensive report detailing the witness's qualifications, previous cases in which the expert has testified, compensation to be paid, and all opinions formed by the witness and the reasoning, facts, data, and exhibits used to support such opinions. FED. R. CIV. P. 26(a)(2)(B)(i)-(vi). These disclosures must be made "at the times and in the sequence that the court orders." FED. R. CIV. P.

26(a)(2)(D).

The consequence of failure to properly disclose an expert witness is exclusion of the information or witness at trial, "unless non-disclosure was justified or harmless." *Tribble,* 670 F. 3d at 760; FED. R. CIV. P. 37(c)(1). In deciding whether non-compliance with Rule 26(a) is harmless a court considers:

> (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

*Id.* (citing *David v. Caterpillar, Inc.,* 324 F. 3d 851, 857 (7th Cir. 2003). Defendants seek to strike two expert disclosures and three non-retained expert disclosures. The Court will take each in turn.

**A. Dr. Schmidt**

Defendants argue that Plaintiffs' disclosure of Dr. Schmidt as an expert witness was untimely resulting in prejudice. Not only did Plaintiffs provide Dr. Schmidt's report on August 6, 2024, and her testimony history on August 7, 2024, after the August 5, 2024 deadline, but a day before the deposition, while Defense Counsel was traveling to Montana, Plaintiffs produced a 9-page timeline prepared by Dr. Schmidt the previous year in 2023, when she initially reviewed Reed's medical records. According to Defendants, during the deposition, Dr. Schmidt produced medical publications that she recently reviewed and relied on in forming new opinions not contained in the most recent August 6 report, and she produced a summary report of her opinions that was not previously provided to Defendants.

Defendants point out that Dr. Schmidt was retained as an expert by Plaintiffs in April 2023, and that Dr. Schmidt testified at her deposition that a previous version of her report was prepared that same year. (Doc. 186, p. 7, citing Doc. 186-1, p. 6). Despite identifying Dr. Schmidt as an expert witness back in 2023, Defendants argue that Plaintiffs, without justification, delayed disclosing Dr. Shmidt's newest report and other Rule 26(a)(2)(B) materials, reducing Defendants'

time to prepare for the deposition on August 15, 2024. Defendants further contend that Plaintiffs failure to comply with the discovery deadlines deprived them of "***any*** inquiry into Dr. Schmidt's summary, and the harm cannot be insignificant as [they] were wholesale unable to assess or inquire." (Doc. 186, p. 10). Because the topic of the publications mentioned during the deposition and Dr. Schmidt's new opinions deal with the "response rate, control rate, post-progression status, and overall survival rates of patients with colon cancer with a BRAF mutations," a sub-specialty of oncology, Defendants argue that to expect Defense Counsel to inquire about the "nuances of BRAF mutations response rate to chemotherapy with no prior ability to review the article, consult the experts, and outline questions, fundamentally unfair." (*Id.* at p. 14). Defendants request for the Court to strike the expert disclosure of Dr. Schmidt in its entirety, or in the alternative strike Dr. Schmidt's opinions not contained in her August 6, 2024 report. (*Id.* at p. 15). If the Court denies the motion to strike, Defendants ask that they be given additional time to depose Dr. Schmidt at Plaintiffs' expense. (*Id.*).

Plaintiffs do not deny that there was a thirty-six-hour delay in submitting Dr. Schmidt's expert report. (Doc. 193, p. 2). Plaintiffs argue, however, that the delay was justified. They explain that when finalizing Dr. Schmidt's report on August 4, 2024, there were depositions of medical providers that had been inadvertently omitted from the martials provided to Dr. Schmidt. (Doc. 193, p. 2). Plaintiffs state that they promptly provided Dr. Schmidt the depositions, but that Dr. Schmidt did not complete her review of the depositions until August 6, 2024. Likewise, the 9-page timeline was produced as soon as Plaintiffs became aware of it during deposition preparation.

Despite, the delay in receiving the report, Plaintiffs argue that Defendants were not prejudiced in any material way and that the delay has already been cured. Plaintiffs contend that Dr. Schmidt did not express any new opinions at her deposition, and Defense Counsel was able to conduct a full and extensive 9.5-hour deposition of Dr. Schmidt. (*Id.* at p. 8). Additionally, Defendants asked for and received a two-day extension to complete their expert disclosures. (*Id.*).

The Court finds that Plaintiffs have not demonstrated a substantial justification for the delay in failing to produce their complete Rule 26(a)(2) disclosure for Dr. Schmidt by the deadline of August 5, 2024. Because Dr. Schmidt was originally retained in April 2023 and the August 5, 2024 deadline was set on June 20, 2024, after several extensions, Plaintiffs had plenty of time to collect required documents and to review and finalize the report. Simple inadvertence at this stage does not justify noncompliance with the disclosure deadline.

That being said, the Court agrees with Plaintiffs that the untimeliness was harmless. "Starting with the likelihood of disruption to the trial in this case, no trial date has been set. As such, the trial will not be affected by [Plaintiffs'] error[s]." *Narismhan v. Lowe's Home Centers, LLC,* No. 19 CV 1255, 2021 WL 3930426, at *2 (N.D. Ill. 2021). As for bad faith or willful conduct on the part of Plaintiffs, Defendants complain generally about Plaintiffs' repeated failure to meet deadlines prolonging this litigation, but they do not argue or produce evidence that Plaintiffs' failure to produce Dr. Schmidt's complete report by the August 5, 2024 deadline was due to bad faith or willful conduct.[2]

As to surprise and prejudice, the Court finds that any prejudice to Defendants is minimal and striking Dr. Schmidt as an expert witness is not warranted. First, Plaintiffs have sufficiently shown that Defendants were not prejudiced by the fact that Dr. Schmidt's new report (August 6 report) was produced a day after the deadline and the testimony history was produced almost two days after the deadline. Defendants concede that Dr. Schmidt's recent August 6 report was "not significantly different" than that of her original report disclosed in 2023, and they do not describe how the information in the August 6 report differs from the 2023 report.

---

[2] In their reply brief, Defendants assert that Plaintiffs made a false statement to the Court by claiming that they offered to push Dr. Schmidt's deposition back by two days to accommodate the late disclosures. (Doc. 196, p. 2-3). Defendants argue that this offer was not made, and the statement is untrue. (*Id.* at p. 3). Because Defendants believe that Plaintiffs have engaged in a repeated pattern of making misrepresentations to the Court, Defendants state that they will be filing a motion for sanctions, which they filed on July 3, 2025. (*Id.;* Doc. 245). The Court will address the allegations pertaining to misrepresentations in ruling on the Motion for Sanctions.

Second, as for the 9-page timeline produced a day before the deposition and the summary produced for the first time at the deposition, Defendants argue that the delay deprived them of the ability to meaningfully inquire into these documents. (Doc. 186, p. 10). Defendants state that the summary contained new opinions, "including about Ms. Stover's rectal examination and summaries of five deposition transcripts, not otherwise discussed in [Dr. Schmidt's] report." (*Id*). Plaintiffs contend that the information in the 9-page timeline and summary cannot be characterized as new opinions and were consistent with the opinions stated in the August 6 report. (Doc. 193, p. 2, 10).

Defendants have not provided a copy of the 9-page timeline or the summary and so the Court cannot assess whether the information in the documents "differ substantially from [Dr. Schmidt's] opinions in [her] expert report," and whether Defendants were truly "ambushed" by the late disclosure. *Rowe v. Intern. Corp. v. Ecast, Inc.,* 586 F. Supp. 2d 924, 935 (N.D. Ill. 2008) (citing *Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 807 (N.D. Ill. 2005)). Furthermore, it does not appear that the summary or the 9-page timeline is cited to or relief upon by the parties in the motions for summary judgment briefings. (*See* Doc. 203, 207).[3] Thus, the Court finds that there was no actual prejudice to Defendants in Plaintiffs' failing to timely disclose the summary and 9-page timeline.

And finally, the Court finds that failure to timely produce the articles that Dr. Schmidt reviewed in preparation of her deposition also did not sufficiently prejudice Defendants as to warrant sanctions. Defendants' argument is a generalized prejudice of not being able to meaningfully pose questions to Dr. Schmidt given that her opinions based on the publications "fall [] within a sub-specialty of oncology and are not expected to be known within the general medical community, let alone common knowledge." (Doc. 186, p. 14). Defendants further argue that "[t]o

---

[3] There is a "Timeline" section in Dr. Schmidt's report, but the Court assumes this is not the same separate 9-page document that Defendants state was disclosed the day before the deposition. (*See* Doc. 200-13, 227-9).

expect counsel to inquire about the nuances of BRAF mutation response rate to chemotherapy with no prior ability to review the article, consult with experts, and outline questions, is fundamentally unfair to Defendants." (*Id.*). Plaintiffs contend that the articles were reviewed after Dr. Schmidt prepared her report while preparing for her deposition, and she did not rely on them to prepare her opinions so there can be no argument of late disclosure. (Doc. 193, p. 9). They state that they have not "introduced 'new' opinions through" the deposition of Dr. Schmidt. (*Id.* at p. 2).

As Plaintiffs state, the record does not indicate that the articles resulted in new opinions. Defendants provide the following excerpts from Dr. Schmidt's deposition to show that she formed new opinions based on the undisclosed articles read in preparation for the deposition:

> Q. What did you rely on in determining that in April of 2018 he had an excellent performance status?
> A. The medical records.
> Q. Where in the medical records?
> A. I think the oncologist was the first one to start actually putting in the ECOG performance status.
> Q. So –
> A. And he still had an ECOG performance status of zero when he was seen by Dr. Saba.
> Q. Okay. So he still had an excellent performance status when he was seen by oncology?
> A. Yeah.
> Q. But as for April of 2018, tell me if I'm wrong, it sounds like you assumed he had an excellent performance status because he subsequently had an excellent performance status?
> A. Right, right.
> Q. So you said that if he was treated with FOLFOX -- say -- Avastin?
> A. Good.
> Q. -- with immediate overall survival, which is typically 10 to 20 months.
> A. Right.
> Q. However, 20 percent of patients would live more than 24 months.
> A. Right.
> Q. And what article in your report are you relying on for that?
> A. Of course, we spent a lot of time talking about the report that -- this article in the Annals of Oncology quoting that.
> Q. You're talking about the report we already discussed?
> A. Yeah.
> …
> Q. It doesn't say he would have lived to December 2020? [referencing Dr. Schmidt's report]
> A. No, it doesn't in my report. I hope I've clarified with me additional references

> today for you.

(Doc. 186, p. 12-13).

> Q. Can you show me what articles that you rely on to say that Mr. Reed's complications, including tumor invasion of the bladder, obstructive uropathy, ileus, ongoing weight loss, spinal cord compression, sacral decubitus and sepsis, would have been delayed and more likely than not prevented had the diagnosis of metastatic CRC been made in a timely fashion?
> A. Just the literature that I've quoted already.
> (Ex. A, 173:12-21; continued discussion of the newly produced article "Investigating the poor outcomes of BRAF-mutant advance colorectal cancer…" 151:1-191:10).

(*Id.* at p. 12, n. 9).

> Q. In Dr. Saba's deposition, he testified that the molecular profile showed "consistent with a profile that we usually see with a very aggressive cancer, with the worse overall prognosis than other average colon cancer and kind of more resistant to traditional chemotherapy." Do you disagree with that?
> A. Yes. We've talked about the response rates with FOLFOX-Avastin with a good prognostic BRAF-positive tumor.
> Q. And your disagreement with that is based on the article that you produced today, that we went through at length,
> about responsive rates and good performance status, right?
> A. Yes.
> Q. And that's the report -- or that was the article that was not listed in your report in this case?
> A. Right. I didn't include that.

(Doc. 196, p. 5, n. 5).

As mentioned, Defendants do not provide a copy of Dr. Schmidt's August 6 report with their motion, but according to the report attached to their motion for summary judgment, Dr. Schmidt includes that Reed "had an excellent performance status and would have been treated with systemic chemotherapy with FOLFOX/Avastin with a median overall survival which is typically 1-20 months, however 20% of patients would live more than 24 months." (Doc. 200-13, p. 6). She writes in the report that the "use of FOLFOX/Avastin seems the preferable upfront option for BRAF-mutant tumors." (*Id.* at p. 21). She concludes that if Reed had been diagnosed in April 2018 or "at various points thereafter, he would have had an excellent performance status and would have likely responded to FOLFOX/Avastin chemotherapy with a median survival of up to 24 months

meaning that his median survival would have been to April 2020." (*Id.* at p. 28). Dr. Schmidt also discusses how Reed's:

> [C]ourse was complicated by tumor invasion into the bladder, obstructive uropathy, ileus, ongoing weight loss, spinal cord compression, sacral decubitus and sepsis which would have been delayed and more likely than not prevented had the diagnosis of metastatic CRC been made in a timely fashion when he had an excellent performance status and likelihood of a meaningful response to FOLFOX/Avastin chemotherapy.

(*Id.* at p. 6). Although Dr. Schmidt states in her deposition testimony that she was relying on the new articles when making her statements, the information she provided in the deposition, as cited by Defendants, does not significantly differ from the information in the August 6 report. The statements from the deposition cited by Defendants do not indicate new opinions, and thus, will not be stricken. *See Solaia Tch. LLC.* 361 F. Supp. 2d at 807.

It may be true that Defendants were forced to "blindly" ask Dr. Schmidt about the articles that had not previously been produced, but any prejudiced created by Dr. Schmidt reviewing new articles in preparation of her deposition could have been cured in a report by Defendants' rebuttal expert, which ultimately was not due for another two months, on November 5, 2024. (*see* Doc. 185). *See Leibfried v. Caterpillar, Inc.,* No. cv-1874, 2023 WL 4080660, at *3 (E.D. Wisc. 2023) (citing *David,* 324 F. 3d at 857-58).

### B. Dr. Venters

Defendants argue that Dr. Venters' report was produced two days late on August 7, 2024, and during his deposition on September 25 and 26, 2024, Dr. Venters identified a new document that he relied on in coming to his opinions that have never been produced – a spreadsheet containing medical information for 25 non-party inmates. (Doc. 186, p. 15). Based on this spreadsheet, Dr. Venters "selected 14 patients whose records he reviewed in this case because the spreadsheet suggested to Dr. Venters that their care was 'relevant' to Mr. Reed's." (*Id.*). Defendants state that when they asked Dr. Venters how he determined from the spreadsheet which

encounters were relevant, he "failed to articulate any meaningful assessment." As of filing the Renewed Motion to Strike, Plaintiffs had not produced a privilege log or the spreadsheet. Because Dr. Venters relied on the spreadsheet in sampling of patients and reviewing this case, Defendants argue any privilege Plaintiffs would attempt to claim is waived. Further, because Defendants were not even aware that the spreadsheet existed, they were unable to seek to compel production prior to the deposition. Without this document, Defendants contend that they were "denied the ability to inquire into the methodology, if any, Dr. Venters used to create the review of records in this case….[and] inquire and challenge Dr. Venters' foundation under FRE 702." (*Id.* at p. 17).

In response, Plaintiffs argue that the parties disagree about whether the spreadsheet was discoverable, but they have since produced the spreadsheet to Defendants. (Doc. 193, p. 8-9). They state that a "discovery dispute is not the same as a disclosure delay and presents no grounds for striking Dr. Venters' report." (*Id.* at p. 9). Plaintiffs clarify that prior to the deposition, Defendants possessed all the medical records paraphrased and summarized in the spreadsheet, and Plaintiffs produced all the documents relied on by the experts. They assert that the spreadsheet did not contain any new information, and Dr. Venters testified that he did not formulate his opinions based on the summaries contained in the spreadsheet.

The Court finds that there is no substantial justification for delaying Dr. Venters' disclosure by two days. Plaintiffs state that Dr. Venters' report was produced late because Dr. Venters had to first review Dr. Schmidt's report, and Dr. Schmidt's report was delayed so that Dr. Schmidt could review depositions not provided to her by the Plaintiffs until August 4, 2024, the day before the deadline. (Doc. 193, p. 2). As previously discussed, the delay was ultimately due to Plaintiffs' carelessness, which does not constitute substantial justification. But Defendants do not articulate any prejudice caused by the two-day delay, and therefore, the Court will not strike Dr. Venters' Rule 26(a)(2)(B) disclosure based on its untimeliness.

The Court also finds that Plaintiffs have not provided substantial justification for why they

did not previously produce the spreadsheet referred to by Dr. Venters in preparing his report or disclose the spreadsheet in a privilege log. Plaintiffs argue that they did not originally produce the spreadsheet because they did not deem it discoverable. (Doc. 193, p. 8-9). The Court does not find this argument well taken. As Defendants state, the spreadsheet became discoverable when it was utilized by Dr. Venters in his review in this case. (Doc. 196, p. 5). Federal Rule 26(b)(4)(C)(ii), exempts from discovery protections "communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B) …[that] identify facts or data that the party's attorney provided that the expert considered in forming the opinions to be expressed." Plaintiffs argue that Dr. Venters testified at the deposition that he did not formulate his opinions based on the summaries contained in the spreadsheet. Rule 26(b)(4)(C)(ii), however, is to be interpreted broadly, and specifies that the party must disclose any facts or data "considered" by the expert, not only those relied upon by the expert. *See United States Commodity Futures Trading Comm'n v. Newell,* 301 F.R.D. 348, 351 (N.D. Ill. 2014) (citing FED. R. CIV. P. 26 advisory comm. n. (2010)). As the Northern District Court has observed, "[i]n the context of Rule 26, 'considered is a term of art.'" *Johnson v. City of Rockford,* No. 15 C 50064, 15 CV 50065, 2018 WL 1508482, at *2 (N.D. Ill. 2018). The court explains:

> An expert must disclose the materials given to him to review in preparation for testifying, "even if in the end he does not rely on them in formulating his expert opinion, because such materials often contain effective ammunition for cross-examination." The term "considered" invokes a "broader spectrum of thought than the phrase 'relied upon' which requires dependence on the information." …While "consider" is to be given a broad meaning, the Seventh Circuit suggests that "considered" applies to that information an expert actively reviews and contemplates, and then chooses not to rely upon.

*Id.* (quoting *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 840 F. Supp. 2d 1072, 1080 (N.D. Ill. 2012)). Put more succinctly, "[d]ocuments that are 'reviewed' are documents that an expert 'considered,' which means they are not protected from disclosure." *Id.* (citations omitted). As such, the spreadsheet should have been produced to Defendants or in the very least recorded in a

privilege log so that they could seek production prior to the deposition. Thus, the Court finds that Plaintiffs were not substantially justified in failing to timely produce the spreadsheet. *Musser v. Gentiva Health Serv.,* 356 F. 3d 751, 758 (7th Cir. 2004) ("A misunderstanding of the law does not equate to a substantial justification for failing to comply with the disclosure deadline.").

As to prejudice, Defendants argue that without the spreadsheet they were "denied the ability to inquire into the methodology, if any, Dr. Venters used to create the review of records in this case." (Doc. 186, p. 17). The Court finds that this contention is not supported by the record. During the deposition, Dr. Venters explained that via an Excel spreadsheet he "was given a list of patients, and the links to their records and types of encounter types." (Doc. 188-1, p. 5, 6). Dr. Venters stated that he reviewed the medical records of 14 of the 25 patients identified in the list. He explained that he selected to review the medical records of only 14 patients due to time constraints. (*Id.* at p. 18, 19). In selecting the 14 patients to review, Dr. Venters testified that he reviewed the spreadsheet for patients that had listed "a lot of encounters" that appeared to be related to chronic care, specialty care, oncology care, or hospital transfers. (*Id.* at p. 3, 4, 6, 10). He explained that based on his training and expertise as a correctional health physician, he believed that the medical records of patients with these types of encounters would be relevant to the care provided to Reed. (*Id.* at p. 10, 14, 22). Dr. Venters continued, "I looked at the list of encounter types, and then the encounter types that struck me as being relevant to the cases of R. Reed and Mr. McCullough. I picked those sets of medical records to open up and examine on my own." (*Id.* at p. 15, 17). He stated that he "didn't make a record or keep notes about why [he] opened some cases and not others, but that was [his] process." (*Id.* at p. 10). Once he selected a patient, he would click on the medical record and review the record for deficiencies in care, specifically "the failure to address abnormal labs, the delays specialty care and the failure to note or act on weight loss." (Doc. 188-1, p. 4, 7, 19). When asked if he knew the methodology that was used to select the 25 patients listed on the spreadsheet, he responded, "I don't recall." (*Id.* at p. 36). While Defendants

may believe Dr. Venters' answers were lacking, the disposition transcripts show that they were able to sufficiently inquire into Dr. Venters' methodology into selecting which patients' medical records to review, as well as call into question the reliability of Dr. Venters' opinions based on inconsistencies between statements made in his report and the actual medical records. Accordingly, the Court does not find that Defendants were prejudiced due to the late disclosure of the spreadsheet.

It also appears from Defendants' Motion and Dr. Venters' deposition transcript that Defendants were not totally in the dark as to the information contained in the spreadsheet as they claim. *See Gecker as Trustee for Collins v. Menard, Inc.,* No. 16 C 50153, 2019 WL 4166859, at *2 (N.D. Ill. 2019) (Rule 26 disclosures may be harmless where the opposing party "was otherwise aware of the substance of the expert's opinion."). First, Defendants do not deny that they already possessed all the medical records paraphrased and summarized in the spreadsheet. (Doc. 193, p. 9). Second, Defendants reference these patients and their conditions in detail in their Motion and the deposition transcript. In their Motion, Defendants state that "[w]hile most of the remaining 14 individuals [Dr. Venters] reviewed had a different type of cancer from Mr. Reed and Mr. McCullough, at least one of the 25 patients in the pool had colon cancer, but Dr. Venters does not know why this care was not 'relevant.'" (Doc. 186, p. 16; Doc. 188-1, p. 17). During the deposition, Defense Counsel asked Dr. Venters, "I believe all 25 were patients that had, or at least most that had cancer; right?" (Doc. 188-1, p. 16). Defense Counsel even references to a few individuals from this pool of patients by name.[4] Thus, the Court finds the element of surprise lacking. For these reasons, the Court finds any prejudice to Defendants minimal, and the Court will not strike Dr. Venters disclosure based on failure to timely produce the spreadsheet.

---

[4] Defendants' motion to seal was granted and the names of other inmates redacted from the deposition transcript. (Doc. 248; Doc. 188-1, p. 15, 16, 17).

### C. *Lippert* Moderators - Dr. Shansky, Dr. Saylor, RN Hewitt

In Dr. Venters' report, he discusses the *Lippert* reports.[5] In response, Defendants retained a statistician at Precision Consulting to assess the methodology of the *Lippert* reports. On November 5, 2024, Defendants disclosed the Precision Consulting 2014 *Lippert* Report, and on November 7, 2024, Defendants disclosed the Precision Consulting 2018 *Lippert* Report. Mr. Heidari, on behalf of Precision Consulting, was deposed on November 13, 2024. On November 18, 2025, the last day of discovery, Plaintiffs produced Rule 26(a)(2)(C) disclosures identifying Dr. Shansky, Dr. Saylor, and RN Hewitt as non-retained and/or rebuttal experts. (Doc. 198-5). These three individuals were monitors in the class action lawsuit *Lippert v. Ghosh,* No. 10-cv-04063 (N.D. Ill.).

Defendants have moved to strike these disclosures arguing that they are barred by orders in the *Lippert* case, untimely, improper, and insufficient. (Doc. 198).

The parties agree that Dr. Shansky is deceased. Thus, the issue of Dr. Shansky serving as a witness in any capacity is moot.

As to Dr. Saylor and RN Hewitt, the Court finds that regardless of whether they were disclosed in accordance with Federal Rule of Civil Procedure 26(a), they are barred from testifying in the case. In *Lippert v. Ghosh,* the court appointed Dr. Shansky as a court-appointed expert. In the order appointing Dr. Shansky (Rule 706 Order), the court established the following:

> 1b. The Expert, his consultants and assistants shall not provide opinions and/or testimony in unrelated cases based on knowledge and/or information gained in the course of performing their services in this matter.

*Lippert,* 10-cv-04603, Doc. 240-1, p. 3. The Court agrees with Defendants that this provision prohibits Plaintiffs from calling Dr. Saylor or RN Hewitt, who are described as part of Dr. Shansky's team (Doc. 209, p. 8), as witnesses in this case.

---

[5] For information about the *Lippert* reports from the class action lawsuit *Lippert v. Ghosh,* No. 10-cv-04603 (N.D. Ill.) see Doc. 77.

Plaintiffs state that because Defendants are attacking the "*Lippert* expert's methodology of identifying patients (and, by extension, Plaintiffs' expert's methodology for identifying patients)" as flawed, their intention in disclosing these individuals as non-retained experts would be to have them "testify consistently with the opinions in the *Lippert* reports, including their knowledge of and expert opinions on the methodology implemented by the *Lippert* medical investigation team." (Doc. 209, p. 2). Plaintiffs argue that this type of testimony is not the type the *Lippert* court sought to prevent. They put forth:

> The court's order in *Lippert* [] was meant to protect Dr. Shansky and his team from being subpoenaed to testify about medical information in the individual cases contained in the *Lippert* reports – not shield them from explaining or defending the methodology they employed to conduct their review of IDOC and Wexford.

(*Id.* at p. 8-9).

The Court disagrees. The *Lippert* court has made clear that the language of the Rule 706 Order is not to be narrowly construed, only applying to testimony regarding medical information in the individual cases contained in the *Lippert* reports, as Plaintiffs suggest. When the *Lippert* court was asked to modify the Rule 706 Order to allow a plaintiff in another civil case to depose Dr. Shansky about "the bases of his opinions pertaining to offsite referrals for specialized medical treatment and medical record keeping," the court denied the request. *Lippert,* No. 10-cv-04603, Doc. 653. The court reasoned that Federal Rule of Evidence 706(a) requires an expert to consent to act as a court-appointed expert witness pursuant to the terms provided by the court, and the terms Dr. Shansky and his team members consented to, as stated in the Rule 706 Order, is that he and his team are prohibited from providing testimony in other individual health care cases against IDOC or Wexford relating to their work in *Lippert*. *Lippert,* No. 10-cv-04603, Doc. 653, p. 9. In his declaration opposing the modification of the Rule 706 Order, Dr. Shansky explained that "without a prohibition on providing opinions and/or testimony in unrelated cases, in cases in which systemic inadequacies of a jail, prison, or larger correctional system are being investigated, his

'work would become unmanageable and overwhelming.'" *Id.* (quoting Doc. 601-1). The court concluded that it could not "retroactively undo the terms on which Dr. Shansky consented to perform his work" and modify the Rule 706 Order. *Id.* at p. 9.

The Court finds this reasoning instructive in determining that the Rule 706 Order in *Lippert* bars Dr. Saylor and RN Hewitt from providing testimonies in this case about their contributions to the 2014 *Lippert* report and their "knowledge of and expert opinions on the methodology implemented by the medical investigation team." (Doc. 198-5). The Court finds that the type of information that Plaintiffs are wanting to solicit falls within "opinions and/or testimony…based on knowledge and/or information gained in the course of performing their services in this matter." To rule otherwise would violate the consent of Dr. Shansky and the other experts to serve as court-appointed experts in *Lippert*, which was given under the belief that their duties would not expose them to "testimony in individual health care cases against the IDOC and/or Wexford." *Lippert,* No. 10-cv-04603, Doc. 653, p. 9. Accordingly, the Joint Motion to Strike Plaintiffs' 26(a)(2)(C) Disclosures is granted to the extent Defendants seek to bar Dr. Saylor and RN Hewitt from serving as witnesses in this case.

## DISPOSITION

The Renewed Joint Motion to Strike Plaintiffs' 26(a)(2)(B) Disclosures filed by Defendants Wexford, Shah, Ritz, and Ahmed is **DENIED**. (Doc. 186). The Joint Motion to Strike Plaintiffs' 26(a)(2)(C) Disclosures is **GRANTED in part.** (Doc. 198). Dr. Saylor and RN Hewitt are barred from testifying in this case.

**IT IS SO ORDERED.**

**DATED: February 20, 2026**

                                            *s/Stephen P. McGlynn*
                                            **STEPHEN P. MCGLYNN**
                                            **United States District Judge**